## IN THE UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| | § | |
| In re: | § | Chapter 11 |
| | § | |
| MIDSTATES PETROLEUM COMPANY, INC., *et al.*,[1] | § | Case No. 16-32237 (DRJ) |
| | § | |
| Debtors. | § | (Joint Administration Requested) |
| | § | (Emergency Hearing Requested) |

## DEBTORS' EMERGENCY MOTION FOR
## ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING
## THE PAYMENT OF PREPETITION (A) OPERATING EXPENSES, (B) JOINT
## INTEREST BILLINGS, (C) MARKETING EXPENSES, (D) SHIPPING AND
## WAREHOUSING CLAIMS, AND (E) 503(B)(9) CLAIMS AND (II) CONFIRMING
## ADMINISTRATIVE EXPENSE PRIORITY OF OUTSTANDING ORDERS

> **THIS MOTION SEEKS ENTRY OF AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.**
>
> **EMERGENCY RELIEF HAS BEEN REQUESTED. IF THE COURT CONSIDERS THE MOTION ON AN EMERGENCY BASIS, THEN YOU WILL HAVE LESS THAN 21 DAYS TO ANSWER. IF YOU OBJECT TO THE REQUESTED RELIEF OR IF YOU BELIEVE THAT THE EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU SHOULD FILE AN IMMEDIATE RESPONSE. A HEARING WILL BE HELD ON THIS MATTER FOR MAY 2, 2016, AT 3:30 PM (CT) BEFORE THE HONORABLE DAVID R. JONES, 515 RUSK STREET, COURTROOM 400, HOUSTON, TEXAS 77002.**
>
> **REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.**

The above-captioned debtors and debtors in possession (together, the "Debtors")

respectfully state the following in support of this motion (the "Motion").

---

[1] The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number, are: Midstates Petroleum Company, Inc. (1816) and Midstates Petroleum Company LLC (2434). The debtors' service address is: 321 South Boston Avenue, Suite 1000, Tulsa, Oklahoma 74103.

**Relief Requested**

1.      The Debtors seek entry of interim and final orders, substantially in the forms attached to this Motion as **Exhibit A** and **Exhibit B** (respectively, the "Interim Order" and "Final Order"):  (a) authorizing, but not directing, the Debtors to pay in the ordinary course of business all undisputed, liquidated, prepetition amounts owing on account of (i) operating expenses, (ii) joint interest billings, (iii) marketing expenses, (iv) shipping and warehousing claims, and (v) 503(b)(9) Claims (as defined herein); and (b) confirming the administrative expense priority status of the Debtors' undisputed obligations for the postpetition delivery of goods and services and authorizing payment of such obligations in the ordinary course of business.  In addition, the Debtors request that the Court schedule a final hearing within approximately 25 days of the commencement of these chapter 11 cases to consider approval of this Motion on a final basis.

**Jurisdiction, Venue, and Procedural Background**

2.      The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The bases for the relief requested herein are sections 105(a), 362, 363, and 503(b) of title 11 of the United States Code (the "Bankruptcy Code"), rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

4.      On April 30, 2016 (the "Petition Date"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  A detailed description surrounding the facts and circumstances of these chapter 11 cases is set forth in the *Declaration of Nelson M. Haight in*

*Support of Chapter 11 Petitions and First Day Motions*, filed contemporaneously with this Motion.

## <u>Obligations to be Paid</u>

### I.     Payment of Operating Expenses.

5.     A mineral interest generally consists of an interest in the oil, gas, and other minerals in place under a parcel of land, typically in the nature of a fee simple interest in real property that entitles its owner to the right to, among other things, explore for, drill, produce, and capture (generally, "<u>Capture</u>") such minerals from the land.  Through a written agreement or order of a governmental agency with jurisdiction therein (an "<u>Oil and Gas Lease</u>"), owners of mineral interests sell or convey to a third party (a "<u>Working Interest Owner</u>") a property interest in such minerals that entitles the Working Interest owner to the exclusive right to Capture minerals from the relevant parcel of land for a term of years "and so long thereafter" as minerals are produced in paying quantities (a "<u>Working Interest</u>"), in exchange for either a share of production or payments in lieu of a share of production (a "<u>Royalty Interest</u>").  The Debtors hold Working Interests in various oil and gas properties in Texas, Oklahoma, and Louisiana.

6.     The efficient Capture of minerals from an area of land or depths (the "<u>Contract Area</u>") often involves the sharing of the economic risk of development among multiple Working Interest Owners who own, or who, by their participation in such development, earn the right to own, Working Interests in more than one Oil and Gas Lease.  Accordingly, the rights and responsibilities associated with the Capture of minerals (including each of the Working Interest Owners according to their respective Working Interests, subject in most cases, to a contractual arrangement governing operations on the Contract Area ordinarily referred to as a joint operating agreement (a "<u>JOA</u>"), or absent a JOA or similar agreement, state statute, or rule or order of any

governmental agency with jurisdiction therein, or by the application of well-established real property and contractual precedents.

7.      Working Interest Owners, either through a JOA or otherwise, will designate one Working Interest Owner (or its designee) as the operator of the Contract Area (the "Operator"). The Operator conducts the exploration, drilling, operations, and production of, as well as the day-to-day business (the "Daily Operations") associated with Capturing minerals in the Contract Area on behalf of itself and the other, non-operating Working Interest Owners (each, the owner of a "Non-Op Working Interest").

8.      The Operator generally will pay all of the expenses associated with the Daily Operations (the "Operating Expenses") on account of its Working Interest and the Non-Op Working Interests.  It subsequently will bill the owners of Non-Op Working Interests for their *pro rata* share of Operating Expenses (each, a "Joint Interest Billing" or "JIB").

9.      On the second business day of each month, the Debtors generate a Joint Interest Billing for the previous month for each owner of a Non-Op Working Interest in an oil and gas property operated by the Debtors.[2]  The following business day, each Non-Op Working Interest owner's respective JIB is then published on a website ("JIBLink") accessible by registered Non-Op Working Interest owners to provide actual notice of their respective Joint Interest Billings for the previous month in which Operating Expenses were incurred by the Debtors in their capacity as Operator.  Simultaneously, hardcopies of such invoices are mailed and/or transmitted by electronic means to Non-Op Working Interest owners that are not registered to used JIBLink[3] The timing of JIB payments from Non-Op Working Interest owners can vary depending on the

---

[2]      For example, the Joint Interest Billing for the month of April 2016 will be generated on May 3, 2016.

[3]      The decision of whether or not to register to receive the Joint Interest Billings via JIBLink or via regular mail and electronic mail is within the sole discretion of each owner of a Non-Op Working Interest.

specific payment arrangement in place, but Non-Op Working Interest owners typically remit payment to the Debtors within 30 to 90 days of receiving their respective JIBs.

10.     Operating Expenses commonly include payments to third parties (the "Lien Claimants") that perform labor or furnish or transport materials, equipment, or supplies used in the drilling, operating, or maintenance of an oil and gas property.

11.     Operating Expenses also can include payments made to third parties who own property interests that are critical to the drilling, operating, or maintenance of an oil and gas property.   Such payments can take the form of lump sum payments, rentals, extensions, minimum payments, or damage payments made to surface or mineral interest owners.

12.     Regardless of when an Operator is reimbursed by Non-Op Working Interest owners through the JIB process, the Operator must continue to pay Operating Expenses in a timely fashion.   Failure to pay Operating Expenses when due could result in the Operator's removal as Operator under the JOA or, as discussed in greater detail below, the perfection and/or enforcement of liens on the Debtors' assets in such instances where the Debtors are the Operator of certain oil and gas properties.[4]

13.     Operating Expenses typically are not uniform and are not entirely predictable on a month-to-month basis.   During 2015, the Debtors paid approximately $504.8 million in Operating Expenses.  Non-Op Working Interest owners reimbursed or were billed by the Debtors approximately $118.9 million on account of JIBs.

14.     By this Motion, the Debtors seek only to pay undisputed, prepetition Operating Expenses owed in the Debtors' ordinary course of business.  As of the Petition Date, the Debtors

---

[4]     By this motion, the Debtors do not concede that the assertion of any such liens would constitute a valid basis for removing the Debtors as Operator of any well and the Debtors expressly reserve the right to contest any such contention.

estimate that they have approximately $6.7 million of Operating Expenses outstanding,[5] for which they will be reimbursed approximately $1.5 million by owners of Non-Op Working Interests.[6]   Accordingly, the Debtors request authority, upon entry of the Interim Order, to pay approximately $1.5 million on account of Operating Expenses outstanding as of the Petition Date (which are currently due and owing), and authority, upon entry of the Final Order, to pay all remaining prepetition Operating Expenses outstanding as of the Petition Date and to continue paying Operating Expenses in the ordinary course of business on a postpetition basis.

**II.     Payment of Joint Interest Billings Arising from Non-Operated Properties.**

15.     The Debtors hold Non-Op Working Interests in many oil and gas properties.  In such circumstances, the Operator is charged with the performance of the Daily Operations and the Operating Expenses associated therewith.  The Debtors' primary responsibility with respect to their Non-Op Working Interests is to timely pay the Operators for their *pro rata* share of Operating Expenses through the Joint Interest Billing process.

16.     The Operator of an oil and gas property commonly is granted a contractual lien and security interest under the JOA in effect for such oil and gas property,[7] and in some states, may also be entitled to a statutory lien,[8] in each case against the Non-Op Working Interest

---

5     Of the approximately $6.7 million in Operating Expenses outstanding as of the Petition Date, approximately $1.5 million remains outstanding as of the Petition Date due to numerous prepetition checks issued by the Debtors on account of Operating Expenses that did not clear just prior to the Debtors' commencement of these chapter 11 cases.

6     The estimate for Operating Expenses outstanding excludes any goods or services received within the 20 days before the Petition Date.

7     *See*  AAPL Form 610 1956 § 9, AAPL Form 610-1982, Art. VII. B, and AAPL Form 610-1989, Arti. VII, B (model forms of JOAs as promulgated by the American Association of Petroleum Landmen providing the nonoperators grant the operator under the joint operating agreement a contractual lien and security interest on its oil and gas rights in the contract area and its share of production and equipment to secure the non-operator's payment of its share of expenses.

8     *See, e.g.*, Okla. Stat. Tit. 52, § 287.8 ("the unit shall have a first and prior lien upon the leasehold estate and other oil and gas rights in and to each separately-owned tract, [and] the interest of the owners thereof in and to

owners' interests in the oil and gas property to secure the payment of obligations owed to the Operator.  As such, failure to timely pay the JIBs owing by the Debtors as an owner of a Non-Op Working Interest is likely to result in the Operators' attempts to enforce such contractual and/or statutory lien rights under applicable state laws on the Debtors' interests in the applicable Oil and Gas Leases, related wells, or the production therefrom.  If asserted, such liens could restrict the Debtors' ability to receive their proportionate share of proceeds from such oil and gas properties, or could restrict their ability to dispose, transfer, or otherwise alienate its property, potentially severely impairing the Debtors' businesses.

17.     Operators under JOAs also have other contractual remedies available to them if a Non-Op Working Interest owner fails timely to pay Joint Interest Billings for which it is responsible.  Such remedies can include the right to suspend the Non-Op Working Interest owner's rights in the Contract Area, the right to commence an action for damages against the Non-Op Working Interest owner, the right to treat the Non-Op Working Interest owner as a "non-consenting party" under the JOA with respect to the unpaid Joint Interest Billings, the right to demand payment in advance for future expenditures in connection with the Contract Area, and the right to interest on the amounts owed.

18.     JIBs are not uniform and are not entirely predictable on a month-to-month basis. In the twelve months preceding the Petition Date, the Debtors paid approximately $16.6 million in Joint Interest Billings.   As of the Petition Date, the Debtors estimate that they have approximately $900,000 of prepetition JIBs outstanding.  To preserve and protect their share of production from such oil and gas properties and to maintain their relationships with the applicable third-party Operators, both during and after the pendency of these chapter 11 cases,

---

the unit production . . . to secure the payment of the amount of the unit expense charged to an assessed against such separately-owned tract.").

the Debtors request approval to pay all Joint Interest Billings outstanding as of the Petition Date, and to continue paying such Joint Interest Billings in the ordinary course of business on a postpetition basis.

## III.    Payment of Marketing Expenses.

19.    In order to effectively transport, market, or sell production from oil and gas properties operated by the Debtors, the Debtors, as Operator, will make contractual arrangements (the "Marketing Arrangements") by which third parties will charge the Operator for gathering, transportation, treating, dehydration, compression, separation, processing, fractionation, and other similar services necessary or desirable to get the oil and natural gas production to market in a condition ready for sale or to increase the value of any such products prior to the sale thereof (such charges, collectively, the "Marketing Expenses").

20.    The Debtors similarly may incur Marketing Expenses on non-operated oil and gas properties where the Debtors make their own Marketing Arrangements by electing to take their production "in-kind," separate and apart from the other Working Interest Owners rather than requesting that the third party Operator market the production associated with the Debtors' Non-Op Working Interests on the Debtors' behalf.  Where the Debtors take their production in-kind, the Debtors similarly will incur Marketing Expenses.  Finally, to the extent that the Debtors request the Operator for oil and gas properties in which the Debtors own a Non-Op Working Interest to market their proportionate share of the oil and gas, the Debtors will typically incur their proportionate share of any such Marketing Expenses incurred by the Operator.

21.    The Debtors' compliance with the Marketing Arrangements and timely payment of the Marketing Expenses is critical to the Debtors' ability to receive revenue from production that they market both on behalf of themselves and third parties (the "Marketed Production"). Failure to receive such revenue would directly threaten and potentially cease the Debtors' ability

to make timely payments to third parties holding an interest in production, such as Working Interest Owners and royalty interest owners.

22.     The Debtors' counterparties to the Marketing Arrangements commonly will have possession and, at times, title to the Marketed Production.  Accordingly, failure to pay Marketing Expenses when due could result in such counterparties refusing to release production or revenues associated with the Marketed Production in their possession or refusing to accept delivery of additional Marketed Production.

23.     In instances where delivery of Marketed Production is refused, the Debtors may be forced to shut-in the affected well(s).  Shutting in any given well may have economic consequences to the Debtors beyond temporary cessation of production and revenue therefrom. For instance, a well is shut-in, it may not be possible to re-establish production from the well in the future.  Further, the act of shutting in a well can trigger obligations to other interest owners in that well, including payment obligations or potential forfeiture of the Debtors' interest under the terms of an Oil and Gas Lease.   Without seamless compliance with their Marketing Arrangements and the ability to make marketable for sale the Debtors' production, the Debtors revenue stream and ability to operate their business potentially would be severely impaired.

24.     In 2015, the Debtors paid approximately $300,000 in Marketing Expenses.  As of the Petition Date, the Debtors estimate that they have approximately $20,000 of prepetition Marketing Expenses outstanding.  To preserve and protect their relationships with the applicable Marketing Arrangement counterparties, both during and after the pendency of these chapter 11 cases, the Debtors request approval to pay all Marketing Expenses outstanding as of the Petition Date, and to continue paying such Marketing Expenses in the ordinary course of business on a postpetition basis.

IV.     **Payment of Shipping and Warehousing Claims.**

25.     In the ordinary course of business, the Debtors, as Operator, engage certain vendors (the "Shippers") to transport or deliver goods, materials, or other property, including drilling pipe, casing, wellheads, and other necessary oil and gas equipment (the "Materials") from a manufacturer to a storage yard, between a storage yard and an oil and gas property, between oil and gas properties, or between storage yards.  The Shippers regularly possess Materials belonging to the Debtors and the owners of Non-Op Working Interests in an oil and gas property.  The Materials are integral in the exploration and production process.  The Debtors commonly require timely, and sometimes immediate, access to the Materials while drilling or operating a well.

26.     Additionally, while the Debtors own multiple storage yards, they rely on approximately 10 additional vendors (collectively, the "Warehousemen") in the ordinary course of business to store Materials when not being used.  If the Debtors were to default on any obligation to the Warehousemen, the Warehousemen may assert a lien, attempt to take possession of the Debtors' property, and/or bar the Debtors' access to Materials stored at the Warehousemen's yards.

27.     Under most state laws, a Shipper or a Warehouseman may have a lien on the goods in its possession, which lien secures the charges or expenses incurred in connection with the transportation or storage of such goods.[9]  As a result, certain Shippers and Warehousemen may refuse to deliver or release Materials or other property in their possession or control, as applicable, before the prepetition amounts owed to them by the Debtors (collectively, the "Shipping and Warehousing Claims") have been satisfied and their liens redeemed.

---

[9]     The Debtors do not concede that any liens (contractual, common law, statutory, or otherwise) described in this Motion are valid, and the Debtors expressly reserve the right to contest the extent, validity, and perfection of any and all such liens, and to seek avoidance thereof.

28.     In 2015, the Debtors paid approximately $5.2 million in Shipping and Warehousing Claims.  As of the Petition Date, the Debtors estimate that they have approximately $251,000 of prepetition Shipping and Warehousing Claims outstanding.  To continue using the Shippers' and Warehousemen's transportation and storage services and have access to the Materials held or controlled thereby, the Debtors request approval to pay all Shipping and Warehousing Claims outstanding as of the Petition Date, and to continue paying such Shipping and Warehousing Claims in the ordinary course of business on a postpetition basis.

**V.      Payment of 503(b)(9) Claims.**

29.     The Debtors may have received certain goods or materials from various vendors (collectively, the "503(b)(9) Claimants") within the 20 days before the Petition Date.  Many of the Debtors' relationships with the 503(b)(9) Claimants are not governed by long-term contracts.  Rather, the Debtors often obtain supplies on an order-by-order basis.  As a result, a 503(b)(9) Claimant may refuse to supply new orders without payment of its prepetition claims.

30.     The Debtors also believe certain 503(b)(9) Claimants could reduce the Debtors' existing trade credit—or demand payment in cash on delivery—further exacerbating the Debtors' limited liquidity.   The Debtors believe that as of the Petition Date, they owe approximately $9.5 million on account of goods delivered within the 20 days prior to the Petition Date, the value of which may be entitled to administrative priority under section 503(b)(9) of the Bankruptcy Code.[10]

31.     Accordingly, the Debtors request the authority, but not the direction, to pay those undisputed claims arising from the value of such goods received by the Debtors within 20 days before the Petition Date that had been sold to the Debtors in the ordinary course of business

---

[10]     The Debtors do not concede that any claims described in this Motion are conclusively entitled to administrative priority under section 503(b)(9) of the Bankruptcy Code, and the Debtors expressly reserve the right to contest the extent or validity of all such claims.

(each, a "503(b)(9) Claim" and, together with the Operating Expenses, Joint Interest Billings, Marketing Expenses, and Shipping and Warehousing Claims, the "Obligations").  The Debtors do not seek to accelerate or modify existing payment terms with respect to the 503(b)(9) Claims. Rather, the Debtors will pay the 503(b)(9) Claims as they come due in the ordinary course of business.

## VI.    Payment of Outstanding Orders.

32.    Prior to the Petition Date and in the ordinary course of business, the Debtors may have ordered goods that will not be delivered until after the Petition Date (the "Outstanding Orders").  To avoid becoming general unsecured creditors of the Debtors' estates with respect to such goods, certain suppliers may refuse to ship or transport such goods (or may recall such shipments) with respect to such Outstanding Orders unless the Debtors issue substitute purchase orders postpetition.  To prevent any disruption to the Debtors' business operations, and given that goods delivered after the Petition Date are afforded administrative expense priority under section 503(b) of the Bankruptcy Code, the Debtors seek an order:  (a) granting administrative expense priority under section 503(b) of the Bankruptcy Code to all undisputed obligations of the Debtors arising from the acceptance of goods subject to Outstanding Orders; and (b) authorizing the Debtors to satisfy such obligations in the ordinary course of business.

## Basis for Relief Requested

## I.    The Debtors Should Be Authorized to Pay the Obligations Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code.

33.    Section 363 of the Bankruptcy Code provides, in relevant part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  Courts in the Fifth Circuit have granted a debtor's request to use property of the estate outside of the ordinary course of business

pursuant to section 363(b) of the Bankruptcy Code upon a finding that such use is supported by sound business reasons.  *See, e.g.*, *Institutional Creditors of Cont'l Air Lines, Inc. v. Cont'l Air Lines, Inc. (In re Cont'l Air Lines)*, 780 F.2d 1223, 1226 (5th Cir. 1986) ("[F]or a debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business."); *see also In re Crutcher Res. Corp.*, 72 B.R. 628, 631 (Bankr. N.D. Tex. 1987) ("A Bankruptcy Judge has considerable discretion in approving a § 363(b) sale of property of the estate other than in the ordinary course of business, but the movant must articulate some business justification for the sale."); *In re Terrace Gardens Park P'ship*, 96 B.R. 707, 714 (Bankr. W.D. Tex. 1989) (noting that there were "legitimate business justifications" for the proposed sales).  Moreover, "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct."  *In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986); *see also In re Tower Air, Inc.*, 416 F.3d 229, 238 (3d Cir. 2005) ("Overcoming the presumptions of the business judgment rule on the merits is a near-Herculean task.").

34.    Furthermore, section 105(a) of the Bankruptcy Code further provides that a court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of" the Bankruptcy Code, pursuant to the "doctrine of necessity."  11 U.S.C. § 105(a). This "doctrine of necessity" functions in a chapter 11 case as a mechanism by which the bankruptcy court can exercise its equitable power to allow payment of critical prepetition claims not explicitly authorized by the Bankruptcy Code and further supports the relief requested herein. *See In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002) ("[I]t is only logical that

the bankruptcy court be able to use § 105(a) of the Bankruptcy Code to authorize satisfaction of the prepetition claim in aid of preservation or enhancement of the estate."); *see also In re Lehigh & New Eng. Ry.*, 657 F.2d 570, 581 (3d Cir. 1981) (holding that a court may authorize payment of prepetition claims if such payment is essential to debtor's continued operation); *see also In re Just for Feet, Inc.*, 242 B.R. 821, 824–25 (D. Del. 1999) (holding that section 105(a) of the Bankruptcy Code "provides a statutory basis for payment of pre-petition claims" under the doctrine of necessity); *In re Columbia Gas Sys., Inc.*, 171 B.R. 189, 191–92 (Bankr. D. Del. 1994) (explaining that the doctrine of necessity is the standard in the Third Circuit for enabling a court to authorize the payment of prepetition claims prior to confirmation of a reorganization plan).

35.     In a long line of well-established cases, courts consistently have permitted postpetition payment of prepetition obligations where necessary to preserve or enhance the value of a debtor's estate for the benefit of all creditors. *See, e.g.*, *Miltenberger v. Logansport, C&S W.R. Co.*, 106 U.S. 286, 312 (1882) (payment of pre-receivership claim prior to reorganization permitted to prevent "stoppage of [crucial] business relations"); *Dudley v. Mealey*, 147 F.2d 268, 271 (2d Cir. 1945) (extending doctrine for payment of prepetition claims beyond railroad reorganization cases), *cert. denied* 325 U.S. 873 (1945); *Mich. Bureau of Workers' Disability Comp. v. Chateaugay Corp. (In re Chateaugay Corp.)*, 80 B.R. 279, 285–86 (S.D.N.Y. 1987) (approving lower court order authorizing payment of prepetition wages, salaries, expenses and benefits).

36.     If the relationships established by the Debtors with these parties are harmed, whether through non-payment or perceived difficulties of working with a chapter 11 debtor, the Debtors may be unable to secure future opportunities with those parties and other third parties

may be unwilling to engage in new business with the Debtors going forward. If that were to occur, the negative effect on the Debtors' businesses, their estates, and creditors would be substantial.

37.     As more particularly described below, based on the adverse consequences that potentially could arise if the Debtors fail to honor the prepetition Obligations, the Debtors submit that the relief requested herein represents a sound exercise of the Debtors' business judgment, is necessary to avoid immediate and irreparable harm to the Debtors' estates, and is therefore justified under sections 105(a) and 363(b) of the Bankruptcy Code.

**A.     Failure To Make Timely Payment of Operating Expenses and Joint Interest Billings Would Threaten the Debtors' Ability To Operate and Subject the Debtors' Assets To The Perfection of Liens.**

38.     State law in the jurisdictions in which the Debtors operate protect the rights of mineral contractors by granting them statutory liens to secure payment for their services. By way of example, chapter 56 of the Texas Property Code grants a "mineral contractor" or "mineral subcontractor" a lien to secure payment for labor or services related to "mineral activities." Tex. Prop. Code Ann. § 56.002 (2014). "Mineral contractor" and "mineral subcontractor" are broadly defined to include, *inter alia*, persons performing labor or furnishing or hauling material, machinery, or supplies used in mineral activities. *Id.* § 56.001(2), (4). "Mineral activities" is similarly broad and includes digging, drilling, torpedoing, operating, completing, maintaining, or repairing an oil, gas, or water well, an oil or gas pipeline, or a mine or quarry. *Id.* § 56.001(1).

39.     Similarly, Oklahoma law provides protections to parties that render services and provide materials to oil and gas companies. *See* Okla. St. Ann. tit. 42 § 144 (providing liens for any "person, corporation, or co-partnership" that performs labor or services or furnishes materials used in connection with any oil or gas well).

15

40.     Moreover, where the Debtors own a Non-Op Working Interest, the JOA and/or applicable state law often grant the Operator special rights to a contractual and/or statutory lien to secure the obligations owed to the Operator on account of the Debtors' interests in the oil and gas lease.  *See, e.g.*, Okla. Stat. Tit. 52, § 287.8 ("[T]he unit shall have a first and prior lien upon the leasehold estate and other oil and gas rights in and to each separately-owned tract, [and] the interest of the owners thereof in and to the unit production . . .  to secure the payment of the amount of the unit expense charged to and assessed against such separately-owned tract.").  In addition, Operators furnishing services, labor, or materials for the operation of a well may fall within the purview of, and seek recourse under, the traditional mineral contract lien statutes referenced.

41.     Pursuant to section 362(b)(3) of the Bankruptcy Code, the act of perfecting statutory liens, to the extent consistent with section 546(b) of the Bankruptcy Code, is expressly excluded from the automatic stay.  11 U.S.C. § 362(b)(3).  As a result, Lien Claimants and Operators may be able to perfect liens against the Debtors' assets notwithstanding the automatic stay.

42.     If the Lien Claimants and Operators were able to assert liens against the Debtors in the course of these chapter 11 cases, the results would be detrimental to the Debtors and their creditors.  It is possible that the Lien Claimants and Operators could place liens on, among other things, the wells, the production and proceeds therefrom, or the Debtors' Working Interests (which are real property rights), or fixtures and equipment associated with the oil and gas properties.  *See, e.g.*, Okla. St. Ann. tit. 42 § 144; Tex. Prop. Code Ann. § 56.002; *see also In re Energy Contractors, Inc.*, 49 B.R. 139, 139–40 (Bankr. M.D. La. 1985) (holding that a lien applies "to the oil and gas produced from a well, to the proceeds of the well that inure to the

working interest in the well, to the mineral lease, and to the drilling equipment"). As such, the Debtors' revenues and their relationships with Non-Op Working Interest owners could be placed in jeopardy absent the relief requested herein.

43. Therefore, failure to timely pay the Joint Interest Billings owing by the Debtors may result in Operators asserting lien rights under applicable state laws on the Debtors' Working Interests in the Oil and Gas Leases or the production or proceeds therefrom. As discussed, pursuant to section 362(b)(3) of the Bankruptcy Code, the act of perfecting statutory liens, to the extent consistent with section 546(b) of the Bankruptcy Code, is expressly excluded from the automatic stay.

44. Where debtors have shown that the payment of prepetition claims is critical to maximize the value of their estates, courts in this District and other jurisdictions have routinely authorized payments to Lien Claimants and Operators under similar circumstances. *See, e.g.*, *See, e.g.*, *In re Equalnet Commc'ns Corp.*, 258 B.R. 368, 369-70 (Bankr. S.D. Tex. 2000) (business transactions critical to the survival of the business of the debtor are exceptions to the general rule of nonpayment of prepetition claims prior to plan confirmation); *In re CoServ, L.L.C.,* 273 B.R. at 497 (authorizing payment of certain prepetition claims pursuant to "doctrine of necessity"); *In re Tri-Union Development Corp.*, 253 B.R. 808, 815 (Bankr. S.D. Tex. 2000) (authorizing the debtor to pay prepetition royalties with respect to Texas oil and gas leases which would otherwise be entitled to statutory liens); *In re Magnum Hunter Res. Corp.*, No. 15-12533 (KG) (Bankr. D. Del. Jan. 11, 2016) (authorizing payment to holders of various lien claims); *In re Quicksilver Res. Inc.*, No. 15-10585 (LSS) (Bankr. D. Del. Apr. 14, 2015) (same); *see also In re Sabine Oil & Gas Corp.*, No. 15-11835 (SCC) (Bankr. S.D.N.Y. Aug. 17, 2015) (same).[11]

---

[11] Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request of the Debtors' proposed counsel.

**B.      Failure To Make Timely Payment of Shippers and Warehousing Claims Would Threaten the Debtors' Ability to Operate and Subject the Debtors' Assets To the Perfection of Liens.**

45.      As noted above, certain Shippers and Warehousemen also may be entitled under applicable non-bankruptcy law to assert certain possessory liens on the Debtors' raw materials, goods, or equipment in their possession (notwithstanding the automatic stay under section 362 of the Bankruptcy Code) in an attempt to secure payment of their prepetition claim.  As a result, the Debtors anticipate that certain of the Shippers and Warehousemen may assert and/or perfect liens, simply refuse to turn over goods in their possession, or stop performing their ongoing obligations if they were not paid.  Even absent a valid lien, to the extent certain Shippers, Warehousemen, or other third-parties have possession of the Debtors' inbound inventory, outbound products, or other Materials, mere possession or retention could severely disrupt the Debtors' operations.

46.      Furthermore, paying the Shipping and Warehousing Claims should not impair unsecured creditor recoveries in these chapter 11 cases.  In instances where the amounts owed to Shippers or Warehousemen is less than the value of the goods that could be held to secure a Shipping and Warehousing Claim, such parties may be fully-secured creditors of the Debtors' estates.  In such instances, payment now only provides such parties with what they might be entitled to receive under a plan of reorganization, only without any interest costs that might otherwise accrue during these chapter 11 cases.  Conversely, all creditors will benefit from the seamless transition of the Debtors' operations into bankruptcy.

47.      Where debtors have shown that the payment of prepetition claims is critical to maximize the value of their estates, courts in this district and other jurisdictions have routinely authorized payments to Shippers and Warehousemen under similar circumstances.  *See, e.g.*, *In re Sherwin Alumina Co.,* No. 16-20012 (Bankr. S.D. Tex. Jan. 13, 2016); *In re Victor Oolitic*

*Stone Co. d/b/a Indiana Limestone Co.*, No. 14-10311 (CSS) (Bankr. D. Del. Feb. 18, 2014); *In re Longview Power, LLC*, No. 13-12211 (BLS) (Bankr. D. Del. Sept. 4, 2013); *In re Maxcom Telecomunicaciones, S.A.B. de C.V.*, No. 13-11839 (PJW) (Bankr. D. Del. July 25, 2013); *In re Geokinetics Inc.*, No. 13-10472 (KJC) (Bankr. D. Del. Mar. 12, 2013); *In re Ormet Corp.*, No. 13-10334 (MFW) (Bankr. D. Del. Feb. 27, 2013).

**II.    The Court Should Authorize the Payment of Claims Entitled to Priority Pursuant to Section 503(b)(9) of the Bankruptcy Code.**

48.    Section 503(b)(9) provides administrative priority for the "value of any goods received by the debtor within 20 days before the date of commencement of a case under this title in which goods have been sold to the debtor in the ordinary course of such debtor's business." These claims must be paid in full for the Debtors to confirm a chapter 11 plan. *See* 11 U.S.C. § 1129(a)(9)(A). Consequently, payment of such claims now only provides such parties with what they would be entitled to receive under a chapter 11 plan. Additionally, all creditors will benefit from the seamless transition of the Debtors' operations into bankruptcy.

49.    Moreover, the Bankruptcy Code does not prohibit a debtor from paying such claims prior to confirmation. As administrative claims incurred in the ordinary course of business, the Debtors believe they may pay such claims in accordance with their business judgment pursuant to section 363(c)(1) of the Bankruptcy Code. *See, e.g.*, *In re Dura Auto. Sys. Inc.*, Case No. 06-11202 (KJC) (Bankr. D. Del. Oct. 31, 2006) Hr'g Tr. 49:21-23 ("I think arguably the debtor could pay its 503(b)(9) claimants without court approval."). The timing of such payments also lies squarely within the Court's discretion. *See In re Global Home Prods., LLC*, Case No. 06-10340 (KG), 2006 WL 3791955, at *3 (Bankr. D. Del. Dec. 21, 2006) (agreeing with parties that "the timing of the payment of that administrative expense claim is left to the discretion of the Court").

50.     The Debtors' ongoing ability to obtain goods as provided herein is key to their survival and necessary to preserve the value of their estates.  Absent payment of the Section 503(b)(9) Claims at the outset of these chapter 11 cases—which merely accelerates the timing of payment and not the ultimate treatment of such claims—the Debtors could be denied access to the equipment and goods necessary to maintain the Debtors' business operations.  Failure to honor these claims in the ordinary course of business may also cause the Debtors' vendor base to withhold support for the Debtors during the chapter 11 process.  Such vendors could accelerate or eliminate favorable trade terms.  Needless to say, such costs and distractions could impair the Debtors' ability to stabilize their operations at this critical juncture to the detriment of all stakeholders.

51.     In addition, courts in this district and others have regularly authorized the payment of claims arising under section 503(b)(9) of the Bankruptcy Code in the ordinary course of business.  *See, e.g.*, *In re Sherwin Alumina Co.* No. 16-20012 (DRJ) (Bankr. S.D. Tex. Jan. 13, 2016) (authorizing debtors to pay claims arising under section 503(b)(9)); *In re Energy & Exploration Partners, Inc.*, No. 15-44931 (RFN) (Bankr. N.D. Tex. Dec. 23, 2015) (same); *In re Reddy Ice Holdings, Inc.*, No. 12-32349 (SGJ) (Bankr. N.D. Tex. Apr. 17, 2012) (same); *In re Age Ref., Inc.*, No. 10-50501 (CAG) (Bankr. W.D. Tex. Feb, 11, 2010) (same).

**III.    The Court Should Confirm that Outstanding Orders Are Administrative Expense Priority Claims and that Payment of Such Claims Is Authorized.**

52.     Pursuant to section 503(b)(1) of the Bankruptcy Code, obligations that arise in connection with the postpetition delivery of goods and services, including goods ordered prepetition, are in fact, administrative expense priority claims because they benefit the estate postpetition.  *See* 11 U.S.C. § 503(b)(1)(A) (providing that the "actual [and] necessary costs and expenses of preserving the estate" are administrative expenses); *see also In re John Clay & Co.*,

20

43 B.R. 797, 809–10 (Bankr. D. Utah 1984) (holding that goods ordered prepetition but delivered postpetition are entitled to administrative priority). Thus, the granting of the relief sought herein with respect to the Outstanding Orders will not afford such claimants any greater priority than they otherwise would have if the relief requested herein were not granted, and will not prejudice any other party in interest.

53.     Absent such relief, however, the Debtors may be required to expend substantial time and effort reissuing the Outstanding Orders to provide certain suppliers with assurance of such administrative priority. The attendant disruption to the continuous and timely flow of critical raw materials and other goods to the Debtors would force the Debtors to potentially halt operations and production, damage the Debtors' business reputation, erode the Debtors' customer base, and ultimately lead to a loss of revenue, all to the detriment of the Debtors and their creditors. Accordingly, the Debtors submit that the Court should confirm the administrative expense priority status of the Outstanding Orders and should authorize the Debtors to pay the Outstanding Orders in the ordinary course of business.

## IV.   Payment of the Obligations Is in Furtherance of the Debtors' Fiduciary Duties Under Bankruptcy Code Sections 1107(a) and 1108.

54.     The Debtors, operating their businesses as debtors in possession under sections 1107(a) and 1108 of the Bankruptcy Code, are fiduciaries "holding the bankruptcy estate and operating the business for the benefit of its creditors and (if the value justifies) equity owners." *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002). Implicit in the duties of chapter 11 debtors in possession is the duty "to protect and preserve the estate, including an operating business's going-concern value." *Id.*

55.     Courts have noted that there are instances in which debtors in possession can fulfill their fiduciary duties "only . . . by the preplan satisfaction of a prepetition claim." *Id.* The

21

*CoServ* court specifically noted that the preplan satisfaction of prepetition claims would be a valid exercise of a debtor's fiduciary duty when the payment "is the only means to effect a substantial enhancement of the estate," *id.*, and also when the payment was to "sole suppliers of a given product." *Id.* at 498. The court provided a three-pronged test for determining whether a preplan payment on account of a prepetition claim was a valid exercise of a debtor's fiduciary duty:

> First, it must be critical that the debtor deal with the claimant. Second, unless it deals with the claimant, the debtor risks the probability of harm, or alternatively, loss of economic advantage to the estate or the debtor's going concern value, which is disproportionate to the amount of the claimant's prepetition claim. Third, there is no practical or legal alternative by which the debtor can deal with the claimant other than by payment of the claim.

*Id.*

56.     Payment of the prepetition Obligations meets each element of the *CoServ* court's standard. ***First***, as described above, each of the creditors holding prepetition Obligations possesses certain critical goods, products, and related materials, or provides critical services, which the Debtors need to continue operations. ***Second***, the cost of replacing such goods, products, materials, held by or the services provided by, the creditors holding prepetition Obligations would be significantly more than the prepetition claim that the Debtors would have to pay. Additionally, any disruption in the Debtors' network of suppliers, service providers, and vendors would significantly disrupt the Debtors' businesses and restructuring process, which could cost the Debtors' estate a substantial amount in lost revenue. Accordingly, the harm and economic disadvantage that would stem from failure to pay any of the prepetition Obligations is grossly disproportionate to the amount of the prepetition claim that would have to be paid. And, ***third***, with respect to each of the holders of the prepetition Obligations, the Debtors have determined that, to avoid significant disruption of the Debtors' business operations, there exists

no practical or legal alternative to payment of the prepetition Obligations. Therefore, the Debtors can only meet their fiduciary duties as debtors in possession under sections 1107(a) and 1108 of the Bankruptcy Code through payment of the prepetition Obligations.

## V.   Cause Exists to Authorize the Debtors' Financial Institutions to Honor Checks and Electronic Fund Transfers.

57.    The Debtors have sufficient funds to pay the amounts described in this Motion in the ordinary course of business by virtue of expected cash flows from ongoing business operations and anticipated access to cash collateral. In addition, under the Debtors' existing cash management system, the Debtors can readily identify checks or wire transfer requests as relating to an authorized payment in respect of the Obligations. Accordingly, the Debtors believe that checks or wire transfer requests, other than those relating to authorized payments, will not be honored inadvertently. Therefore, the Debtors respectfully request that the Court authorize and direct all applicable financial institutions, when requested by the Debtors, to receive, process, honor, and pay any and all checks or wire transfer requests in respect of the relief requested in this Motion.

<u>**Emergency Consideration**</u>

58.    The Debtors respectfully request emergency consideration of this Motion pursuant to Bankruptcy Rule 6003, which empowers a court to grant relief within the first 21 days after the commencement of a chapter 11 case "to the extent that relief is necessary to avoid immediate and irreparable harm." As set forth in this Motion, the Debtors believe an immediate and orderly transition into chapter 11 is critical to the viability of their operations and that any delay in granting the relief requested could hinder the Debtors' operations and cause irreparable harm. Furthermore, the failure to receive the requested relief during the first 21 days of these chapter 11 cases would severely disrupt the Debtors' operations at this critical juncture

23

and imperil the Debtors' restructuring.  Accordingly, the Debtors submit that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 and, therefore, respectfully request that the Court approve the relief requested in this Motion on an emergency basis.

**Reservation of Rights**

59.     Nothing contained herein is intended or shall be construed as:  (a) an admission as to the validity of any prepetition claim against a Debtor entity; (b) a waiver of the Debtors' or any other party in interest's rights to dispute any prepetition claim on any grounds; (c) a promise or requirement to pay a prepetition claims; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion or any order granting the relief requested by this Motion; (e) a request or authorization to assume any prepetition agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; or (f) a waiver of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable law.

**Waiver of Bankruptcy Rule 6004(a) and 6004(h)**

60.     To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

**Notice**

61.     The Debtors will provide notice of this Motion to:  (a) the Office of the U.S. Trustee for the Southern District of Texas; (b) the holders of the 50 largest unsecured claims against the Debtors (on a consolidated basis); (c) the administrative agent under the Debtors' first lien credit facility; (d) the indenture trustee for the Debtors' second lien notes; (e) the indenture trustee for the Debtors' third lien notes; (f) counsel to the ad hoc committees of holders of claims specified in clauses (d) and (e); (g) the indenture trustees for the Debtors' senior unsecured notes

24

due 2020 and 2021; (h) the United States Attorney's Office for the Southern District of Texas; (i) the Internal Revenue Service; (j) the United States Securities and Exchange Commission; (k) the Environmental Protection Agency and similar state environmental agencies for states in which the Debtors conduct business; (l) the state attorneys general for states in which the Debtors conduct business; (m) the Operators; and (n)  the Lien Claimants; and (o) any party that has requested notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice is required.

### **No Prior Request**

62.     No prior request for the relief sought in this motion has been made to this or any other court.

*[Remainder of page intentionally left blank.]*

WHEREFORE, the Debtors respectfully request that the Court enter the Interim Order and Final Order, granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

Dated: May 1, 2016
Houston, Texas

*/s/ Patricia B. Tomasco*

Patricia B. Tomasco (TX Bar No. 01797600)
Matthew D. Cavenaugh (TX Bar No. 24062656)
Jennifer F. Wertz (TX Bar No. 24072822)
**JACKSON WALKER L.L.P.**
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:    (713) 752-4200
Facsimile:    (713) 752-4221
Email:        ptomasco@jw.com
              mcavenaugh@jw.com
              jwertz@jw.com

-and-

Edward O. Sassower, P.C. (*pro hac vice* admission pending)
Joshua A. Sussberg, P.C. (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email:        edward.sassower@kirkland.com
              joshua.sussberg@kirkland.com

-and-

James H.M. Sprayregen, P.C. (*pro hac vice* admission pending)
William A. Guerrieri (*pro hac vice* admission pending)
Jason Gott (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Email:        james.sprayregen@kirkland.com
Email:        will.guerrieri@kirkland.com
Email:        jason.gott@kirkland.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

## **Certificate of Service**

I certify that on May 1, 2016, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Patricia B. Tomasco*
One of Counsel