**IN THE UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| | § | |
| In re: | § | Chapter 11 |
| | § | |
| MIDSTATES PETROLEUM COMPANY, INC., *et al.*,[1] | § | Case No. 16-32237 (DRJ) |
| | § | |
| Debtors. | § | (Joint Administration Requested) |
| | § | (Emergency Hearing Requested) |

**DEBTORS' EMERGENCY MOTION FOR ENTRY OF AN ORDER AUTHORIZING THE DEBTORS TO (I) PAY PREPETITION WAGES, SALARIES, OTHER COMPENSATION, REIMBURSABLE EXPENSES, AND DIRECTOR OBLIGATIONS AND (II) CONTINUE EMPLOYEE BENEFITS PROGRAMS**

**THIS MOTION SEEKS ENTRY OF AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.**

**EMERGENCY RELIEF HAS BEEN REQUESTED. IF THE COURT CONSIDERS THE MOTION ON AN EMERGENCY BASIS, THEN YOU WILL HAVE LESS THAN 21 DAYS TO ANSWER. IF YOU OBJECT TO THE REQUESTED RELIEF OR IF YOU BELIEVE THAT THE EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU SHOULD FILE AN IMMEDIATE RESPONSE. A HEARING WILL BE HELD ON THIS MATTER FOR MAY 2, 2016, AT 3:30 P.M. (CT) BEFORE THE HONORABLE DAVID R. JONES, 515 RUSK STREET, COURTROOM 400, HOUSTON, TEXAS 77002.**

**REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.**

The above-captioned debtors and debtors in possession (together, the "Debtors"), respectfully state the following in support of this motion (this "Motion").

[1] The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number, are: Midstates Petroleum Company, Inc. (1816) and Midstates Petroleum Company LLC (2434). The debtors' service address is: 321 South Boston, Suite 1000, Tulsa, Oklahoma 74103.

## Relief Requested

1. The Debtors seek entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Order"), authorizing the Debtors to (a) pay prepetition wages, salaries, other compensation, reimbursable expenses, and director obligations and (b) continue employee benefits programs in the ordinary course of business, including payment of certain prepetition obligations related thereto.

## Jurisdiction, Venue, and Procedural Background

2. The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3. The bases for the relief requested herein are sections 105(a), 362(d), 363(b), and 507(a) of title 11 of the United States Code (the "Bankruptcy Code") and rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

4. On April 30, 2016 (the "Petition Date"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. A detailed description surrounding the facts and circumstances of these chapter 11 cases is set forth in the *Declaration of Nelson M. Haight in Support of Chapter 11 Petitions and First Day Motions*, filed contemporaneously with this Motion.

## The Debtors' Workforce

5. The Debtors employ approximately 120 individuals on a full-time basis (collectively, the "Employees"). All 120 Employees are salaried. Of these Employees, 89 are exempt from overtime, and 31 are non-exempt from overtime. None of the Employees are represented by a union or collective bargaining unit. The Employees perform a wide variety of

functions critical to the administration of these chapter 11 cases and the Debtors' restructuring. Their skills, knowledge, and understanding of the Debtors' operations and infrastructure are essential to preserving operational stability and efficiency. In many instances, the Debtors' Employees include highly trained personnel who are not easily replaced. Without the continued, uninterrupted services of their Employees, the Debtors' restructuring efforts will be halted.

6. In addition to the Employees, the Debtors supplement their workforce with independent contractors (the "Independent Contractors") engaged to complete discrete projects, as well as temporary workers (the "Temporary Staff") from 19 staffing agencies (collectively, the "Staffing Agencies") to fulfill certain duties on a short-term basis. The Debtors currently retain approximately 43 Independent Contractors and Temporary Staff in the aggregate, although this number fluctuates based on the Debtors' specific needs at any given time. The Independent Contractors and Temporary Staff are a critical supplement to the efforts of the Debtors' Employees.

7. The vast majority of employees rely exclusively on their compensation and benefits to pay their daily living expenses and support their families. Thus, employees will be exposed to significant financial hardships if the Debtors are not permitted to continue paying their compensation, providing benefits, and maintaining existing programs. Consequently, the relief requested is necessary and appropriate.

**Compensation and Benefits**

8. The Debtors seek to minimize the personal hardship the Employees would suffer if employee obligations are not paid when due or as expected. The Debtors are seeking authority to pay and honor certain prepetition claims relating to, among other things, wages, salaries, and other related obligations and health and welfare benefits that the Debtors have historically provided to their Employees, Independent Contractors, Temporary Staff, and Staffing Agencies

(collectively, the "Compensation and Benefits"). The Debtors also seek to pay all costs incidental to the Compensation and Benefits.

9. Subject to the Court's approval of the relief requested herein, the Debtors intend to continue their prepetition Compensation and Benefits programs in the ordinary course of business on a postpetition basis and to pay prepetition amounts (if any) related thereto. To the extent applicable, the Debtors also request authority to modify, change, and discontinue any of their Compensation and Benefits and to implement new programs, policies, and benefits in the ordinary course of business during these chapter 11 cases and without the need for further Court approval, subject to applicable law.

## I. Compensation and Withholding Obligations.

### A. Unpaid Wages.

10. The Debtors pay their Employees' wage and salary obligations (collectively, the "Wages") on a salaried basis semi-monthly. As of the Petition Date, the Debtors' average semimonthly gross payroll expense, including all Wages, was approximately $650,000. As of the Petition Date, the Debtors do not believe that any accrued prepetition wages, salaries, overtime, and other compensation (excluding reimbursable expenses, paid time off, and amounts related to the Debtors' 401(k) plan) remain outstanding (collectively, the "Unpaid Wages") as of the Petition Date, nor that any of the Unpaid Wages will exceed the $12,850 priority cap imposed under subsections (a)(4) and (a)(5) of section 507 of the Bankruptcy Code with respect to any individual Employee. To the extent any prepetition obligations on account of Unpaid Wages remain outstanding, the Debtors request authority to pay such Unpaid Wages in the ordinary course of business on a postpetition basis.

**B. Independent Contractors and Temporary Staff**.

11. On an annual basis, the Debtors spend approximately $13.5 million on Independent Contractors in the aggregate and $450,000 on payments to the Staffing Agencies in the aggregate (collectively, the "Contractor Compensation"). The Debtors estimate that, as of the Petition Date, approximately $360,000 of obligations to the Independent Contractors and the Staffing Agencies remains outstanding on account of services rendered prior to the Petition Date. Pursuant to this Motion, the Debtors request authority to pay any such prepetition amounts outstanding and to continue to pay the Contractor Compensation in the ordinary course of business on a postpetition basis.

**C. Withholding Obligations**.

12. The Debtors routinely deduct certain amounts from Employees' paychecks, including garnishments, child support, and other pre-tax deductions payable pursuant to certain of the health and welfare programs (collectively, the "Deductions") for remittance to various third-party recipients. As of the Petition Date, the Debtors do not believe that there are any aggregate Deductions.

13. Applicable law also requires the Debtors to withhold from the Employees' Wages certain amounts related to federal, state, and local income taxes, as well as Social Security and Medicare taxes (collectively, the "Employee Payroll Taxes") for remittance to the appropriate federal, state, and local taxing authorities. The Debtors must then match certain of the Employee Payroll Taxes from their own funds and pay, based upon a percentage of gross payroll, additional amounts for state and federal unemployment insurance, as well as Social Security and Medicare taxes (collectively, the "Employer Payroll Taxes," and, together with the Employee Payroll Taxes, the "Payroll Taxes"). The Payroll Taxes generally are processed and forwarded to the appropriate federal, state, or local taxing authority, in connection with the disbursement of

Employees' Wages. As of the Petition Date, the Debtors estimate that no Payroll Taxes are outstanding. To the extent any such prepetition amounts remain outstanding, the Debtors seek authority to pay the Payroll Taxes.

14. The Debtors seek authority to transfer any unpaid Deductions and Payroll Taxes (together, the "Withholding Obligations") to the appropriate recipients in the ordinary course of business and consistent with past practice and to continue remitting any Withholding Obligations in the ordinary course of business on a postpetition basis. As of the Petition Date, the Debtors estimate that no Withholding Obligations are outstanding.

**D. Payroll Processing.**

15. The Debtors utilize ADP LLC ("ADP"), a third-party payroll service, to process payroll disbursements and provide certain related services. The Debtors have historically paid approximately $3,500 per month to ADP on account of such services. As of the Petition Date, the Debtors estimate that no prepetition fees payable to ADP remain outstanding. The failure to pay prepetition or postpetition payroll servicing fees may delay employee payroll disbursements to the detriment of their Employees and the Debtors' operations. To the extent any such prepetition amounts remain outstanding, the Debtors seek to continue administering payroll in the ordinary course of business on a postpetition basis (including paying any prepetition or postpetition amounts payable to ADP).

**E. Expense Reimbursements.**

16. The Debtors have historically reimbursed management-level Employees for certain expenses incurred in the scope of their employment (collectively, the "Expense Reimbursements") related to, among other things, travel, lodging, ground transportation, meals, relocation costs, continuing professional education, and other reasonable and documented business-related expenses. On average, the Debtors have historically paid

approximately $10,000–$15,000 per pay period on account of Expense Reimbursements. As of the Petition Date, the Debtors estimate that no Expense Reimbursements remain outstanding. To the extent any such prepetition amounts remain outstanding, the Debtors seek authority to honor such outstanding prepetition obligations in the ordinary course of business and consistent with past practice and to continue paying any such obligations related thereto in the ordinary course of business on a postpetition basis.

## II. Employee Benefit Programs.

### A. Health Insurance Programs.

#### 1. The Medical Plans.

17. The Debtors offer comprehensive medical coverage to current Employees (the "Medical Plan"), administered by Blue Cross Blue Shield of Oklahoma. Under the Medical Plan, participants receive coverage for, among other things, preventive care, doctor visits, hospital care, prescription drugs, vision care, and wellness. Monthly health care premiums paid under the Medical Plan vary depending on whether the participant has dependents covered by the applicable plan. Participants pay semi-monthly premiums which are deducted from their paychecks.

18. The Debtors have historically paid approximately $195,000 per month in the aggregate for their contributions to, the administrative and premium payments for, and claims under the Medical Plan. As of the Petition Date, the Debtors estimate that no prepetition Medical Plan-related obligations are outstanding. To the extent any such prepetition amounts remain outstanding, the Debtors seek authority to pay in a manner consistent with historical practice any unpaid amounts on account of the Medical Plans and to continue administering the Medical Plans in the ordinary course of business and consistent with past practice.

19. In addition, the Debtors provide their Employees with access to flexible spending accounts (the "FSAs") administered by Benefit Plan Administrators, Inc. ("BPAS") to cover incidental medical costs and dependent child care. As of the Petition Date, approximately 36 Employees use FSAs for medical costs, and 9 Employees use FSAs for dependent child care, for which the Debtors pay a monthly administration fee of approximately $180. The Debtors do not make any contributions to any Employee's FSAs. As of the Petition Date, the Debtors do not believe there are any outstanding FSA-related obligations.

20. The Debtors also continue to provide certain benefits to certain former Employees after their termination, retirement, or disability leave, including benefits provided under the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"). The Debtors are fully insured and only pay administrative fees to ADP for each COBRA participant. The Debtors are currently reimbursing COBRA premiums for 35 former Employees whose employment with the Debtors terminated prior to the Petition Date. The Debtors seek the authority, pursuant to the Order, to continue making payments that accrued prepetition and postpetition payments in the ordinary course of business during the pendency of these chapter 11 cases for any Employees that may be severed following the Petition Date. The most recent monthly payment made for this program was $19,921. The Debtors estimate prepetition obligations for all 35 employees to be approximately $87,000.

**2. The Dental and Vision Plans.**

21. The Debtors provide their Employees dental insurance through a plan administered by Lincoln Financial Group (the "Dental Plan"). The Debtors also provide their Employees vision insurance through a plan also administered by Lincoln Financial Group (the "Vision Plan"). The Dental Plan, which is fully insured, has historically cost approximately $12,000 per month exclusive of Employee contributions, which have historically totaled

approximately $4,000 per month. The Debtors incur no costs associated with the Vision Plan, which is fully insured, exclusive of Employee contributions, which have historically totaled approximately $2,500 per month. In addition, the Debtors make COBRA payments of approximately $6,500 for every two months of coverage under the Dental Plan and approximately $1,000 for every two months of coverage under the Vision Plan. As of the Petition Date, the Debtors estimate there are no prepetition Dental Plan or Vision Plan-related obligations outstanding. To the extent any such prepetition amounts remain outstanding, the Debtors seek authority to pay in a manner consistent with historical practice any unpaid amounts on account of the Dental Plan and the Vision Plan and to continue administering the Dental Plan and Vision Plan in the ordinary course of business and consistent with past practice.

**B. Insurance, Disability, and Workers' Compensation Programs**.

**1. Life and AD&D Insurance Programs**.

22. The Debtors provide life and accidental death and dismemberment insurance coverage to current and certain former Employees (the "Standard Life and AD&D Insurance") through Lincoln Financial Group, which provides maximum coverage per Employee of the lesser of $300,000 and two times the annual salary of the Employee for term life insurance and the lesser of $300,000 and two times the annual salary of the Employee for accidental life and dismemberment insurance coverage. Current and certain former Employees may also purchase voluntary life insurance through Lincoln Financial Group, which provides maximum coverage of an additional $500,000 in the event of death (the "Voluntary Life Insurance" and together with the Standard Life and AD&D Insurance, the "Life and AD&D Insurance"). Employees are eligible for the Life and AD&D Insurance as of their date of hire. The Debtors are fully insured through the Standard Life and AD&D Insurance, and the Debtors pay approximately $4,801 per month with respect to their portion of the premiums for the Life and AD&D Insurance.

23. As of the Petition Date, the Debtors estimate no prepetition Life and AD&D Insurance obligations remain outstanding. To the extent any prepetition amounts remain outstanding, the Debtors seek authority to pay the Life and AD&D Insurance obligations.

**2. Disability Benefits.**

24. The Debtors provide Employees with short-term disability benefits (the "Short-Term Disability Benefits") and long-term disability benefits (the "Long-Term Disability Benefits" and together with the Short-Term Disability Benefits, the "Disability Benefits") administered by Lincoln Financial Group. Employees' Short-Term Disability Benefits begin on the 8th consecutive day of disability due to an accidental injury and the 8th consecutive day of disability due to sickness and continue for up to 12 weeks of any disability thereafter. The Long-Term Disability Benefits, available to Employees after 13 weeks of absence from work, generally permit eligible Employees to continue to receive 60 percent of their monthly wages (subject to a monthly maximum of $10,000) in the event of qualified long-term medical disability due to illness of injury. The Debtors pay Lincoln Financial Group administrative fees of approximately $4,000 per month with respect to the Short-Term Disability Benefits and approximately $3,500 per month in premiums with respect to the Long-Term Disability Benefits. As of the Petition Date, three Employees currently receive Short-Term Disability Benefits.

25. As of the Petition Date, the Debtors do not believe they owe any prepetition amounts on account of the Disability Benefits and associated premiums, which have historically totaled approximately $7,500 per month. To the extent any prepetition amounts remain outstanding, the Debtors seek authority to pay the Disability Benefits.

**3. Workers' Compensation Program.**

26. The Debtors maintain workers' compensation insurance for Employees at the levels required by laws in the states in which the Debtors operate (collectively, the "Workers' Compensation Program"). More specifically, AIG Insurance maintains the Workers' Compensation Program for Employees, a service that historically cost the Debtors approximately $90,000 per month prior to the Petition Date. As of the Petition Date, the Debtors estimate there are no prepetition Workers' Compensation fees outstanding. To the extent any prepetition amounts remain outstanding, the Debtors seek authority to pay the Workers' Compensation fees.

27. No Employees are collecting workers' compensation from the Debtors, and no Employees are expected to assert claims under the Workers' Compensation Program against the Debtors at this time. Nevertheless, it is possible that certain obligations under the Workers' Compensation Program may have been incurred prepetition but have yet to be asserted against the Debtors. For the claims administration process to operate in an efficient manner and to ensure that the Debtors comply with applicable state law, the Debtors must continue to assess, determine, and adjudicate claims (if any). Accordingly, the Debtors seek authority, but not direction, to continue to maintain the Workers' Compensation Program in the ordinary course of business, including by modifying the automatic stay solely to facilitate the administration of the Workers' Compensation Program.

**C. The 401(k) Plan.**

28. The Debtors provide all Employees with the opportunity to participate in a 401(k) employee stock ownership program (the "401(k) Plan") administered by ADP. Employees are generally eligible to participate in the 401(k) Plan as of the first day of the month following the date of their hire. The 401(k) Plan generally provides for pre-tax deductions of compensation up

to limits set by the Internal Revenue Code, as well as for certain post-tax deductions. Each Employee's 401(k) contributions are deducted automatically from each paycheck and transferred to a trust established under the 401(k) Plan (collectively, the "401(k) Deductions").

29. The Debtors may match each eligible Employee's 401(k) Plan contributions on a dollar-for-dollar basis up to 8 percent of such Employee's compensation (the "401(k) Contributions"). The Debtors' 401(k) Contributions are fully vested after five years of service with the Debtors. The 401(k) Contributions, which have historically totaled approximately $725,000 per year, are transferred to the 401(k) Plan each pay period. As of the Petition Date, the Debtors are not holding any 401(k) Contributions and 401(k) Deductions.

30. The Debtors pay Merrill Lynch, which acts as investment advisor to the 401(k) Plan, approximately $15,000 in annual administrative fees and seek to pay any outstanding prepetition administrative fees owed to Merrill Lynch.

**D. Counseling Programs.**

31. The Debtors provide Employees with an employee assistance program when an Employee becomes ill or is in need of additional services, such as counseling at no cost to the Employees (the "Employee Assistance Program"). The Debtors do not incur any costs in connection with the Employee Assistance Program and do not have any amounts outstanding as of the Petition Date.

**E. Education Assistance Program.**

32. The Debtors reimburse certain tuition costs and other educational expenses incurred by Employees (the "Education Assistance Program"). Pursuant to the Education Assistance Program, the Debtors reimburse Employees 100 percent of the tuition and other mandatory, incidental expenses required for enrollment up to $5,250 per calendar year. As of the Petition Date, no Employees participate in the Education Assistance Program. The Debtors

believe that, as of the Petition Date, there are no accrued prepetition Education Assistance Program payments.

**F. Safety Equipment Programs**.

33. The Debtors maintain several safety equipment programs for approximately 75 Employees who work near drilling sites, warehouses, or other potentially dangerous locations (the "Safety Equipment Programs"). The Debtors have historically spent approximately $85,000 each year on the Safety Equipment Program. As of the Petition Date, the Debtors estimate that there are no unpaid obligations related to the Safety Equipment Programs. To the extent any prepetition amounts remain outstanding, the Debtors seek authority to pay the obligations associated with the Safety Equipment Program.

**G. Paid Leave**.

34. The Debtors maintain the following paid leave benefit programs (collectively, the "Paid Leave") for Employees:

- Paid Time Off. In the ordinary course of business, the Debtors provide paid time off ("PTO") to each eligible Employee in the form of vacation days and sick days. Vacation time accrues at a specified rate based on the Employee's years of service and date of hire. Employees accrue between 3.33 and 6.66 hours of vacation each pay period. Employees accrue 3.33 hours of sick leave each pay period up to a maximum of 80 hours per year. Vacation and sick time begins accruing upon the date of hire. Employees may carry over any vacation time into future calendar years up to a maximum of 160-240 hours, depending on years of service. Employees may carry over a maximum of 40 hours of unused accrued paid sick leave into the following year, but if the carried over paid sick is not taken in the year following the year in which it was accrued, it will be lost. Employees who are terminated or resign are entitled to a cash payment in lieu of the accrued but unused vacation time. The Debtors estimate that, as of the Petition Date, the aggregate amount of accrued but unpaid vacation time is approximately $850,000. This amount, however, is not a current cash payment obligation, as Employees are only entitled to cash payment for accrued and unused vacation time in the event the Employees leave the Debtors' employment. For the avoidance of doubt, the Debtors seek to pay prepetition PTO on account of unused vacation time upon an Employee's departure solely to the extent such PTO for a particular Employee does not exceed the priority wage cap under section 507(a)(4) of the Bankruptcy

Code. The Debtors will request authority to make such a payment in excess of the priority wage cap on separate motion.

- Holidays. The Debtors also offer Employees 10 paid holidays throughout the year (each a "Holiday" and collectively, the "Holidays"). Generally, eligible Employees are not required to work on a designated Holiday and are paid for Holiday time at their base rate of pay.

35. The Debtors believe that the continuation of the Paid Leave policy in accordance with prior practice is essential to maintaining Employee morale during these chapter 11 cases. Further, the policy is a broad-based program upon which all Employees have come to depend. Finally, the Debtors anticipate that their Employees will use any accrued Paid Leave in the ordinary course of business, which will not create any material cash flow requirements beyond the Debtors' normal payroll obligations.

**H. Postpetition Non-Employee Director Compensation.**

36. The Board of Directors for the Debtors includes three non-employee independent directors (collectively, the "Independent Directors"). The Independent Directors each receive a $150,000 annual retainer and additional annual retainers for serving as members or chairpersons of Board committees (collectively, the "Annual Retainers"). In addition, the Independent Directors are also paid for each Board or committee meeting attended and are entitled to expense reimbursement for out-of-pocket expenses (together with the Annual Retainers, the "Independent Director Compensation"). Generally, the total Independent Director Compensation for each Independent Director ranges from approximately $60,000–$80,000 per quarter, subject to variations depending on the number of meetings convened. As of the Petition Date, the Debtors estimate that no prepetition Independent Director Compensation remain outstanding. The Debtors request authority to continue to pay Independent Director Compensation on a postpetition basis.

## Basis for Relief

**I. Sufficient Cause Exists to Authorize the Debtors to Honor the Compensation and Benefits.**

**A. Certain Compensation and Benefits Are Entitled to Priority Treatment.**

37. Sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code entitle certain of the Compensation and Benefits owed to the Employees to priority treatment. Under section 1129(a)(9)(b) of the Bankruptcy Code, the Debtors must pay these priority claims in full to confirm a chapter 11 plan. Thus, granting the relief sought herein should only affect the timing of certain payments to the Employees and should not negatively affect recoveries for general unsecured creditors. Indeed, the Debtors submit that payment of the Compensation and Benefits at this time enhances value for the benefit of all interested parties.

**B. Payment of Certain Compensation and Benefits Is Required by Law.**

38. The Debtors seek authority to pay the applicable Withholding Obligations to the appropriate third-party entities. These amounts principally represent Employee earnings that governments, Employees, and judicial authorities have designated for deduction from the Employees' paychecks. Indeed, certain Withholding Obligations are not property of the Debtors' estates because the Debtors have withheld such amounts from the Employees' paychecks on another party's behalf. *See* 11 U.S.C. § 541(b)(1), (d). Further, federal and state laws require the Debtors to withhold certain tax payments from the Employees' paychecks and to pay such amounts to the appropriate taxing authority. 26 U.S.C. §§ 6672, 7501(a); *see also City of Farrell v. Sharon Steel Corp.*, 41 F.3d 92, 95–97 (3d Cir. 1994) (finding that state law requiring a corporate debtor to withhold city income tax from its employees' wages created a trust relationship between debtor and the city for payment of withheld income taxes); *In re DuCharmes & Co.*, 852 F.2d 194, 196 (6th Cir. 1988) (noting that individual officers of a

company may be held personally liable for failure to pay trust fund taxes). Because the Withholding Obligations may not be property of the Debtors' estates, the Debtors request that the Court authorize them to transmit the Withholding Obligations on account of the Employees to the proper parties in the ordinary course of business.

39. Similarly, state laws require the Debtors to maintain the Workers' Compensation Program. If the Debtors fail to maintain the Workers' Compensation Program, state laws may prohibit the Debtors from operating in those states. Payment of all workers' compensation amounts is therefore crucial to the Debtors' continued operations and the success of the Debtors' ongoing chapter 11 process.

## II. Payment of the Compensation and Benefits Is Proper Pursuant to Section 363(b) of the Bankruptcy Code and the Doctrine of Necessity.

40. Section 363(b)(1) of the Bankruptcy Code provides that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." Courts in the Fifth Circuit have granted a debtor's request to use property of the estate outside of the ordinary course of business pursuant to section 363(b) of the Bankruptcy Code upon a finding that such use is supported by sound business reasons. *See, e.g.*, *Institutional Creditors of Cont'l Air Lines, Inc. v. Cont'l Air Lines, Inc. (In re Cont'l Air Lines, Inc.)*, 780 F.2d 1223, 1226 (5th Cir. 1986) ("[F]or a debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business."); *see also In re Crutcher Res. Corp.*, 72 B.R. 628, 631 (Bankr. N.D. Tex. 1987) ("A Bankruptcy Judge has considerable discretion in approving a § 363(b) sale of property of the estate other than in the ordinary course of business, but the movant must articulate some business justification for the sale."); *In re Terrace Gardens Park P'ship*, 96 B.R. 707, 714 (Bankr. W.D. Tex. 1989).

41. Furthermore, section 105(a) of the Bankruptcy Code further provides that a court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of" the Bankruptcy Code, pursuant to the "doctrine of necessity." The "doctrine of necessity" functions in a chapter 11 case as a mechanism by which the bankruptcy court can exercise its equitable power to allow payment of critical prepetition claims not explicitly authorized by the Bankruptcy Code and further supports the relief requested herein. *See In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002) (recognizing the "doctrine of necessity"); *see also In re Lehigh & New Eng. Ry.*, 657 F.2d 570, 581 (3d Cir. 1981) (holding that a court may authorize payment of prepetition claims if such payment is essential to debtor's continued operation); *see also In re Just for Feet, Inc.*, 242 B.R. 821, 824–25 (D. Del. 1999) (holding that section 105(a) of the Bankruptcy Code "provides a statutory basis for payment of pre-petition claims" under the doctrine of necessity); *In re Columbia Gas Sys., Inc.*, 171 B.R. 189, 191–92 (Bankr. D. Del. 1994) (explaining that the doctrine of necessity is the standard in the Third Circuit for enabling a court to authorize the payment of prepetition claims prior to confirmation of a reorganization plan).

42. The necessity of payment doctrine is designed to foster a debtor's rehabilitation, which courts have recognized is "the paramount policy and goal of chapter 11." *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 176 (Bankr. S.D.N.Y. 1989); *see also Just for Feet*, 242 B.R. at 826 (finding that payment of prepetition claims to certain trade vendors was "essential to the survival of the debtor during the chapter 11 reorganization"); *In re Quality Interiors, Inc.*, 127 B.R. 391, 396 (Bankr. N.D. Ohio 1991) ("[P]ayment by a debtor-in-possession of pre-petition claims outside of a confirmed plan of reorganization is generally prohibited by the Bankruptcy Code," but "[a] general practice has developed . . . where

bankruptcy courts permit the payment of certain pre-petition claims, pursuant to 11 U.S.C. § 105, where the debtor will be unable to reorganize without such payment."); *In re Eagle-Picher Indus., Inc.*, 124 B.R. 1021, 1023 (Bankr. S.D. Ohio 1991) (approving payment of prepetition unsecured claims of toolmakers as "necessary to avert a serious threat to the chapter 11 process").

43. Paying the Compensation and Benefits is warranted under this authority and the facts of these chapter 11 cases. The majority of the Employees, Independent Contractors, Temporary Staff, and Staffing Agencies rely exclusively on the Compensation and Benefits to satisfy their daily living expenses. Consequently, Employees will be exposed to significant financial difficulties if the Debtors are not permitted to honor obligations for unpaid Compensation and Benefits. Additionally, continuing ordinary course benefits will help maintain Employee morale and minimize the adverse effect of the commencement of these chapter 11 cases on the Debtors' ongoing business operations.

44. Moreover, the Employees, Independent Contractors, Temporary Staff, and Staffing Agencies provide the Debtors with services necessary to conduct the Debtors' businesses, and the Debtors believe that absent the payment of the Compensation and Benefits owed, the Debtors may experience turnover and instability at this critical time in these chapter 11 cases. The oil and gas industry is a highly specialized business that requires unique technical expertise, but is also geographically concentrated in certain areas of the country and certain cities, in particular—including the Debtors' two headquarters locations, Houston, Texas, and Tulsa, Oklahoma. The Debtors believe that without these payments, the Employees, Independent Contractors, and Temporary Staff may become demoralized and unproductive because of the potential significant financial strain and other hardships these individuals may

face. Such individuals may then elect to seek alternative employment opportunities. Additionally, a significant portion of the value of the Debtors' business is tied to their workforce, which cannot be replaced without significant efforts—efforts that may not be successful given the overhang of these chapter 11 cases. The Debtors therefore believe that payment of the prepetition obligations with respect to the Compensation and Benefits is a necessary and critical element of the Debtors' efforts to preserve value and will give the Debtors the greatest likelihood of retention of their Employees as the Debtors seek to operate their businesses in these chapter 11 cases.

45. Indeed, bankruptcy courts in the Fifth Circuit have recognized the importance of satisfying employee obligations in cases requesting relief similar to that requested herein. *See, e.g.*, *In re Sherwin Alumina Co.*, No 16-20012 (DRJ) (Bankr. S.D. Tex. Jan. 13, 2016); *In re RAAM Glob. Energy Co.*, No. 15-35615 (MI) (Bankr. S.D. Tex. Nov. 18, 2015); *In re BPZ Res., Inc.*, No. 15-60016 (DRJ) (Bankr. S.D. Tex. Mar. 10, 2015); *In re Univ. Gen. Health Sys., Inc.*, No. 15-31086 (LZP) (Bankr. S.D. Tex. Mar. 2, 2015); *In re Autoseis, Inc.*, No. 14-20130 (RSS) (Bankr. S.D. Tex. Apr. 25, 2014).[2] Accordingly, the Debtors respectfully request that the Court authorize the Debtors to pay and continue the Compensation and Benefits in the ordinary course of business and consistent with past practice.

## III. A Limited Waiver of the Automatic Stay for Workers' Compensation Claims Is Appropriate Here.

46. Section 362(a) of the Bankruptcy Code operates to stay "the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the

---

[2] Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request of the Debtors' proposed counsel.

commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title . . . ." 11 U.S.C. § 362(a)(1).

47. Section 362 of the Bankruptcy Code, however, permits a debtor or other parties in interest to request a modification or termination of the automatic stay for "cause." Id. at § 362(d)(1). Cause exists here to modify the automatic stay to permit the Employees to proceed with workers' compensation claims in the appropriate judicial or administrative forum. Staying the workers' compensation claims could have a detrimental effect on the financial well-being and morale of the Employees.

## IV. Cause Exists to Authorize the Debtors' Financial Institutions to Honor Checks and Electronic Fund Transfers.

48. The Debtors have sufficient funds to pay the amounts described in this Motion in the ordinary course of business by virtue of expected cash flows from ongoing business operations. In addition, under the Debtors' existing cash management system, the Debtors can readily identify checks or wire transfer requests as relating to an authorized payment in respect of the Compensation and Benefits, as applicable. Accordingly, the Debtors believe that checks or wire transfer requests, other than those relating to authorized payments, will not be honored inadvertently. Therefore, the Debtors respectfully request that the Court authorize and direct all applicable financial institutions, when requested by the Debtors, to receive, process, honor, and pay any and all checks or wire transfer requests in respect of the relief requested in this Motion.

## Emergency Consideration

49. The Debtors respectfully request emergency consideration of this Motion pursuant to Bankruptcy Rule 6003, which empowers a court to grant relief within the first 21 days after the commencement of a chapter 11 case "to the extent that relief is necessary to avoid immediate and irreparable harm." Here, the Debtors believe an immediate and orderly

transition into chapter 11 is critical to the viability of their operations and that any delay in granting the relief requested could hinder the Debtors' operations and cause irreparable harm. Furthermore, the failure to receive the requested relief during the first 21 days of these chapter 11 cases would severely disrupt the Debtors' operations at this critical juncture. Accordingly, the Debtors submit that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 and, therefore, respectfully request that the Court approve the relief requested in this Motion on an emergency basis.

**Waiver of Bankruptcy Rules 6004(a) and 6004(h)**

50. To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

**Reservation of Rights**

51. Nothing contained herein is intended or shall be construed as: (a) an admission as to the amount of, basis for, or validity of any claim against the Debtors under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's rights to dispute any claim; (c) an assumption, adoption, or rejection of any agreement, contract, or lease under section 365 of the Bankruptcy Code; (d) an admission as to the validity, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; or (e) a waiver of any claims or causes of action which may exist against any entity.

**Notice**

52. The Debtors will provide notice of this Motion to: (a) the Office of the U.S. Trustee for the Southern District of Texas; (b) the holders of the 50 largest unsecured claims against the Debtors (on a consolidated basis); (c) the administrative agent under the Debtors' first

lien credit facility; (d) the indenture trustee for the Debtors' second lien notes; (e) the indenture trustee for the Debtors' third lien notes; (f) counsel to the ad hoc committees of holders of claims specified in clauses (d) and (e); (g) the indenture trustees for the Debtors' senior unsecured notes due 2020 and 2021; (h) the United States Attorney's Office for the Southern District of Texas; (i) the Internal Revenue Service; (j) the United States Securities and Exchange Commission; (k) the Environmental Protection Agency and similar state environmental agencies for states in which the Debtors conduct business; (l) the state attorneys general for states in which the Debtors conduct business; and (m) any party that has requested notice pursuant to Bankruptcy Rule 2002. The Debtors submit that, in light of the nature of the relief requested, no other or further notice is required.

## No Prior Request

53. No prior request for the relief sought in this Motion has been made to this or any other court.

[*Remainder of page intentionally left blank.*]

WHEREFORE, the Debtors respectfully request that the Court enter the Order granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

Houston, Texas
Dated: May 1, 2016

*/s/ Patricia B. Tomasco*
Patricia B. Tomasco (TX Bar No. 01797600)
Matthew D. Cavenaugh (TX Bar No. 24062656)
Jennifer F. Wertz (TX Bar No. 24072822)
**JACKSON WALKER L.L.P.**
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone: (713) 752-4200
Facsimile: (713) 752-4221
Email: ptomasco@jw.com
mcavenaugh@jw.com
jwertz@jw.com

-and-

Edward O. Sassower, P.C. (*pro hac vice* admission pending)
Joshua A. Sussberg, P.C. (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
Email: edward.sassower@kirkland.com
joshua.sussberg@kirkland.com

-and-

James H.M. Sprayregen, P.C. (*pro hac vice* admission pending)
William A. Guerrieri (*pro hac vice* admission pending)
Jason Gott (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
Email: james.sprayregen@kirkland.com
Email: will.guerrieri@kirkland.com
Email: jason.gott@kirkland.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

**Certificate of Service**

I certify that on May 1, 2016, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Patricia B. Tomasco*
One of Counsel