IN THE UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| MIDSTATES PETROLEUM COMPANY, INC., *et al.*,[1] | § | Case No. 16-32237 (DRJ) |
| | § | |
| Debtors. | § | (Joint Administration Requested) |
| | § | |

## DECLARATION OF NELSON M. HAIGHT
## IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

I, Nelson M. Haight, hereby declare under penalty of perjury:

1.      I am the Executive Vice President and Chief Financial Officer of Midstates Petroleum Company, Inc. ("Midstates"), a corporation organized under the laws of the State of Delaware and one of the above-captioned debtors and debtors-in-possession (collectively, the "Debtors").  I have been employed by Midstates as the Chief Financial Officer since January 2014.  Before joining Midstates, I had 23 years of experience in financial services and other financial roles in oil and gas and other industries.

2.      To effectuate their restructuring, on the date hereof (the "Petition Date"), the Debtors filed their voluntary petitions for relief under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), with the United States Bankruptcy Court for the Southern District of Texas (the "Court").  To minimize the adverse effects upon their businesses, the Debtors have filed motions and pleadings seeking various types of "first day" relief (collectively, the "First Day Motions").  The First Day Motions seek relief to allow

---

[1]     The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number, are:  Midstates Petroleum Company, Inc. (1816) and Midstates Petroleum Company LLC (2434).  The debtors' service address is:  321 South Boston, Suite 1000, Tulsa, Oklahoma 74103.

the Debtors to meet necessary obligations and fulfill their duties as debtors in possession.  I am familiar with the contents of each First Day Motion and believe that the relief sought in each First Day Motion is necessary to enable the Debtors to operate in chapter 11 with minimal disruption or loss of productivity and value, constitutes a critical element in achieving a successful reorganization of the Debtors, and best serves the Debtors' estates and creditors' interests.  The facts set forth in each First Day Motion are incorporated herein by reference.

3.     I am generally familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records.  Except as otherwise indicated herein, all facts set forth in this declaration are based upon my personal knowledge of the Debtors' employees, operations, and finances, information learned from my review of relevant documents, information supplied to me by other members of the Debtors' management and its advisors, or my opinion based upon my experience, knowledge, and information concerning the Debtors' operations and financial condition.  I am authorized to submit this declaration on behalf the Debtors, and, if called upon to testify, I could and would testify competently to the facts set forth herein.

4.     This declaration has been organized into four sections.  The ***first*** provides background information on the Debtors' businesses and operations.[2]  The ***second*** offers detailed information on the Debtors' capital structure.  The ***third*** describes the events leading to the filing of these chapter 11 cases and the Debtors' prepetition restructuring efforts, including the relevant terms of the Debtors' Plan Support Agreement.  The ***fourth*** section and **Exhibit A** summarize the relief requested in, and the legal and factual basis supporting, the First Day Motions.

---

[2]   Many of the financial figures presented in this declaration are unaudited and potentially subject to change but reflect the Debtors' most recent review of their businesses.  The Debtors reserve all rights to revise and supplement the figures presented herein.

**Preliminary Statement**

5.     The Debtors file these chapter 11 cases to deleverage their balance sheet by more than $1.8 billion—*over 90 percent* of their funded debt—and position their businesses for stability and success after emerging.  Importantly, this restructuring carries the support of each class of the Debtors' secured creditors, as their RBL Agent, approximately 80 percent of their RBL Lenders, approximately 74 percent of holders of their Second Lien Notes, and approximately 77 percent of holders of their Third Lien Notes have executed a plan support agreement, which provides for the parties to support a restructuring transaction pursuant to the terms of the Plan Support Agreement attached hereto as **Exhibit C**.  Such level of consensus for a comprehensive restructuring reflects not only the enormous efforts undertaken by the Debtors and these secured creditors over recent months, but also the parties' belief in the Debtors and their go-forward business prospects.

6.     The Debtors are oil and natural gas exploration and production ("E&P") companies with a principal focus upon the Mid-Continent region of the United States, primarily in Oklahoma and Texas.  In 2015, the Debtors achieved oil and natural gas production of approximately 12 million barrels of oil equivalent ("MMBoe").[3]  These cases arise in the context of the continuing financial stress in the oil and gas E&P industry resulting from persistently low commodity prices.  Oil and natural gas prices have declined significantly and show little sign of returning to higher levels.  Domestic crude oil prices have fallen over 50 percent since mid-2014, trading on the date hereof at *less than $46* per barrel.  Domestic natural gas prices have fallen over 50 percent since mid-2014, trading on the date hereof at *less than $2.20* per MMBtu.  With prices so depressed, over 30 E&P companies filed for chapter 11 in 2015, and more than 20 to

---

[3]     "Mboe", when used in this pleading, refers to barrels of oil equivalent when measured in the thousands.

date in 2016.  Larger companies that have been able to successfully avoid filing for bankruptcy protection are now beginning to experience acute financial distress.  For many domestic E&P companies, debt levels are unsustainable at current prices, and liquidity is beginning to run out as favorable hedging contracts continue to expire in 2016.

7.      Despite their efficient operations, including significant well cost efficiency in its primary oil and gas play in the Mississippian Lime, the Debtors must undertake a comprehensive balance-sheet restructuring to maintain their long-term viability in this commodity-price environment.  At these prices, the Debtors cannot continue to service the obligations on their approximately $2.0 billion of funded debt and remain profitable.

8.      Before the Petition Date, the Debtors took a proactive approach to these market challenges.  Starting in 2014, the Debtors began to implement comprehensive cost cutting and efficiency initiatives in the field.  These operational programs, combined with general and administrative cost-cutting efforts, including a workforce reduction in February 2016, have substantially increased the Debtors' overall efficiency.

9.      Moreover, the Debtors were one of the first E&P companies to complete a restructuring transaction in the current cycle when they consummated a significant refinancing and a debt-for-debt exchange in May and June 2015.  In early 2015, the Debtors began a process to explore strategic alternatives and undertake efforts to strengthen their balance sheet and liquidity.  Based on the then-prevailing commodity pricing environment (i.e., oil at roughly $60 per barrel), the Debtors set out to implement an out-of-court restructuring that would alleviate the pressure of their capital structure.  After significant negotiations and extensive preparation, on May 21, 2015, the Debtors sold $625.0 million of 10.0% Second Lien Senior Secured Notes due 2020 (the "Second Lien Notes") and utilized a portion of the proceeds to repay the

outstanding balance of its reserve based revolving credit facility (the "RBL Facility") with approximately $156.8 million retained for general corporate purposes. In addition, the Debtors issued approximately $504.1 million of 12.0% Third Lien Senior Secured Notes due 2020 (the "Third Lien Notes") in exchange for approximately $279.8 million of 10.75% Senior Unsecured Notes due 2020 (the "2020 Senior Notes") and approximately $350.3 million of 9.25% Senior Unsecured Notes due 2021 (the "2021 Senior Notes" and together with the 2020 Senior Notes, the "Unsecured Notes"). On June 2, 2015, the Debtors consummated an additional exchange of approximately $20.0 million of Third Lien Notes for approximately $26.6 million of 2020 Senior Notes and $2.0 million of 2021 Senior Notes.

10.     Despite these efforts to strengthen their balance sheet, the Debtors were severely affected when oil and gas prices again declined significantly during late 2015 and the first quarter of 2016. Faced with a tightening liquidity position, the Debtors determined to draw on the RBL Facility in full (a total of $249.2 million) in February 2016. Then, in March 2016, the Debtors received a notice from the RBL Agent (as defined below) that the borrowing base under the RBL Facility would be $170.0 million, approximately $82 million lower than the prior borrowing base. On March 30, 2016, the Debtors filed their 2015 annual financials containing a "going concern" qualification, in violation of certain covenants under the RBL Facility. The Debtors also determined to enter into the 30-day grace period with respect to a $16 million semi-annual interest payment due on April 1, 2016, under the 2020 Senior Notes, to preserve cash. The depressed cash flows, potential events of default under the RBL Facility and 2020 Senior Notes (with attendant cross-defaults throughout its capital structure), no additional borrowing availability, and the borrowing base deficiency requiring repayment due to the March

redetermination, made it clear that the Debtors would need to focus all efforts on the ongoing negotiations with their existing creditors regarding a comprehensive restructuring transaction.

11.     With the assistance of their advisors, the Debtors entered into comprehensive restructuring negotiations with (a) their first lien revolving lenders (the "RBL Lenders") and agent bank, SunTrust Bank (the "RBL Agent") under the RBL Facility, (b) an ad hoc committee of holders of the Second Lien Notes (the "Second Lien Group"), and (c) an ad hoc committee of certain holders of both the Second Lien Notes and Third Lien Notes (the "Crossover Group"). Each of these groups retained advisors to facilitate due diligence and negotiations.  Discussions focused on a chapter 11 plan of reorganization that would ultimately convert all of the Debtors' Second Lien Notes, Third Lien Notes, and Unsecured Notes to equity in the reorganized company.

12.     As due diligence and negotiations progressed, the Debtors, the RBL Agent, the Second Lien Group, and the Crossover Group focused on reaching consensus in advance of expiration of the grace periods for the violation of the RBL Facility covenant resulting from the "going concern" qualification in the Debtors' annual financials and the missed April 1 interest payment on the 2020 Senior Notes.  To that end, through February, March, and April 2016, numerous meetings and telephone conferences occurred among the parties and their respective advisors and legal counsel to drive negotiations toward a resolution.  The parties also exchanged iterations of a comprehensive restructuring term sheet and an RBL exit facility term sheet and held multiple in-person meetings among principals and advisors.  Among these efforts, the parties participated in an all-day, all-hands meeting in early April, which resulted in a substantial narrowing of the relevant issues.  This hard work culminated on April 30, 2016, when the

Debtors entered into a Plan Support Agreement (the "PSA") with the RBL Agent, certain RBL

Lenders, the Second Lien Group, and the Crossover Group.

13.     As noted above, the PSA contemplates a substantial deleveraging of the Debtors'

balance sheet under a chapter 11 plan of reorganization (the "Plan") and has the support of the

RBL Agent, 80 percent of the RBL Lenders, and 74 percent of the holders of Second Lien Notes,

and 77 percent of the holders of Third Lien Notes.  The Plan will embody, among other things, a

settlement (the "Settlement") among the Second Lien Group and the Crossover Group, pursuant

to which:

- the parties agree that 98.8 percent of the value of the Debtors' assets is encumbered by valid, enforceable liens in favor of the RBL Lenders, holders of Second Lien Notes, and holders of Third Lien Notes (collectively, the "Prepetition Secured Lenders");

- the holders of Second Lien Notes agree that the holders of Third Lien Notes shall receive 2.5 percent of the equity of reorganized Midstates and warrants to acquire 15 percent of such equity;

- the Prepetition Secured Lenders will be deemed to waive any applicable deficiency claims and adequate protection claims, subject to certain conditions; and

- the members of the Second Lien Group, on the one hand, and the members Crossover Group, in their capacities as holders of Third Lien Notes, on the other hand, will be deemed to have mutually waived and released all claims against one another related to the Debtors and the Plan, including the right to object or otherwise oppose the Plan, while the PSA remains in force.

14.     Thus, the Plan will provide for the following baseline treatment of claims against

the Debtors:

- holders of priority and secured claims (other than secured claims arising under the RBL Facility, the Second Lien Notes, or the Third Lien Notes) will be paid in full, in cash;

- the RBL Lenders will receive approximately $82 million in cash and, in return, will provide a reserve-based exit facility in the amount of $170 million, on the terms and conditions set forth or otherwise described in the applicable term sheet

attached to the PSA, which facility will be subject to a borrowing base redetermination holiday until April 1, 2018;

- holders of Second Lien Notes will receive (a) cash in an amount equal to the Debtors' cash on hand as of the Plan's effective date, less cash payments and reserves to be funded under the Plan (including a cash collateral account to be funded in connection with the exit facility) and $70 million of balance sheet cash, but in no event more than $60 million, and (b) 96.3 percent[4] of the equity in reorganized Midstates;

- holders of Third Lien Notes will receive 2.5 percent of the equity in reorganized Midstates and warrants to acquire an additional 15 percent of such equity, which warrants will strike at a $600 million equity valuation for reorganized Midstates and will expire 42 months after the Plan's effective date; and

- holders of Unsecured Notes and general unsecured claims will receive their pro rata share 1.2 percent of the equity in reorganized Midstates.

15.     By dramatically reducing leverage and modifying the terms of the RBL Facility, this restructuring solution will position the Debtors for emergence with a streamlined capital structure and an opportunity for the Debtors' to execute on their business plan in light of current commodity pricing.  Significantly, the prepetition agreement among these parties will enable the Debtors to move through the chapter 11 process quickly and efficiently, keeping the costs of restructuring to a minimum.  Importantly, the Debtors enter these chapter 11 cases with support from the RBL Agent, certain RBL Lenders, the Second Lien Group, and the Crossover Group, which collectively hold more than two-thirds (by amount) of each of the RBL Facility (80 percent), the Second Lien Notes (74 percent), and the Third Lien Notes (77 percent).  The PSA and the Plan will position the Debtors to continue their focus on maximizing efficiency and returns while capitalizing on opportunities for growth.

---

[4]     All equity in reorganized Midstates to be distributed pursuant to the Plan will be subject to dilution by equity issued in connection with the management incentive plan to be implemented in connection with consummation of the Plan, as contemplated by the PSA.

<u>Discussion</u>

I.      **The Debtors' Businesses.**

16.     The Debtors conduct their E&P activities through Midstates Petroleum Company LLC ("<u>Midstates Sub</u>").  These E&P operations involve the capture and sale of oil, natural gas liquids, and natural gas from domestic onshore hydrocarbon basins.  Through oil and gas leases entered into with mineral rights owners throughout the Debtors' operating regions, the Debtors hold operating interests in oil and gas properties that provide them with the right to drill and maintain wells in the applicable geographic areas.  The Debtors operate these wells with the expectation of producing hydrocarbons for sale.  After receipt of proceeds, the Debtors distribute funds to various working interest holders, royalty interest holders, governmental entities, and other parties.

A.      **The Debtors' History.**

1.      **Founding and IPO.**

17.     The Debtors' business was founded in 1993 to focus on oilfields in the Upper Gulf Coast Tertiary trend, located onshore in central Louisiana.  Midstates was incorporated in Delaware on October 25, 2011 to become a holding company for Midstates Sub.  On April 25, 2012, Midstates undertook an initial public offering (the "<u>IPO</u>") with an approximately $497 million market capitalization, and Midstates' common stock began trading on the New York Stock Exchange (the "<u>NYSE</u>").  However, Midstates' common stock was recently delisted by the NYSE and now trades on the over the counter market.

2.      **Expansion of the U.S. Onshore Oil and Gas Industry.**

18.     Leading up to the IPO, the oil and gas industry began to experience significant technological breakthroughs, including advances in hydraulic fracturing—or "fracking."  Specifically, the application of horizontal drilling, combined with fracturing technology in

tighter reservoirs and shales, caused a breakthrough in opportunity that drove U.S. exploration and production for almost a decade.

19.     Fracking refers to the use of fluids injected at pressures exceeding the natural stresses on the rock to cause the rock to crack.  Once cracked or fractured, the fissures allow for oil and gas to be more easily extracted through the cracks in the rock formation.  The diagram below illustrates the fracking process.



Source: Northern Territory Department of Mines and Energy, Energy Directorate, Petroleum Operations, April 2014

20.     Improved technology (including fracking technology advancements coupled with horizontal drilling) led to wide-spread development in natural gas and oil production, especially from shale rock.  Wells developed using the fracking process, though expensive, allow for a high percentage of reserves to be recovered quickly, usually in their first two years.  While wells developed using conventional technology experience more gradual annual declines in yield, thereby assuring more consistent production over the long term, wells developed using fracking experience significant production declines during the first few years, often as high as 70 percent, and then flatten out over time.  The steep initial decline of fracked wells requires constant capital

investment—at much higher drilling costs than for vertical wells—in new drilling projects to maintain stable production levels.

### 3. Evolution of the Debtors' Geographic Focus.

21.     Following the IPO, the Debtors executed a series of transactions that established the Mid-Continent region as the geographic focus of the Debtors' operations.  In particular, the Debtors established a dominant position in the Mississippian Lime (the "Mississippian"), a carbonate formation that straddles the Oklahoma and Kansas border.  On October 1, 2012, the Debtors closed on the acquisition of all of Eagle Energy Production, LLC's producing properties and undeveloped acreage located primarily in the Mississippian for $325 million in cash and $325 million in preferred stock.  Once a major operational site for many of the Debtors' E&P competitors, the Debtors are now among only a few operators in the Mississippian.  This shift was the result of both operational difficulties in the Mississippian and the Debtors' success in overcoming these obstacles and their premier acreage position in the heart of the play.

22.     Other transactions have been critical to the Debtors shift in geographic focus.  On May 31, 2013, the Debtors closed on the acquisition of producing properties and undeveloped acreage in the Anadarko Basin in Texas and Oklahoma from Panther Energy Company, LLC and its partners for approximately $618 million in cash.  In addition, on May 1, 2014, the Debtors closed on the sale of all of their ownership interest in developed and undeveloped acreage in the Pine Prairie field area of Evangeline Parish, Louisiana, to a private buyer for $170 million in cash, before customary post-closing adjustments.  On April 21, 2015, the Debtors completed the divestiture of their remaining producing properties in Louisiana for $44.0 million in cash, before customary post-closing adjustments.  The diagram below illustrates the Debtors' geographic focus.



**B.      The Debtors' Assets and Operations.**

23.      The Debtors, through Midstates Sub, primarily operate in the "upstream" sector of the oil and gas industry, which involves the exploration and production of hydrocarbons.  The Debtors obtain "midstream" services, which involve the gathering, transportation, and processing of produced hydrocarbons, from various third-party providers.  A corporate organizational chart is attached hereto as **Exhibit B**.

**1.      Upstream Activities.**

24.      As discussed above, the Debtors presently conduct their core E&P operations in the Mississippian.  These operations are supported by growth potential in the Anadarko Basin. In 2015, the Debtors' E&P activities yielded total production of approximately 12 MMboe and adjusted EBITDA of approximately $315.3 million.

**a.      The Mississippian.**

25.      The Debtors have proved reserves in the Mississippian of approximately 64.61 MMboe, which yielded average production of approximately 26,683 net barrels of oil equivalent per day from January 2016 to March 2016.   Conventional E&P activities—using

vertical rather than horizontal drilling—have been underway in the Mississippian for over 50 years. With the advent of horizontal drilling and fracking, the Mississippian experienced a boom beginning around 2009. The Mississippian was hailed by industry participants as the next major oil and gas play, in part because it is a relatively shallow formation that many hoped would reduce drilling costs.

26.     The boom, however, was ultimately tempered by broad-market declines in the E&P industry and operational challenges unique to the region, including complex geological characteristics. One of these challenges is the Mississippian's relatively high ratio of "saltwater" to produced oil and gas. During the normal production of oil and gas, saltwater mixed with hydrocarbon byproducts comes to the surface, and its separation and disposal increases production costs. Low production volumes and higher than expected production costs caused many operators to reduce activity in the Mississippian.

27.     The Debtors employ a number of strategies to continue to achieve competitive returns in the Mississippian. This includes aggressive cost reduction initiatives and an innovative completion technique deployed in their drilling program. In 2015, the Debtors succeeded in achieving drilling and completion cost reductions in the Mississippian from an average of approximately $3.96 million per horizontal well in 2014 to an average of approximately $2.86 million per horizontal well in 2015. This was the result of efficiency gains and service cost reductions. The chart below illustrates the Debtors' cost reductions in 2014 and 2015 and those expected in 2016 for their operations in the Mississippian.



28.     The Debtors also make use of their integrated saltwater gathering and disposal systems to transport produced saltwater through a pipeline infrastructure to saltwater disposal wells, where it is reinjected into disposal reservoirs.   The Debtors' saltwater gathering and disposal system is critical to mitigating the costs associated with handling and disposing of the relatively high volumes of saltwater produced from the Mississippian.

<b>b.       Anadarko Basin.</b>

29.     On May 31, 2013, the Debtors acquired approximately 138,900 net acres in the Andarko Basin, with 101,400 net acres in Texas and 37,500 net acres in western Oklahoma.   The Debtors currently do not operate any drilling rigs in this area, and the Debtors do not expect to drill any new wells in this area in the near future.   The Debtors will continue to evaluate the acreage for future drilling if commodity prices increase significantly or drilling and completion costs improve.

<b>2.       Headquarters.</b>

30.     The Debtors lease real estate located in Houston, Texas, and Tulsa, Oklahoma, which serve as their co-headquarters.

**II.     The Debtors' Capital Structure.**

31.     As of the Petition Date, the Debtors have approximately $2.045 billion in total funded debt.  This consists of $249.2 million under the RBL Facility, $625.0 million of Second Lien Notes, $529.7 million of Third Lien Notes, $293.6 million of 2020 Senior Notes, and $347.7 million of 2021 Senior Notes.   The following table depicts the Debtors' prepetition capital structure:

| Debt | Approximate Principal Amount Outstanding ($mm) |
|---|---|
| RBL Facility[5] | $249.2 |
| Second Lien Notes | $625.0 |
| Third Lien Notes | $529.7 |
| 2020 Senior Notes | $293.6 |
| 2021 Senior Notes | $347.7 |
| **Total Debt** | **$2,045.2** |

**A.     RBL Facility.**

32.     The Debtors maintain the RBL Facility, which is a reserve-based revolving first lien credit facility, under the Second Amended and Restated Credit Agreement, dated as of June 8, 2012 (as subsequently amended, the "Credit Agreement"), by and among Midstates, as Parent, Midstates Sub, as borrower, SunTrust Bank, as administrative agent, and the lender parties thereto.   The Credit Agreement is subject to a borrowing base that may be adjusted at least semi-annually by the agent and lenders based on the then-value of the Debtors' oil and gas reserves.

---

[5]     Excludes approximately $2.8 million in letters of credit outstanding under the RBL Facility.

33.     The Credit Agreement has been amended nine times, most recently on October 14, 2015.  As of the Petition Date, $249.2 million of the principal amount remains outstanding under the RBL Facility, plus accrued and unpaid interest, and approximately $2.8 million of letters of credit obligations are outstanding.  As described above, on April 1, 2016, the Debtors received a notice from the RBL Agent of the result of a scheduled borrowing base redetermination that had the effect of reducing the prior borrowing base under the RBL Facility to $170 million.

34.     The RBL Facility bears interest at a floating rate—currently LIBOR plus 2.00% to 3.00% per annum based on the borrowing base utilization—and matures on May 31, 2018, subject to a springing maturity.  In addition to the interest expense, the RBL Facility requires the payment of, among other fees, a commitment fee, which is computed at the rate of either 0.375% or 0.500% per annum based on the average daily amount by which the borrowing base exceeds the outstanding borrowings during each quarter.  The obligations are secured by first-priority liens on substantially all of the Debtors' assets, including, among other things, the equity of Midstates Sub, oil and gas assets intended to represent at least 90% of the discounted value of the Debtors' proved reserves, and the Debtors' deposit and securities accounts (collectively, the "Collateral").

**B.     Second Lien Notes.**

35.     The Debtors have approximately $625.0 million of outstanding Second Lien Notes, issued pursuant to that certain Indenture dated as of May 21, 2015, among Midstates and Midstates Sub, as issuers, and Wilmington Trust, N.A. as trustee and collateral agent.  The Second Lien Notes mature on the earlier of June 1, 2020, or 12 months after the maturity date of the RBL Facility.  In addition, the Second Lien Notes require semiannual coupon payments at an interest rate of 10.00% per annum and are secured by second-priority liens on the Collateral.

### C.   Third Lien Notes.

36.   The Debtors have approximately $529.7 million of outstanding Third Lien Notes, issued pursuant to that certain Indenture dated as of May 21, 2015, among Midstates and Midstates Sub, as issuers, and Wilmington Trust, N.A. as trustee and collateral agent.  The Third Lien Notes were issued in a private placement and in exchange for an aggregate $306.4 million of the 2020 Senior Notes and $352.3 million of the 2021 Senior Notes.  The Third Lien Notes are secured by third-priority liens on the Collateral.  The Third Lien Notes have an interest rate of 12.00% per annum, consisting of cash interest of 10.00% and paid-in-kind interest of 2.00%, and mature on the earlier of June 1, 2020, or 12 months after the maturity date of the RBL Facility. The cash interest is payable semiannually, while the paid-in-kind interest increases the outstanding principal balance of the Third Lien Notes semiannually.

### D.   Intercreditor Agreement.

37.   Midstates, Midstates Sub, SunTrust Bank, as priority lien agent, and Wilmington Trust, N.A., as second lien collateral agent and third lien collateral agent, are parties to that certain intercreditor agreement, dated May 21, 2015, to govern the respective rights and obligations of the RBL Agent and the RBL Lenders, the trustee under and the holders of the Second Lien Notes, and the trustee under and the holders of the Third Lien Notes.

### E.   2020 Senior Notes.

38.   The Debtors have approximately $293.6 million of outstanding 2020 Senior Notes, issued pursuant to that certain Indenture dated as of October 1, 2012, among Midstates and Midstates Sub, as issuers, and Wells Fargo Bank N.A., as indenture trustee.  The 2020 Senior Notes mature on October 1, 2020 and require semiannual coupon payments at an interest rate of 10.75% per year.  The 2020 Senior Notes are unsecured and rank *pari passu* with the 2021 Senior Notes.

### F.      2021 Senior Notes.

39.      The Debtors have approximately $347.7 million of outstanding 2021 Senior Notes, issued pursuant to that certain Indenture, dated as of May 31, 2013, among Midstates and Midstates Sub, as issuers, and Wells Fargo Bank N.A., as trustee.  The 2021 Senior Notes mature on June 1, 2021 and require semiannual coupon payments at an interest rate of 9.25% per year. The 2021 Senior Notes are unsecured and rank *pari passu* with the 2020 Senior Notes.

### G.      Preferred and Common Stock.

40.      On October 1, 2012, Midstates issued 325,000 shares of Series A Mandatorily Convertible Preferred Stock (the "Series A Preferred Stock").  The Series A Preferred Stock was mandatorily convertible on September 30, 2015 into shares of common stock, and thus, each share of Series A Preferred Stock was converted into common stock, resulting in the issuance of 3,738,424 additional shares of common stock.

41.      Midstates' common stock traded on the NYSE under the ticker symbol "MPO," after its IPO in 2012, but it was delisted by the NYSE on February 3, 2016.  Midstates' common stock now trades on the over the counter market under the symbol "MPOY."  As of the Petition Date, there are approximately 10.9 million shares of common stock outstanding.

## III.   Events Leading Up to the Restructuring.

42.      The difficulties faced by the Debtors are consistent with problems faced industry-wide.  Exploration and production companies and others have been continually challenged by low commodity prices.  In particular, natural gas prices have been depressed for years, and prices currently remain below $2.20 per MMBtu today, down from over $12.00 in 2008.   More recently, the price of crude oil has undergone a similarly steep decline:  the price of West Texas intermediate crude oil is currently below $46 per barrel as of the Petition Date and dropped as

low as $26 per barrel in February 2016, down from prices of well above $100 per barrel as recently as July 2014.



**Domestic Oil & Gas Prices**

43.     These market conditions have affected oil and gas companies at every level of the industry around the world.  All companies in the oil and gas industry (not just E&P companies) have felt these effects.  However, independent E&P companies have been especially hard-hit, as their revenues are generated from the sale of unrefined oil and gas.  Over 30 of them, including American Eagle Energy Corporation, Magnum Hunter Resources Corporation, Quicksilver Resources Inc., Saratoga Resources Inc., Sabine Oil & Gas Corporation, and Samson Resources Corporation, filed for chapter 11 in 2015.  Numerous other E&P companies have defaulted on their debt obligations, negotiated amendments or covenant relief with creditors to avoid defaulting, or have effectuated out-of-court restructurings.  The current volatility in the commodity markets has made it especially difficult for some companies to identify and execute on any viable restructuring alternatives.

44.      Despite these secular market adjustments, the Debtors were able to maintain strong operations through 2015 and, accordingly, believe they have ample liquidity both to fund their chapter 11 cases and their post-emergence business plan.  This resulted, in part, from key operational and financial responses to the deteriorating market, as well as a proactive approach to addressing leverage concerns.   Specifically, the Debtors determined that pursuing a comprehensive balance sheet restructuring was preferable to efforts to continue to wait out the market, which could ultimately have led to a less organized or free fall chapter 11 filing at a later date.

A.      **Operational Responses.**

45.      As discussed above, in response to the oil and gas crisis, the Debtors implemented a number of operational initiatives to reduce costs and increase efficiencies.  This included an overall management strategy focused on preserving and increasing net asset value through operational efficiencies and cost reductions, as opposed to a focus on top-line growth.  To implement this strategy, the Debtors enforce strict capital discipline designed to preserve and increase net asset value.

46.      In particular, throughout 2015, the Debtors reduced their rig counts to preserve liquidity and focused their activity and attention on their anticipated highest-return areas and realizing operational efficiencies and well cost reductions.  In 2015, drilling and completion costs were substantially reduced through efficiency gains and service cost savings.  In 2015, the Debtors reduced average drilling cycle time from 22 to 17 days, and in 2016, the Debtors anticipate reducing it to 15 days.  The Debtors have identified and are executing on additional opportunities to realize operational savings in 2016.  Leading up to the Petition Date, the Debtors also reduced general and administrative expenses, including implementing a reduction in force in February 2016.

**B.     Financial Responses.**

47.     The Debtors have also undertaken efforts to increase liquidity and strengthen their balance sheet.  On May 21, 2015, the Debtors issued $625.0 million of Second Lien Notes and utilized a portion of the proceeds to repay the outstanding balance of the RBL Facility in an amount of approximately $468.2 million, with the remainder utilized for general corporate purposes.  Further, the Debtors exchanged approximately $504.1 million of Third Lien Notes for approximately $279.8 million of 2020 Senior Notes and $350.3 million of 2021 Senior Notes, representing an exchange at 80.0% of the exchanged Unsecured Notes' par value.  Additionally, on June 2, 2015, the Debtors exchanged approximately $20.0 million of Third Lien Notes for approximately $26.6 million of 2020 Senior Notes and $2.0 million of 2021 Senior Notes, representing an exchange at 70.0% of the exchanged Unsecured Notes' par value.  Approximately $63.9 million of the principal amount of 2020 Senior Notes and $70.7 million of the principal amount of 2021 Senior Notes were extinguished.

48.     Further, in February 2016, to ensure full access to the liquidity under their RBL Facility, the Debtors borrowed the full availability thereunder (an additional $249.2 million), which funded by February 9, 2016.  Access to this cash has proved critical both in restructuring negotiations and as a source of cash to fund the Debtors' ongoing restructuring efforts and go-forward operations.

**C.     Potential Defaults.**

49.     However, after drawing on the RBL Facility, the Debtors then faced a number of potential obstacles in early 2016.  First, on March 30, the Debtors filed their annual financial statements on Form 10-K for 2015, which contained a "going concern" qualification from their independent external auditor, which resulted in a violation of or default under the terms of the Credit Agreement that is subject to a 30-day cure period.  Second, on April 1, the Debtors

determined not to make a coupon payment of approximately $16 million under their 2020 Senior Notes due that day.  That payment was also subject to a 30-day grace period.  Finally, the April 1 redetermination notice issued by the RBL Agent would, subject to the Debtors' legal rights, have required the Debtors to repay approximately $82 million to the RBL Lenders to reduce the outstanding amount under the RBL Facility to $170.0 million.  Failing to meet or cure any of these obligations would have generally resulted in cross-defaults elsewhere in the Debtors' capital structure.

50.     Although the Debtors had liquidity to fund these payments, there was simply no way to cure the "going concern" qualification in the audit opinion included in their 2015 financial statements.  Thus, the Debtors opted to preserve their cash and press forward with negotiations with their secured lenders.

**D.     Negotiations with Creditors.**

51.     In particular, the Debtors focused on discussions with the RBL Agent, the Second Lien Group, and the Crossover Group.  Although the parties approached the discussions with divergent views and positions, the Debtors began to make immediate progress toward a comprehensive restructuring solution.

52.     From the outset, the Debtors' focus was on building consensus.  With the RBL Agent, discussions focused on terms for use of cash collateral and the conversion of the RBL Facility to a sustainable credit facility upon emergence.  In negotiations with the Second Lien Group and the Crossover Group, the focus was on achieving a fair allocation of the reorganized equity among the holders of Second Lien Notes and Third Lien Notes, as well as the holders of Unsecured Notes and other unsecured claims.  In sum, the Debtors sought to reach a solution that satisfied the following parameters:

- converting all of the Debtors' funded debt to equity in the reorganized company, other than the RBL Facility;

- facilitating the availability of capital to support the Debtors' new business plan and related capital expenditures amid ongoing challenges in the oil and gas industry;

- providing sufficient runway should market conditions not improve in the near term after emergence; and

- maximizing enterprise value.

53. Throughout February and March 2016, the Debtors, the Second Lien Group, and the Crossover Group exchanged written proposals and conducted numerous telephonic and in-person meetings to narrow the spread on the parties' positions regarding an appropriate allocation of equity in reorganized Midstates as between the Second Lien Notes and the Third Lien Notes, as well as the terms of a related settlement. Meanwhile, the RBL Agent was engaged in significant business and financial diligence efforts to inform its position regarding the treatment of the RBL Facility and potential exit financing, culminating in several meetings and discussions with the Debtors and, ultimately, a late March proposal by the RBL Agent regarding the terms of the new exit facility.

54. In mid-April, after the Debtors met with the Second Lien Group and Crossover Group to discuss the Debtors' go-forward business plan and potential restructuring terms, all four constituencies—the Debtors, the RBL Agent, the Second Lien Group, and the Crossover Group—and their advisors gathered for an all-day, all-hands negotiation session. During that day, the divides between the parties grew closer and the issues narrowed to a few terms for each of the new exit facility and the overall restructuring transaction.

55. Ultimately, in the week before the Petition Date, the parties reached consensus: first, on the terms of the new exit facility and then, with those terms in place, on the economics

for the debt-to-equity conversion of the remainder of the Debtors' capital structure and the parameters for the parties' efforts to implement their deal.

### E.  Plan Support Agreement.

56.    On April 30, 2016, the Debtors entered into the PSA with the RBL Agent, certain RBL Lenders, the Second Lien Group, and the Crossover Group.  The PSA is attached to this Declaration as **Exhibit C**.  The PSA contemplates a plan of reorganization that will implement a massive deleveraging of the Debtors' balance sheet, from more than $2 billion of funded debt to a new $170 million reserve-based facility through these chapter 11 cases, all as more fully described above.  That transaction carries the overwhelming support of the Debtors' primary creditor constituencies, including the RBL Agent, RBL Lenders holding approximately 80 percent of the RBL Facility, holders of approximately 74 percent of the Second Lien Notes, and holders of approximately 77 percent of the Third Lien Notes.

57.    The PSA also implements a critical intercreditor settlement providing for (a) an agreed valuation allocation with respect to the Debtors' encumbered assets, (b) the waiver of any adequate protection claims and deficiency claims, and (c) an agreement by the holders of the Second Lien Notes that the holders of the Third Lien Notes shall receive 2.5 percent  of the equity in reorganized Midstates (plus warrants to acquire an additional 15 percent) in exchange for a waiver and release of all intercreditor claims and objections or challenges to the Plan.

### F.  Consensual Cash Collateral Terms.

58.    In connection with the PSA, the RBL Agent, the Second Lien Group, and the Crossover Group have agreed to terms for the Debtors' postpetition use of cash collateral.  As more fully set forth in the First Day Motion requesting authority for the use of cash collateral, as adequate protection, the Debtors will provide the Prepetition Secured Parties with replacement liens on their prepetition collateral, liens on unencumbered assets, and (for the RBL Lenders

only) superpriority claims, each in the same priority as the Prepetition Secured Parties' liens and claims held prepetition.   These cash collateral and adequate protection terms are a critical component of the broadly consensual restructuring contemplated by the PSA.

## IV.   First Day Motions.

59.   Contemporaneously herewith, the Debtors have filed a number of First Day Motions seeking orders granting various forms of relief intended to stabilize the Debtors' business operations, facilitate the efficient administration of these chapter 11 cases, and expedite a swift and smooth restructuring of the Debtors' balance sheet.  I have reviewed each of the First Day Motions.  I believe that the relief requested in the First Day Motions is necessary to allow the Debtors to operate with minimal disruption during the pendency of these chapter 11 cases.  A description of the relief requested and the facts supporting each of the First Day Motions is detailed in **Exhibit A**.


*[Remainder of page intentionally left blank.]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated:  May 1, 2016

Nelson M. Haight
Executive Vice President and
Chief Financial Officer