**IN THE UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| | § | |
| In re: | § | Chapter 11 |
| | § | |
| MIDSTATES PETROLEUM COMPANY, INC., *et al.*,[1] | § | Case No. 16-32237 (DRJ) |
| | § | |
| Debtors. | § | |
| | § | |

**DISCLOSURE STATEMENT FOR THE JOINT**
**CHAPTER 11 PLAN OF REORGANIZATION OF**
**MIDSTATES PETROLEUM COMPANY, INC. AND ITS DEBTOR AFFILIATE**

Edward O. Sassower, P.C. (admitted *pro hac vice*)
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:        (212) 446-4800
Facsimile:        (212) 446-4900

-and-

James H.M. Sprayregen, P.C. (admitted *pro hac vice*)
William A. Guerrieri (admitted *pro hac vice*)
Jason Gott (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:        (312) 862-2000
Facsimile:        (312) 862-2200

Patricia B. Tomasco (Texas Bar No. 01797600)
Matthew D. Cavenaugh (Texas Bar No. 24062656)
Jennifer F. Wertz (Texas Bar No. 24072822)
**JACKSON WALKER L.L.P.**
401 McKinney Street, Suite 190
Houston, Texas 77010
Telephone:        (713) 752-4200
Facsimile:        (713) 752-4221

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

**THIS IS NOT A SOLICITATION OF AN ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.  THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.  THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE.  THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Midstates Petroleum Company, Inc. (1816) and Midstates Petroleum Company LLC (2434).  The Debtors' service address is:  321 South Boston, Suite 1000, Tulsa, Oklahoma 74103.

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO HOLDERS OF CLAIMS AND INTERESTS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE JOINT PLAN OF REORGANIZATION OF MIDSTATES PETROLEUM COMPANY, INC. AND ITS DEBTOR AFFILIATE PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE.  NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE.  BEFORE DECIDING WHETHER TO VOTE FOR OR AGAINST THE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN ARTICLE X HEREIN.

THE PLAN IS SUPPORTED BY THE DEBTORS AND CERTAIN HOLDERS OF FIRST LIEN CLAIMS, THE FIRST LIEN ADMINISTRATIVE AGENT, CERTAIN HOLDERS OF SECOND LIEN NOTES CLAIMS, AND CERTAIN HOLDERS OF THIRD LIEN CLAIMS (EACH AS DEFINED HEREIN) AND ALL SUCH PARTIES URGE HOLDERS OF CLAIMS WHOSE VOTES ARE BEING SOLICITED TO ACCEPT THE PLAN.

THE DEBTORS URGE EACH HOLDER OF A CLAIM TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY.  FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, AND CERTAIN ANTICIPATED EVENTS IN THE DEBTORS' CHAPTER 11 CASES.  ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH ANTICIPATED EVENTS.  IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES.  FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED.  THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(B) AND IS NOT NECESSARILY PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS.

THIS DISCLOSURE STATEMENT WAS NOT FILED WITH THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE AUTHORITY AND NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE AUTHORITY HAVE PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN.

IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THE DEBTORS' BOOKS AND RECORDS AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES.  WHILE THE DEBTORS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES AND THEIR FUTURE RESULTS AND OPERATIONS.  THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD LOOKING STATEMENTS CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER.  THE DEBTORS MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED.  ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO, AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE. HOLDERS OF CLAIMS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED.   INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT.  THE DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME, SUBJECT TO THE TERMS OF THE PLAN.

THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT. THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AND INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE RESTRUCTURING TRANSACTIONS CONTEMPLATED THEREBY.

# TABLE OF CONTENTS

Page

| | | |
|---|---|---|
| I. | **INTRODUCTION** | 4 |
| II. | **PRELIMINARY STATEMENT** | 4 |
| III. | **OVERVIEW OF THE PLAN AND THE PLAN SUPPORT AGREEMENT** | 6 |
| | A. | Overview of Treatment of Claims | 6 |
| | B. | Plan Settlements | 7 |
| | C. | New Common Stock | 8 |
| | D. | New Warrants | 8 |
| | E. | The New Credit Facility | 8 |
| | F. | Releases | 9 |
| IV. | **QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND PLAN** | 9 |
| | A. | What is chapter 11? | 9 |
| | B. | Why are the Debtors sending me this Disclosure Statement? | 10 |
| | C. | Am I entitled to vote on the Plan? | 10 |
| | D. | What will I receive from the Debtors if the Plan is consummated? | 10 |
| | E. | What will I receive from the Debtors if I hold an Allowed Administrative Claim or a Priority Tax Claim? | 17 |
| | F. | Are any regulatory approvals required to consummate the Plan? | 17 |
| | G. | What happens to my recovery if the Plan is not confirmed or does not go effective? | 17 |
| | H. | If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation?" | 18 |
| | I. | What are the sources of Cash and other consideration required to fund the Plan? | 18 |
| | J. | Are there risks to owning the New Common Stock upon emergence from chapter 11? | 18 |
| | K. | Is there potential litigation related to the Plan? | 18 |
| | L. | What is the Management Incentive Plan and how will it affect the distribution I receive under the Plan? | 18 |
| | M. | Will the final amount of Allowed General Unsecured Claims affect my recovery under the Plan? | 18 |
| | N. | How will the preservation of the Causes of Action impact my recovery under the Plan? | 19 |
| | O. | Will there be releases and exculpation granted to parties in interest as part of the Plan? | 20 |
| | P. | What impact does the Claims Bar Date have on my Claim? | 24 |
| | Q. | What is the deadline to vote on the Plan? | 25 |
| | R. | How do I vote for or against the Plan? | 25 |
| | S. | Why is the Bankruptcy Court holding a Confirmation Hearing? | 25 |
| | T. | When is the Confirmation Hearing set to occur? | 25 |
| | U. | What is the purpose of the Confirmation Hearing? | 26 |
| | V. | What is the effect of the Plan on the Debtors' ongoing business? | 26 |
| | W. | Will any party have significant influence over the corporate governance and operations of the Reorganized Debtors? | 26 |
| | X. | Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan? | 27 |
| | Y. | Do the Debtors recommend voting in favor of the Plan? | 27 |
| | Z. | Who Supports the Plan? | 27 |
| V. | **IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT** | 27 |
| | A. | Certain Key Terms Used in this Disclosure Statement | 27 |
| | B. | Additional Important Information | 28 |

| VI. | THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW | 31 |
|---|---|---|
| | A. | Assets and Operations. | 31 |
| | B. | Prepetition Capital Structure. | 32 |
| VII. | EVENTS LEADING TO THE CHAPTER 11 FILINGS | 34 |
| | A. | Commodity Price Decline. | 34 |
| | B. | Operational Responses. | 34 |
| | C. | Financial Responses. | 35 |
| | D. | Potential Defaults. | 35 |
| | E. | Negotiations with Creditors. | 35 |
| | F. | Plan Support Agreement. | 36 |
| | G. | Consensual Cash Collateral Terms. | 37 |
| VIII. | EVENTS OF THE CHAPTER 11 CASES | 37 |
| | A. | Corporate Structure upon Emergence. | 37 |
| | B. | Expected Timetable of the Chapter 11 Cases. | 37 |
| | C. | First Day Relief. | 38 |
| IX. | PROJECTED FINANCIAL INFORMATION | 38 |
| X. | RISK FACTORS | 38 |
| | A. | Bankruptcy Law Considerations. | 38 |
| | B. | Risks Related to Recoveries under the Plan. | 42 |
| | C. | Risks Related to the Debtors' and the Reorganized Debtors' Businesses. | 44 |
| XI. | SOLICITATION AND VOTING PROCEDURES | 52 |
| | A. | Holders of Claims Entitled to Vote on the Plan | 52 |
| | B. | Voting Record Date. | 53 |
| | C. | Voting on the Plan. | 53 |
| | D. | Ballots Not Counted. | 53 |
| XII. | CONFIRMATION OF THE PLAN | 54 |
| | A. | Requirements for Confirmation of the Plan. | 54 |
| | B. | Best Interests of Creditors/Liquidation Analysis. | 54 |
| | C. | Feasibility. | 54 |
| | D. | Acceptance by Impaired Classes. | 55 |
| | E. | Confirmation Without Acceptance by All Impaired Classes. | 55 |
| | F. | Valuation of the Debtors. | 56 |
| XIII. | CERTAIN SECURITIES LAW MATTERS | 56 |
| | A. | New Common Stock and New Warrants. | 56 |
| | B. | Issuance and Resale of New Common Stock Under the Plan | 56 |
| XIV. | CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN | 58 |
| | A. | Introduction. | 58 |
| | B. | Certain U.S. Federal Income Tax Consequences to the Debtors and the Reorganized Debtors. | 60 |
| | C. | Certain U.S. Federal Income Tax Consequences to Certain U.S. Holders of Claims. | 62 |
| | D. | Certain U.S. Federal Income Tax Consequences to Certain Non-U.S. Holders of Claims. | 69 |
| | E. | Information Reporting and Back-Up Withholding. | 72 |
| XV. | RECOMMENDATION | 74 |

**EXHIBITS**

EXHIBIT A     Plan of Reorganization

EXHIBIT B     Plan Support Agreement

EXHIBIT C     Disclosure Statement Order

EXHIBIT D     Financial Projections

EXHIBIT E     Valuation Analysis

EXHIBIT F     Liquidation Analysis

EXHIBIT G     Solicitation and Voting Procedures

## I.     INTRODUCTION

Midstates Petroleum Company, Inc. ("Midstates Inc.") and its debtor affiliate Midstates Petroleum Company LLC ("Midstates LLC"), as debtors and debtors in possession (collectively, the "Debtors"), submit this disclosure statement (the "Disclosure Statement") pursuant to section 1125 of the Bankruptcy Code to holders of Claims against and Interests in the Debtors in connection with the solicitation of acceptances with respect to the *Joint Plan of Reorganization of Midstates Petroleum Company, Inc. and its Debtor Affiliate* (the "Plan"), dated May 14, 2016.[1]  A copy of the Plan is attached hereto as **Exhibit A** and incorporated herein by reference.  The Plan constitutes a separate chapter 11 plan for Midstates Inc. and Midstates LLC.

THE DEBTORS, THE FIRST LIEN ADMINISTRATIVE AGENT, CERTAIN FIRST LIEN LENDERS, CERTAIN CONSENTING SECOND LIEN NOTEHOLDERS, AND CERTAIN CONSENTING CROSS-OVER NOTEHOLDERS (COLLECTIVELY, THE "CONSENTING PARTIES") BELIEVE THAT THE COMPROMISE CONTEMPLATED UNDER THE PLAN IS FAIR AND EQUITABLE, MAXIMIZES THE VALUE OF THE DEBTORS' ESTATES AND PROVIDES THE BEST RECOVERY TO CLAIM HOLDERS UNDER THE CIRCUMSTANCES. AT THIS TIME, THE DEBTORS AND THE OTHER CONSENTING PARTIES BELIEVE THIS IS THE BEST AVAILABLE ALTERNATIVE FOR COMPLETING THE CHAPTER 11 CASES. THE DEBTORS STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.

### IMPORTANT DATES

- **Date by which Ballots must be received by the Notice, Claims, and Solicitation Agent: July 18, 2016**

- **Date by which objections to the Plan must be filed and served: July 18, 2016**

- **Date for the hearing at which the Court will consider Confirmation of the Plan: [●], 2016**

## II.     PRELIMINARY STATEMENT

The Debtors are an independent oil and gas company focused on the exploration, development, and production of natural gas and oil through their ownership and operating interests in oil and gas properties located in some of the most prolific and long-lived basins in the United States.  Headquartered in Tulsa, Oklahoma, and Houston, Texas, the Debtors produced approximately 12 million barrels of oil equivalent in 2015.

The depressed commodity pricing environment that has prevailed since late 2014 has crippled the Debtors' ability both to sustain their leveraged capital structure and obtain and commit the capital necessary for their core exploration and production activities ("E&P").  The continuation of dramatically low natural gas prices, a steep drop in the price of oil, and general market uncertainty has created an incredibly challenging operational environment for all E&P companies.  Since mid-2014, the price of oil has dropped more than 50 percent, trading *below $46 a barrel* as of the Petition Date.  Domestic natural

---

[1]  Capitalized terms used but not otherwise defined in this Disclosure Statement will have the meaning ascribed to such terms in the Plan. The summary of the Plan provided herein is qualified in its entirety by reference to the Plan.  In the case of any inconsistency between this Disclosure Statement and the Plan, the Plan will govern.

gas prices have also fallen over 50 percent since mid-2014, trading on the Petition Date at *less than $2.20* per MMBtu. At these prices, the Debtors simply cannot continue to service the obligations on their approximately $2.0 billion of funded debt and remain profitable.

The Debtors have attacked these challenges in many different ways, including but not limited to internal cost cutting measures (including decreasing the number of drilling rigs), an emphasis on increased drilling efficiencies, performance improvement initiatives, and isolated non-core asset sales. These operational changes, combined with general and administrative cost-cutting efforts, including a significant workforce reduction in February 2016, have substantially increased the Debtors' overall efficiency.  Notwithstanding these initiatives, it became clear that these steps were not sufficient in and of themselves to insulate the Debtors from the market turmoil that has impacted every level of the oil and gas industry worldwide.

In fact, the Debtors were one of the first E&P companies to complete a restructuring transaction during the current cycle when they consummated a significant refinancing and a debt-for-debt exchange in May and June 2015.  In early 2015, the Debtors began a process to explore strategic alternatives and undertake efforts to strengthen their balance sheet and liquidity.  Based on the then-prevailing pricing environment, the Debtors set out to implement an out-of-court restructuring that would enhance liquidity and alleviate the pressure of their then-current capital structure.  After months of negotiations and preparation, on May 21, 2015, the Debtors sold $625.0 million of their Second Lien Notes, utilizing a portion of the proceeds to repay the outstanding balance of their First Lien Credit Facility and increasing the Debtors' liquidity to approximately $420.0 million.  In addition, the Debtors issued approximately $504.1 million of their Third Lien Notes in exchange for approximately $630.1 million in Unsecured Notes.  On June 2, 2015, the Debtors made an additional exchange of approximately $20.0 million of Third Lien Notes for approximately $26.6 million of Unsecured Notes.

Despite these efforts to deleverage their balance sheets, the Debtors were severely affected by the steep decline in oil prices during 2015 and the first quarter of 2016.  Faced with a tightening liquidity position, the Debtors determined to draw on the First Lien Credit Facility in full (a total of $249.2 million) in early February 2016.  On March 30, 2016, the Debtors filed their 2015 annual financial statements on Form 10-K, which contained an audit opinion from their independent registered public accounting firm that included a "going concern" qualification, in violation of certain covenants under the First Lien Credit Facility that would become a default unless the Debtors could cure it within thirty (30) days.  Then, on April 1, 2016, the Debtors received a notice from the First Lien Administrative Agent that the conforming borrowing base under the First Lien Credit Facility would be redetermined to $170.0 million, approximately $82 million lower than the prior borrowing base, creating a deficiency for the Debtors to resolve within thirty (30) days, either by commencing an immediate or gradual repayment or by providing a reserve report for additional unencumbered assets.  The Debtors also determined to enter into the 30-day grace period with respect to a $16 million semiannual interest payment due on April 1, 2016, under the 2020 Senior Notes, to preserve cash.  With depressed cash flows, looming events of default under the First Lien Credit Facility and 2020 Senior Notes (with attendant cross-defaults throughout their capital structure), no additional borrowing availability, the borrowing base deficiency requiring cure by April 30, 2016, and declining present values of their reserves, the Debtors had no choice but to pursue and implement a restructuring.

With the assistance of their advisors, the Debtors entered into comprehensive restructuring negotiations beginning in February 2016 with the First Lien Lenders and the First Lien Administrative Agent, an ad hoc committee of Second Lien Noteholders (the "Consenting Second Lien Noteholders"), and an ad hoc committee of certain cross-over holders of both the Second Lien Notes and Third Lien Notes (the "Consenting Cross-Over Noteholders").  Each of these committees retained advisors to facilitate due diligence and negotiations.  Discussions focused on a chapter 11 plan of reorganization that

would ultimately convert all of the Debtors' Second Lien Notes, Third Lien Notes, and Unsecured Notes into equity in the reorganized company, as well as provide consensual treatment of the First Lien Lenders in order to obtain an ongoing reserve-based revolving credit facility.

As negotiations progressed, the Debtors, the First Lien Administrative Agent, the Consenting Second Lien Noteholders, and the Consenting Cross-Over Noteholders focused on reaching consensus in advance of expiration of the various grace periods for the violation of the First Lien Credit Facility covenant resulting from the "going concern" audit opinion qualification in the Debtors' annual financials and the missed April 1, 2016 interest payment on the 2020 Senior Notes. To that end, through February, March, and April 2016, the parties, along with their respective advisors and legal counsel, engaged in numerous meetings and telephone conferences to achieve a consensual resolution. The parties also exchanged iterations of a comprehensive restructuring term sheet and an exit facility term sheet. To spur discussions, the parties participated in an all-day, all-hands meeting in early April, which resulted in a substantial narrowing of the relevant issues. On April 30, 2016, the Debtors entered into a Plan Support Agreement with the First Lien Administrative Agent, certain First Lien Lenders, the Consenting Second Lien Noteholders, and the Consenting Cross-Over Noteholders.

The Plan Support Agreement has the support of the First Lien Administrative Agent, approximately 86 percent of the First Lien Lenders, approximately 79 percent of the holders of Second Lien Notes, and approximately 77 percent of the holders of Third Lien Notes.[2] The transactions set forth in the Plan Support Agreement were subsequently reflected in the Plan filed contemporaneously herewith.

Ultimately, the proposed restructuring will delever the Debtors' balance sheets by more than $1.8 billion—representing *over 90 percent* of the Debtors' funded debt.

## III.   OVERVIEW OF THE PLAN AND THE PLAN SUPPORT AGREEMENT

The Plan will significantly reduce the Debtors' leverage through, among other things, a modification of the terms of the First Lien Credit Facility and the equitization of all of the debt junior to the First Lien Credit Facility. This restructuring solution will position the Debtors for emergence with a streamlined capital structure and an opportunity for the Debtors to execute on their business plan. Importantly, the support agreement among these parties will enable the Debtors to move through chapter 11 quickly and efficiently. The key terms of the Plan are as follows:

### A.   Overview of Treatment of Claims.

The Plan contemplates the following distributions to Holders of Allowed Claims and Interests:

- holders of priority, Lien Trade Claims (defined as a Claim against the Debtors arising from the provision to the Debtors of goods or services that may be Secured by valid and enforceable Liens or other security interests, whether pursuant to an agreement with the Debtors or applicable law) and secured claims (other than secured claims arising under the First Lien Credit Facility, the Second Lien Notes, or the Third Lien Notes) will be paid in full, in cash;

- First Lien Lenders will receive (i) approximately $82 million in cash and (ii) a new credit facility in the amount of $170 million (the "New Credit Facility"), which (a) will be in the form of (I) a revolving, reserve-based facility for First Lien Lenders who vote to accept the

---

[2]   These numbers reflect an increase from the figures disclosed in the *Declaration of Nelson M. Haight in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration") [Docket No. 16], which increase is on account of either existing Plan Support Parties purchasing additional debt or new parties executing the Plan Support Agreement.

Plan or elect to receive the revolving facility or (II) a term loan facility for First Lien Lenders who vote to reject the Plan or do not submit a vote to accept or reject the Plan and do not otherwise elect to receive the revolving facility, (b) will be secured by substantially all of the assets of the Reorganized Debtors, including $40 million in a segregated and restricted cash collateral account which, following the Effective Date, can be applied to reduce the outstanding amounts under the New Credit Facility Revolving Loans that will become accessible subject to and after notice of the determination on or about April 1, 2018, and (c) will be subject to a borrowing base redetermination holiday (provided certain conditions are met) until April 1, 2018, among other terms;

- Second Lien Noteholders will receive: (i) cash in an amount equal to the Debtors' cash on hand as of the Plan's Effective Date, less cash payments and reserves to be funded under the Plan (including a $40 million cash collateral account to be funded in connection with the New Credit Facility) and $70 million of balance sheet cash, but in no event more than $60 million, and (ii) 96.3 percent of the New Common Stock in the Reorganized Parent (subject to dilution by the New Warrants and the Management Incentive Plan);

- Third Lien Noteholders will receive: (i) 2.5 percent of the New Common Stock in the Reorganized Parent (subject to dilution by the New Warrants and the Management Incentive Plan) and (ii) the New Warrants to acquire an additional 15 percent of such equity, which warrants will strike at a $600 million equity valuation for the New Common Stock and will expire 42 months after the Plan's Effective Date; and

- Unsecured Noteholders and General Unsecured Creditors will receive their Pro Rata share of 1.2 percent of the New Common Stock of Reorganized Parent (the "Unencumbered Asset Equity Distribution"), which is subject to adjustment in the event of a Challenge by any General Unsecured Party or a Settlement Termination Event, each as discussed in more detail in Article III.B herein.

## B.    Plan Settlements.

The Plan embodies, among other things, the following settlements:

- the agreement by the Debtors, the Consenting First Lien Lenders, the Consenting Second Lien Noteholders, and the Consenting Cross-Over Noteholders that 98.8 percent of the value of the Debtors' assets is encumbered by valid, enforceable liens in favor of the First Lien Lenders, the Second Lien Noteholders, and the Third Lien Noteholders (collectively, the "Prepetition Secured Parties");

- the agreement by the Consenting Second Lien Noteholders and the Consenting Cross-Over Noteholders pursuant to which the Second Lien Secured Parties and Third Lien Secured Parties release all intercreditor claims among them in consideration of the Second Lien Noteholders' agreement that the Third Lien Noteholders shall receive through the Plan their Pro Rata share of two and one-half percent (2.5 percent) of the New Common Stock and the New Warrants;

- the Prepetition Secured Parties will be deemed to waive deficiency claims and adequate protection claims, subject to certain conditions, for the benefit of General Unsecured Creditors and holders of Unsecured Notes Claim; and

- the Second Lien Secured Parties, on the one hand, and the Third Lien Secured Parties, on the other hand, will be deemed to have mutually waived and released all claims against one

another related to the Debtors and the Plan, including the right to object or otherwise oppose the Plan, subject to the Plan Support Agreement.

In the event that either (a) the Court issues any written or oral judgment denying approval of the Intercreditor Settlement or any material component thereof or (b) the Requisite Second Lien Noteholders elect to terminate the settlement pursuant to Section 6(b)(iv) of the Plan Support Agreement, the agreements described above will automatically terminate under the Plan.   Subject to the rights of the Consenting Second Lien Noteholders and the Consenting Cross-Over Noteholders under the Plan Support Agreement, the Unencumbered Asset Equity Distribution will then be distributed first to the Prepetition Secured Parties on account of any adequate protection claims they may hold, and the balance of the Unencumbered Asset Equity Distribution will be shared Pro Rata among all holders of General Unsecured Claims and holders of Unsecured Notes Claim, including Deficiency Claims held by the Prepetition Secured Parties.

Further, in the event of any Challenge by any General Unsecured Party to the settlements contemplated by the Plan, approval of the Disclosure Statement, and/or Confirmation of the Plan, (i) the Prepetition Secured Parties' Diminution in Value Claims will not be waived, (ii) the Prepetition Secured Parties' Diminution in Value Claims will attach to the Unencumbered Assets (and will include, without limitation, all estate fees and costs associated with any General Unsecured Party's Challenge), and (iii) the Prepetition Secured Parties' Deficiency Claims will share Pro Rata in any recovery available to the Classes of General Unsecured Creditors and Unsecured Notes Claims.

## C.   New Common Stock.

On the Effective Date, after cancellation of Interests in Midstates Inc., the Reorganized Debtors will issue the New Common Stock in Reorganized Parent.  The Debtors intend for the New Common Stock to be publicly traded and listed on the New York Stock Exchange or the NASDAQ Stock Market.

## D.   New Warrants.

On the Effective Date, the Reorganized Debtors shall issue the New Warrants on account of Third Lien Notes Claims.  The New Warrants shall consist of 3.5-year, out of the money, standard warrants for fifteen percent (15%) of the New Common Stock struck at a strike price corresponding to a $600 million valuation of the New Common Stock.

The Debtors strongly believe that the Plan is in the best interests of the Debtors' estates, especially in the face of significant market instability, represents the best available alternative, and provides the Debtors with a post-restructuring capital structure that allows for future growth and expansion.

## E.   The New Credit Facility.

As indicated above, the New Credit Facility will have aggregate commitments and an initial borrowing base of $170 million and shall be deemed fully drawn on the Effective Date, with no borrowing base redeterminations to occur until April 1, 2018 (provided certain conditions are met) and semiannual borrowing base redeterminations thereafter.  The New Credit Facility will mature on the earlier of September 30, 2020, or 4 years from the Plan Effective Date, with interest payable at LIBOR plus 4.50% per annum, subject to a 1.00% LIBOR floor.  The New Credit Facility will be secured by first priority mortgages on at least 95% of the proved oil and gas reserves included in the most recently delivered reserve report, and mortgages on 95% of all other oil and gas properties, pledges of capital stock, a first priority security interest in the cash, cash equivalents, deposit, securities and other similar accounts, including $40 million in a segregated, restricted cash collateral account (which, after the

Effective Date, may be applied against the outstanding amounts under the New Exit Revolving Credit Facility), and a first-priority perfected security interest in substantially all other tangible and intangible assets (including but not limited to as-extracted collateral, accounts receivable, inventory, equipment, general intangibles, investment property, intellectual property, real property and the proceeds of the foregoing). The New Credit Facility is subject to a variety of other terms and conditions including conditions precedent to funding, financial covenants, and various other covenants and representations and warranties.  The New Credit Facility and agreement with the First Lien Lenders is described in detail in the term sheet attached to the Plan Support Agreement attached hereto as **Exhibit B**.

      **F.**      **Releases.**

      The Plan contains certain releases (as described more fully in Article IV.O herein), including releases of the Debtors and the Debtors' current and former officers and directors, the First Lien Secured Parties, the Second Lien Secured Parties, the Third Lien Secured Parties, the Consenting First Lien Lenders, the Consenting Second Lien Noteholders, the Consenting Cross-Over Noteholders, to the extent permitted by the Bankruptcy Court, each Holder of a Claim or Interest entitled to vote on the Plan that votes to accept the Plan, and each of such Entities' directors, officers, current and former shareholders (regardless of whether such interests are held directly or indirectly) partners, managers, trustees, assigns, principals, members, employees, agents, affiliates, advisory board members, parents, subsidiaries, predecessors, successors, heirs, executors and assignees, attorneys, financial advisors, investment bankers, accountants, consultants and other professionals or representatives; *provided*, *however*, that any Holder of a Claim that, in its Ballot, "opts out" of the release provided in the Plan and does not vote to accept the Plan shall not be considered to be included in the definition of "Released Parties."

      The Plan also provides that each of the following Entities, among others, will be deemed to have expressly, unconditionally, generally, individually, and collectively released and discharged all claims and causes of action against the Debtors and the Released Parties: (i) each Holder of a Claim that votes to accept the Plan; (ii) each Holder of a Claim that votes to reject the Plan, provided that such Holder does not affirmatively elect to "opt out" of being a Releasing Party and Released Party on its Ballot; (iii) to the fullest extent permitted by law, each Holder of a Claim entitled to vote for or against the Plan that does not vote to accept or reject the Plan, in each case provided that such Holder does not affirmatively elect to "opt out" of being a Releasing Party; (iv) all Holders of Claims and Interests to the maximum extent permitted by law; (v) all Holders of Claims and Interests that are deemed to reject the Plan that do not timely object to the releases set forth in the Plan; (vi) each Holder of a claim that is Unimpaired and presumed to accept the Plan; (vii) with respect to each of these Entities, such Entity's directors, officers, current and former shareholders (regardless of whether such interests are held directly or indirectly), partners, managers, officers, principals, members, employees, agents, affiliates, advisory board members, parents, subsidiaries, predecessors, successors, heirs, executors and assignees, attorneys, financial advisors, investment bankers, accountants, consultants, and other professionals or representatives.

**IV.**      **QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND PLAN.**

      **A.**      **What is chapter 11?**

      Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.  In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for creditors and similarly situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

      The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a plan is the principal objective of a chapter 11 case.  A bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor, and any other entity as may be ordered by the bankruptcy court. Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

**B.      Why are the Debtors sending me this Disclosure Statement?**

The Debtors are seeking to obtain Bankruptcy Court approval of the Plan.  Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan.  This Disclosure Statement is being submitted in accordance with these requirements.

**C.      Am I entitled to vote on the Plan?**

Your ability to vote on, and your distribution under, the Plan, if any, depends on what type of Claim or Interest you hold.  Each category of Holders of Claims or Interests, as set forth in Article III of the Plan pursuant to section 1122(a) of the Bankruptcy Code, is referred to as a "Class."  Each Class's respective voting status is set forth below.

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 2 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 3 | Lien Trade Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 4 | First Lien Claims | Impaired | Entitled to Vote |
| 5 | Second Lien Notes Claims | Impaired | Entitled to Vote |
| 6 | Third Lien Notes Claims | Impaired | Entitled to Vote |
| 7 | Unsecured Notes Claims | Impaired | Entitled to Vote |
| 8 | General Unsecured Claims | Impaired | Entitled to Vote |
| 9 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 10 | Intercompany Claims | Unimpaired/Impaired | Not Entitled to Vote (Presumed to Accept/Deemed to Reject) |
| 11 | Intercompany Interests | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 12 | Interests in Parent | Impaired | Not Entitled to Vote (Deemed to Reject) |

**D.      What will I receive from the Debtors if the Plan is consummated?**

The following chart provides a summary of the anticipated recovery to Holders of Claims and Interests under the Plan.  Any estimates of Claims and Interests in this Disclosure Statement may vary from the final amounts allowed by the Bankruptcy Court.  Your ability to receive distributions under the Plan depends upon the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Plan.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE.  FOR A COMPLETE**

DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS
AND INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN.[3]

| | SUMMARY OF EXPECTED RECOVERIES | | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims | Projected Recovery Under the Plan |
| 1 | Other Priority Claims | Except to the extent that a Holder of an Allowed Other Priority Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed Other Priority Claim, each such Holder shall receive payment in full, in cash, of the unpaid portion of its Allowed Other Priority Claim on the Effective Date or as soon thereafter as reasonably practicable (or, if payment is not then due, shall be paid in accordance with its terms) or pursuant to such other terms as may be agreed to by the Holder of an Allowed Other Priority Claim and the Debtors. | $1,297,000 | 100% |

---

[3]    The recoveries set forth below may change based upon changes in the amount of Claims that are "Allowed" as well as other factors related to the Debtors' business operations and general economic conditions.  "Allowed" means with respect to any Claim:  (a) a Claim that is scheduled by the Debtors as neither disputed, contingent, nor unliquidated and for which no contrary proof of claim has been filed; (b) a Claim that is not a Disputed Claim or has been allowed by a Final Order; (c) a Claim that is allowed (i) pursuant to the terms of the Plan, (ii) in any stipulation that is approved by the Bankruptcy Court or (iii) pursuant to any contract, instrument, indenture, or other agreement entered into or assumed in connection herewith; or (d) a Claim as to which a Proof of Claim has been timely Filed and as to which no objection has been Filed as of the Claims Objection Deadline.  Except for any Claim that is expressly Allowed pursuant to the Plan, any Claim that has been, or is hereafter, listed in the Schedules as contingent, unliquidated, or disputed and for which no Proof of Claim has been Filed is not considered Allowed and shall be deemed expunged upon entry of the Confirmation Order.

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims | Projected Recovery Under the Plan |
| 2 | Other Secured Claims | On the Effective Date, except to the extent that a Holder of an Allowed Other Secured Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed Other Secured Claim, each such Holder shall receive, at the sole option of the Debtors either (i) payment in full in cash of the unpaid portion of its Allowed Other Secured Claim, including any interest thereon required to be paid under section 506(b) of the Bankruptcy Code, on the Effective Date or as soon thereafter as reasonably practicable (or if payment is not then due, shall be paid in accordance with its terms), (ii) reinstatement pursuant to section 1124 of the Bankruptcy Code, (iii) the collateral securing such Allowed Other Secured Claim, plus any interest thereon required to be paid under section 506(b) of the Bankruptcy Code, on the Effective Date or as soon thereafter as is reasonably practicable or (iv) such other recovery necessary to satisfy section 1129 of the Bankruptcy Code. | $0 | 100% |
| 3 | Lien Trade Claims | On the Effective Date, except to the extent that a Holder of an Allowed Lien Trade Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed Lien Trade Claim, each such Holder shall receive payment in full in cash of the unpaid portion of its Allowed Lien Trade Claim, including any interest thereon required to be paid under section 506(b) of the Bankruptcy Code, on the Effective Date or as soon thereafter as reasonably practicable. | $20,885,404 | 100% |

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims | Projected Recovery Under the Plan |
| 4 | First Lien Claims | On the Effective Date, or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed First Lien Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed First Lien Claim, each Holder of an Allowed First Lien Claim shall receive its Pro Rata share of (a) approximately $82 million in Cash as necessary to pay down the obligations to the First Lien Lenders (including outstanding obligations with respect to existing letters of credit) to an amount not greater than $170 million, and (b)(i) if such Holder is a First Lien Accepting Lender, the New Credit Facility Revolving Loans, or (ii) if such Holder is a First Lien Rejecting Lender, the New Credit Facility Term Loans (in each case, secured by substantially all of the assets of the Reorganized Debtors, including $40 million in a segregated, restricted cash collateral account, which, after the Effective Date, may be applied to reduce the outstanding amounts under the New Credit Facility Revolving Loans); *provided* that, in the event of a Settlement Termination Event, each Holder of an Allowed First Lien Claim shall instead receive, in addition to the foregoing distributions, its Pro Rata share of a portion of the Unencumbered Assets Equity Distribution equal in value to 100 percent of the amount of any Diminution in Value Claims held by such Holder, up to the full amount of the Unencumbered Assets Equity Distribution.  For the avoidance of doubt, in the event the Intercreditor Settlement is approved, then the Holders of Allowed First Lien Claims will be deemed to waive their respective rights to any distribution on account of any Diminution in Value Claims. | $252,024,575 | [●]% |

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims | Projected Recovery Under the Plan |
| 5 | Second Lien Notes Claims | On the Effective Date, or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed Second Lien Notes Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for its Allowed Second Lien Notes Claim, each Holder of an Allowed Second Lien Notes Claim shall receive, on account of its Allowed Second Lien Notes Secured Claim, its Pro Rata share of (a) ninety-six and three-tenths percent (96.3%) of the New Common Stock (subject to dilution by the Management Incentive Plan, any other compensation arrangements under the Management Compensation Term Sheet, and New Common Stock issuable upon the exercise of the New Warrants) and (b) the Excess Cash; *provided*, *however*, that in the event of a Settlement Termination Event, each Holder of an Allowed Second Lien Notes Claim shall instead receive, on account of its Allowed Second Lien Notes Secured Claim, its Pro Rata share of (x) ninety-eight and eight-tenths percent (98.8%) of the New Common Stock (subject to dilution by the Management Incentive Plan and any other compensation arrangements under the Management Compensation Term Sheet), (y) the Excess Cash, and (z) the portion of the Unencumbered Assets Equity Distribution equal in value to 100 percent of the amount of the Diminution in Value Claims held by such Holder, up to the full amount of the Unencumbered Assets Equity Distribution remaining after any distribution thereof to Holders of Allowed First Lien Claims. | $650,868,056 | [●]% |

14

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims | Projected Recovery Under the Plan |
| 6 | Third Lien Notes Claims | On the Effective Date, or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed Third Lien Notes Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed Third Lien Notes Claim, each Holder of an Allowed Third Lien Notes Claim shall receive its Pro Rata share of (i) two and one-half percent (2.5%) of the New Common Stock (subject to dilution under the Management Incentive Plan, any other compensation arrangements under the Management Compensation Term Sheet, and New Common Stock issuable upon exercise of the New Warrants) and (ii) the New Warrants; *provided*, *however*, that in the event of a Settlement Termination Event, each Holder of Allowed Third Lien Notes Claims shall instead receive its Pro Rata share, on account of its Allowed Third Lien Notes Deficiency Claim, of the Unencumbered Assets Equity Distribution, which (i) will be distributed first to the Prepetition Secured Parties on account of their respective Diminution in Value Claims and (ii) thereafter shared Pro Rata among all Holders of Unsecured Notes Claims and General Unsecured Claims, including the Deficiency Claims. | $555,959,507 | [●]% |

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims | Projected Recovery Under the Plan |
| 7 | Unsecured Notes Claims | On the Effective Date, or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed Unsecured Notes Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed Unsecured Notes Claim, each Holder of an Allowed Unsecured Notes Claim shall receive its Pro Rata share of the Unencumbered Assets Equity Distribution, *provided* that the Prepetition Secured Parties shall be deemed to have waived any right to any distribution from the Unencumbered Assets Equity Distribution on account of the Diminution in Value Claims and the Deficiency Claims; *provided*, *further*, *however*, that in the event of (a) a Settlement Termination Event, or (b) any Challenge by any General Unsecured Party, the Unencumbered Assets Equity Distribution will be (i) distributed first to the Prepetition Secured Parties on account of their respective Diminution in Value Claims and (ii) thereafter shared Pro Rata among all Holders of Unsecured Notes Claims and General Unsecured Claims, including the Deficiency Claims. | $672,911,815 | [●]% |
| 8 | General Unsecured Claims | On the Effective Date, or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed General Unsecured Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall receive its Pro Rata share of the Unencumbered Assets Equity Distribution, *provided* that the Prepetition Secured Parties shall be deemed to have waived any right to any distribution from the Unencumbered Assets Equity Distribution on account of the Diminution in Value Claims and the Deficiency Claims; *provided*, *further*, however, that in the event of (a) a Settlement Termination Event, or (b) any Challenge by any General Unsecured Party, the Unencumbered Assets Equity Distribution will be (i) distributed first to the Prepetition Secured Parties on account of their respective Diminution in Value Claims and (ii) thereafter shared Pro Rata among all Holders of Unsecured Notes Claims and General Unsecured Claims, including the Deficiency Claims. | $1,293,397.60 | [●]% |

16

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims | Projected Recovery Under the Plan |
| 9 | Section 510(b) Claims | On the Effective Date, each Section 510(b) Claim shall be cancelled without any distribution and such Holders of Section 510(b) Claims will receive no recovery. | N/A | 0% |
| 10 | Intercompany Claims | Intercompany Claims may be Reinstated as of the Effective Date or, at the Debtors' or the Reorganized Debtors' option, with the consent of the Requisite Second Lien Noteholders, be cancelled, and no distribution shall be made on account of such Claims. | $0 | N/A |
| 11 | Intercompany Interests | Intercompany Interests will be Reinstated as of the Effective Date. | N/A | 100% |
| 12 | Interests in Parent | On the Effective Date, existing Interests in Parent shall be deemed canceled and extinguished, and shall be of no further force and effect, whether surrendered for cancelation or otherwise, and there shall be no distribution to holders of Interests in Parent on account of such Interests. | N/A | 0% |

**E.      What will I receive from the Debtors if I hold an Allowed Administrative Claim or a Priority Tax Claim?**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.  Administrative Claims will be satisfied as set forth in Article II.A of the Plan, and Priority Tax Claims will be satisfied as set forth in Article II.D of the Plan.

**F.      Are any regulatory approvals required to consummate the Plan?**

No.  There are no known regulatory approvals that are required to consummate the Plan.

**G.      What happens to my recovery if the Plan is not confirmed or does not go effective?**

In the event that the Plan is not confirmed or does not go effective, there is no assurance that the Debtors will be able to reorganize their businesses.  It is possible that any alternative may provide Holders of Claims and Interests with less than they would have received pursuant to the Plan.  For a more detailed description of the consequences of an extended chapter 11 case, or of a liquidation scenario, *see* "Confirmation of the Plan - Best Interests of Creditors/Liquidation Analysis," which begins on page 54 of this Disclosure Statement, and the Liquidation Analysis attached as **Exhibit F**.

**H.    If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation?"**

"Confirmation" of the Plan refers to approval of the Plan by the Bankruptcy Court.  Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan.  After Confirmation of the Plan by the Bankruptcy Court, there are conditions that need to be satisfied or waived so that the Plan can go effective.  Initial distributions to holders of Allowed Claims will only be made on the date the Plan becomes effective—the "Effective Date"—or as soon as practicable thereafter, as specified in the Plan.  *See* "Confirmation of the Plan," which begins on page 54 of this Disclosure Statement, for a discussion of the conditions precedent to consummation of the Plan.

**I.    What are the sources of Cash and other consideration required to fund the Plan?**

The Debtors shall fund distributions under the Plan, with: (1) Cash on hand, including cash from operations, (2) the New Credit Facility, (3) the New Common Stock, and (4) the New Warrants, if applicable.  From and after the Effective Date, the Reorganized Debtors, subject to applicable limitations set forth in any post-Effective Date agreement (including, without limitation, the New Credit Facility Documents), shall have the right and authority without further order of the Court to raise additional capital and obtain additional financing as the New Board deems appropriate.

**J.    Are there risks to owning the New Common Stock upon emergence from chapter 11?**

Yes.  *See* "Risk Factors," which begin on page 38 of this Disclosure Statement.  The Debtors intend for the New Common Stock to be publicly trade.

**K.    Is there potential litigation related to the Plan?**

Parties in interest may object to the approval of this Disclosure Statement and may object to Confirmation of the Plan as well, which objection potentially could give rise to litigation.

In the event that it becomes necessary to confirm the Plan over the rejection of certain Classes, the Debtors may seek confirmation of the Plan notwithstanding the rejection of such rejecting Classes. The Bankruptcy Court may confirm the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code, which allow the Bankruptcy Court to confirm a plan that has been rejected by an Impaired Class if it determines that the Plan satisfies section 1129(b) of the Bankruptcy Code.  *See* Article XII.E herein.

**L.    What is the Management Incentive Plan and how will it affect the distribution I receive under the Plan?**

Under the Plan, the Reorganized Debtors will implement a Management Incentive Plan, without any further action by the New Board of the Reorganized Debtors.  The material terms of the Management Incentive Plan are set forth in the term sheet attached to the Plan as **Exhibit 1**.  Shares of New Common Stock issued pursuant to the Management Incentive Plan will dilute the New Common Stock issued pursuant to the Plan.

**M.    Will the final amount of Allowed General Unsecured Claims affect my recovery under the Plan?**

The Debtors estimate that General Unsecured Claims may total approximately $1.3 million.  Each Holder of a General Unsecured Claim shall receive its Pro Rata share of the Unencumbered Assets Equity Distribution (shared Pro Rata by Holders of General Unsecured Claims and Unsecured Notes Claims),

and the Prepetition Secured Parties shall waive any right to distribution on account of the Adequate Protection Claims and the Secured Party Deficiency Claims, as applicable; *provided*, *however*, that in the event of a Settlement Termination Event, the Unencumbered Assets Equity Distribution will be (i) distributed first to the Prepetition Secured Parties on account of any Diminution in Value Claims and (ii) otherwise shared Pro Rata among all Holders of Unsecured Notes Claims and General Unsecured Claims, including the Prepetition Secured Parties' Deficiency Claims.  As noted above, in the event of any Challenge to the Settlements contemplated by the Plan and/or the Plan by any General Unsecured Party, (i) the Prepetition Secured Parties' Diminution in Value Claims will not be waived, (ii) the contingent adequate protection liens and claims held by the Prepetition Secured Parties will attach to the Debtors' unencumbered assets (and will include, without limitation, all estate fees and costs associated with any General Unsecured Party's Challenge), and (iii) the Noteholder Deficiency Claims will share Pro Rata in any recovery available to the class of General Unsecured Creditors.

Moreover, the Debtors are evaluating their rights to reject and in the future may reject certain Executory Contracts and Unexpired Leases, which may result in additional rejection damages claims not accounted for in this estimate.  Further, the Debtors or the official committee of unsecured creditors appointed in the Chapter 11 Cases may object to certain proofs of claim, and any such objections could ultimately cause the total amount of General Unsecured Claims to change.  These changes could affect recoveries for Holders of Claims in Class 8, as well as any other Class to the extent such Class will share in any recovery Pro Rata with General Unsecured Claims, and such changes could be material.

**N.     How will the preservation of the Causes of Action impact my recovery under the Plan?**

In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity, other than those released pursuant to the Plan Support Agreement or the Plan, shall vest in the Reorganized Debtors.  The applicable Reorganized Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action.  The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, or to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

In accordance with section 1123(b) of the Bankruptcy Code, but subject in all respects to Article VIII and Article IV.H of the Plan, and except as otherwise set forth in the Plan Support Agreement, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and such rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors.  **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Causes of Action against it as any indication that the Debtors or the Reorganized Debtors will not pursue any and all available Causes of Action against it.  The Debtors or the Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan.**  Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan Support Agreement or the Plan or a Court order, the Debtors or Reorganized Debtors, as applicable, expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall

apply to such Causes of Action upon, after, or as a consequence of the Confirmation or consummation of the Plan.

In accordance with section 1123(b)(3) of the Bankruptcy Code, except as otherwise provided herein, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors. The applicable Reorganized Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Court.

### O. Will there be releases and exculpation granted to parties in interest as part of the Plan?

Yes, the Plan proposes to release the Released Parties and to exculpate the Exculpated Parties. The Debtors' releases, releases by Holders of Claims and Interests, and exculpation provisions included in the Plan are an integral part of the Debtors' overall restructuring efforts and were an essential element of the negotiations between the Debtors and the consenting creditors in obtaining their support for the Plan pursuant to the terms of the Plan Support Agreement.

All of the Released Parties and the Exculpated Parties have made substantial and valuable contributions to the Debtors' restructuring through efforts to negotiate and implement the Plan, which will maximize and preserve the going-concern value of the Debtors for the benefit of all parties in interest. Accordingly, each of the Released Parties and the Exculpated Parties warrants the benefit of the release and exculpation provisions.

As set forth more fully in the Plan, the Plan also provides that each of the following Entities, among others, will be deemed to have expressly, unconditionally, generally, individually, and collectively released and discharged all claims and causes of action against the Debtors and the Released Parties: (i) each Holder of a Claim that votes to accept the Plan; (ii) each Holder of a Claim that votes to reject the Plan, provided that such Holder does not affirmatively elect to "opt out" of being a Releasing Party and Released Party on its Ballot; (iii) to the fullest extent permitted by law, each Holder of a Claim entitled to vote for or against the Plan that do not vote to accept or reject the Plan, provided that such Holder does not affirmatively elect to "opt out" of being a Releasing Party; (iv) all Holders of Claims and Interests to the maximum extent permitted by law; (v) all Holders of Claims and Interests that are deemed to reject that Plan who do not timely object to the releases set forth in the Plan; (vi) each Holder of a claim that is Unimpaired and presumed to accept the Plan; (vii) with respect to each of these Entities, such Entity's directors, officers, current and former shareholders (regardless of whether such interests are held directly or indirectly), partners, managers, officers, principals, members, employees, agents, affiliates, advisory board members, parents, subsidiaries, predecessors, successors, heirs, executors and assignees, attorneys, financial advisors, investment bankers, accountants, consultants, and other professionals or representatives.

Based on the foregoing, the Debtors believe that the releases and exculpations in the Plan are necessary and appropriate and meet the requisite legal standard promulgated by the United States Court of Appeals for the Fifth Circuit.

1) **Release of Liens.**

Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates (except for those mortgages, deeds of trust, Liens, pledges or other security interests against any property of the Estates granted under and in relation to the First Lien Credit Agreement) shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the applicable Reorganized Debtor and its successors and assigns.

2) **Releases by the Debtors.**

**PURSUANT TO SECTION 1123(b) OF THE BANKRUPTCY CODE, AND EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED IN THE PLAN, FOR GOOD AND VALUABLE CONSIDERATION, INCLUDING THE EFFORTS OF THE RELEASED PARTIES TO FACILITATE THE EXPEDITIOUS REORGANIZATION OF THE DEBTORS AND THE IMPLEMENTATION OF THE RESTRUCTURING CONTEMPLATED BY THE PLAN, PURSUANT TO THE CONFIRMATION ORDER AND ON AND AFTER THE EFFECTIVE DATE, THE RELEASED PARTIES AND THEIR RESPECTIVE PROPERTIES ARE CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY, AND FOREVER DEEMED RELEASED, ACQUITTED AND DISCHARGED BY THE DEBTORS, THE REORGANIZED DEBTORS AND THE ESTATES FROM ANY AND ALL CLAIMS, DEBTS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, DEBTS, CAUSES OF ACTION, REMEDIES, AND LIABILITIES WHATSOEVER, INCLUDING ANY DERIVATIVE CLAIMS ASSERTED OR ASSERTABLE ON BEHALF OF THE DEBTORS OR THEIR ESTATES, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, MATURED OR UNMATURED, EXISTING OR HEREINAFTER ARISING, IN LAW, EQUITY, CONTRACT, TORT, OR OTHERWISE, BY STATUTE, VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS OR OTHERWISE THAT THE DEBTORS, THE REORGANIZED DEBTORS, THE ESTATES OR THEIR AFFILIATES WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR ON BEHALF OF THE HOLDER OF ANY CLAIM OR EQUITY INTEREST OR OTHER ENTITY, BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS, THE REORGANIZED DEBTORS, THE CHAPTER 11 CASES, THE DEBTORS' RESTRUCTURING, THE PURCHASE, SALE OR RESCISSION OF THE PURCHASE OR SALE OF ANY SECURITY OF THE DEBTORS OR THE REORGANIZED DEBTORS, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN THE DEBTORS AND ANY RELEASED PARTY, THE RESTRUCTURING OF CLAIMS AND INTERESTS PRIOR TO OR IN THE CHAPTER 11 CASES, THE NEGOTIATION, FORMULATION OR PREPARATION OF THE PLAN, THE PLAN SUPPORT AGREEMENT, THE PLAN SUPPLEMENT, THE DISCLOSURE STATEMENT, THE NEW CREDIT FACILITY DOCUMENTS AND ANY RELATED AGREEMENTS, INSTRUMENTS, OR OTHER DOCUMENTS, ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE CONFIRMATION DATE.**

**THE FOREGOING RELEASE (1) SHALL NOT APPLY TO ANY EXPRESS CONTRACTUAL OR FINANCIAL OBLIGATIONS OR ANY RIGHT OR OBLIGATIONS ARISING UNDER OR THAT IS PART OF THE PLAN OR ANY AGREEMENTS ENTERED**

21

INTO PURSUANT TO, IN CONNECTION WITH OR CONTEMPLATED BY THE PLAN (INCLUDING THE PLAN SUPPORT AGREEMENT) AND (2) SHALL HAVE NO EFFECT ON THE LIABILITY OF ANY ENTITY THAT RESULTS FROM ANY SUCH ACT OR OMISSION THAT IS DETERMINED IN A FINAL ORDER TO HAVE CONSTITUTED FRAUD, GROSS NEGLIGENCE, OR WILLFUL MISCONDUCT.  FOR THE AVOIDANCE OF DOUBT, THE DEBTORS AND REORGANIZED DEBTORS WILL CONTINUE TO HONOR ALL POSTPETITION AND POST-EFFECTIVE DATE OBLIGATIONS UNDER THE NEW CREDIT FACILITY DOCUMENTS AND ANY RELATED AGREEMENTS, INSTRUMENTS, OR OTHER DOCUMENTS.

3)   **Releases by Holders of Claims and Interests.**

AS OF THE EFFECTIVE DATE, EACH OF THE RELEASING PARTIES (REGARDLESS OF WHETHER A RELEASING PARTY IS A RELEASED PARTY) SHALL BE DEEMED TO HAVE CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY AND FOREVER RELEASED, ACQUITTED AND DISCHARGED THE DEBTORS, THE REORGANIZED DEBTORS AND THE RELEASED PARTIES AND THEIR RESPECTIVE PROPERTY FROM ANY AND ALL CLAIMS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, DEBTS, CAUSES OF ACTION, REMEDIES, AND LIABILITIES WHATSOEVER, INCLUDING ANY DERIVATIVE CLAIMS ASSERTED OR ASSERTABLE OR ASSERTABLE ON BEHALF OF A DEBTOR, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, MATURED OR UNMATURED, EXISTING OR HEREAFTER ARISING, IN LAW, EQUITY, CONTRACT, TORT OR OTHERWISE, BY STATUTE, VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS OR OTHERWISE THAT SUCH ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR ON BEHALF OF THE HOLDER OF ANY CLAIM OR EQUITY INTEREST OR OTHER ENTITY, BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS, THE REORGANIZED DEBTORS, THE DEBTORS' RESTRUCTURING, THE CHAPTER 11 CASES, THE PURCHASE, SALE OR RESCISSION OF THE PURCHASE OR SALE OF ANY SECURITY OF THE DEBTORS OR THE REORGANIZED DEBTORS, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN THE DEBTORS AND ANY RELEASED PARTY, THE RESTRUCTURING OF CLAIMS AND INTERESTS PRIOR TO OR DURING THE CHAPTER 11 CASES, THE NEGOTIATION, FORMULATION, OR PREPARATION OF THE PLAN, THE DISCLOSURE STATEMENT, THE PLAN SUPPLEMENT, THE PLAN SUPPORT AGREEMENT, THE NEW CREDIT FACILITY DOCUMENTS AND ANY RELATED AGREEMENTS, INSTRUMENTS OR OTHER DOCUMENTS, ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE CONFIRMATION DATE.

NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING, THE RELEASE SET FORTH ABOVE DOES NOT RELEASE ANY POST-EFFECTIVE DATE OBLIGATIONS OF ANY PARTY OR ENTITY UNDER THE PLAN OR ANY DOCUMENT, INSTRUMENT OR AGREEMENT (INCLUDING THOSE SET FORTH IN THE PLAN SUPPLEMENT) EXECUTED TO IMPLEMENT THE PLAN (REGARDLESS OF WHETHER RIGHTS TO ENFORCE SUCH OBLIGATIONS IN COLLATERAL ARISE FROM INSTRUMENTS ESTABLISHING SUCH RIGHTS PRIOR TO THE EFFECTIVE DATE), INCLUDING THE RIGHT TO RECEIVE DISTRIBUTIONS FROM THE DEBTORS OR THE REORGANIZED DEBTORS ON ACCOUNT OF AN ALLOWED CLAIM AGAINST THE

DEBTORS PURSUANT TO THIS PLAN (WHICH, FOR THE AVOIDANCE OF DOUBT, SHALL INCLUDE OBLIGATIONS UNDER OR IN CONNECTION WITH THE NEW CREDIT FACILITY DOCUMENTS AND ANY RELATED AGREEMENTS, INSTRUMENTS, OR OTHER DOCUMENTS AND THE PLAN SUPPORT AGREEMENT). NOTWITHSTANDING THE FOREGOING, THE DEBTORS AND THE REORGANIZED DEBTORS WILL CONTINUE TO HONOR ALL POSTPETITION AND POST-EFFECTIVE DATE OBLIGATIONS UNDER ANY ASSUMED EXECUTORY CONTRACTS AND UNEXPIRED LEASES IN ACCORDANCE WITH THEIR TERMS REGARDLESS OF WHETHER SUCH OBLIGATIONS ARE LISTED AS A CURE AMOUNT, AND WHETHER SUCH OBLIGATIONS ACCRUED PRIOR TO OR AFTER THE EFFECTIVE DATE, AND NEITHER THE PAYMENT OF CURE NOR ENTRY OF THE CONFIRMATION ORDER SHALL BE DEEMED TO RELEASE THE DEBTORS OR THE REORGANIZED DEBTORS FROM SUCH OBLIGATIONS. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING, THE RELEASE SET FORTH ABOVE (1) DOES NOT RELEASE THE PERSONAL LIABILITY OF ANY OF THE AFOREMENTIONED RELEASED PARTIES IN ARTICLE VIII OF THE PLAN FOR ANY STATUTORY VIOLATION OF APPLICABLE TAX LAWS OR BAR ANY RIGHT OF ACTION ASSERTED BY A GOVERNMENTAL TAXING AUTHORITY AGAINST THE AFOREMENTIONED RELEASED PARTIES FOR ANY STATUTORY VIOLATION OF APPLICABLE TAX LAWS AND (2) SHALL HAVE NO EFFECT ON THE LIABILITY OF ANY ENTITY THAT RESULTS FROM ANY SUCH ACT OR OMISSION THAT IS DETERMINED IN A FINAL ORDER TO HAVE CONSTITUTED FRAUD, GROSS NEGLIGENCE, OR WILLFUL MISCONDUCT.

4)   **Exculpation.**

UPON AND EFFECTIVE AS OF THE EFFECTIVE DATE, THE DEBTORS AND THEIR DIRECTORS, OFFICERS, EMPLOYEES, ATTORNEYS, INVESTMENT BANKERS, FINANCIAL ADVISORS, RESTRUCTURING CONSULTANTS AND OTHER PROFESSIONAL ADVISORS AND AGENTS WILL BE DEEMED TO HAVE SOLICITED ACCEPTANCES OF THIS PLAN IN GOOD FAITH AND IN COMPLIANCE WITH THE APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE, INCLUDING SECTION 1125(E) OF THE BANKRUPTCY CODE.

EXCEPT WITH RESPECT TO ANY ACTS OR OMISSIONS EXPRESSLY SET FORTH IN AND PRESERVED BY THE PLAN, THE PLAN SUPPLEMENT, OR RELATED DOCUMENTS, THE EXCULPATED FIDUCIARIES AND, SOLELY TO THE EXTENT PROVIDED BY SECTION 1125(E) OF THE BANKRUPTCY CODE, THE SECTION 1125(E) PARTIES, SHALL NEITHER HAVE, NOR INCUR ANY LIABILITY TO ANY ENTITY FOR ANY PREPETITION OR POSTPETITION ACT TAKEN OR OMITTED TO BE TAKEN IN CONNECTION WITH, OR RELATED TO FORMULATING, NEGOTIATING, PREPARING, DISSEMINATING, IMPLEMENTING, ADMINISTERING, CONFIRMING, OR EFFECTING THE PLAN (INCLUDING THE PLAN SUPPORT AGREEMENT) OR ANY CONTRACT, INSTRUMENT, RELEASE OR OTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO IN CONNECTION WITH THE PLAN OR ANY OTHER PREPETITION OR POSTPETITION ACT TAKEN OR OMITTED TO BE TAKEN IN CONNECTION WITH OR IN CONTEMPLATION OF THE RESTRUCTURING OF THE DEBTORS; *PROVIDED, THAT* THE FOREGOING "EXCULPATION" SHALL HAVE NO EFFECT ON THE LIABILITY OF ANY ENTITY THAT RESULTS FROM ANY SUCH ACT OR OMISSION THAT IS DETERMINED IN A FINAL ORDER TO HAVE CONSTITUTED FRAUD, GROSS NEGLIGENCE, OR WILLFUL MISCONDUCT; *PROVIDED, FURTHER* THAT EACH EXCULPATED PARTY SHALL BE ENTITLED TO RELY UPON THE ADVICE OF COUNSEL CONCERNING HIS,

HER OR ITS DUTIES PURSUANT TO, OR IN CONNECTION WITH, THE PLAN OR ANY OTHER RELATED DOCUMENT, INSTRUMENT, OR AGREEMENT.

THE EXCULPATED PARTIES HAVE, AND UPON CONFIRMATION, SHALL BE DEEMED TO HAVE, PARTICIPATED IN GOOD FAITH AND IN COMPLIANCE WITH THE APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE, INCLUDING WITH REGARD TO THE DISTRIBUTIONS OF NEW COMMON STOCK AND NEW WARRANTS (IF ANY) PURSUANT TO THE PLAN AND, THEREFORE, ARE NOT AND SHALL NOT BE LIABLE AT ANY TIME FOR THE VIOLATIONS OF ANY APPLICABLE LAW, RULE, OR REGULATION GOVERNING THE SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN OR SUCH DISTRIBUTIONS MADE PURSUANT TO THE PLAN.

     5)   **Injunction.**

EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, ALL ENTITIES WHO HAVE HELD, HOLD, OR MAY HOLD CLAIMS, INTERESTS, CAUSES OF ACTION, OR LIABILITIES THAT: (A) ARE SUBJECT TO COMPROMISE AND SETTLEMENT PURSUANT TO THE TERMS OF THE PLAN; (B) HAVE BEEN RELEASED PURSUANT TO ARTICLE VIII.D OF THE PLAN; (C) HAVE BEEN RELEASED PURSUANT TO ARTICLE VIII.E OF THE PLAN, (D) ARE SUBJECT TO EXCULPATION PURSUANT TO ARTICLE VIII.F OF THE PLAN (BUT ONLY TO THE EXTENT OF THE EXCULPATION PROVIDED IN ARTICLE VIII.F OF THE PLAN), OR (E) ARE OTHERWISE DISCHARGED, SATISFIED, STAYED OR TERMINATED PURSUANT TO THE TERMS OF THE PLAN, ARE PERMANENTLY ENJOINED AND PRECLUDED, FROM AND AFTER THE EFFECTIVE DATE, FROM COMMENCING OR CONTINUING IN ANY MANNER, ANY ACTION OR OTHER PROCEEDING, INCLUDING ON ACCOUNT OF ANY CLAIMS, INTERESTS, CAUSES OF ACTION, OR LIABILITIES THAT HAVE BEEN COMPROMISED OR SETTLED AGAINST THE DEBTORS, THE REORGANIZED DEBTORS, OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATE OF ANY ENTITY, DIRECTLY OR INDIRECTLY, SO RELEASED OR EXCULPATED) ON ACCOUNT OF, OR IN CONNECTION WITH OR WITH RESPECT TO, ANY DISCHARGED, RELEASED, SETTLED, COMPROMISED, OR EXCULPATED CLAIMS, INTERESTS, CAUSES OF ACTION, OR LIABILITIES.

For more detail see "Article VIII—Settlement, Release, Injunction and Related Provisions," of the Plan, which is incorporated herein by reference.

    **P.**    **What impact does the Claims Bar Date have on my Claim?**

The Bankruptcy Court will establish a Claims bar date (the "Bar Date") in the Chapter 11 Cases, and the Debtors will serve notice on all parties in interest of the Bar Date. The following entities holding Claims against the Debtors that arose (or that are deemed to have arisen) prior to the Petition Date, including without limitation Class 8 General Unsecured Claims, must file proofs of claim on or before the Bar Date: (1) any entity whose Claim against a Debtor is not listed in the applicable Debtor's schedules of assets and liabilities ("Schedules") or is listed in the applicable Debtor's Schedules as contingent, unliquidated, or disputed if such entity desires to participate in any of the Chapter 11 Cases or share in any distribution in any of the Chapter 11 Cases; (2) any entity that believes its Claim is improperly classified in the Schedules or is listed in an incorrect amount and desires to have its Claim allowed in a different classification or amount from that identified in the Schedules; (3) any entity that believes its Claim as listed in the Schedules is not an obligation of the specific Debtor against which the Claim is listed and that desires to have its Claim allowed against a Debtor other than that identified in the Schedules; and (4) any entity that believes its Claim against a Debtor is or may be an administrative

expense pursuant to section 503(b)(9) of the Bankruptcy Code (but not any entity that believes it holds an administrative expense Claim under section 503(b)(1) of the Bankruptcy Code).

In accordance with Bankruptcy Rule 3003(c)(2), if any person or entity that is required, but fails, to file a proof of claim on or before the Bar Date: (1) such person or entity will be forever barred, estopped, and enjoined from asserting such Claim against the Debtors (or filing a proof of claim with respect thereto); (2) the Debtors and their property may be forever discharged from any and all indebtedness or liability with respect to or arising from such Claim; (3) such person or entity will not receive any distribution in the Chapter 11 Cases on account of that Claim; and (4) such person or entity will not be permitted to vote on any plan or plans of reorganization for the Debtors on account of these barred Claims or receive further notices regarding such Claim.

As described in this Disclosure Statement, the distribution you receive on account of your Claim (if any) may depend, in part, on the amount of Claims for which proofs of claim are filed on or before the Bar Date.

**Q.   What is the deadline to vote on the Plan?**

The Voting Deadline is July 18, 2016 at 5:00 p.m. (prevailing Central Time).

**R.   How do I vote for or against the Plan?**

Detailed instructions regarding how to vote on the Plan are contained on the ballots distributed to holders of Claims that are entitled to vote on the Plan.  For your vote to be counted, your ballot must be completed and signed so that it is **actually received** by July 18, 2016 at 5:00 p.m. (prevailing Central Time) at the following address:  Midstates Petroleum Company, Inc., Ballot Processing Center, c/o Kurtzman Carson Consultants LLC, 2335 Alaska Avenue, El Segundo, CA 90245.  *See* Article XI herein.

**S.   Why is the Bankruptcy Court holding a Confirmation Hearing?**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on confirmation of the Plan and recognizes that any party in interest may object to Confirmation of the Plan.

**T.   When is the Confirmation Hearing set to occur?**

The Bankruptcy Court has scheduled the Confirmation Hearing for July 25, 2016.  The Confirmation Hearing may be adjourned from time to time without further notice.

Objections to Confirmation of the Plan must be filed and served on the Debtors, and certain other parties, by no later than July 18, 2016 at 5:00 p.m. (prevailing Central Time) in accordance with the notice of the Confirmation Hearing that accompanies this Disclosure Statement and the Disclosure Statement Order attached hereto as **Exhibit C** and incorporated herein by reference.

The Debtors will publish the notice of the Confirmation Hearing, which will contain the deadline for objections to the Plan and the date and time of the Confirmation Hearing, in *USA Today* (national edition), the *Houston Chronicle*, the *Daily Oklahoman*, the *Tulsa World*, the *Oil & Gas Journal*, and the *Amarillo Globe-News* to provide notification to those persons who may not receive notice by mail.  The Debtors may also publish the notice of the Confirmation Hearing in such trade or other publications as the Debtors may choose.

**U.      What is the purpose of the Confirmation Hearing?**

The confirmation of a plan of reorganization by a bankruptcy court binds the debtor, any issuer of securities under a plan of reorganization, any person acquiring property under a plan of reorganization, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code.  Subject to certain limited exceptions, the order issued by the bankruptcy court confirming a plan of reorganization discharges a debtor from any debt that arose before the confirmation of such plan of reorganization and provides for the treatment of such debt in accordance with the terms of the confirmed plan of reorganization.

**V.      What is the effect of the Plan on the Debtors' ongoing business?**

The Debtors are reorganizing under chapter 11 of the Bankruptcy Code.  As a result, Confirmation means that the Debtors will not be liquidated or forced to go out of business.  Following Confirmation, the Plan will be consummated on the Effective Date, which is the date that is a Business Day selected by the Debtors, in consultation with the Consenting First Lien Lenders, the Consenting Second Lien Noteholders, and the Consenting Cross-Over Noteholders, on which:  (i) no stay of the Confirmation Order is in effect; (ii) all conditions precedent specified in Article IX.A of the Plan have been satisfied or waived (in accordance with Article IX.B of the Plan); and (c) the Plan is declared effective.  On or after the Effective Date, and unless otherwise provided in the Plan, the Reorganized Debtors may operate their businesses and, except as otherwise provided by the Plan, may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.  Additionally, upon the Effective Date, all actions contemplated by the Plan will be deemed authorized and approved.

**W.      Will any party have significant influence over the corporate governance and operations of the Reorganized Debtors?**

As of the Effective Date, the term of the current members of the board of directors of the Parent shall expire, and the New Board, as well as the officers of each of the Reorganized Debtors, shall be appointed in accordance with the New Organizational Documents and other constituent documents of each Reorganized Debtor.  The initial New Board shall consist of those individuals disclosed prior to the Confirmation Hearing.  Successors will be elected in accordance with the New Organizational Documents of Reorganized Parent.  If the Plan Settlement is approved, the New Board shall be appointed by parties to the Plan Support Agreement who hold, in the aggregate, at least fifty and one-tenth percent (50.1%) in principal amount outstanding of the Second Lien Notes Claims held by all parties to the Plan Support Agreement.

Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtors will, to the extent practicable, disclose in advance of the Confirmation Hearing the identity and affiliations of any Person proposed to serve on the initial New Board, as well as those Persons that will serve as an officer of any of the Reorganized Debtors.  To the extent any such director or officer is an "insider" under the Bankruptcy Code, the nature of any compensation to be paid to such director or officer will also be disclosed.  Each such director and officer shall serve from and after the Effective Date pursuant to the terms of the New Organizational Documents and other constituent documents of the Reorganized Debtors.

**X.      Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan?**

If you have any questions regarding this Disclosure Statement or the Plan, please contact the Debtors' notice, claims, and solicitation agent, Kurtzman Carson Consultants, LLC:

> *By regular mail, hand delivery, or overnight mail at:*
> Midstates Petroleum Company, Inc.
> c/o Kurtzman Carson Consultants
> 2335 Alaska Avenue
> El Segundo, CA 90245
>
> *By electronic mail at:*
> MidstatesInfo@kccllc.com
>
> *By telephone at:*
> (888) 773-1446 (U.S. and Canada)
> (310) 751-2635 (International)

Copies of the Plan, this Disclosure Statement, and any other publicly filed documents in the Chapter 11 Cases are available upon written request to the Debtors' notice, claims, and solicitation agent at the address above or by downloading the exhibits and documents from the website of the Debtors' notice, claims, and solicitation agent at http://www.kccllc.net/midstates (free of charge) or the Bankruptcy Court's website at www.deb.uscourts.gov (for a fee).

**Y.      Do the Debtors recommend voting in favor of the Plan?**

Yes.  The Debtors believe the Plan provides for a larger distribution to the Debtors' creditors than would otherwise result from any other available alternative.  The Debtors believe the Plan, which contemplates a significant deleveraging, is in the best interest of all Holders of Claims, and that other alternatives fail to realize or recognize the value inherent under the Plan.

**Z.      Who Supports the Plan?**

The Plan carries the overwhelming support of the Debtors' primary creditor constituencies, including the First Lien Administrative Agent, First Lien Lenders holding approximately 86 percent of the First Lien Credit Facility, holders of approximately 79 percent of the Second Lien Notes, and holders of approximately 77 percent of the Third Lien Notes.[4]

**V.      IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT**

**A.      Certain Key Terms Used in this Disclosure Statement.**

The following are some of the defined terms used in this Disclosure Statement.  This is not an exhaustive list of defined terms in the Plan or this Disclosure Statement, but is provided for ease of reference only.  Please refer to the Plan for additional defined terms.

"Bankruptcy Court" means the United States Bankruptcy Court for the Southern District of Texas having jurisdiction over the Chapter 11 Cases, and, to the extent of the withdrawal of any reference under

---

[4]      These numbers reflect an increase from the figures disclosed in the First Day Declaration, which increase is on account of either existing Plan Support Parties purchasing additional debt or new parties executing the Plan Support Agreement.

28 U.S.C. § 157 and/or the General Order of the District Court pursuant to section 151 of title 28 of the United States Code, the United States District Court for the Southern District of Texas.

"Bankruptcy Rules" means Federal Rules of Bankruptcy Procedure, as applicable to the Chapter 11 Cases, promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court.

"Chapter 11 Cases" means (a) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court and (b) when used with reference to all of the Debtors, the procedurally consolidated and jointly administered chapter 11 cases pending for the Debtors in the Bankruptcy Court.

"Claim" shall have the meaning set forth in section 101(5) of the Bankruptcy Code.

"Confirmation Date" means the date upon which the Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

"Confirmation Hearing" means the hearing held by the Bankruptcy Court to consider Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code.

"Interests" means the common stock, preferred stock, limited liability company interests, and any other equity, ownership, or profits interests of any Debtor and options, warrants, rights, or other securities or agreements to acquire the common stock, preferred stock, limited liability company interests, or other equity, ownership, or profits interests of any Debtor (whether or not arising under or in connection with any employment agreement), including any claim against the Debtors subject to subordination pursuant to section 510(b) of the Bankruptcy Code arising from or related to any of the foregoing.

"Person" shall have the meaning set forth in section 101(41) of the Bankruptcy Code.

"Plan Supplement" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan, in each case, as applicable, subject to the Definitive Document Plan Support Agreement Requirements (as amended, supplemented, or modified from time to time), to be Filed by the Debtors no later than 7 days before the Voting Deadline, and additional documents or amendments to previously Filed documents, Filed before the Confirmation Date as amendments to the Plan Supplement, including the following, as applicable:  (a) the New Organizational Documents; (b) the New Credit Agreement; (c) the Schedule of Assumed Executory Contracts and Unexpired Leases; (d) a list of retained Causes of Action; (e) a document listing the members of the New Board; (f) the Registration Rights Agreement; and (g) the form of the New Warrants.  The Debtors shall have the right to amend the documents contained in, and exhibits to, the Plan Supplement (other than the Definitive Documents) through the Effective Date with the reasonable consent of the Requisite Creditors.

## B.    Additional Important Information.

The Confirmation and effectiveness of the Plan are subject to certain material conditions precedent described herein and set forth in Article IX of the Plan.  There is no assurance that the Plan will be confirmed, or if confirmed, that the conditions required to be satisfied for the Plan to go effective will be satisfied (or waived).

You are encouraged to read this Disclosure Statement in its entirety, including the section entitled "Risk Factors," and the Plan before submitting your ballot to vote on the Plan.

***The Bankruptcy Court's approval of this Disclosure Statement does not constitute a guarantee by the Bankruptcy Court of the accuracy or completeness of the information contained herein or an endorsement by the Bankruptcy Court of the merits of the Plan.***

Summaries of the Plan and statements made in this Disclosure Statement are qualified in their entirety by reference to the Plan.  The summaries of the financial information and the documents annexed to this Disclosure Statement or otherwise incorporated herein by reference are qualified in their entirety by reference to those documents.  The statements contained in this Disclosure Statement are made only as of the date of this Disclosure Statement, and there is no assurance that the statements contained herein will be correct at any time after such date.  Except as otherwise provided in the Plan or in accordance with applicable law, the Debtors are under no duty to update or supplement this Disclosure Statement.

The information contained in this Disclosure Statement is included for purposes of soliciting acceptances to, and Confirmation of, the Plan and may not be relied on for any other purpose.  In the event of any inconsistency between the Disclosure Statement and the Plan, the relevant provisions of the Plan shall govern.

This Disclosure Statement has not been approved or disapproved by the United States Securities and Exchange Commission (the "SEC") or any similar federal, state, local or foreign regulatory agency, nor has the SEC or any other agency passed upon the accuracy or adequacy of the statements contained in this Disclosure Statement.

The Debtors have sought to ensure the accuracy of the financial information provided in this Disclosure Statement; however, the financial information contained in this Disclosure Statement or incorporated herein by reference has not been, and will not be, audited or reviewed by the Debtors' independent auditors unless explicitly provided otherwise.

Upon Confirmation of the Plan, certain of the securities described in this Disclosure Statement will be issued without registration under the Securities Act or any similar federal, state, or local law in reliance upon either (a) section 1145 of the Bankruptcy Code or (b) section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder.  All shares of New Common Stock and New Warrants issued pursuant to the exemption from registration set forth in section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder will be considered "restricted securities" and may not be transferred except pursuant to an effective registration statement under the Securities Act or an available exemption therefrom.

The Debtors make statements in this Disclosure Statement that are considered forward-looking statements under federal securities laws.  The Debtors consider all statements regarding anticipated or future matters, to be forward-looking statements.  Forward-looking statements may include statements about the Debtors':

- business strategy;

- estimated future net reserves and present value thereof;

- technology;

- financial condition, revenues, cash flows, and expenses;

- levels of indebtedness, liquidity, and compliance with debt covenants;

- financial strategy, budget, projections, and operating results;

- oil and natural gas realized prices;

- timing and amount of future production of oil and natural gas;

- availability of drilling and production equipment;

- availability of oilfield labor;

- availability of third-party natural gas gathering and processing capacity;

- the amount, nature, and timing of capital expenditures, including future development costs;

- availability and terms of capital;

- drilling of wells, including the Debtors' identified drilling locations;

- successful results from the Debtors' identified drilling locations;

- marketing of oil and natural gas;

- the integration and benefits of asset and property acquisitions or the effects of asset and property acquisitions or dispositions on the Debtors' cash position and levels of indebtedness;

- infrastructure for salt water disposal and electricity;

- ability to economically dispose of produced salt water via injection wells;

- sources of electricity utilized in operations and the related infrastructures;

- costs of developing the Debtors' properties and conducting other operations;

- general economic conditions;

- effectiveness of the Debtors' risk management activities;

- environmental liabilities;

- counterparty credit risk;

- the outcome of pending and future litigation;

- governmental regulation and taxation of the oil and natural gas industry;

- developments in oil-producing and natural gas-producing countries;

- uncertainty regarding the Debtors' future operating results;

- plans, objectives, and expectations;

- variations in the market demand for, and prices of, oil, natural gas liquids and natural gas;

- uncertainties about the Debtors' estimated quantities of oil and natural gas reserves;

- the adequacy of the Debtors' capital resources and liquidity;

- access to capital and general economic and business conditions;

- uncertainties about the Debtors' ability to replace reserves and economically develop their current reserves;

- risks in connection with acquisitions;

- the potential adoption of new governmental regulations; and

- the Debtors' ability to satisfy future cash obligations and environmental costs.

Statements concerning these and other matters are not guarantees of the Reorganized Debtors' future performance.  There are risks, uncertainties, and other important factors that could cause the Debtors' actual performance or achievements to be different from those they may project, and the Debtors undertake no obligation to update the projections made herein.  These risks, uncertainties, and factors may include:  the Debtors' ability to confirm and consummate the Plan; the potential that the Plan may be converted to a process to sell all or substantially all of the Debtors' assets under section 363 of the Bankruptcy Code; the Debtors' ability to reduce their overall financial leverage; the potential adverse impact of the Chapter 11 Cases on the Debtors' operations, management, and employees, and the risks associated with operating the Debtors' businesses during the Chapter 11 Cases; responses to the Chapter 11 Cases; the Debtors' inability to discharge or settle Claims during the Chapter 11 Cases; general economic, business, and market conditions; currency fluctuations; interest rate fluctuations; dramatic commodity price increases or decreases; exposure to litigation; the Debtors' ability to implement cost reduction initiatives in a timely manner; the Debtors' ability to divest existing assets if so desired; financial conditions of the Debtors' counter-parties, purchasers, or working-interest owners; adverse tax changes; limited access to capital resources; changes in domestic laws and regulations; trade balance; natural disasters; geopolitical instability; and the effects of governmental regulation on the Debtors' businesses.

## VI.    THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW

The Debtors are an independent oil and gas company focused on the exploration, development, and production of natural gas and oil through their ownership and operating interests in oil and gas properties located in some of the most prolific and long-lived basins in the United States. Co-headquartered in Tulsa, Oklahoma, and Houston, Texas, the Debtors primary operations are in the Mississippian Lime play in Woods and Alfalfa Counties of Oklahoma (the "Mississippian"), but also hold considerable reserves in the Anadarko Basin located in Texas and western Oklahoma (the "Anadarko Basin").  The Debtors generate revenue from the sale of oil and natural gas production as well as the sale of natural gas liquids ("NGLS") that are extracted from their high liquids content natural gas.  Below is a summary of the Debtors' businesses and operations.

### A.    Assets and Operations.

The Mississippian comprises a net acreage of approximately 92,000, and in 2015, the net production in the Mississippian was approximately 26,282 net barrels of equivalent per day ("Boe/d"). The Anadarko Basin comprises a net acreage of approximately 111,190, and in 2015, the net production in the Anadarko Basin was approximately 6,222 Boe/d.

For 2016, the Debtors plan to allocate substantially all of their drilling and completions capital budget to development activities in the Mississippian based on the stronger economic returns expected from these assets in the current commodity price and cost environment.

31

As of the Petition Date, the Debtors had approximately 120 full-time employees. None of their employees are represented by a collective bargaining unit. A corporate chart is attached to the First Day Declaration as **Exhibit B**.

### B.    Prepetition Capital Structure.

As of the Petition Date,[5] the Debtors reported approximately $2.045 billion in total funded debt. As described in greater detail below, the Debtors' significant funded debt obligations include: (a) approximately $249.2 million in principal amount of obligations under the Debtors' First Lien Credit Facility; (b) approximately $625.0 million in principal amount of Second Lien Notes; (c) approximately $529.7 million in principal amount of Third Lien Notes; and (d) approximately $641.3 million in principal amount of Unsecured Notes.

### 1)    First Lien Credit Facility.

The Debtors maintain a reserve-based revolving credit facility under the First Lien Credit Agreement.

As of the Petition Date, the borrowing base under the First Lien Credit Facility was $170 million, and the total amount drawn was approximately $249.2 million plus outstanding letters of credit in the approximate amount of $2.8 million. The First Lien Credit Facility bears interest at LIBOR plus an applicable margin which, depending upon the Debtors' borrowing base utilization, floats between 2.00% and 3.00% per annum. The First Lien Credit Facility matures on May 31, 2018. In addition to the interest expense, the Credit Facility requires the payment of a commitment fee, which is computed at the rate of either 0.375% or 0.500% per annum based on the average daily amount by which the borrowing base exceeds the outstanding borrowings during each quarter.

The obligations under the First Lien Credit Facility are secured by first-priority liens on, among other things, the Debtors' ownership interest in their oil and gas assets intended to represent at least substantially all of the present value of the Debtors' proved reserves, and the Debtors' deposit and securities accounts.

### 2)    Second Lien Notes.

On May 21, 2015, the Debtors issued $625.0 million in aggregate principal amount of Second Lien Notes under the Second Lien Indenture. The interest rate of 10.0% per annum is payable semi-annually on June 1 and December 1 of each fiscal year. The Second Lien Notes are secured by second-priority liens on all of the assets that secure the Debtors' First Lien Credit Facility. The Second Lien Notes mature on the earlier of June 1, 2020, or 12 months after the maturity date of the Debtors' First Lien Credit Facility (including any extension or refinancing of such facility).

### 3)    Third Lien Notes.

The Debtors have approximately $529.7 million of outstanding Third Lien Notes, issued pursuant to the Third Lien Indenture. The Third Lien Notes were issued in a private placement and in exchange for an aggregate $306.4 million of the 2020 Senior Notes and $352.3 million of the 2021 Senior Notes. The Third Lien Notes are secured by third-priority liens on all of the assets that secure the First Lien Credit Facility and the Second Lien Notes. The Third Lien Notes have an interest rate of 12.00% per annum, consisting of cash interest of 10.00% and paid-in-kind interest of 2.00%, and mature on the earlier of June

---

[5]    These financial figures reflect the Debtors' most recent review of their businesses. The Debtors reserve all rights to revise and supplement the figures presented herein.

1, 2020, or 12 months after the maturity date of the First Lien Credit Facility (including any extension or refinancing of such facility). The cash interest is payable semiannually, while the paid-in-kind interest increases the outstanding principal balance of the Third Lien Notes semiannually.

### 4) Unsecured Notes.

On October 1, 2012, the Debtors issued $600.0 million in aggregate principal amount of 2020 Senior Notes pursuant to the 2020 Senior Notes Indenture. On May 31, 2013, the Debtors issued $700.0 million in aggregate principal amount of 2021 Senior Notes. The 2020 Senior Notes mature on October 1, 2020 and require semiannual coupon payments at an interest rate of 10.75% per year. The 2021 Senior Notes mature on June 1, 2021 and require semiannual coupon payments at an interest rate of 9.25% per year.

As noted above, on May 21, 2015, the Debtors issued approximately $504.1 million of Third Lien Notes in exchange for approximately $279.8 million of 2020 Senior Notes and $350.3 million of 2021 Senior Notes, representing an exchange at 80.0% of the exchanged Unsecured Notes' par value. Additionally, on June 2, 2015, the Debtors exchanged approximately $20.0 million of Third Lien Notes for approximately $26.6 million of 2020 Senior Notes and $2.0 million of 2021 Senior Notes, representing an exchange at 70.0% of the exchanged Unsecured Notes' par value. After the exchanges described above, approximately $293.6 million and $347.7 million of principal amounts under the 2020 Senior Notes and the 2021 Senior Notes, respectively, remained outstanding.

### 5) Intercreditor Agreement.

Midstates Inc., Midstates LLC, SunTrust Bank, as First Lien Administrative Agent, and Wilmington Trust, N.A., as second lien collateral agent and third lien collateral agent, are parties to that certain intercreditor agreement, dated May 21, 2015, to govern the respective rights and obligations of the First Lien Administrative Agent and the First Lien Lenders, the trustee under and the holders of the Second Lien Notes, and the trustee under and the holders of the Third Lien Notes. After the Petition Date, UMB Bank, National Association succeeded to Wilmington Trust, N.A. as third lien collateral agent.

### 6) Preferred and Common Stock.

On October 1, 2012, Midstates issued 325,000 shares of Series A Mandatorily Convertible Preferred Stock (the "Series A Preferred Stock"). The Series A Preferred Stock was mandatorily convertible on September 30, 2015 into shares of common stock, and thus, each share of Series A Preferred Stock was converted into common stock, resulting in the issuance of 3,738,424 additional shares of common stock.

Midstates Inc.'s common stock traded on the NYSE under the ticker symbol "MPO," after its IPO in 2012, but it was delisted by the NYSE on February 3, 2016. Midstates Inc.'s common stock now trades on the over-the-counter market under the symbol "MPOY." As of the Petition Date, there are approximately 10.9 million shares of common stock outstanding.

## VII.    EVENTS LEADING TO THE CHAPTER 11 FILINGS

### A.    Commodity Price Decline.

The difficulties faced by the Debtors are consistent with problems faced industry-wide. Exploration and production companies and others have faced continued challenges with low commodity prices. Natural gas prices, in particular, have been depressed for years, and prices remained below $2.20 per MMBtu as of the Petition Date, down from over $12.00 in 2008. More recently, the price of crude oil has undergone a similarly steep decline:  the price of West Texas intermediate crude oil was below $46 per barrel as of the Petition Date after dropping as low as $26 per barrel in February 2016, down from prices of well above $100 per barrel as recently as July 2014.

These market conditions have affected oil and gas companies at every level of the industry around the world. All companies in the oil and gas industry (not just E&P companies) have felt these effects.  However, independent E&P companies have been especially hard-hit, as their revenues are generated from the sale of unrefined oil and gas.  Over 30 of them, including American Eagle Energy Corporation, Magnum Hunter Resources Corporation, Quicksilver Resources Inc., Saratoga Resources Inc., Sabine Oil & Gas Corporation, and Samson Resources Corporation, filed for chapter 11 in 2015. And several more, including Linn Energy LLC, Goodrich Petroleum Corp., Energy XXI Ltd., Ultra Petroleum Corp., and Chaparral Energy Inc., have filed for chapter 11 over recent weeks as the consequences of the current pricing environment continue to unfold.  Numerous other E&P companies have defaulted on their debt obligations, negotiated amendments or covenant relief with creditors to avoid defaulting, or have effectuated out-of-court restructurings.  The current volatility in the commodity markets has made it especially difficult for some companies to identify and execute on any viable restructuring alternatives.

Despite these secular market adjustments, the Debtors were able to maintain strong operations through 2015 and, accordingly, believe they have ample liquidity both to fund their Chapter 11 Cases and their post-emergence business plan.  This resulted, in part, from key operational and financial responses to the deteriorating market, as well as a proactive approach to addressing leverage concerns.  Specifically, the Debtors determined that pursuing a comprehensive balance sheet restructuring was preferable to continuing to wait out the market, which could ultimately have led to a less organized or free fall chapter 11 filing at a later date.

### B.    Operational Responses.

As discussed above, in response to the commodity price decline, the Debtors implemented a number of operational initiatives to reduce costs and increase efficiencies.  This included an overall management strategy focused on preserving and increasing net asset value through operational efficiencies and cost reductions, as opposed to a focus on top-line growth.  To implement this strategy, the Debtors enforce strict capital discipline designed to preserve and increase net asset value.

In particular, throughout 2015, the Debtors reduced their rig counts to preserve liquidity and focused their activity and attention on their anticipated highest-return areas and realizing operational efficiencies and well cost reductions.  In 2015, drilling and completion costs were substantially reduced through efficiency gains and service cost savings, and the Debtors reduced average drilling cycle time on new wells in the Missippian from twenty-two (22) to seventeen (17) days.  In 2016, the Debtors anticipate further reducing drilling cycle time to fifteen (15) days.  The Debtors have identified and are executing on additional opportunities to realize operational savings in 2016.  Before the Petition Date, the Debtors also reduced general and administrative expenses, including implementing a reduction in force in February 2016.

### C.      Financial Responses.

The Debtors have also undertaken efforts to increase liquidity.  On May 21, 2015, the Debtors issued $625.0 million of Second Lien Notes and utilized a portion of the proceeds to repay the outstanding balance of the First Lien Credit Facility in an amount of approximately $468.2 million, with the remainder utilized for general corporate purposes.  Further, the Debtors issued approximately $504.1 million of Third Lien Notes in exchange for approximately $279.8 million of 2020 Senior Notes and $350.3 million of 2021 Senior Notes, representing an exchange at 80.0% of the exchanged Unsecured Notes' par value.  Additionally, on June 2, 2015, the Debtors exchanged approximately $20.0 million of Third Lien Notes for approximately $26.6 million of 2020 Senior Notes and $2.0 million of 2021 Senior Notes, representing an exchange at 70.0% of the exchanged Unsecured Notes' par value.  As part of that transaction, the parties executed the Intercreditor Agreement that sets forth certain rights and obligations among them.

Further, in February 2016, to ensure full access to the liquidity under the First Lien Credit Facility, the Debtors borrowed the full availability thereunder (an additional $249.2 million), that funded by February 9, 2016.  Access to this cash has proved critical both in restructuring negotiations and as a source of cash to fund the Debtors' ongoing restructuring efforts and go-forward operations.

### D.      Potential Defaults.

However, after drawing on the First Lien Credit Facility, the Debtors faced a number of obstacles in early 2016.  First, on March 30, 2016, the Debtors filed their annual financial statements on Form 10-K for 2015 that contained a "going concern" qualification from their independent registered public accounting firm, which resulted in a violation of or default under the terms of the First Lien Credit Agreement that was subject to a 30-day cure period.  Second, on April 1, 2016, the Debtors determined not to make a coupon payment of approximately $16 million under their 2020 Senior Notes due that day. That payment was also subject to a 30-day grace period.  Finally, the April 1, 2016 redetermination of the Debtors' borrowing base in association with its reserve-based loan was completed by the First Lien Lenders, and the First Lien Agent issued notice, subject to the Debtors' legal rights, that required the Debtors to ultimately repay approximately $82 million for the borrowing base deficiency to the First Lien Lenders to reduce the outstanding amount under the First Lien Credit Facility to $170.0 million.  Failing to meet or cure any of these obligations would have generally resulted in cross-defaults elsewhere in the Debtors' capital structure.

Although the Debtors had liquidity to fund these payments, there was simply no way to cure the "going concern" qualification in the audit opinion included in their 2015 financial statements.  Thus, the Debtors opted to preserve their cash and press forward with negotiations with their secured lenders.

### E.      Negotiations with Creditors.

In particular, the Debtors focused on discussions with the First Lien Administrative Agent, the Consenting Second Lien Ad Hoc Committee, and the Consenting Cross-Over Ad Hoc Committee. Although the parties approached the discussions with divergent views and positions, the Debtors began to make immediate progress toward a comprehensive restructuring solution.

From the outset, the Debtors' focus was on building consensus.  With the First Lien Administrative Agent, discussions focused on terms for use of cash collateral and the conversion of the First Lien Credit Facility to a sustainable credit facility upon emergence.  In negotiations with the Consenting Second Lien Ad Hoc Committee and the Consenting Cross-Over Ad Hoc Committee, the focus was on achieving a fair allocation of the reorganized equity among the holders of Second Lien

Notes and Third Lien Notes, as well as the holders of Unsecured Notes and other unsecured claims.  In sum, the Debtors sought to reach a solution that satisfied the following parameters:

- converting all of the Debtors' funded debt to equity in the reorganized company, other than the First Lien Credit Facility;

- facilitating the availability of capital to support the Debtors' new business plan and related capital expenditures amid ongoing challenges in the oil and gas industry;

- providing sufficient runway should market conditions not improve in the near term after emergence; and

- maximizing enterprise value.

Throughout February and March 2016, the Debtors, the Consenting Second Lien Ad Hoc Committee, and the Consenting Cross-Over Ad Hoc Committee exchanged written proposals and conducted numerous telephonic and in-person meetings to narrow the spread on the parties' positions regarding an appropriate allocation of equity in Reorganized Parent as between the Second Lien Notes and the Third Lien Notes, as well as the terms of a related settlement.  Meanwhile, the First Lien Administrative Agent was engaged in significant business and financial diligence efforts to inform its position regarding the treatment of the First Lien Credit Facility and potential exit financing, culminating in several meetings and discussions with the Debtors and, ultimately, a late March proposal by the First Lien Administrative Agent regarding the terms of the new exit facility.

In mid-April, after the Debtors met with the Consenting Second Lien Ad Hoc Committee and the Consenting Cross-Over Ad Hoc Committee to discuss the Debtors' go-forward business plan and potential restructuring terms, all four constituencies—the Debtors, the First Lien Administrative Agent, the Consenting Second Lien Ad Hoc Committee, and the Consenting Cross-Over Ad Hoc Committee—and their advisors gathered for an all-day, all-hands negotiation session.  During that day, the divides between the parties grew closer and the issues narrowed to a few terms for each of the new exit facility and the overall restructuring transaction.

Ultimately, in the week before the Petition Date, the parties reached consensus:  first, on the terms of the new exit facility and then, with those terms in place, on the economics for the debt-to-equity conversion of the remainder of the Debtors' funded debt and the parameters for the parties' efforts to implement their deal.

### F.    Plan Support Agreement.

On April 30, 2016, the Debtors entered into the Plan Support Agreement with the First Lien Administrative Agent, certain First Lien Lenders, the Consenting Second Lien Ad Hoc Committee and the Consenting Cross-Over Ad Hoc Committee.  The Plan Support Agreement is attached hereto as **Exhibit B**.  The Plan Support Agreement contemplates a plan of reorganization that will implement a massive deleveraging of the Debtors' balance sheet, from more than $2 billion of funded debt to a new $170 million reserve-based facility, through these Chapter 11 Cases.

As discussed above, the Plan Support Agreement lays the foundation for a critical intercreditor settlement providing for, among other things: (a) an agreed valuation allocation with respect to the Debtors' encumbered assets, (b) the waiver of recoveries on account of any adequate protection claims and deficiency claims, and (c) an agreement by the holders of the Second Lien Notes that the holders of the Third Lien Notes shall receive 2.5 percent of the equity in Reorganized Parent (plus the New

36

Warrants) in exchange for a waiver and release of all intercreditor claims and objections or challenges to the Plan.

The transactions contemplated by the Plan and the Plan Support Agreement carry the overwhelming support of the Debtors' primary creditor constituencies, including the First Lien Administrative Agent, First Lien Lenders holding approximately 86 percent of the First Lien Credit Facility, holders of approximately 79 percent of the Second Lien Notes, and holders of approximately 77 percent of the Third Lien Notes.[6]

      G.     **Consensual Cash Collateral Terms.**

In connection with the Plan Support Agreement, the First Lien Administrative Agent, the Consenting Second Lien Noteholders and the Consenting Cross-Over Noteholders have agreed to terms for the Debtors' postpetition use of cash collateral. As more fully set forth in the Debtors' motion requesting authority for the use of cash collateral, as adequate protection, the Debtors will provide the Prepetition Secured Parties with replacement liens on their prepetition collateral, liens on unencumbered assets, and (for the First Lien Lenders only) superpriority claims, each in the same priority as the Prepetition Secured Parties' liens and claims held prepetition. These cash collateral and adequate protection terms are a critical component of the broadly consensual restructuring contemplated by the Plan Support Agreement.

The Debtors filed the Chapter 11 Cases to implement their prearranged plan pursuant to the terms of the Plan Support Agreement, enhance liquidity, and bolster their long-term growth prospects and operating performance. The Plan represents the successful culmination of months of restructuring efforts and offers the Debtors a path to emerge from chapter 11 as a substantially deleveraged business well-positioned to compete in the competitive E&P industry going forward.

## VIII.    EVENTS OF THE CHAPTER 11 CASES

      A.     **Corporate Structure upon Emergence.**

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, each Debtor shall continue to exist after the Effective Date as a separate corporation, limited liability company, partnership, or other form of entity, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form of entity, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and by-laws (or other analogous formation documents) in effect before the Effective Date, except to the extent such certificate of incorporation and bylaws (or other analogous formation documents) are amended by the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law).

      B.     **Expected Timetable of the Chapter 11 Cases.**

The Debtors expect the Chapter 11 Cases to proceed quickly. Should the Debtors' projected timelines prove accurate, the Debtors could emerge from chapter 11 within 100 days of the Petition Date.

---

[6]    These numbers reflect an increase from the figures disclosed in the First Day Declaration, which increase is on account of either existing Plan Support Parties purchasing additional debt or new parties executing the Plan Support Agreement.

**No assurances can be made, however, that the Bankruptcy Court will enter various orders on the timetable anticipated by the Debtors.**

### C.     First Day Relief.

On the Petition Date, the Debtors filed several motions (the "First Day Motions") designed to facilitate the administration of the Chapter 11 Cases and minimize disruption to the Debtors' operations, by, among other things, easing the strain on the Debtors' relationships with employees, vendors, and mineral interest owners and working interest owners (among others) following the commencement of the Chapter 11 Cases.  At a hearing on May 2, 2016, the Bankruptcy Court granted all of the relief requested in the First Day Motions.  The First Day Motions, and all orders for relief granted in the Chapter 11 Cases, can be viewed free of charge at http://www.kccllc.net/midstates.

## IX.     PROJECTED FINANCIAL INFORMATION

Attached hereto as **Exhibit D** is a projected consolidated income statement, which includes consolidated, projected, unaudited, financial statement information of the Reorganized Debtors (collectively, the "Financial Projections") for the period beginning August 1, 2016 and continuing through December 31, 2020.  The Financial Projections are based on an assumed Effective Date of July 31, 2016.  To the extent that the Effective Date occurs before or after July 31, 2016, recoveries on account of Allowed Claims could be impacted.  Creditors and other interested parties should see the below "Risk Factors" for a discussion of certain factors that may affect the future financial performance of the Reorganized Debtors.

## X.     RISK FACTORS

Holders of Claims should read and consider carefully the risk factors set forth below before voting to accept or reject the Plan.  Although there are many risk factors discussed below, these factors should not be regarded as constituting the only risks present in connection with the Debtors' businesses or the Plan and its implementation.

### A.     Bankruptcy Law Considerations.

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to holders of Allowed Claims under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of holders of Claims in such Impaired Classes.

#### 1)     The Plan is based upon assumptions that may prove incorrect.

The Plan affects both the Debtors' capital structure and the ownership, structure, and operation of their business and reflects assumptions and analyses based on the Debtors' experience and perception of historical trends, current conditions, and expected future developments, as well as other factors that the Debtors consider appropriate under the circumstances.  Whether actual future results and developments will be consistent with the Debtors' expectations and assumptions depends on a number of factors, including but not limited to the Debtors' (a) ability to obtain adequate liquidity and financing sources; and (b) ability to incentive key employees, as well as the overall strength and stability of general economic conditions of the oil and gas industry.  The failure of any of these factors could materially adversely affect the successful reorganization of the Debtors' business.

In addition, the Plan relies upon Financial Projections, including with respect to revenues, EBITDA, debt service, and cash flow.  Financial forecasts are necessarily speculative, and it is likely that

one or more of the assumptions and estimates that are the basis of these financial forecasts will not be accurate. Consequently, there can be no assurance that the results or developments contemplated by any plan of reorganization implemented will occur or, even if they do occur, that they will have the anticipated effects on the Debtors and their subsidiaries or their businesses or operations. The failure of any such results or developments to materialize as anticipated could materially adversely affect the successful execution of the Plan.

### 2) Parties in Interest May Object to the Plan's Classification of Claims and Interests.

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

### 3) The Conditions Precedent to the Effective Date of the Plan May Not Occur.

As more fully set forth in Article IX of the Plan, the Effective Date is subject to a number of conditions precedent. There is no guarantee as to the timing of the Effective Date. If such conditions precedent are not met or waived, the Effective Date will not take place. In that event, the Plan would be deemed null and void and the Debtors or any other party may propose or solicit votes on an alternative plan of reorganization that may not be as favorable to parties in interest as the Plan.

### 4) The Debtors May Fail to Satisfy Vote Requirements.

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan. In the event that sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan. There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the holders of Allowed Claims as those proposed in the Plan.

### 5) The Debtors May Not Be Able to Secure Confirmation of the Plan.

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Bankruptcy Court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims and equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code. Although the Debtors believe that the Plan will meet the requirements for Confirmation, there is no guarantee that the Plan will be confirmed.

Additionally, there can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A non-accepting holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determines that this Disclosure Statement, the balloting procedures, and voting results are appropriate, the Bankruptcy

Court could still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation are not met.  If a chapter 11 plan of reorganization is not confirmed by the Bankruptcy Court, it is unclear whether the Debtors will be able to reorganize their business and what, if anything, holders of Allowed Claims against them would ultimately receive on account of such Allowed Claims.

Confirmation of the Plan is also subject to certain conditions as described in Article IX of the Plan.  If the Plan is not confirmed, it is unclear what distributions, if any, Holders of Allowed Claims will receive on account of such Allowed Claims.

The Debtors, subject to the terms and conditions of the Plan and the Plan Support Agreement, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation.  Any such modifications could result in less favorable treatment of any non-accepting Class, as well as any Class junior to such non-accepting Class, than the treatment currently provided in the Plan.  Such a less favorable treatment could include a distribution of property with a lesser value than currently provided in the Plan or no distribution whatsoever under the Plan.

### 6)   Nonconsensual Confirmation.

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class(es).  The Debtors believe that the Plan satisfies these requirements, and the Debtors may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion.  In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to professional compensation.

### 7)   Continued Risk upon Confirmation.

Even if a chapter 11 plan of reorganization is consummated, the Debtors will continue to face a number of risks, including certain risks that are beyond their control, such as further deterioration or other changes in economic conditions, changes in the industry, potential revaluing of their assets due to chapter 11 proceedings, changes in consumer demand for, and acceptance of, their oil and gas, and increasing expenses. Some of these concerns and effects typically become more acute when a case under the Bankruptcy Code continues for a protracted period without indication of how or when the case may be completed. As a result of these risks and others, there is no guarantee that a chapter 11 plan of reorganization reflecting the Plan will achieve the Debtors' stated goals.

In addition, at the outset of the Chapter 11 Cases, the Bankruptcy Code will give the Debtors the exclusive right to propose the Plan and will prohibit creditors and others from proposing a plan. The Debtors will have retained the exclusive right to propose the Plan upon filing their petitions for chapter 11 relief. If the Bankruptcy Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Debtors' ability to achieve confirmation of the Plan in order to achieve the Debtors' stated goals.

Furthermore, even if the Debtors' debts are reduced and/or discharged through the Plan, the Debtors may need to raise additional funds through public or private debt or equity financing or other various means to fund the Debtors' business after the completion of the proceedings related to the

Chapter 11 Cases. Adequate funds may not be available when needed or may not be available on favorable terms.

### 8) The Chapter 11 Cases May Be Converted to Cases Under Chapter 7 of the Bankruptcy Code.

If the Bankruptcy Court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code. In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code. The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in a chapter 11 plan because of (a) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time rather than reorganizing or selling in a controlled manner affecting the business as a going concern, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (c) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation, and including Claims resulting from the rejection of Unexpired Leases and other Executory Contracts in connection with cessation of operations.

### 9) The Debtors May Object to the Amount or Classification of a Claim.

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Plan. The estimates set forth in this Disclosure Statement cannot be relied upon by any holder of a Claim where such Claim is subject to an objection. Any holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

### 10) Risk of Non-Occurrence of the Effective Date.

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur.

### 11) Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan.

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims. The occurrence of any and all such contingencies, which could affect distributions available to Holders of Allowed Claims under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement. Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed. Such differences may materially and adversely affect, among other things, the percentage recoveries to holders of Allowed Claims under the Plan.

**12) Releases, Injunctions, and Exculpations Provisions May Not Be Approved.**

Article VIII of the Plan provides for certain releases, injunctions, and exculpations, including a release of liens and third-party releases that may otherwise be asserted against the Debtors, Reorganized Debtors, or Released Parties, as applicable. The releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved. If the releases are not approved, certain Released Parties may withdraw their support for the Plan.

**B.    Risks Related to Recoveries under the Plan.**

**1) The Amount of General Unsecured Claims is Uncertain.**

With respect to holders of Unsecured Notes Claims and Allowed General Unsecured Claims, the claims filed against the Debtors' estates may be materially higher than the Debtors have estimated. As holders of Allowed Unsecured Notes Claims and General Unsecured Claims receive a Pro Rata distribution, additional claims could reduce the recovery.

**2) The Recovery for Unsecured Notes Claims and General Unsecured Claims Could Be Reduced in the Event of a Settlement Termination Event or a Challenge by a General Unsecured Party to the Settlements Contemplated by the Plan, Approval of the Disclosure Statement, and/or Confirmation of the Plan.**

In the event that either (a) the Court issues any written or oral judgment denying approval of the Intercreditor Settlement or any material component thereof or (b) the Requisite Second Lien Noteholders elect to terminate the settlement pursuant to Section 6(b)(iv) of the Plan Support Agreement, the Intercreditor Settlement will automatically terminate under the Plan. Subject to the rights of Consenting Second Lien Noteholders and the Consenting Cross-Over Noteholders, under the Plan Support Agreement, the Unencumbered Asset Equity Distribution will then be distributed first to the Prepetition Secured Parties on account of any adequate protection claims they may hold, and the balance of the Unencumbered Asset Equity Distribution will be shared Pro Rata among all holders of Unsecured Notes Claims and General Unsecured Claims, including Deficiency Claims held by the Prepetition Secured Parties.

Further, in the event of any Challenge by any General Unsecured Party to the settlements contemplated by the Plan, approval of the Disclosure Statement, and/or Confirmation of the Plan, (a) the Diminution in Value Claims will not be waived, (b) the Prepetition Secured Parties' Diminution in Value Claims and adequate protection liens will attach to the Unencumbered Assets (and will include, without limitation, all estate fees and costs associated with any General Unsecured Party's Challenge), and (c) the Prepetition Secured Parties' Deficiency Claims will share Pro Rata in any recovery available to the Classes of General Unsecured Creditors and Unsecured Notes Claims.

**3) The Debtors May Not Be Able to Achieve Their Projected Financial Results.**

With respect to holders of Interests in the Reorganized Debtors, the Reorganized Debtors may not be able to achieve their projected financial results. The Financial Projections set forth in this Disclosure Statement represent the Debtors' management team's best estimate of the Debtors' future financial performance, which is necessarily based on certain assumptions regarding the anticipated future performance of the Reorganized Debtors' operations, as well as the United States and world economies in general, and the particular industry segments in which the Debtors operate in particular. In addition, unanticipated events and circumstances occurring subsequent to the date of this Disclosure Statement may affect the actual financial results of the operations of the Reorganized Debtors. These variations may be

material and adverse.  While the Debtors believe that the Financial Projections contained in this Disclosure Statement are reasonable, there can be no assurance that they will be realized.  If the Debtors do not achieve their projected financial results, (a) the value of the New Common Stock may be negatively affected, (b) the Debtors may lack sufficient liquidity to continue operating as planned after the Effective Date; and (c) the Debtors may be unable to service their debt obligations as they come due.  Moreover, the financial condition and results of operations of the Reorganized Debtors from and after the Effective Date may not be comparable to the financial condition or results of operations reflected in the Debtors' historical financial statements.

### 4)   The Restructuring of the Debtors May Adversely Affect the Debtors' Tax Attributes.

Under federal income tax law, a corporation is generally permitted to deduct from taxable income NOLs carried forward from prior years. The Debtors have net operating loss carryforwards and other tax attributes of approximately $423 million as of December 31, 2015.  The Debtors' ability to utilize their NOL carryforwards and other tax attributes to offset future taxable income and to reduce federal income tax liability is subject to certain requirements and restrictions.  If the Debtors experience an "ownership change," as defined in section 382 of the Tax Code (as defined herein), then their ability to use the net operating loss carryforwards and other tax attributes may be substantially limited, which could have a negative impact on the Debtors' financial position and results of operations.  Generally, there is an "ownership change" if one or more stockholders owning 5 percent or more of a corporation's common stock have aggregate increases in their ownership of such stock of more than 50 percentage points over the prior three-year period.  Following the implementation of a plan of reorganization, it is possible that an "ownership change" may be deemed to occur.  Under section 382 of the Tax Code, absent an applicable exception, if a corporation undergoes an "ownership change," the amount of its net operating loss carryforwards and other tax attributes that may be utilized to offset future taxable income generally is subject to an annual limitation.  Even if the net operating loss carryforwards and other tax attributes are subject to limitation under section 382, such net operating loss carryforwards and other tax attributes can be reduced by the amount of discharge of indebtedness arising in a chapter 11 case under section 108 of the Tax Code or to offset any taxable gains recognized by the Debtors attributable to the Restructuring Transactions.  The Debtors currently expect that their net operating loss carryforwards and other tax attributes may be significantly reduced in connection with the Restructuring Transactions, through a combination of one or more of the above factors.

For a detailed description of the effect consummation of the Plan may have on the Debtors' tax attributes, see "Certain United States Federal Income Tax Consequences of the Plan," in Article XIV herein.

### 5)   The Debtors May Not Be Able to Accurately Report Their Financial Results.

The Debtors have established internal controls over financial reporting.  However, internal controls over financial reporting may not prevent or detect misstatements or omissions in the Debtors' financial statements because of their inherent limitations, including the possibility of human error, and the circumvention or overriding of controls or fraud.  Therefore, even effective internal controls can provide only reasonable assurance with respect to the preparation and fair presentation of financial statements.  If the Debtors fail to maintain the adequacy of their internal controls, the Debtors may be unable to provide financial information in a timely and reliable manner within the time periods required for the Debtors' financial reporting under SEC rules and regulations and the terms of the agreements governing the Debtors' indebtedness.  Any such difficulties or failure could materially adversely affect the Debtors' business, results of operations, and financial condition.

C.      **Risks Related to the Debtors' and the Reorganized Debtors' Businesses.**

1)    **The Debtors May Not Be Able to Generate Sufficient Cash to Service All of Their Indebtedness.**

The Debtors' ability to make scheduled payments on, or refinance their debt obligations depends on the Debtors' financial condition and operating performance, which are subject to prevailing economic, industry, and competitive conditions and to certain financial, business, legislative, regulatory, and other factors beyond the Debtors' control (including the factors discussed in Article X.C.6 herein).   The Debtors may be unable to maintain a level of cash flow from operating activities sufficient to permit the Debtors to pay the principal and interest on their indebtedness.

2)    **The Debtors Will Be Subject to the Risks and Uncertainties Associated with the Chapter 11 Cases.**

For the duration of the Chapter 11 Cases, the Debtors' ability to operate, develop, and execute a business plan, and continue as a going concern, will be subject to the risks and uncertainties associated with bankruptcy. These risks include the following:  (a) ability to develop, confirm, and consummate the Restructuring Transactions specified in the Plan; (b) ability to obtain court approval with respect to motions filed in the Chapter 11 Cases from time to time; (c) ability to maintain relationships with suppliers, service providers, customers, employees, royalty interest holders, working interest holders, and other third parties; (d) ability to maintain contracts that are critical to the Debtors' operations; (e) ability of third parties to seek and obtain court approval to terminate contracts and other agreements with the Debtors; (f) ability of third parties to seek and obtain court approval to terminate or shorten the exclusivity period for the Debtors to propose and confirm a chapter 11 plan, to appoint a chapter 11 trustee, or to convert the Chapter 11 Cases to chapter 7 proceedings; and (g) the actions and decisions of the Debtors' creditors and other third parties who have interests in the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

These risks and uncertainties could affect the Debtors' businesses and operations in various ways. For example, negative events associated with the Chapter 11 Cases could adversely affect the Debtors' relationships with suppliers, service providers, customers, employees, and other third parties, which in turn could adversely affect the Debtors' operations and financial condition.  Also, the Debtors will need the prior approval of the Bankruptcy Court for transactions outside the ordinary course of business, which may limit the Debtors' ability to respond timely to certain events or take advantage of certain opportunities.  Because of the risks and uncertainties associated with the Chapter 11 Cases, the Debtors cannot accurately predict or quantify the ultimate impact of events that occur during the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

3)    **Operating in Bankruptcy for a Long Period of Time May Harm the Debtors' Businesses.**

The Debtors' future results will be dependent upon the successful confirmation and implementation of a plan of reorganization.  A long period of operations under Bankruptcy Court protection could have a material adverse effect on the Debtors' businesses, financial condition, results of operations, and liquidity. So long as the proceedings related to the Chapter 11 Cases continue, senior management will be required to spend a significant amount of time and effort dealing with the reorganization instead of focusing exclusively on business operations. A prolonged period of operating under Bankruptcy Court protection also may make it more difficult to retain management and other key personnel necessary to the success and growth of the Debtors' businesses.  In addition, the longer the proceedings related to the Chapter 11 Cases continue, the more likely it is that customers and suppliers

will lose confidence in the Debtors' ability to reorganize their businesses successfully and will seek to establish alternative commercial relationships.

So long as the proceedings related to the Chapter 11 Cases continue, the Debtors will be required to incur substantial costs for professional fees and other expenses associated with the administration of the Chapter 11 Cases.  The chapter 11 proceedings may also require the Debtors to seek debtor-in-possession financing to fund operations.  If the Debtors are unable to obtain such financing on favorable terms or at all, the chances of successfully reorganizing the Debtors' businesses may be seriously jeopardized, the likelihood that the Debtors will instead be required to liquidate their assets may be enhanced, and, as a result, creditor recoveries may be significantly impaired.

Furthermore, the Debtors cannot predict the ultimate amount of all settlement terms for the liabilities that will be subject to a plan of reorganization.  Even after a plan of reorganization is approved and implemented, the Debtors' operating results may be adversely affected by the possible reluctance of prospective lenders and other counterparties to do business with a company that recently emerged from bankruptcy protection.

### 4)   Financial Results May Be Volatile and May Not Reflect Historical Trends.

During the Chapter 11 Cases, the Debtors expect that their financial results will continue to be volatile as asset impairments, possible asset dispositions, restructuring activities and expenses, contract terminations and rejections, and claims assessments significantly impact the Debtors' consolidated financial statements.  As a result, the Debtors' historical financial performance likely will not be indicative of their financial performance after the Petition Date.

In addition, if the Debtors emerge from chapter 11, the amounts reported in subsequent consolidated financial statements may materially change relative to historical consolidated financial statements, including as a result of revisions to the Debtors' operating plans pursuant to a plan of reorganization.  The Debtors also may be required to adopt fresh start accounting, in which case their assets and liabilities will be recorded at fair value as of the fresh start reporting date, which may differ materially from the recorded values of assets and liabilities on the Debtors' consolidated balance sheets. The Debtors' financial results after the application of fresh start accounting also may be different from historical trends.

### 5)   The Debtors' Substantial Liquidity Needs May Impact Production Levels and Revenue.

The Debtors' principal sources of liquidity historically have been cash flow from operations, sales of oil and gas properties, borrowings under the First Lien Credit Facility and issuances of debt securities. The Debtors' capital program could require additional financing above the level of cash expected to be generated by operations to fund growth.  If the Debtors' cash flow from operations remains depressed or decreases as a result of lower commodity prices or otherwise, the Debtors' ability to expend the capital necessary to replace proved reserves, maintain leasehold acreage, or maintain production may be limited, resulting in decreased production and proved reserves over time.

The Debtors' liquidity, including the ability to meet ongoing operational obligations, will be dependent upon, among other things:  (a) ability to comply with the terms and condition of any cash collateral order entered by the Bankruptcy Court in connection with the Chapter 11 Cases; (b) ability to maintain adequate cash on hand; (c) ability to generate cash flow from operations; (d) ability to develop, confirm, and consummate a chapter 11 plan or other alternative restructuring transaction; and (e) the cost, duration, and outcome of the Chapter 11 Cases. The Debtors' ability to maintain adequate liquidity depends, in part, upon industry conditions and general economic, financial, competitive, regulatory, and

other factors beyond the Debtors' control.  In the event that cash on hand and cash flow from operations are not sufficient to meet the Debtors' liquidity needs, the Debtors may be required to seek additional financing.  The Debtors can provide no assurance that additional financing would be available or, if available, offered to the Debtors on acceptable terms.  The Debtors' access to additional financing is, and for the foreseeable future likely will continue to be, extremely limited if it is available at all.  The Debtors' long-term liquidity requirements and the adequacy of their capital resources are difficult to predict at this time.

> **6) Oil and Natural Gas Prices Are Volatile, and Low Oil or Natural Gas Prices Could Materially Adversely Affect the Debtors' Businesses, Results of Operations, and Financial Condition.**

The Debtors' revenues, profitability and the value of the Debtors' properties substantially depend on prevailing oil and natural gas prices.  Oil and natural gas are commodities, and therefore, their prices are subject to wide fluctuations in response to changes in supply and demand.  Oil and natural gas prices historically have been volatile and are likely to continue to be volatile in the future, especially given current economic and geopolitical conditions.  The spot oil prices during 2015 ranged from a high of $61.36 to a low of $34.55 per Bbl and the spot natural gas prices during 2015 ranged from a high of $3.32 to a low of $1.63 per MMBtu.  From January through April 30, 2016, commodity prices have continued to be depressed and volatile relative to past years, with spot oil prices ranging from a high of $46.03 to a low of $26.21 per Bbl and the spot natural gas prices ranging from a high of $2.53 to a low of $1.50 per MMBtu.  The Debtors expect such volatility to continue in the future.  The prices for oil and natural gas are subject to a variety of factors beyond the Debtors' control, such as:

- domestic and global economic conditions impacting the supply and demand of oil and natural gas;

- uncertainty in capital and commodities markets;

- the price and quantity of foreign imports;

- domestic and global political conditions, particularly in oil and natural gas producing countries or regions, such as the Middle East, Russia, the North Sea, Africa and South America;

- the ability of members of the OPEC and other producing countries to agree upon and maintain oil prices and production levels;

- the level of consumer product demand, including in emerging markets such as China;

- weather conditions and force majeure events such as earthquakes and nuclear meltdowns;

- technological advances affecting energy consumption and the development of oil and natural gas reserves;

- domestic and foreign governmental regulations and taxes, including administrative or agency actions and policies;

- commodity processing, gathering and transportation cost and availability, and the availability of refining capacity;

- the price and availability of alternative fuels and energy;

- the strengthening and weakening of the United States dollar relative to other currencies; and

- variations between product prices at sales points and applicable index prices.

Oil and natural gas prices affect the amount of cash flow available to the Debtors to meet their financial commitments and fund capital expenditures. Moreover, prior to the Petition Date, all of the Debtors' open commodity derivative contracts expired, meaning all of the Debtors' estimated production is exposed to commodity price volatility. Oil and natural gas prices also impact the Debtors' ability to borrow money and raise additional capital. For example, the amount the Debtors will be able to borrow under the New Credit Facility will be subject to periodic redeterminations based (subject to an initial redetermination holiday until April 1, 2018), in part, on current oil and natural gas prices and on changing expectations of future prices. Lower prices may also reduce the amount of oil and natural gas that the Debtors can economically produce and have an adverse effect on the value of the Debtors' reserves, which could result in material impairments to the Debtors' oil and natural gas properties. As a result, if there is a further decline or sustained depression in commodity prices, the Debtors may, among other things, be unable to maintain or increase their borrowing capacity, meet their debt obligations or other financial commitments, or obtain additional capital, all of which could materially adversely affect the Debtors' businesses, results of operations, and financial condition.

### 7) Drilling for and Producing Oil and Natural Gas Are High Risk Activities with Many Uncertainties That Could Materially Adversely Affect the Debtors' Businesses, Results of Operations, and Financial Condition.

The Debtors' operations are subject to many risks, including the risk that the Debtors will not discover commercially productive reservoirs. Drilling for oil and natural gas can be unprofitable, not only from dry holes, but from productive wells that do not produce sufficient revenue to return a profit. The Debtors decisions to purchase, explore, develop, or otherwise exploit prospects or properties will depend in part on the evaluation of data obtained through geophysical and geological analyses, as well as production data and engineering studies, the results of which are often inconclusive or subject to varying interpretations. In addition, the results of the Debtors' exploratory drilling in new or emerging areas are more uncertain than drilling results in areas that are developed and have established production, and the Debtors' operations may involve the use of recently-developed drilling and completion techniques. The Debtors' cost of drilling, completing, equipping, and operating wells is often uncertain before drilling commences. Declines in commodity prices and overruns in budgeted expenditures are common risks that can make a particular project uneconomic or less economic than forecasted. Further, many factors may curtail, delay, or cancel drilling and completion projects, including the following:

- delays or restrictions imposed by or resulting from compliance with regulatory and contractual requirements;

- delays in receiving governmental permits, orders, or approvals;

- differing pressure than anticipated or irregularities in geological formations;

- equipment failures or accidents;

- fires, natural disasters and adverse weather conditions;

- environmental hazards, such as natural gas leaks, oil spills, pipeline ruptures and discharges of toxic gases;

- surface access restrictions;

- loss of title or other title related issues;

- shortages or delays in the availability of, increases in the cost of, or increased competition for, drilling rigs and crews, fracture stimulation crews and equipment, pipe, chemicals, and supplies; and

- restrictions in access to or disposal of water resources used in drilling and completion operations.

In addition, the Debtors' hydraulic fracturing operations require significant quantities of water. Regions where the Debtors' operate have recently experienced drought conditions. These conditions could persist in the future, diminishing our access to water for hydraulic fracturing operations. Any diminished access to water for use in hydraulic fracturing, whether due to usage restrictions or drought or other weather conditions, could curtail the Debtors' operations or otherwise result in delays in operations or increased costs.

Historically, there have been periods of shortages of drilling and workover rigs, pipe, other oilfield equipment, and skilled personnel during periods of rising oil and gas prices, as demand for rigs, equipment, and personnel increased along with the number of wells being drilled. Should commodity prices improve from their current levels and activity increase, the Debtors could face significant increases in costs for equipment, services, and/or personnel. Such shortages or increases in costs could significantly decrease the Debtors' profit margin, cash flow, and operating results, or restrict the Debtors' operations in the future.

The occurrence of certain of these events, particularly equipment failures or accidents, could impact third parties, including persons living in proximity to the Debtors' operations, the Debtors' employees, and employees of the Debtors' contractors, leading to possible injuries, death, or significant property damage. As a result, the Debtors face the possibility of liabilities from these events that could materially adversely affect the Debtors' businesses, results of operations, and financial condition.

**8) Legislation or regulatory initiatives intended to address seismic activity could restrict the Debtors' ability to dispose of saltwater produced alongside their hydrocarbons, which could limit their ability to produce oil and gas economically and have a material adverse effect on their business.**

The Debtors dispose of large volumes of saltwater produced alongside oil and natural gas in connection with their drilling and production operations pursuant to permits issued to them by governmental authorities overseeing such disposal activities. While these permits are issued pursuant to existing laws and regulations, the applicable legal requirements are subject to change, which could result in the imposition of more stringent operating constraints or new monitoring and reporting requirements.

There exists a growing concern that the injection of saltwater into belowground disposal wells contribute to seismic activity in certain areas, including Oklahoma and Texas, where the Debtors operate. For instance, on April 21, 2015, the Oklahoma Geologic Survey ("OGS") issued a document entitled "Statement of Oklahoma Seismicity," in which the agency states "[t]he OGS considers it very likely that the majority of recent earthquakes, particularly those in central and north-central Oklahoma, are triggered by the injection of produced water in disposal wells." In response to these concerns, regulators in some states, including Oklahoma and Texas, are pursuing initiatives designed to impose additional requirements in the permitting and operation of saltwater disposal wells or otherwise to assess any relationship between seismicity and the use of such wells. For example, in 2015, the Oklahoma

Corporation Commission (the "OCC"), which regulates oil and gas activity in the state of Oklahoma, adopted rules for operators of saltwater disposal wells in certain seismically-active areas ("Areas of Interest") disposing into the Arbuckle formation, requiring operators to monitor and record well pressure and injection volumes on a daily basis and further requiring operators of wells permitted for disposal of 20,000 barrels per day or more of saltwater to conduct mechanical integrity testing.  On March 25, 2015, the Oil and Gas Conservation Division of the OCC (the "OGCD") issued a directive, expanding the Areas of Interest for induced seismicity. Under the new directive, operators of 347 disposal wells located within the expanded Areas of Interest of the Arbuckle formation were given until April 18, 2015 to demonstrate that their wells were not disposing into or in communication with the crystalline basement rock underlying the Arkbuckle formation. Operators of wells in contact or communication with the basement rock were required to reduce the depth of, or "plug back," those wells or, alternatively, to reduce disposal volume by 50 percent.  On July 17, 2015, the OGCD issued another directive, further expanding the covered area to include an additional 211 disposal wells.  Under this second directive, operators were given until August 14, 2015 to prove that they were not injecting below the Arbuckle formation or, as necessary, to plug back those wells in contact or communication with the crystalline basement rock, without the option of reducing disposal volume by 50 percent.

Most recently, on January 13, 2016, the OGCD announced a plan in response to recent earthquakes in the Fairview area of Oklahoma. The plan calls for changes to the operations of oil and gas wastewater disposal wells in the area that dispose into the Arbuckle formation.  Under the plan, a total of 27 Arbuckle disposal wells will be required to reduce disposal volume.  The plan will affect 11 disposal wells the Debtors currently operate in the Arbuckle formation.  On February 16, 2016, the OGCD requested the Debtors curtail their wastewater disposal volumes by approximately 40%.  The Debtors are currently in discussions with the OGCD regarding these matters and are working to mitigate any potential impact to their operations.

In Texas, effective on November 17, 2014, the Texas Railroad Commission adopted a new rule governing permitting or re-permitting of disposal wells that requires, among other things, the submission of information on seismic events occurring within a specified radius of the disposal well location, as well as logs, geologic cross sections and structure maps relating to the disposal area in question.  If a permittee or a prospective permittee fails to demonstrate that the saltwater or other fluids are confined to the disposal zone or if scientific data indicates such a disposal well is likely to be or determined to be contributing to seismic activity, then the Commission may deny, modify, suspend or terminate the permit application or existing operating permit for that well.

The adoption and implementation of any new laws, regulations, or directives that restrict their ability to dispose of saltwater by plugging back the depths of disposal wells, reducing the volume of oil and natural gas wastewater disposed in such wells, restricting disposal well locations, or by requiring the Debtors to shut down disposal wells, which could require the Debtors to cease operations at a substantial number of their oil and natural gas wells, could have a material adverse effect on their ability to produce oil and gas economically and, accordingly, could materially and adversely affect their business, financial condition and results of operations.

### 9)   Commodity Prices and Hedging May Present Additional Risks.

The Debtors currently do not have any outstanding derivative instruments.  During the Chapter 11 Cases, the Debtors' ability to enter into new commodity derivatives covering additional estimated future production will depend upon either entering into unsecured hedges or obtaining Bankruptcy Court approval to enter into secured hedges.  As a result, the Debtors may not be able to enter into commodity derivatives covering their production in future periods on favorable terms or at all.  If the Debtors cannot

or choose not to enter into commodity derivatives in the future, the Debtors could be more affected by changes in commodity prices than their competitors that engage in hedging arrangements. The Debtors' inability to hedge the risk of low commodity prices in the future, on favorable terms or at all, could have a material adverse impact on their businesses, financial condition, and results of operations.

If the Debtors are able to enter into any commodity derivatives, such derivatives may limit the benefit the Debtors would receive from increases in commodity prices. These arrangements would also expose the Debtors to risk of financial losses in some circumstances, including the following: (a) the Debtors' production could be materially less than expected; or (b) the counterparties to the contracts could fail to perform their contractual obligations.

If the Debtors' actual production and sales for any period are less than the production covered by any commodity derivatives (including reduced production due to operational delays) or if the Debtors are unable to perform their exploration and development activities as planned, the Debtors might be required to satisfy a portion of their obligations under those commodity derivatives without the benefit of the cash flow from the sale of that production, which may materially impact the Debtors' liquidity. Additionally, if market prices for production exceed collar ceilings or swap prices, the Debtors would be required to make monthly cash payments, which could materially adversely affect their liquidity.

**10) Reorganized Parent does not expect to pay dividends in the near future.**

As set forth in the Plan, Reorganized Parent does not anticipate that cash dividends or other distributions will be paid with respect to the New Common Stock, which will be publicly traded, in the foreseeable future and there can be no assurance that such dividends or other distributions will be paid at any time in the future or at all. In addition, restrictive covenants in certain debt instruments to which Reorganized Parent will, or may, be a party, may limit the ability of Reorganized Parent to pay dividends or for Reorganized Parent to receive dividends from its subsidiaries.

**11) The Reorganized Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases.**

In the future, the Reorganized Debtors may become party to litigation. In general, litigation can be expensive and time consuming to bring or defend against. Such litigation could result in settlements or damages that could significantly affect the Reorganized Debtors' financial results. It is also possible that certain parties will commence litigation with respect to the treatment of their Claims under the Plan. It is not possible to predict the potential litigation that the Reorganized Debtors may become party to, nor the final resolution of such litigation. The impact of any such litigation on the Reorganized Debtors' businesses and financial stability, however, could be material.

**12) The Debtors' estimated proved reserves are based on many assumptions that may turn out to be inaccurate. Any significant inaccuracies in these assumptions will materially affect the quantities and estimated present value of their reserves.**

The process of estimating oil and natural gas reserves is complex. It requires interpretations of available technical data and many assumptions, including assumptions relating to current and future economic conditions and commodity prices. Any significant inaccuracies in these assumptions could materially affect the estimated quantities and present value of reserves shown in this report.

In order to prepare the Debtors' estimates, the Debtors must estimate production rates and the timing of development expenditures. The Debtors must also analyze available geological, geophysical, production and engineering data. The extent, quality and reliability of this data can vary. The process also requires economic assumptions about matters such as oil and natural gas prices, drilling and operating

50

expenses, capital expenditures, taxes and availability of funds. Estimates of oil and natural gas reserves are inherently imprecise. In addition, reserve estimates for properties that do not have a lengthy production history, including the areas in which the Debtors operate, are less reliable than estimates for fields with lengthy production histories. There can be no assurance that analysis of previous production data relating to the Mississippian Lime or Anadarko Basin will accurately predict future production, development expenditures or operating expenses from wells drilled and completed using modern techniques. In addition, this data is partially based on vertically drilled wells, which may not accurately reflect production, development expenditures or operating expenses that may result from the application of horizontal drilling techniques.

Actual future production, oil and natural gas prices, revenues, taxes, development expenditures, operating expenses and quantities of recoverable oil and natural gas reserves may vary from the Debtors' estimates. Any significant variance could materially affect the estimated quantities and present value of reserves. In addition, the Debtors may adjust estimates of proved reserves to reflect production history, results of exploration and development, prevailing oil and natural gas prices and other factors, many of which are beyond their control.

### 13) The Development of the Debtors' Undeveloped Reserves in the Debtors' Areas of Operation May Take Longer and May Require Higher Levels of Capital Expenditures than the Debtors Currently Anticipate. Therefore, the Debtors' Undeveloped Reserves May not be Ultimately Developed or Produced.

Development of these reserves may take longer and require higher levels of capital expenditures than the Debtors currently anticipate. Delays in the development of the Debtors' reserves or increases in costs to drill and develop such reserves will reduce the future net revenues estimated for such reserves and may result in some projects becoming uneconomic. In addition, pursuant to existing SEC rules and guidance, subject to limited exceptions, proved undeveloped reserves may only be booked if they relate to wells scheduled to be drilled within five years of the date of booking. Accordingly, delays in the development of such reserves, increases in capital expenditures required to develop such reserves and changes in commodity prices may cause the Debtors to reclassify certain of their proved undeveloped reserves as unproved reserves, which may materially adversely affect their business, results of operations and financial condition. Specifically, due to uncertainty around the Debtors' ability to adequately finance the development of their proved undeveloped reserves over a five year period, 77,362 MBoe comprising $179.0 million of PV-10 value (at SEC pricing) of proved undeveloped reserves was transferred and booked in the probable reserve category as of December 31, 2015.

### 14) The Loss of Key Personnel Could Adversely Affect the Debtors' Operations.

The Debtors' operations are dependent on a relatively small group of key management personnel, including the Debtors' executive officers. The Debtors' recent liquidity issues and the Chapter 11 Cases have created distractions and uncertainty for key management personnel and employees. As a result, the Debtors have experienced and may continue to experience increased levels of employee attrition. Because competition for experienced personnel in the oil and gas industry can be significant, the Debtors may be unable to find acceptable replacements with comparable skills and experience and the loss of such key management personnel could adversely affect the Debtors' ability to operate their businesses. In addition, a loss of key personnel or material erosion of employee morale at the corporate and/or field levels could have a material adverse effect on the Debtors' ability to execute their business plan and meet counterparty expectations, thereby adversely affecting the Debtors' businesses and the results of operations.

**15) Certain Claims May Not Be Discharged and Could Have a Material Adverse Effect on the Debtors' Financial Condition and Results of Operations.**

The Bankruptcy Code provides that the confirmation of a plan of reorganization discharges a debtor from substantially all debts arising prior to confirmation. With few exceptions, all claims that arise prior to the Debtors' filing a petition for reorganization under the Bankruptcy Code or before confirmation of the Plan (a) would be subject to compromise and/or treatment under the plan of reorganization and/or (b) would be discharged in accordance with the terms of the Plan. Any claims not ultimately discharged through the Plan could be asserted against the Reorganized Debtors and may have an adverse effect on the Reorganized Debtors' financial condition and results of operations on a post-reorganization basis.

## XI.   SOLICITATION AND VOTING PROCEDURES

This Disclosure Statement, which is accompanied by a Ballot or Ballots to be used for voting on the Plan, is being distributed to the holders of Claims in those Classes that are entitled to vote to accept or reject the Plan. The procedures and instructions for voting and related deadlines are set forth in the exhibits annexed to the Disclosure Statement Order, which is attached hereto as **Exhibit C**.

**THE DISCLOSURE STATEMENT ORDER IS INCORPORATED HEREIN BY REFERENCE AND SHOULD BE READ IN CONJUNCTION WITH THIS DISCLOSURE STATEMENT AND IN FORMULATING A DECISION TO VOTE TO ACCEPT OR REJECT THE PLAN**.

---

**THE DISCUSSION OF THE SOLICITATION AND VOTING PROCESS SET FORTH IN THIS DISCLOSURE STATEMENT IS ONLY A SUMMARY.**

**PLEASE REFER TO THE ATTACHED DISCLOSURE STATEMENT ORDER FOR A MORE COMPREHENSIVE DESCRIPTION OF THE SOLICITATION AND VOTING PROCESS.**

---

### A.   Holders of Claims Entitled to Vote on the Plan

Under the provisions of the Bankruptcy Code, not all holders of claims against a debtor are entitled to vote on a chapter 11 plan. The table in section IV.C of this Disclosure Statement, which begins on page 10 hereof, provides a summary of the status and voting rights of each Class (and, therefore, of each holder within such Class absent an objection to the holder's Claim) under the Plan.

As shown in the table, the Debtors are soliciting votes to accept or reject the Plan only from holders of Claims in Classes 4, 5, 6, 7, and 8 (collectively, the "Voting Classes"). The holders of Claims in the Voting Classes are Impaired under the Plan and may, in certain circumstances, receive a distribution under the Plan. Accordingly, holders of Claims in the Voting Classes have the right to vote to accept or reject the Plan.

The Debtors are *not* soliciting votes from holders of Claims and Interests in Classes 1, 2, 3, 9, 10, 11, and 12. Additionally, the Disclosure Statement Order provides that certain holders of Claims in the Voting Classes, such as those holders whose Claims have been disallowed or are subject to a pending objection, are not entitled to vote to accept or reject the Plan.

B.      **Voting Record Date.**

**The Voting Record Date is June 17, 2016**.  The Voting Record Date is the date on which it will be determined which holders of Claims in the Voting Classes are entitled to vote to accept or reject the Plan and whether Claims have been properly assigned or transferred under Bankruptcy Rule 3001(e) such that an assignee or transferee, as applicable, can vote to accept or reject the Plan as the holder of a Claim.

C.      **Voting on the Plan.**

**The Voting Deadline is July 18, 2016 at 5:00 p.m. prevailing Central Time**.  In order to be counted as votes to accept or reject the Plan, all ballots must be properly executed, completed, and delivered (either by using the return envelope provided, by first class mail, overnight courier, or personal delivery) so that the ballots are **actually received** by the Debtors' voting and claims agent (the "Voting and Claims Agent") on or before the Voting Deadline at the following address:

---

**DELIVERY OF BALLOTS**

**MIDSTATES PETROLEUM COMPANY, INC.**
**C/O KURTZMAN CARSON CONSULTANTS, LLC**
**2335 ALASKA AVENUE**
**EL SEGUNDO, CALIFORNIA 90245**

**IF YOU ARE A BENEFICIAL HOLDER AND RECEIVED AN ENVELOPE ADDRESSED TO YOUR NOMINEE, PLEASE RETURN YOUR BALLOT TO YOUR NOMINEE(S) IN ACCORDANCE WITH THEIR INSTRUCTIONS, ALLOWING ENOUGH TIME FOR YOUR NOMINEE(S) TO CAST YOUR VOTE ON A BALLOT BEFORE THE VOTING DEADLINE.**

---

D.      **Ballots Not Counted.**

**No ballot will be counted toward Confirmation if, among other things**:  (1) it is illegible or contains insufficient information to permit the identification of the holder of such Claim; (2) such Ballot is cast by Entity that does not hold a Claim in a Voting Class; (3) such Ballot has been cast for a Claim scheduled as unliquidated, contingent, or disputed for which no Proof of Claim was timely filed; (4) such Ballot is unsigned or lacks an original signature (for the avoidance of doubt, a Ballot submitted via the Notice and Claims Agent's online balloting portal shall be deemed an original signature); (5) such Ballot is not marked to accept or reject the Plan or marked both to accept and reject the Plan; and (6) such Ballot is submitted by any Entity not entitled to vote pursuant to the procedures described in the Disclosure Statement Order.  **Please refer to the Disclosure Statement Order for additional requirements with respect to voting to accept or reject the Plan.**

---

**IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING PROCESS, PLEASE CONTACT THE VOTING AND CLAIMS AGENT TOLL-FREE AT (888) 773-1446 (U.S. AND CANADA) OR (310) 751-2635 (INTERNATIONAL).
ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR OTHERWISE NOT IN COMPLIANCE WITH THE SOLICITATION ORDER WILL NOT BE COUNTED.**

---

## XII.    CONFIRMATION OF THE PLAN

### A.    Requirements for Confirmation of the Plan.

Among the requirements for Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code are:  (1) the Plan is accepted by all Impaired Classes of Claims or Interests, or if rejected by an Impaired Class, the Plan "does not discriminate unfairly" and is "fair and equitable" as to the rejecting Impaired Class; (2) the Plan is feasible; and (3) the Plan is in the "best interests" of holders of Claims and Interests.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies all of the requirements of section 1129 of the Bankruptcy Code.  The Debtors believe that:  (1) the Plan satisfies, or will satisfy, all of the necessary statutory requirements of chapter 11; (2) the Debtors have complied, or will have complied, with all of the necessary requirements of chapter 11; and (3) the Plan has been proposed in good faith.

### B.    Best Interests of Creditors/Liquidation Analysis.

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each impaired class, that each holder of a claim or an equity interest in such impaired class either (1) has accepted the plan or (2) will receive or retain under the plan property of a value that is not less than the amount that the non-accepting holder would receive or retain if the debtors liquidated under chapter 7.

Attached hereto as **Exhibit F** and incorporated herein by reference is a liquidation analysis (the "Liquidation Analysis") prepared by the Debtors with the assistance of Huron Consulting Group, the Debtors' financial advisor.  As reflected in the Liquidation Analysis, the Debtors believe that liquidation of the Debtors' businesses under chapter 7 of the Bankruptcy Code would result in substantial diminution in the value to be realized by holders of Claims as compared to distributions contemplated under the Plan. Consequently, the Debtors and their management believe that Confirmation of the Plan will provide a substantially greater return to holders of Claims than would a liquidation under chapter 7 of the Bankruptcy Code.

If the Plan is not confirmed, and the Debtors fail to propose and confirm an alternative plan of reorganization, the Debtors' businesses may be liquidated pursuant to the provisions of a chapter 11 liquidating plan.  In liquidations under chapter 11, the Debtors' assets could be sold in an orderly fashion over a more extended period of time than in a liquidation under chapter 7.  Thus, a chapter 11 liquidation may result in larger recoveries than a chapter 7 liquidation, but the delay in distributions could result in lower present values received and higher administrative costs.  Any distribution to holders of Claims under a chapter 11 liquidation plan would most likely be substantially delayed.  Most importantly, the Debtors believe that any distributions to creditors in a chapter 11 liquidation scenario would fail to capture the significant going concern value of their businesses, which is reflected in the New Common Stock to be distributed under the Plan.  Accordingly, the Debtors believe that a chapter 11 liquidation would not result in distributions as favorable as those under the Plan.

### C.    Feasibility.

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan of reorganization is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in such plan of reorganization).

To determine whether the Plan meets this feasibility requirement, the Debtors have analyzed their ability to meet their respective obligations under the Plan.  As part of this analysis, the Debtors have prepared the Financial Projections.  Based upon the Financial Projections, the Debtors believe that they will be a viable operation following the Chapter 11 Cases and that the Plan will meet the feasibility requirements of the Bankruptcy Code.

### D.    Acceptance by Impaired Classes.

The Bankruptcy Code requires, as a condition to confirmation, except as described in the following section, that each class of claims or equity interests impaired under a plan, accept the plan.  A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such a class is not required.[7]

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in a dollar amount and more than one-half in a number of allowed claims in that class, counting only those claims that have *actually* voted to accept or to reject the plan.  Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number actually cast their ballots in favor of acceptance.

### E.    Confirmation Without Acceptance by All Impaired Classes.

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it; *provided*, *however*, the plan has been accepted by at least one impaired class.  Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as a "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

If any Impaired Class rejects the Plan, the Debtors reserve the right to seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code.  To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors will request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code.  The Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Plan or any Plan Supplement document, including the right to amend or modify the Plan or any Plan Supplement document to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

### 1)    No Unfair Discrimination.

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a plan.  The test does not require that the treatment be the same or equivalent, but that treatment be "fair."  In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (*e.g.*, classes of the same legal character).  Bankruptcy courts will take into account a number of factors in determining whether a plan

---

[7]     A class of claims is "impaired" within the meaning of section 1124 of the Bankruptcy Code unless the plan (a) leaves unaltered the legal, equitable and contractual rights to which the claim or equity interest entitles the holder of such claim or equity interest or (b) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable, or contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest.

discriminates unfairly.  A plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

### 2)  Fair and Equitable Test.

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims in the class.  As to the dissenting class, the test sets different standards depending upon the type of claims or equity interests in the class.

The Debtors submit that if the Debtors "cramdown" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured so that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement.  With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank.  The Debtors believe that the Plan and the treatment of all Classes of Claims and Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

### F.      Valuation of the Debtors.

In conjunction with formulating the Plan and satisfying their obligations under section 1129 of the Bankruptcy Code, the Debtors determined that it was necessary to estimate the post-Confirmation going concern value of the Debtors.  The Valuation Analysis is set forth in **Exhibit E** attached hereto and incorporated herein by reference.

## XIII.   CERTAIN SECURITIES LAW MATTERS

### A.      New Common Stock and New Warrants.

As discussed herein, the Plan provides for Reorganized Parent to distribute New Common Stock, New Warrants, and New Common Stock issuable upon exercise of the New Warrants.

The Debtors believe that the class of New Common Stock and New Warrants will be "securities," as defined in section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code and any applicable state securities law (a "Blue Sky Law").  The Debtors further believe that the offer and sale of the New Common Stock pursuant to the Plan are, and subsequent transfers of the New Common Stock and New Warrants by the holders thereof that are not "underwriters" (as defined in section 2(a)(11) of the Securities Act and in the Bankruptcy Code) will be, exempt from federal and state securities registration requirements under various provisions of the Securities Act, the Bankruptcy Code, and any applicable state Blue Sky Law.

### B.      Issuance and Resale of New Common Stock Under the Plan

### 1)  Private Placement Exemptions.

All shares of New Common Stock and New Warrants issued under the Plan will be issued without registration under the Securities Act or any similar federal, state, or local law in reliance upon either (a) section 1145 of the Bankruptcy Code or (b) section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder.  All shares of New Common Stock and New Warrants issued pursuant to the exemption from registration set forth in section 4(a)(2) of the Securities Act or Regulation D promulgated

thereunder will be considered "restricted securities" and may not be transferred except pursuant to an effective registration statement under the Securities Act or an available exemption therefrom.

Persons who purchase the New Common Stock or New Warrants pursuant to the exemption from registration set forth in section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder will hold "restricted securities." Resales of such restricted securities would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Holders of restricted securities would, however, be permitted to resell New Common Stock and New Warrants without registration if they are able to comply with the applicable provisions of Rule 144 or Rule 144A under the Securities Act, or if such securities are registered with the Securities and Exchange Commission.

**RECIPIENTS OF NEW COMMON STOCK AND NEW WARRANTS ARE ADVISED TO CONSULT WITH THEIR OWN LEGAL ADVISORS AS TO THE AVAILABILITY OF ANY EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT AND ANY APPLICABLE STATE BLUE SKY LAW.**

### 2) Resale of New Common Stock; Definition of Underwriter.

Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as one who, except with respect to "ordinary trading transactions" of an entity that is not an "issuer": (a) purchases a claim against, interest in, or claim for an administrative expense in the case concerning, the debtor, if such purchase is with a view to distribution of any security received or to be received in exchange for such claim or interest; (b) offers to sell securities offered or sold under a plan for the holders of such securities; (c) offers to buy securities offered or sold under a plan from the holders of such securities, if such offer to buy is (i) with a view to distribution of such securities and (ii) under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of securities under the plan; or (d) is an "issuer" of the securities within the meaning of section 2(a)(11) of the Securities Act. In addition, a Person who receives a fee in exchange for purchasing an issuer's securities could also be considered an underwriter within the meaning of section 2(a)(11) of the Securities Act.

The definition of an "issuer" for purposes of whether a Person is an underwriter under section 1145(b)(1)(D) of the Bankruptcy Code, by reference to section 2(a)(11) of the Securities Act, includes as "statutory underwriters" all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities. The reference to "issuer," as used in the definition of "underwriter" contained in section 2(a)(11) of the Securities Act, is intended to cover "Controlling Persons" of the issuer of the securities. "Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise. Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be a "Controlling Person" of the debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities. While there is no precise definition of a "controlling" stockholder, the legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who owns ten percent or more of a class of securities of a reorganized debtor may be presumed to be a "Controlling Person" and, therefore, an underwriter.

Resales of the New Common Stock or New Warrants by Entities deemed to be "underwriters" (which definition includes "Controlling Persons") are not exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Under certain circumstances, holders of New Common Stock or New Warrants who are deemed to be "underwriters" may be entitled to

resell such New Common Stock or New Warrants pursuant to the limited safe harbor resale provisions of Rule 144 of the Securities Act. Generally, Rule 144 of the Securities Act would permit the public sale of securities received by such Person if the required holding period has been met and, under certain circumstances, current information regarding the issuer is publicly available and volume limitations, manner of sale requirements and certain other conditions are met. Whether any particular Person would be deemed to be an "underwriter" (including whether the Person is a "Controlling Person") with respect to the New Common Stock or New Warrants, as applicable, would depend upon various facts and circumstances applicable to that Person. Accordingly, the Debtors express no view as to whether any Person would be deemed an "underwriter" with respect to New Common Stock and New Warrants and, in turn, whether any Person may freely resell New Common Stock or New Warrants.

The securities issued under the Plan pursuant to section 1145(a) of the Bankruptcy Code generally may be resold, provided the seller is not deemed an underwriter, without registration under state securities laws pursuant to various exemptions provided by the respective laws of those states. However, the availability of such state exemptions depends on the securities laws of each state, and holders of Claims may wish to consult with their own legal advisors regarding the availability of these exemptions in their particular circumstances.

Given the complex nature of the question of whether a particular person may be an underwriter and other issues arising under applicable securities laws, the Debtors make no representations concerning the right of any person to transfer stock interests in Reorganized Parent issued pursuant to the Plan. The Debtors recommend that potential recipients of New Common Stock or New Warrants consult their own counsel concerning their ability to freely trade such securities without compliance with the federal law and any applicable state Blue Sky Law.

On the Effective Date, any party that (i) receives 10% or more of the New Common Stock or (ii) is an "affiliate" (as such term is defined in the Securities Act) of the Reorganized Debtors at emergence as reasonably determined on the advice of legal counsel and holds "restricted" or "control" (as such terms are defined in the Securities Act) New Common Stock (collectively, the "Registration Rights Beneficiaries") and Reorganized Parent shall enter into a registration rights agreement in form and substance acceptable to Reorganized Parent, the Requisite Second Lien Noteholders, and the Requisite Cross-Over Noteholders. The registration rights agreement shall provide the Registration Rights Beneficiaries with certain demand registration rights (including with respect to underwritten offerings) and with piggyback registration rights. The registration rights agreement shall also provide that on or before the date that is ninety (90) days after the Effective Date, Reorganized Parent shall file, and shall thereafter use its commercially reasonable efforts to cause to be declared effective as promptly as practicable, a registration statement on Form S-1 (or other appropriate form) for the offer and resale of the New Common Stock held by the Registration Rights Beneficiaries. The registration rights agreement shall contain customary terms and conditions, including, without limitation, provisions with respect to blackout periods.

## XIV. CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### A. Introduction.

The following discussion summarizes certain United States ("U.S.") federal income tax consequences of the implementation of the Plan to the Debtors, the Reorganized Debtors, and certain Holders of Claims. This summary is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), the U.S. Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial decisions and published administrative rules, and pronouncements of the Internal Revenue

Service (the "IRS"), all as in effect on the date hereof (collectively, "Applicable Tax Law"). Changes in the rules or new interpretations of the rules may have retroactive effect and could significantly affect the U.S. federal income tax consequences described below. The Debtors have not requested, and will not request, any ruling or determination from the IRS or any other taxing authority with respect to the tax consequences discussed herein, and the discussion below is not binding upon the IRS or the courts. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This summary does not address foreign, state, or local tax consequences of the Plan, nor does it purport to address all aspects of U.S. federal income taxation that may be relevant to a holder in light of its individual circumstances or to a holder that may be subject to special tax rules (such as Persons who are related to the Debtors within the meaning of the Tax Code, foreign taxpayers, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax exempt organizations, pass-through entities, beneficial owners of pass-through entities, subchapter S corporations, persons who hold Claims or who will hold the New Credit Facility, New Common Stock, and/or New Warrants as part of a straddle, hedge, conversion transaction, or other integrated investment, persons using a mark-to-market method of accounting, and Holders of Claims who are themselves in bankruptcy). Furthermore, this summary assumes that a Holder of a Claim holds only Claims in a single Class and holds a Claim only as a "capital asset" (within the meaning of section 1221 of the Tax Code). This summary also assumes that the various debt and other arrangements to which any of the Debtors are a party will be respected for U.S. federal income tax purposes in accordance with their form, and that the Claims constitute interests in the Debtors "solely as a creditor" for purposes of section 897 of the Tax Code. This summary does not discuss differences in tax consequences to Holders of Claims that act or receive consideration in a capacity other than any other Holder of a Claim of the same Class or Classes, and the tax consequences for such Holders may differ materially from that described below.

For purposes of this discussion, a "U.S. Holder" is a Holder of a Claim that is: (1) an individual citizen or resident of the United States for U.S. federal income tax purposes; (2) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (A) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons have authority to control all substantial decisions of the trust or (B) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person. For purposes of this discussion, a "non-U.S. holder" is any Holder of a Claim that is not a U.S. holder other than any partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder of a Claim, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the entity. Partners (or other beneficial owners) of partnerships (or other pass-through entities) that are Holders of Claims should consult their respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM OR INTEREST. ALL HOLDERS OF CLAIMS OR INTERESTS ARE URGED TO CONSULT**

THEIR OWN TAX ADVISORS AS TO THE FEDERAL, STATE, LOCAL, AND NON-U.S. INCOME, ESTATE, AND OTHER TAX CONSEQUENCES OF THE PLAN.

> ### B.  Certain U.S. Federal Income Tax Consequences to the Debtors and the Reorganized Debtors.
>
> #### 1)  Cancellation of Debt and Reduction of Tax Attributes.

In general, absent an exception, a debtor will realize and recognize cancellation of debt income ("COD Income") upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness.  The amount of COD Income, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the sum of (i) the amount of Cash paid, (ii) the issue price of any new indebtedness of the taxpayer issued, and (iii) the fair market value of any other new consideration (including stock of the debtor) given in satisfaction of such indebtedness at the time of the exchange.

Under section 108 of the Tax Code, a debtor is not required to include COD Income in gross income if the debtor is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding.  Instead, as a consequence of such exclusion, a debtor must reduce its tax attributes by the amount of COD Income that it excluded from gross income pursuant to the rule discussed in the preceding sentence.  In general, tax attributes will be reduced in the following order: (a) NOLs and NOL carryforwards; (b) general business credit carryovers; (c) minimum tax credit carryovers; (d) capital loss carryovers; (e) tax basis in assets; (f) passive activity loss and credit carryovers; and (g) foreign tax credit carryovers.  Alternatively, a debtor with COD Income may elect first to reduce the basis of its depreciable assets pursuant to section 108(b)(5) of the Tax Code.  The reduction in tax attributes occurs only after the tax for the year of the debt discharge has been determined.  Any excess COD Income over the amount of available tax attributes is not subject to U.S. federal income tax and has no other U.S. federal income tax impact.

The Treasury Regulations address the method and order for applying tax attribute reduction to an affiliated group of corporations.  Under these Treasury Regulations, the tax attributes of each member of an affiliated group of corporations that is excluding COD Income is first subject to reduction.  To the extent the debtor member's tax basis in stock of a lower-tier member of the affiliated group is reduced, a "look through rule" requires that a corresponding reduction be made to the tax attributes of the lower-tier member.  If a debtor member's excluded COD Income exceeds its tax attributes, the excess COD Income is applied to reduce certain remaining consolidated tax attributes of the affiliated group.  Because the Plan provides that, in the event the Intercreditor Settlement is approved, the Holders of First Lien Claims will receive the New Credit Facility, the Holders of the Second Lien Note Claims will receive New Common Stock, the Holders of the Third Lien Note Claims will receive New Common Stock and New Warrants, and the holders of General Unsecured Claims will receive New Common Stock, the amount of COD Income, and accordingly the amount of tax attributes required to be reduced, will depend on the issue price of the New Credit Facility and the fair market value of the New Common Stock and the New Warrants.  This value cannot be known with certainty at this time.  However, as a result of Confirmation, the Debtors expect that there will be material reductions in, or elimination of, NOLs, NOL carryforwards and other tax attributes.

> #### 2)  Limitation of NOL Carryforwards and Other Tax Attributes.

As of December 31, 2015, the Debtors had approximately $423 million of net operating loss carryovers and other tax attributes.  Following the Effective Date, the Debtors anticipate that any remaining net operating loss carryover, capital loss carryover, tax credit carryovers, and certain other tax attributes (such as losses and deductions that have accrued economically but are unrecognized as of the

date of the ownership change) of the Reorganized Debtors allocable to periods before the Effective Date (collectively, the "Pre-Change Losses") may be subject to limitation or elimination under sections 382 and 383 of the Tax Code as a result of an "ownership change" of the Reorganized Debtors by reason of the transactions consummated pursuant to the Plan.

Under sections 382 and 383 of the Tax Code, if a corporation undergoes an "ownership change," the amount of its Pre-Change Losses that may be utilized to offset future taxable income generally is subject to an annual limitation. The rules of section 382 of the Tax Code are complicated, but as a general matter, the Debtors anticipate that the distribution of the New Common Stock pursuant to the Plan will result in an "ownership change" of the Reorganized Debtors for these purposes, and that the Reorganized Debtors' use of their Pre-Change Losses will be subject to limitation unless an exception to the general rules of section 382 of the Tax Code applies.

For this purpose, if a corporation (or consolidated group) has a net unrealized built-in loss at the time of an ownership change (taking into account most assets and items of "built-in" income and deductions), then generally built-in losses (including amortization or depreciation deductions attributable to such built-in losses) recognized during the following five years (up to the amount of the original net unrealized built-in loss) will be treated as Pre-Change Losses and similarly will be subject to the annual limitation. In general, a corporation's (or consolidated group's) net unrealized built-in loss will be deemed to be zero unless it is greater than the lesser of (a) $10,000,000 or (b) fifteen (15) percent of the fair market value of its assets (with certain adjustments) before the ownership change. The Debtors do not expect to be in a net unrealized built-in loss position at the Effective Date.

### (a) General Section 382 Annual Limitation.

In general, the amount of the annual limitation to which a corporation that undergoes an "ownership change" would be subject is equal to the product of (i) the fair market value of the stock of the corporation immediately before the "ownership change" (with certain adjustments) multiplied by (ii) the "long-term tax-exempt rate" (which is the highest of the adjusted federal long-term rates in effect for any month in the 3-calendar-month period ending with the calendar month in which the "ownership change" occurs; the adjusted federal long-term rate in effect for May 2016 is 2.27 percent). The section 382 Limitation may be increased to the extent that the Debtors recognize certain built-in gains in their assets during the five-year period following the ownership change, or are treated as recognizing built-in gains pursuant to the safe harbors provided in IRS Notice 2003-65. Section 383 of the Tax Code applies a similar limitation to capital loss carryforwards and tax credits. Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year. As discussed below, however, special rules may apply in the case of a corporation that experiences an ownership change as the result of a bankruptcy proceeding.

### (b) Special Bankruptcy Exceptions.

An exception to the foregoing annual limitation rules generally applies when so-called "qualified creditors" of a debtor corporation in chapter 11 receive, in respect of their Claims, at least 50 percent of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in chapter 11) pursuant to a confirmed chapter 11 plan (the "382(l)(5) Exception"). Under the 382(l)(5) Exception, a debtor's Pre-Change Losses are not limited on an annual basis, but, instead, net operating loss carryforwards will be reduced by the amount of any interest deductions claimed during the three taxable years preceding the effective date of the plan of reorganization, and during the part of the taxable year prior to and including the effective date of the plan of reorganization, in respect of all debt converted into stock in the reorganization. If the 382(l)(5) Exception applies and the Reorganized Debtors undergo another "ownership change" within two years after the Effective Date, then the Reorganized Debtors' Pre-Change Losses effectively would be eliminated in their entirety.

Where the 382(l)(5) Exception is not applicable to a corporation in bankruptcy (either because the debtor does not qualify for it or the debtor otherwise elects not to utilize the 382(l)(5) Exception), a second special rule will generally apply (the "382(l)(6) Exception").  Under the 382(l)(6) Exception, the annual limitation will be calculated by reference to the lesser of the value of the debtor corporation's new stock (with certain adjustments) immediately after the ownership change or the value of such debtor corporation's assets (determined without regard to liabilities) immediately before the ownership change.  This differs from the ordinary rule that requires the fair market value of a debtor corporation that undergoes an "ownership change" to be determined before the events giving rise to the change.  The 382(l)(6) Exception also differs from the 382(l)(5) Exception in that under it the debtor corporation is not required to reduce its net operating loss carryforwards by the amount of interest deductions claimed within the prior three-year period, and the debtor may undergo a change of ownership within two years without triggering the elimination of its Pre-Change Losses.

The Debtors have not yet determined whether they qualify for, or if so, whether or not they will utilize the 382(l)(5) Exception.  It is possible that the Debtors will not qualify for the 382(l)(5) Exception.  Alternatively, the Reorganized Debtors may decide to elect out of the 382(l)(5) Exception, particularly if it appears likely that another ownership change will occur within two years after emergence.  In either case, the Debtors expect that their use of the Pre-Change Losses (if any) after the Effective Date will be subject to limitation (if not eliminated) based on the rules discussed above.  Regardless of whether the Reorganized Debtors take advantage of the 382(l)(6) Exception or the 382(l)(5) Exception, the Reorganized Debtors' use of their Pre-Change Losses after the Effective Date may be adversely affected if an "ownership change" within the meaning of section 382 of the Tax Code were to occur after the Effective Date.

### 3)   Alternative Minimum Tax.

In general, an alternative minimum tax ("AMT") is imposed on a corporation's alternative minimum taxable income ("AMTI") at a 20 percent rate to the extent such tax exceeds the corporation's regular federal income tax for the year.  AMTI is generally equal to regular taxable income with certain adjustments.  For purposes of computing AMTI, certain tax deductions and other beneficial allowances are modified or eliminated.  For example, except for alternative tax NOLs generated in certain years, which can offset 100 percent of a corporation's AMTI, only ninety (90) percent of a corporation's AMTI may be offset by available alternative tax NOL carryforwards.  The effect of this rule could cause the Reorganized Debtors to owe an amount of federal and state income tax on taxable income in future years even if NOL carryforwards are available to offset that taxable income.  Additionally, under section 56(g)(4)(G) of the Tax Code, an ownership change (as discussed above) that occurs with respect to a corporation having a net unrealized built-in loss in its assets will cause, for AMT purposes, the adjusted basis of each asset of the corporation immediately after the ownership change to be equal to its proportionate share (determined on the basis of respective fair market values) of the fair market value of the assets of the corporation, as determined under section 382(h) of the Tax Code, immediately before the ownership change, the effect of which may increase the amount of AMT owed by the Reorganized Debtors.

### C.   Certain U.S. Federal Income Tax Consequences to Certain U.S. Holders of Claims.

The following discussion assumes that the Debtors will undertake the Restructuring Transactions currently contemplated by the Plan.  Holders of Claims and Interests are urged to consult their tax advisors regarding the tax consequences of the Restructuring Transactions.

### 4)   Consequences to U.S. Holders of Class 4 Claims.

Pursuant to the Plan, in exchange for full and final satisfaction, settlement, release and discharge of the First Lien Claims, each Holder of an Allowed First Lien Claim shall receive Cash and its Pro Rata share of the New Credit Facility, and also, if the Intercreditor Settlement is not approved, New Common Stock.  Whether and the extent to which the U.S. Holder of such First Lien Claim recognizes gain or loss as a result of the exchange of its Claim for Cash and the New Credit Facility (and New Common Stock, if applicable) depends, in part, on whether the exchange qualifies as an exchange of securities pursuant to a tax-free reorganization, which in turn depends on whether the debt underlying the First Lien Claim surrendered, and if the Intercreditor Settlement is approved, the debt constituting the New Credit Facility, are treated as a "securities" for purposes of the reorganization provisions of the Tax Code.

### (a)   Treatment of a Debt Instrument as a "Security."

Whether a debt instrument constitutes a "security" for U.S. federal income tax purposes is determined based on all the relevant facts and circumstances, but most authorities have held that the length of the term of a debt instrument is an important factor in determining whether such instrument is a security for U.S. federal income tax purposes.  These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that it is a security.  There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including the security for payment, the creditworthiness of the obligor, the subordination or lack thereof to other creditors, the right to vote or otherwise participate in the management of the obligor, convertibility of the instrument into an equity interest of the obligor, whether payments of interest are fixed, variable, or contingent, and whether such payments are made on a current basis or accrued.  This discussion assumes that the New Credit Facility is not treated as a "security" under the applicable guidance, however, if both the First Lien Credit Facility and the New Credit Facility are treated as securities, or if the First Lien Credit Facility is treated as a security and the Intercreditor Settlement is not approved (such that a Holder of an Allowed First Lien Claim also receives New Common Stock) the discussion below applicable to an exchange treated as reorganization would apply to the exchange of the First Lien Claim for an interest in the New Credit Facility plus Cash (and New Common Stock, if applicable).

### (b)   Treatment of a U.S. Holder of an Allowed First Lien Claim if the New Credit Facility Is not Treated as a Security.

If the New Credit Facility does not constitute a security for purposes of the Tax Code, the exchange of an Allowed First Lien Claim for the New Credit Facility and Cash will be treated as a fully taxable exchange.  A U.S. Holder of an Allowed First Lien Claim who is subject to this treatment should recognize gain or loss equal to the difference between (a)(i) the amount of Cash received plus (ii) the issue price of the New Credit Facility interest received, in each case to the extent not allocable to accrued but untaxed interest (see "Accrued Interest" in Article XIV.C.11 herein), and (b) the U.S. Holder's adjusted tax basis in its Allowed First Lien Claim.  The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the U.S. Holder, the nature of the Claim in such U.S. Holder's hands, whether the Claim was purchased at a discount, and whether and to what extent the U.S. Holder has previously claimed a bad debt deduction with respect to its Claim.  If recognized gain is capital gain, it generally would be long-term capital gain if the U.S. Holder held its Allowed First Lien Claim for more than one year at the time of the exchange. The deductibility of capital losses is subject to certain limitations as discussed below.  *See* "Limitation on Use of Capital Losses" in Article XIV.C.13 herein.  To the extent that a portion of the consideration received in exchange for its Allowed First Lien Claim is allocable to accrued but untaxed interest, the U.S. Holder may recognize ordinary income.  *See* "Accrued Interest" and "Market Discount" in Articles

XIV.C.11 and XIV.C.12 respectively herein.  A U.S. Holder's tax basis in the New Credit Facility interest should equal its issue price.  A U.S. Holder's holding period for the New Credit Facility received on the Effective Date should begin on the day following the Effective Date.

**(c)      Treatment of a U.S. Holder of an Allowed First Lien Claim if the New Credit Facility Is Treated as a Security or the Intercreditor Agreement is not Approved.**

If the New Credit Facility constitutes a security for purposes of the Tax Code, or the Intercreditor Agreement is not approved (such that a Holder of an Allowed First Lien Claim also receives New Common Stock), the exchange of a U.S. Holder's Claim for the New Credit Facility and Cash (and New Common Stock, if applicable) should be treated as a partially tax-free exchange pursuant to a plan of reorganization.  In such case, a U.S. Holder should not recognize loss with respect to the exchange and should not recognize gain (subject to "Accrued Interest" discussed in Article XIV.C.11 herein) except to the extent of Cash received.  Such U.S. Holder's tax basis in its New Credit Facility (and New Common Stock, if applicable) should equal the U.S. Holder's tax basis in the Allowed First Lien Claim surrendered therefor increased by any gain recognized in the transaction and reduced by the Cash received in exchange therefor.  Subject to "Accrued Interest" discussed in Article XIV.C.11 herein, a U.S. Holder's holding period for its interest in the New Credit Facility (and New Common Stock, if applicable) should include the holding period for the surrendered Allowed First Lien Claim surrendered therefor.

**5)   Consequences to U.S. Holders of Class 5 Claims.**

Pursuant to the Plan, in exchange for full and final satisfaction, settlement, release and discharge of the Second Lien Notes Claims, each Holder of an Allowed Second Lien Notes Claim shall receive New Common Stock and Cash.

Whether and the extent to which the U.S. Holder of a Second Lien Notes Claim recognizes gain or loss as a result of the exchange of its Claim for New Common Stock and Cash depends, in part, on whether the exchange qualifies as a tax-free reorganization, which in turn depends on whether the debt underlying the Second Lien Notes surrendered is treated as a "security" for purposes of the reorganization provisions of the Tax Code, as further described above under the discussion applicable to U.S. Holders of Class 4 Claims.  The Debtors expect to take the position that the Second Lien Notes Claims constitute "securities" for these purposes.

**(a)      Treatment of a U.S. Holder of an Allowed Second Lien Notes Claim if the Second Lien Notes are Treated as Securities.**

If the Second Lien Notes constitute securities for purposes of the Tax Code, the exchange of an Allowed Second Lien Note Claim for New Common Stock and Cash is treated as an exchange pursuant to a plan of reorganization, and a U.S. Holder should not recognize loss with respect to the exchange and should not recognize gain (subject to "Accrued Interest" discussed in Article XIV.C.11 herein) except to the extent of the Cash received.  Such U.S. Holder's tax basis in its New Common Stock received should equal the U.S. Holder's tax basis in the Allowed Second Lien Notes Claim surrendered therefor increased by any gain recognized in the transaction and reduced by the Cash received in exchange therefor.  Subject to "Accrued Interest" discussed in Article XIV.C.11 herein, a U.S. Holder's holding period for its interest in the New Common Stock should include the holding period for the surrendered Allowed Second Lien Notes Claim surrendered therefor.

64

**(b)** **Treatment of a U.S. Holder of an Allowed Second Lien Notes Claim if the Second Lien Notes are not Treated as Securities.**

If the Second Lien Notes do not constitute securities for purposes of the Tax Code, the exchange of an Allowed Second Lien Notes Claim for New Common Stock and Cash will be treated as a fully taxable exchange. A U.S. Holder of an Allowed Second Lien Notes Claim who is subject to this treatment should recognize gain or loss equal to the difference between (a) the total fair market value of the New Common Stock plus Cash received and (b) the U.S. Holder's adjusted tax basis in its Allowed Second Lien Notes Claim. The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the U.S. Holder, the nature of the Claim in such U.S. Holder's hands, whether the Claim was purchased at a discount, and whether and to what extent the U.S. Holder has previously claimed a bad debt deduction with respect to its Claim. If recognized gain is capital gain, it generally would be long-term capital gain if the U.S. Holder held its Allowed Second Lien Notes Claim for more than one year at the time of the exchange. The deductibility of capital losses is subject to certain limitations as discussed below. *See* "Limitation on Use of Capital Losses" in Article XIV.C.13 herein. To the extent that a portion of the consideration received in exchange for its Allowed Second Lien Notes Claim is allocable to accrued but untaxed interest, the U.S. Holder may recognize ordinary income. *See* "Accrued Interest" and "Market Discount" in Articles XIV.C.11 and XIV.C.12, respectively, herein. A U.S. Holder's tax basis in the New Common Stock should be equal to its fair market value on the Effective Date. A U.S. Holder's holding period for its interest in the New Common Stock received on the Effective Date should begin on the day following the Effective Date.

**6)** **Consequences to U.S. Holders of Class 6 Claims.**

Pursuant to the Plan, in exchange for full and final satisfaction, settlement, release, and discharge of the Third Lien Notes Claims, each Holder of an Allowed Third Lien Notes Claim shall receive New Common Stock and, so long as the Intercreditor Settlement is approved, New Warrants. Whether and the extent to which the U.S. Holder of a Third Lien Notes Claim recognizes gain or loss as a result of the exchange of its Claim for the New Common Stock (and New Warrants, if applicable) depends, in part, on whether the exchange qualifies as an exchange of securities pursuant to a tax-free reorganization, which in turn depends on whether the debt underlying the Third Lien Notes surrendered is treated as a "security" for purposes of the reorganization provisions of the Tax Code, as further described above under the discussion applicable to U.S. Holders of Class 4 Claims. The Debtors expect to take the position that the Third Lien Notes Claims constitute "securities" for these purposes.

**(a)** **Treatment of a U.S. Holder of an Allowed Third Lien Notes Claim if the Third Lien Notes are Treated as Securities.**

If the Third Lien Notes constitute securities for purposes of the Tax Code, the exchange of an Allowed Third Lien Notes Claim for New Common Stock (and New Warrants, if applicable) will be treated as an exchange pursuant to a plan of reorganization, and a U.S. Holder should not recognize gain or loss with respect to the exchange (subject to "Accrued Interest" discussed in Article XIV.C.11 herein). Such U.S. Holder's aggregate tax basis in its New Common Stock (and New Warrants, if applicable) received should equal the U.S. Holder's tax basis in the Allowed Third Lien Notes Claim surrendered therefor increased by any gain recognized in the transaction. Such aggregate tax basis will be allocated to the New Common Stock and New Warrants based on their relative fair market values. Subject to "Accrued Interest" discussed in Article XIV.C.11 herein, a U.S. Holder's holding period for its interest in the New Common Stock (and New Warrants, if applicable) should include the holding period for the surrendered Allowed Third Lien Notes Claim surrendered therefor.

(b)     **Treatment of a U.S. Holder of an Allowed Third Lien Notes Claim if the Third Lien Notes are not Treated as Securities.**

If the Third Lien Notes do not constitute securities for purposes of the Tax Code, the exchange of an Allowed Third Lien Notes Claim for New Common Stock (and New Warrants, if applicable) will be treated as a fully taxable exchange.  A U.S. Holder of an Allowed Third Lien Notes Claim who is subject to this treatment should recognize gain or loss equal to the difference between (i) the fair market value of the New Common Stock (and New Warrants, if applicable) and (ii) the U.S. Holder's adjusted tax basis in its Allowed Third Lien Notes Claim.  The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the U.S. Holder, the nature of the Claim in such U.S. Holder's hands, whether the Claim was purchased at a discount, and whether and to what extent the U.S. Holder has previously claimed a bad debt deduction with respect to its Claim.  If recognized gain is capital gain, it generally would be long-term capital gain if the U.S. Holder held its Allowed Third Lien Notes Claim for more than one year at the time of the exchange.  The deductibility of capital losses is subject to certain limitations as discussed below.  *See* "Limitation on Use of Capital Losses" in Article XIV.C.13 herein.  To the extent that a portion of the consideration received in exchange for its Allowed Third Lien Notes Claim is allocable to accrued but untaxed interest, the U.S. Holder may recognize ordinary income.  *See* "Accrued Interest" and "Market Discount" in Articles XIV.C.11 and XIV.C.12, respectively, herein.  A U.S. Holder's tax basis in the New Common Stock (and New Warrants, if applicable) received should be equal to its fair market value on the Effective Date.  A U.S. Holder's holding period for its interest in the New Common Stock (and New Warrants, if applicable) received on the Effective Date should begin on the day following the Effective Date.

7)   **Consequences to U.S. Holders of Class 7 and Class 8 Claims.**

Pursuant to the Plan, in exchange for full and final satisfaction, settlement, release and discharge of the Unsecured Notes Claims and General Unsecured Claims, each Holder of an Allowed Unsecured Notes Claim or Allowed General Unsecured Claim shall receive New Common Stock.

Whether and the extent to which the U.S. Holder of an Unsecured Notes Claim or General Unsecured Claim recognizes gain or loss as a result of the exchange of its Claim for New Common Stock depends, in part, on whether the exchange qualifies as a tax-free reorganization, which in turn depends on whether the debt underlying the Unsecured Notes Claim or General Unsecured Claim surrendered is treated as a "security" for purposes of the reorganization provisions of the Tax Code, as further described above under the discussion applicable to U.S. Holders of Class 4 Claims.  The Debtors expect to take the position that the Unsecured Notes Claims constitute "securities" for these purposes, and that the General Unsecured Claims are not "securities" for these purposes.

(a)     **Treatment of a U.S. Holder of an Allowed Unsecured Notes Claim if the Unsecured Notes are Treated as Securities.**

If the Unsecured Notes constitute securities for purposes of the Tax Code, the exchange of an Allowed Unsecured Notes Claim for New Common Stock will treated as an exchange pursuant to a plan of reorganization, and a U.S. Holder should not recognize loss with respect to the exchange (subject to "Accrued Interest" discussed in Article XIV.C.11 herein).  Such U.S. Holder's tax basis in its New Common Stock received should equal the U.S. Holder's tax basis in the Allowed Unsecured Notes Claim surrendered therefor increased by any gain recognized in the transaction.  Subject to "Accrued Interest" discussed in Article XIV.C.11 herein, a U.S. Holder's holding period for its interest in the New Common Stock should include the holding period for the surrendered Allowed Unsecured Notes Claim surrendered therefor.

(b)    **Treatment of a U.S. Holder of an Allowed Unsecured Notes Claim or General Unsecured Claim if the Exchange of Its Claim Is not Treated as an Exchange of Securities Pursuant to a Reorganization.**

If the exchange of an Allowed Unsecured Claim or General Unsecured Claim for New Common Stock is not treated as an exchange of securities pursuant to a plan of reorganization, a U.S. Holder of an Allowed Unsecured Notes Claim or General Unsecured Claim should be treated as exchanging its Claim for New Common Stock in a fully taxable exchange. A U.S. Holder of an Allowed Unsecured Notes Claim or General Unsecured Claim who is subject to this treatment should recognize gain or loss equal to the difference between (a) the fair market value of the New Common Stock received and (b) the U.S. Holder's adjusted tax basis in its Allowed Unsecured Notes Claim or General Unsecured Claim. The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the U.S. Holder, the nature of the Claim in such U.S. Holder's hands, whether the Claim was purchased at a discount, and whether and to what extent the U.S. Holder has previously claimed a bad debt deduction with respect to its Claim. If recognized gain is capital gain, it generally would be long-term capital gain if the U.S. Holder held its Allowed Unsecured Notes Claim or General Unsecured Claim for more than one year at the time of the exchange. The deductibility of capital losses is subject to certain limitations as discussed below. *See* "Limitation on Use of Capital Losses" in Article XIV.C.13 herein. To the extent that a portion of the consideration received in exchange for its Allowed Unsecured Claim or General Unsecured Claim is allocable to accrued but untaxed interest, the U.S. Holder may recognize ordinary income. *See* "Accrued Interest" and "Market Discount" in Articles XIV.C.11 and XIV.C.12, respectively, herein. A U.S. Holder's tax basis in the New Common Stock received should be equal to its respective fair market value on the Effective Date. A U.S. Holder's holding period for its interest in the New Common Stock received on the Effective Date should begin on the day following the Effective Date.

**HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE RECOGNITION OF GAIN OR LOSS, FOR FEDERAL INCOME TAX PURPOSES, ON THE SATISFACTION OF THEIR CLAIMS.**

8)    **Dividends on New Common Stock.**

Any distributions made on account of the New Common Stock will constitute dividends for U.S. federal income tax purposes to the extent of the current or accumulated earnings and profits of the Reorganized Debtors as determined under U.S. federal income tax principles. To the extent that a U.S. Holder receives distributions that would otherwise constitute dividends for U.S. federal income tax purposes but that exceed such current and accumulated earnings and profits, such distributions will be treated first as a non-taxable return of capital reducing the U.S. Holder's basis in its shares. Any such distributions in excess of the U.S. Holder's basis in its shares (determined on a share-by-share basis) generally will be treated as capital gain.

Dividends paid to U.S. Holders that are corporations generally will be eligible for the dividends-received deduction so long as there are sufficient earnings and profits. However, the dividends-received deduction is only available if certain holding period requirements are satisfied. The length of time that a shareholder has held its stock is reduced for any period during which the shareholder's risk of loss with respect to the stock is diminished by reason of the existence of certain options, contracts to sell, short sales, or similar transactions. In addition, to the extent that a corporation incurs indebtedness that is directly attributable to an investment in the stock on which the dividend is paid, all or a portion of the dividends received deduction may be disallowed.

9)   **Sale, Redemption, or Repurchase of New Common Stock.**

Unless a non-recognition provision applies, U.S. Holders generally will recognize capital gain or loss upon the sale, redemption, or other taxable disposition of New Common Stock. Such capital gain will be long-term capital gain if at the time of the sale, exchange, retirement, or other taxable disposition, the U.S. Holder held the New Common Stock for more than one year. Long-term capital gains of an individual taxpayer generally are taxed at preferential rates. The deductibility of capital losses is subject to certain limitations as described below. *See* "Limitation on Use of Capital Losses" in Article XIV.C.13 herein.

10)   **Medicare Tax.**

Certain U.S. Holders that are individuals, estates, or trusts are required to pay an additional 3.8% tax on, among other things, dividends and gains from the sale or other disposition of capital assets. U.S. holders that are individuals, estates, or trusts should consult their tax advisors regarding the effect, if any, of this tax provision on their ownership and disposition of New Common Stock, New Warrants, or interests in the New Credit Facility.

11)   **Accrued Interest.**

To the extent that any amount received by a U.S. Holder of a Claim is attributable to accrued but unpaid interest on the debt instruments constituting the surrendered Claim, the receipt of such amount should be taxable to the U.S. Holder as ordinary interest income (to the extent not already taken into income by the U.S. Holder). Conversely, a U.S. Holder of a Claim may be able to recognize a deductible loss (or, possibly, a write off against a reserve for worthless debts) to the extent that any accrued interest previously was included in the U.S. Holder's gross income but was not paid in full by the Debtors. Such loss may be ordinary, but the tax law is unclear on this point.

If the fair value of the consideration is not sufficient to fully satisfy all principal and interest on Allowed Claims, the extent to which such consideration will be attributable to accrued interest is unclear. Under the Plan, the aggregate consideration to be distributed to U.S. Holders of Allowed Claims in each Class will be allocated first to the principal amount of Allowed Claims, with any excess allocated to unpaid interest that accrued on these Claims, if any. Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, while certain Treasury Regulations treat payments as allocated first to any accrued but unpaid interest. The IRS could take the position that the consideration received by the U.S. Holder should be allocated in some way other than as provided in the Plan. U.S. Holders of Claims should consult their own tax advisors regarding the proper allocation of the consideration received by them under the Plan.

**HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE ALLOCATION OF CONSIDERATION RECEIVED IN SATISFACTION OF THEIR CLAIMS AND THE FEDERAL INCOME TAX TREATMENT OF ACCRUED BUT UNPAID INTEREST.**

12)   **Market Discount.**

Under the "market discount" provisions of the Tax Code, some or all of any gain realized by a U.S. Holder of a Claim who exchanges the Claim for an amount on the Effective Date may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt instruments constituting the exchanged Claim. In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if its U.S. Holder's adjusted tax basis in the debt instrument is less than (a) the sum of all remaining payments to be made on

68

the debt instrument, excluding "qualified stated interest" or (b) in the case of a debt instrument issued with original issue discount, its adjusted issue price, by at least a *de minimis* amount (equal to 0.25 percent of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a U.S. Holder on the taxable disposition of a Claim that had been acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while the Claim was considered to be held by the U.S. Holder (unless the U.S. Holder elected to include market discount in income as it accrued).  To the extent that the Allowed Claims that were acquired with market discount are exchanged in a tax-free transaction for other property, any market discount that accrued on the Allowed Claims (*i.e.*, up to the time of the exchange) but was not recognized by the U.S. Holder is carried over to the property received therefor and any gain recognized on the subsequent sale, exchange, redemption, or other disposition of the property is treated as ordinary income to the extent of the accrued, but not recognized, market discount.

**HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE APPLICATION OF THE MARKET DISCOUNT RULES TO THEIR CLAIMS.**

### 13) Limitation on Use of Capital Losses.

A U.S. Holder of a Claim who recognizes capital losses as a result of the distributions under the Plan will be subject to limits on the use of such capital losses.  For a non-corporate U.S. Holder, capital losses may be used to offset any capital gains (without regard to holding periods), and also ordinary income to the extent of the lesser of (a) $3,000 ($1,500 for married individuals filing separate returns) or (b) the excess of the capital losses over the capital gains.  A non-corporate U.S. Holder may carry over unused capital losses and apply them against future capital gains and a portion of their ordinary income for an unlimited number of years.  For corporate U.S. Holders, capital losses may only be used to offset capital gains.  A corporate U.S. Holder that has more capital losses than may be used in a tax year generally may carry back unused capital losses to the three years preceding the capital loss year or may carry over unused capital losses for the five years following the capital loss year.

### D.    Certain U.S. Federal Income Tax Consequences to Certain Non-U.S. Holders of Claims.

The following discussion assumes that the Debtors will undertake the Restructuring Transactions currently contemplated by the Plan and includes only certain U.S. federal income tax consequences of the Restructuring Transactions to non-U.S. Holders.  The discussion does not include any non-U.S. tax considerations.  The rules governing the U.S. federal income tax consequences to non-U.S. Holders are complex. Each non-U.S. Holder should consult its own tax advisor regarding the U.S. federal, state, and local and the non-U.S. tax consequences of the consummation of the Plan to such non-U.S. Holders and the ownership and disposition of the New Credit Facility, New Common Stock, or New Warrants in each case, as applicable.

### 1)   Gain Recognition.

Any gain realized by a non-U.S. Holder on the exchange of its Claim generally will not be subject to U.S. federal income taxation unless (a) the non-U.S. holder is an individual who was present in the United States for 183 days or more during the taxable year in which the Restructuring Transactions occur and certain other conditions are met or (b) such gain is effectively connected with the conduct by such non-U.S. Holder of a trade or business in the United States (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such non-U.S. holder in the United States).

If the first exception applies, to the extent that any gain is taxable, the non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange.  If the second exception applies, the non-U.S. holder generally will be subject to U.S. federal income tax with respect to any gain realized on the exchange in the same manner as a U.S. Holder.  To claim an exemption from withholding tax, such non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or such successor form as the IRS designates). In addition, if such a non-U.S. holder is a corporation, it may be subject to a branch profits tax equal to 30% (or such lower rate provided by an applicable treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

### 2)  Interest Payments under the New Credit Facility and Accrued Interest

Interests payments to a non-U.S. Holder under the New Credit Faculty and any other payments to a non-U.S. Holder that are attributable to accrued but untaxed interest generally will not be subject to U.S. federal income tax or withholding, provided that the withholding agent has received or receives, prior to payment, appropriate documentation (generally, IRS Form W-8BEN or W-8BEN-E) establishing that the non-U.S. Holder is not a U.S. person, unless:

- the non-U.S. Holder actually or constructively owns 10% or more of the total combined voting power of all classes of Reorganized Parent's stock entitled to vote;

- the non-U.S. Holder is a "controlled foreign corporation" that is a "related person" with respect to Reorganized Parent (each, within the meaning of the Tax Code);

- the non-U.S. Holder is a bank receiving interest described in Section 881(c)(3)(A) of the Tax Code; or

- such interest is effectively connected with the conduct by the non-U.S. Holder of a trade or business within the United States (in which case, provided the non-U.S. Holder provides a properly executed IRS Form W-8ECI (or successor form) to the withholding agent, the non-U.S. Holder (x) generally will not be subject to withholding tax, but (y) will be subject to U.S. federal income tax in the same manner as a U.S. Holder (unless an applicable income tax treaty provides otherwise), and a non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such non-U.S. Holder's effectively connected earnings and profits that are attributable to the accrued but untaxed interest at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty)).

A non-U.S. Holder that does not qualify for the portfolio interest exemption generally will be subject to withholding of U.S. federal income tax at a 30% rate (or at a reduced rate or exemption from tax under an applicable income tax treaty) on any interest payments under the New Credit Facility and any other payments that are attributable to accrued but untaxed interest. For purposes of providing a properly executed IRS Form W-8BEN or W-BEN-E, special procedures are provided under applicable Treasury Regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business.

### 3)  Dividends on New Common Stock.

Any distributions made with respect to New Common Stock will constitute dividends for U.S. federal income tax purposes to the extent of Reorganized Parent's current or accumulated earnings and

profits as determined under U.S. federal income tax principles.  To the extent that a non-U.S. Holder receives distributions that would otherwise constitute dividends for U.S. federal income tax purposes but that exceed such current and accumulated earnings and profits, such distributions will be treated first as a non-taxable return of capital reducing the non-U.S. Holder's basis in its shares. Any such distributions in excess of a non-U.S. Holder's basis in its shares (determined on a share-by-share basis) generally will be treated as capital gain from a sale or exchange (and the respective excess distributions as proceeds from a sale or exchange as described below; *see* "Sale, Redemption, or Repurchase of New Common Stock and New Warrants" in Article XIV.D.4 herein).  Except as described below, dividends paid with respect to New Common Stock held by a non-U.S. Holder that are not effectively connected with a non-U.S. Holder's conduct of a U.S. trade or business (or if an income tax treaty applies, are not attributable to a permanent establishment maintained by such non-U.S. holder in the United States) will be subject to withholding at a rate of 30% (or lower treaty rate or exemption from tax, if applicable).  A non-U.S. Holder generally will be required to satisfy certain IRS certification requirements in order to claim a reduction of or exemption from withholding under a tax treaty by filing IRS Form W-8BEN or W-8BEN-E (or a successor form) upon which the non-U.S. Holder certifies, under penalties of perjury, its status as a non-U.S. person and its entitlement to the lower treaty rate or exemption from tax with respect to such payments.  Dividends paid with respect to New Common Stock held by a non-U.S. Holder that are effectively connected with a non-U.S. Holder's conduct of a U.S. trade or business (and if an income tax treaty applies, are attributable to a permanent establishment maintained by such non-U.S. Holder in the United States) generally will be subject to U.S. federal income tax in the same manner as a U.S. Holder, and a non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such non-U.S. Holder's effectively connected earnings and profits that are attributable to the dividends at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty).

### 4)  Sale, Redemption, or Repurchase of New Common Stock and New Warrants.

The Debtors expect that Reorganized Parent will constitute a "United States real property holding corporation" within the meaning of section 897 of the Tax Code as of the Effective Date, and thus that the New Common Stock and New Warrants will constitute United States real property interests, for the period required under the Tax Code.  As such, any non-U.S. Holders of New Common Stock or New Warrants that sell, exchange, or otherwise dispose of their New Common Stock or New Warrants may be subject to fifteen (15) percent gross proceeds withholding, and generally will be required to file U.S. federal income tax returns and pay U.S. federal income tax on a graduated basis on any gains recognized on such disposition.  Non-U.S. Holders who may receive or acquire New Common Stock or New Warrants in connection with the Restructuring Transactions are urged to consult a U.S. tax advisor with respect to the U.S. tax consequences applicable to their acquisition, holding, and disposition of the New Common Stock or New Warrants, as applicable.

### 5)  Sale, Redemption, or Repurchase of interests in the New Credit Facility.

Any non-U.S. Holders of the New Credit Facility that sell, exchange, or otherwise dispose of their interests in the New Credit Facility generally will not be subject to U.S. federal income taxation unless (a) the non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year in which such sale, exchange or other disposition occurs and certain other conditions are met or (b) such gain is effectively connected with the conduct by such non-U.S. Holder of a trade or business in the United States (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such non-U.S. Holder in the United States).

If the first exception applies, to the extent that any gain is taxable, the non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30% (or at a reduced rate or exemption from tax

under an applicable income tax treaty) on the amount by which such non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange.  If the second exception applies, the non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain realized on the exchange in the same manner as a U.S. Holder.  To claim an exemption from withholding, such non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or such successor form as the IRS designates). In addition, if such a non-U.S. holder is a corporation, it may be subject to a branch profits tax equal to 30% (or such lower rate provided by an applicable treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

### 6)  FATCA

Under the Foreign Account Tax Compliance Act ("FATCA"), foreign financial institutions and certain other foreign entities must report certain information with respect to their U.S. account holders and investors or be subject to withholding at a rate of 30% on the receipt of "withholdable payments." For this purpose, "withholdable payments" are generally U.S. source payments of fixed or determinable, annual or periodical income (including dividends, if any, on shares of New Common Stock), and also include gross proceeds from the sale of any property of a type which can produce U.S. source interest or dividends (which would include New Common Stock and the New Warrants).  FATCA withholding will apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding.

As currently proposed, FATCA withholding rules would apply to payments of gross proceeds from the sale or other disposition of property of a type which can produce U.S. source interest or dividends that occur after December 31, 2018.

Each non-U.S. Holder should consult its own tax advisor regarding the possible impact of these rules on such non-U.S. Holder's ownership of New Common Stock, New Warrants, or the New Credit Facility.

### E.    Information Reporting and Back-Up Withholding.

Payments in respect of Allowed Claims under the Plan may be subject to applicable information reporting and backup withholding.  Backup withholding of taxes will generally apply to payments in respect of an Allowed Claim under the Plan if the Holder of such Allowed Claim fails to provide an accurate taxpayer identification number or otherwise fails to comply with the applicable requirements of the backup withholding rules.

Backup withholding is not an additional tax.  Amounts withheld under the backup withholding rules may be credited against a Holder's U.S. federal income tax liability, and a Holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS (generally, a federal income tax return).

In addition, from an information reporting perspective, the Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds.  Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

**THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF FEDERAL INCOME**

**TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION.   ALL HOLDERS OF CLAIMS AND INTERESTS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, OR FOREIGN TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS**.

[*Remainder of page intentionally left blank.*]

## XV.    RECOMMENDATION

In the opinion of the Debtors, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' creditors than would otherwise result in any other scenario. Accordingly, the Debtors recommend that Holders of Claims entitled to vote on the Plan vote to accept the Plan and support Confirmation of the Plan.

Dated:  May 14, 2016

Respectfully submitted,

Midstates Petroleum Company, Inc. and
Midstates Petroleum Company LLC

By:    */s/ Nelson M. Haight*
Name: Nelson M. Haight
Title:  Executive Vice President & Chief Financial
          Officer

**<u>Exhibit A</u>**

**Plan of Reorganization**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| MIDSTATES PETROLEUM COMPANY, INC., *et al.*,[1] | ) | Case No. 16-32237 (DRJ) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**JOINT CHAPTER 11 PLAN OF REORGANIZATION OF**
**MIDSTATES PETROLEUM COMPANY, INC. AND ITS DEBTOR AFFILIATE**

Edward O. Sassower, P.C. (admitted *pro hac vice*)
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900

-and-

James H.M. Sprayregen, P.C. (admitted *pro hac vice*)
William A. Guerrieri (admitted *pro hac vice*)
Jason Gott (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200

Patricia B. Tomasco (Texas Bar No. 01797600)
Matthew D. Cavenaugh (Texas Bar No. 24062656)
Jennifer F. Wertz (Texas Bar No. 24072822)
**JACKSON WALKER L.L.P.**
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:      (713) 752-4200
Facsimile:      (713) 752-4221

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

> **THIS IS NOT A SOLICITATION OF AN ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.   THIS DRAFT PLAN HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.**

---

[1]   The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number, include:  Midstates Petroleum Company, Inc. (1816); and Midstates Petroleum Company LLC (2434).  The debtors' service address is:  321 South Boston Avenue, Tulsa, Oklahoma 74103.

**TABLE OF CONTENTS**

ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME,
AND GOVERNING LAW ..................................................................................................1
    A.      Defined Terms ...........................................................................................................1
    B.      Rules of Interpretation ............................................................................................16
    C.      Computation of Time ..............................................................................................17
    D.      Governing Law .......................................................................................................17
    E.      Reference to Monetary Figures ...............................................................................17
    F.      Reference to the Debtors or the Reorganized Debtors ...........................................17
    G.      Controlling Document .............................................................................................17

ARTICLE II. ADMINISTRATIVE CLAIMS AND PRIORITY CLAIMS ..............................17
    A.      Administrative Claims .............................................................................................18
    B.      Administrative Claims Bar Date ..............................................................................18
    C.      Professional Compensation .....................................................................................18
    D.      Priority Tax Claims .................................................................................................19
    E.      Statutory Fees ..........................................................................................................19

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS............20
    A.      Summary of Classification ......................................................................................20
    B.      Treatment of Claims and Interests ..........................................................................20
    C.      Special Provision Governing Unimpaired Claims ..................................................25
    D.      Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy
              Code .........................................................................................................................25
    E.      Elimination of Vacant Classes ................................................................................25
    F.      Voting Classes; Presumed Acceptance by Non-Voting Classes..............................25
    G.      Presumed Acceptance and Rejection of the Plan ....................................................26
    H.      Subordinated Claims ...............................................................................................26

ARTICLE IV. MEANS FOR IMPLEMENTATION OF THE PLAN ........................................26
    A.      The Intercreditor Settlement ...................................................................................26
    B.      Restructuring Transactions ......................................................................................27
    C.      Sources of Consideration for Plan Distributions.....................................................27
    D.      The New Credit Facility and Approval of the New Credit Facility ........................27
    E.      The New Common Stock and New Warrants ..........................................................28
    F.      Exemption from Registration Requirements............................................................29
    G.      Corporate Existence .................................................................................................30
    H.      Vesting of Assets in the Reorganized Debtors ........................................................30
    I.      Cancellation of Existing Securities .........................................................................30
    J.      Corporate Action .....................................................................................................31
    K.      New Organizational Documents ..............................................................................31
    L.      Directors and Officers of the Reorganized Debtors ................................................31
    M.      Effectuating Documents; Further Transactions .......................................................32
    N.      Exemption from Certain Taxes and Fees .................................................................32
    O.      Preservation of Causes of Action ............................................................................32
    P.      Director and Officer Liability Insurance..................................................................32
    Q.      Management Incentive Plan and Management Employment Agreements ................33
    R.      Employee and Retiree Benefits................................................................................33
    S.      Payment of Fees and Expenses of the First Lien Administrative Agent..................33
    T.      Payment of Fees and Expenses of the Second Lien Notes Trustee..........................33
    U.      Payment of Fees and Expenses of the Third Lien Notes Trustee.............................34
    V.      Payment of Fees and Expenses of the Consenting Second Lien Noteholders and
              Consenting Cross-Over Noteholders .......................................................................34

i

**ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES** ...................**34**

A.   Assumption and Rejection of Executory Contracts and Unexpired Leases .................... 34
B.   Claims Based on Rejection of Executory Contracts or Unexpired Leases ..................... 34
C.   Cure of Defaults for Assumed Executory Contracts and Unexpired Leases................... 35
D.   Indemnification Obligations ............................................................................... 35
E.   Insurance Policies ........................................................................................... 36
F.   Modifications, Amendments, Supplements, Restatements, or Other Agreements............ 36
G.   Reservation of Rights ...................................................................................... 36
H.   Nonoccurrence of Effective Date........................................................................ 36
I.   Contracts and Leases Entered into After the Effective Date ........................................ 36

**ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS** ........................................**36**

A.   Timing and Calculation of Amounts to Be Distributed ............................................. 36
B.   Delivery of Distributions and Undeliverable or Unclaimed Distributions........................ 37
C.   Compliance with Tax Requirements..................................................................... 39
D.   Allocations .................................................................................................... 39
E.   No Postpetition Interest on Claims ..................................................................... 39
F.   Setoffs and Recoupment .................................................................................. 39
G.   Claims Paid or Payable by Third Parties ............................................................... 39

**ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT,  UNLIQUIDATED, AND
DISPUTED CLAIMS** ...........................................................................................**40**

A.   Allowance of Claims ....................................................................................... 40
B.   Claims and Interests Administration Responsibilities ................................................ 40
C.   Estimation of Claims ....................................................................................... 40
D.   Adjustment to Claims Without Objection .............................................................. 41
E.   Time to File Objections to Claims ....................................................................... 41
F.   Disallowance of Claims .................................................................................... 41
G.   Amendments to Claims .................................................................................... 41
H.   No Distributions Pending Allowance .................................................................... 42
I.   Distributions After Allowance ............................................................................ 42

**ARTICLE VIII. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS** ....................**42**

A.   Discharge of Claims and Termination of Interests; Compromise and Settlement
     of Claims, Interests, and Controversies ............................................................... 42
B.   Term of Injunctions or Stays ............................................................................. 43
C.   Release of Liens............................................................................................. 43
D.   **Releases by the Debtors** ................................................................................. 43
E.   **Releases by Holders of Claims and Interests** ......................................................... 44
F.   **Exculpation** ................................................................................................. 45
G.   **Injunction** ................................................................................................... 45
H.   Protection Against Discriminatory Treatment ........................................................ 46
I.   Recoupment .................................................................................................. 46
J.   Subordination Rights. ...................................................................................... 46

**ARTICLE IX. CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF
THE PLAN** .......................................................................................................**46**

A.   Conditions Precedent to the Effective Date ........................................................... 46
B.   Waiver of Conditions ...................................................................................... 47
C.   Substantial Consummation ............................................................................... 47
D.   Effect of Non-Occurrence of Conditions to the Effective Date ................................... 47

**ARTICLE X. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN**...............................**47**

A.   Modification of Plan........................................................................................ 47
B.   Effect of Confirmation on Modifications ............................................................... 48
C.   Revocation or Withdrawal of the Plan.................................................................. 48

**ARTICLE XI. RETENTION OF JURISDICTION** ......................................................................**48**

**ARTICLE XII. MISCELLANEOUS PROVISIONS** ..................................................................**50**
    A.          Immediate Binding Effect .............................................................50
    B.          Additional Documents ..................................................................50
    C.          Payment of Statutory Fees ...........................................................50
    D.          Dissolution of the Committee .......................................................50
    E.          Reservation of Rights ...................................................................50
    F.          Successors and Assigns .................................................................51
    G.         Service of Documents ...................................................................51
    H.         Term of Injunctions or Stays .......................................................52
    I.           Entire Agreement..........................................................................52
    J.           Successors and Assigns .................................................................52
    K.         Exhibits.........................................................................................52
    L.          Nonseverability of Plan Provisions upon Confirmation ...............52
    M.        Votes Solicited in Good Faith ......................................................52
    N.         Further Assurances .......................................................................53
    O.         Closing of Chapter 11 Cases.........................................................53

**INTRODUCTION**

Midstates Petroleum Company, Inc., and its wholly-owned subsidiary, Midstates Petroleum Company LLC (together, "Midstates"), as debtors and debtors in possession (each, a "Debtor" and, collectively, the "Debtors") propose this joint plan of reorganization (together with the documents comprising the Plan Supplement, the "Plan") for the resolution of outstanding Claims against, and Interests in, the Debtors.  Capitalized terms used and not otherwise defined shall have the meanings ascribed to such terms in Article I.A hereof.  Holders of Claims and Interests may refer to the Disclosure Statement for a discussion of the Debtors' history, businesses, assets, results of operations, historical financial information, and projections of future operations, as well as a summary and description of the Plan.  The Debtors are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code.

ALL HOLDERS OF CLAIMS AND INTERESTS, TO THE EXTENT APPLICABLE, ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

**ARTICLE I.**
**DEFINED TERMS, RULES OF INTERPRETATION,**
**COMPUTATION OF TIME, AND GOVERNING LAW**

A.    *Defined Terms*

As used in this Plan, capitalized terms have the meanings set forth below.

1.    "*Accrued Professional Compensation*" means, at any given time, all accrued, contingent, and/or unpaid fees and expenses (including success fees) for legal, financial advisory, accounting, and other services and reimbursement of expenses that are awardable and allowable under sections 328, 330, or 331 of the Bankruptcy Code or otherwise rendered allowable before the Effective Date by any retained estate Professional in the Chapter 11 Cases, (a) all to the extent that any such fees and expenses have not been previously paid (regardless of whether a fee application has been Filed for any such amount) and (b) after applying any retainer that has been provided to such Professional.  To the extent that the Bankruptcy Court or any higher court of competent jurisdiction denies or reduces by a Final Order any amount of a Professional's fees or expenses, then those reduced or denied amounts shall no longer constitute Accrued Professional Compensation.  For the avoidance of doubt, Accrued Professional Compensation includes unbilled fees and expenses incurred on account of services provided by Professionals that have not yet been submitted for payment, except to the extent that such fees and expenses are either denied or reduced by a Final Order by the Bankruptcy Court or any higher court of competent jurisdiction.

2.    "*Administrative Claim*" means a Claim for costs and expenses of administration of the Debtors' Estates pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code other than a Professional Fee Claim, including:  (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors; and (b) all Allowed requests for compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), (4), and (5) of the Bankruptcy Code.

3.    "*Administrative Claims Bar Date*" means the first Business Day that is 30 days following the Effective Date, except as specifically set forth in the Plan or a Final Order.

4.    "*Affiliate*" shall have the meaning set forth in section 101(2) of the Bankruptcy Code.

5.    "*Allowed*" means with respect to any Claim, except as otherwise provided herein:  (a) a Claim that is evidenced by a Proof of Claim Filed by the Claims Bar Date (or for which Claim under the Plan, the Bankruptcy Code, or a Final Order of the Bankruptcy Court, a Proof of Claim is not or shall not be required to be Filed); (b) a Claim that is listed in the Schedules as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim, as applicable, has been timely Filed; or (c) a Claim Allowed pursuant to the Plan or a Final Order of the Bankruptcy Court; *provided* that with respect to a Claim described in clauses (a) and (b) above, such Claim shall be

1

considered Allowed only if and to the extent that with respect to such Claim, no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or such an objection is so interposed and the Claim, as applicable, shall have been Allowed by a Final Order.   Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed, and for which no Proof of Claim is or has been timely Filed, is not considered Allowed and shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court.   Notwithstanding anything to the contrary herein, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes such Debtor or Reorganized Debtor, as applicable.   For the avoidance of doubt, a Proof of Claim Filed after the Claims Bar Date shall not be Allowed for any purposes whatsoever absent entry of a Final Order Allowing such late-filed Claim.   "Allow" and "Allowing" shall have correlative meanings.

6.      "*Ballot*" means the ballots accompanying the Disclosure Statement upon which certain Holders of Impaired Claims entitled to vote shall, among other things, indicate their acceptance or rejection of the Plan in accordance with the Plan and the procedures governing the solicitation process.

7.      "*Bankruptcy Code*" means title 11 of the United States Code, as amended and in effect during the pendency of the Chapter 11 Cases.

8.      "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of Texas having jurisdiction over the Chapter 11 Cases, and, to the extent of the withdrawal of any reference under 28 U.S.C. § 157 and/or the General Order of the District Court pursuant to section 151 of title 28 of the United States Code, the United States District Court for the Southern District of Texas.

9.      "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure, as applicable to the Chapter 11 Cases, promulgated under section 2075 of the Judicial Code, and the general, local, and chambers rules of the Bankruptcy Court.

10.     "*Business Day*" means any day, other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

11.     "*Cash*" means the legal tender of the United States of America or the equivalent thereof.

12.     "*Cash Collateral Order*" means the interim order or the Final Order, as applicable, entered by the Bankruptcy Court on May 2, 2016, and [_____], 2016, respectively, in form and substance reasonably acceptable to the Debtors and the Requisite Creditors, authorizing the Debtors to use the Prepetition Collateral (including cash collateral) and granting adequate protection to the Prepetition Secured Parties (as applicable), including the provision of adequate protection liens on the Unencumbered Assets in favor of the Prepetition Secured Parties (as applicable).

13.     "*Causes of Action*" means any action, claim, cause of action, controversy, demand, right, action, Lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license, and franchise of any kind or character whatsoever, whether known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law, or in equity or pursuant to any other theory of law.   For the avoidance of doubt, "Cause of Action" includes:  (a) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) the right to object to Claims or Interests; (c) any Claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any state or foreign law fraudulent transfer or similar claim.

14.     "*Challenge*" means (a) the Filing of any objection, limited objection, reservation of rights, other responsive pleading, or any document, (b) the raising of any argument in any hearing before the Bankruptcy Court, or (c) the making of any public statement of any kind, in each case, to the extent such document, argument, or

2

statement raises a position in any way against approval of the the Intercreditor Settlement, the Second/Third Lien Plan Settlement, the Unencumbered Value Settlement, approval of the Disclosure Statement, and/or Confirmation of the Plan.

15.     "*Chapter 11 Cases*" means (a) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court and (b) when used with reference to all of the Debtors, the procedurally consolidated and jointly administered chapter 11 cases pending for the Debtors in the Bankruptcy Court.

16.     "*Claim*" shall have the meaning set forth in section 101(5) of the Bankruptcy Code.

17.     "*Claims Bar Date*" means the date or dates to be established by the Bankruptcy Court by which Proofs of Claim must be Filed.

18.     "*Claims Bar Date Order*" means that certain order entered by the Bankruptcy Court establishing the Claims Bar Date.

19.     "*Claims Objection Deadline*" means the deadline for objecting to a Claim, which shall be on the date that is the later of (a) ninety (90) days after the Effective Date and (b) such other period of limitation as may be specifically fixed by the Debtors or the Reorganized Debtors, as applicable, or by an order of the Bankruptcy Court for objecting to such Claims.

20.     "*Claims Register*" means the official register of Claims maintained by the Notice and Claims Agent.

21.     "*Class*" means a category of Holders of Claims or Interests as set forth in <u>Article III</u> hereof pursuant to section 1122(a) of the Bankruptcy Code.

22.     "*Committee*" means the official committee of unsecured creditors appointed in the Chapter 11 Cases pursuant to section 1102(a) of the Bankruptcy Code.

23.     "*Confirmation*" means the entry of the Confirmation Order on the docket of the Chapter 11 Cases.

24.     "*Confirmation Date*" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

25.     "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court to consider Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code.

26.     "*Confirmation Order*" means a Final Order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

27.     "*Consenting Cross-Over Ad Hoc Committee*" means the ad hoc committee of Consenting Cross-Over Noteholders that is represented by, *inter alia*, Milbank, Tweed, Hadley & McCloy LLP and Centerview Partners LLC.

28.     "*Consenting Cross-Over Noteholders*" means the beneficial Holders of Third Lien Notes Claims and Second Lien Notes Claims that are party to the Plan Support Agreement (together with their respective successors and permitted assigns) and members of the Consenting Cross-Over Ad Hoc Committee.

29.     "Consenting First Lien Lenders" means the beneficial Holders of First Lien Claims that are party to the Plan Support Agreement (together with their respective successors and permitted assigns).

30.     "*Consenting Second Lien Ad Hoc Committee*" means the ad hoc committee of Consenting Second Lien Noteholders that is represented by, *inter alia*, Davis Polk & Wardwell LLP and Houlihan Lokey Capital, Inc.

31.     "*Consenting Second Lien Noteholders*" means the beneficial Holders of Second Lien Notes Claims that are party to the Plan Support Agreement (together with their respective successors and permitted assigns) and members of the Consenting Second Lien Ad Hoc Committee.

32.     "*Consummation*" means the occurrence of the Effective Date.

33.     "*Cure Claim*" means a monetary Claim based upon the Debtors' defaults under any Executory Contract or Unexpired Lease at the time such contract or lease is assumed by the Debtors pursuant to section 365 of the Bankruptcy Code.

34.     "*Cure Notice*" means a notice of a proposed amount of a Cure Claim in connection with an Executory Contract or Unexpired Lease to be assumed under the Plan pursuant to section 365 of the Bankruptcy Code, which notice shall include (a) procedures for objecting to proposed assumptions of Executory Contracts and Unexpired Leases, (b) Cure Claims to be paid in connection therewith and (c) procedures for resolution by the Bankruptcy Court of any related disputes.

35.     "*D&O Liability Insurance Policies*" means all insurance policies (including any "tail policy") of any of the Debtors for current or former directors', managers', and officers' liability.

36.     "*Debtors*" means Midstates Petroleum Company, Inc. and Midstates Petroleum Company LLC, the debtors and debtors in possession in the Chapter 11 Cases.

37.     "*Deficiency Claims*" means the First Lien Deficiency Claims (if any) and the Secured Notes Deficiency Claims.

38.     "*Definitive Documents*" means (a) the Plan, (b) the Plan Supplement, (c) the Disclosure Statement, (d) the motion seeking approval of the Disclosure Statement and the Disclosure Statement Order, (e) the Confirmation Order, (f) Cash Collateral Order, (g) the New Credit Facility Documents, and (h) the New Organizational Documents.

39.     "*Definitive Document Plan Support Agreement Requirements*" means that the Definitive Documents shall (a) contain terms and conditions consistent in all material respects with the Plan Support Agreement and the exhibits thereto, and (b) shall otherwise be reasonably satisfactory in all respects to the Debtors, the Requisite First Lien Lenders, the Requisite Second Lien Noteholders, and the Requisite Cross-Over Noteholders (solely with respect to any provision directly impacting the Second/Third Lien Plan Settlement, including with respect to any modifications, amendments, or supplements to such Definitive Documents at any time during the Plan Support Period (as defined in the Plan Support Agreement)); *provided*, *however*, that solely with respect to the Cash Collateral Order and New Credit Facility Documents, only the Requisite First Lien Lenders and Requisite Second Lien Noteholders shall have such consent rights, and the Cash Collateral Orders and the New Credit Facility Loan Agreements, respectively, must be acceptable in all respects to the Requisite First Lien Lenders; *provided further*, *however*, that solely with respect to the New Organizational Documents, only the Requisite Second Lien Noteholders shall have such consent rights; *provided further*, *however*, that solely for purposes of this Plan and determining whether the conditions to effectiveness in Article IX have been satisfied, a Definitive Document shall be deemed to satisfy the Definitive Documents Plan Support Agreement Requirements unless the Requisite First Lien Lenders, Requisite Second Lien Noteholders, or Requisite Cross-Over Noteholders, as applicable, provide written notice to the Debtors' counsel that the Definitive Document does not satisfy the Definitive Plan Support Agreement Requirements within ten (10) Business Days after the filing or entry, as applicable, of such Definitive Document.  Notwithstanding anything herein to the contrary, the Consenting Cross-Over Ad Hoc Committee shall have the right to receive all Definitive Documents contemporaneously with the Company, the First Lien Agent, and the Consenting Second Lien Ad Hoc Committee, as applicable.

40.     "*Diminution in Value Claims*" any claims that may be asserted against the Debtors' assets by the Prepetition Secured Parties arising under the Cash Collateral Order from any diminution in value of the Prepetition Collateral after the Petition Date through to the Effective Date, which, for the avoidance of doubt, shall include,

without limitation, all fees and costs incurred or reimbursed by the Estates in connection with a Challenge by any General Unsecured Party as approved by the Bankruptcy Court.

41.     "*Disallowed*" means, with respect to any Claim, a Claim or any portion thereof that (a) has been disallowed by a Final Order, (b) is Scheduled as zero or as contingent, disputed, or unliquidated and as to which no Proof of Claim or request for payment of an Administrative Claim has been timely filed or deemed timely filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely filed under applicable law or this Plan, (c) is not Scheduled and as to which no Proof of Claim or request for payment of an Administrative Claim has been timely filed or deemed timely filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely filed under applicable law or this Plan, (d) has been withdrawn by agreement of the applicable Debtor and the Holder thereof, or (e) has been withdrawn by the Holder thereof.

42.     "*Disclosure Statement*" means the *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of the Midstates Petroleum Company, Inc. and Its Debtor Affiliate* dated as of May 14, 2016, as may be amended from time to time, including all exhibits and schedules thereto and references therein that relate to the Plan, that is prepared and distributed in accordance with the Bankruptcy Code, the Bankruptcy Rules, and any other applicable law, and which shall be in form and substance reasonably acceptable to the Debtors and the Requisite Creditors.

43.     "*Disclosure Statement Order*" means the order of the Bankruptcy Court approving the Disclosure Statement [Docket No.____].

44.     "*Disputed*" means a Claim that is not yet Allowed.

45.     "*Disputed Claim Amount*" means (a) if a liquidated amount is set forth in the Proof of Claim relating to a Disputed Claim:  (i) the liquidated amount set forth in the Proof of Claim relating to the Disputed Claim; (ii) an amount agreed to by the Debtors or the Reorganized Debtors, as applicable, and the Holder of such Disputed Claim; or (iii) if a request for estimation is Filed by any party, the amount at which such Disputed Claim is estimated by the Bankruptcy Court, (b) if no liquidated amount is set forth in the Proof of Claim relating to a Disputed Claim:  (i) an amount agreed to by the Debtors or the Reorganized Debtors, as applicable, and the Holder of such Disputed Claim; (ii) the amount estimated by the Bankruptcy Court with respect to such Disputed Claim, (iii) the amount estimated in good faith by the Debtors or Reorganized Debtors, as applicable, with respect to the Disputed Claim, or (c) zero, if the Disputed Claim was listed on the Schedules as unliquidated, contingent, or disputed and no Proof of Claim was Filed, or deemed to have been Filed, by the applicable Claims Bar Date and the Claim has not been resolved by written agreement of the parties or an order of the Bankruptcy Court.

46.     "*Distribution Record Date*" means the date for determining which Holders of Claims or Interests are eligible to receive distributions hereunder and shall be the Voting Deadline or such other date as designated in a Final Order of the Bankruptcy Court.

47.     "*DTC*" means Depository Trust Company.

48.     "*Effective Date*" means, with respect to the Plan, the date that is a Business Day selected by the Debtors, in consultation with the Consenting First Lien Lenders, the Consenting Second Lien Noteholders, and the Consenting Cross-Over Noteholders, on which:  (a) no stay of the Confirmation Order is in effect; (b) all conditions precedent specified in Article IX.A have been satisfied or waived (in accordance with Article IX.B); and (c) the Plan is declared effective.

49.     "*Entity*" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

50.     "*Estate*" means, as to each Debtor, the estate created for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

KE 40522588

51.     "*Excess Cash*" means Cash in an amount equal to the lesser of (i) any Cash remaining on any of the Debtors' balance sheets as of the Effective Date, less (a) the amount of Cash to be paid to Holders of First Lien Claims on the Plan Effective Date, (b) all payments of Cash and reserves of Cash required under the Plan (other than distributions of Cash on account of Second Lien Notes Claims, including, but not limited to, payments and reserves on account of Administrative Claims, Other Priority Claims, Priority Tax Claims, expenses in connection with the Restructuring Transactions and Professional Fee Claims (including Professional Fee Reserve Amount to fund the Professional Fee Escrow Account)), and (c) $110 million, and (ii) $60 million.

52.     "*Exculpated Fiduciary*" means, collectively, each of the following in their respective capacities as such:  (a) the Debtors; (b) the Reorganized Debtors; and (c) with respect to each of (a) and (b) to the extent they were employed in such capacity on or after the Petition Date, such Entity's directors, officers, shareholders (regardless of whether such interests are held directly or indirectly), partners, managers, trustees, assigns, principals, members, employees, agents, affiliates, advisory board members, parents, subsidiaries, predecessors, successors, heirs, executors and assignees, attorneys, financial advisors, investment bankers, accountants, consultants and other professionals or representatives.

53.     "*Exculpated Parties*" means, collectively: (a) the Exculpated Fiduciaries and (b) the Section 1125(e) Parties.

54.     "*Executory Contract*" means a contract to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

55.     "*Federal Judgment Rate*" means the federal judgment rate in effect as of the Petition Date, compounded annually.

56.     "*File*," "*Filed*," or "*Filing*" means file, filed, or filing in the Chapter 11 Cases with the Bankruptcy Court or, with respect to the filing of a Proof of Claim or proof of Interest, the Notice and Claims Agent.

57.     "*Final Order*" means an order or judgment of the Bankruptcy Court (or any other court of competent jurisdiction) entered by the Clerk of the Bankruptcy Court (or any other court) on the docket in the Chapter 11 Cases (or the docket of such other court), which has not been reversed, stayed, modified, amended, or vacated, and as to which (a) the time to appeal, petition for certiorari, or move for a new trial, stay, reargument, or rehearing has expired and as to which no appeal, petition for certiorari, or motion for new trial, stay, reargument, or rehearing shall be pending or (b) if an appeal, writ of certiorari, new trial, stay, reargument, or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court (or other court of competent jurisdiction) shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, stay, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari, or move for a new trial, stay, reargument, or rehearing shall have expired, as a result of which such order shall have become final in accordance with rule 8002 of the Bankruptcy Rules; *provided* that the possibility that a motion under rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed relating to such order, shall not cause an order not to be a Final Order.

58.     "*First Lien Accepting Lenders*" means the First Lien Lenders that (a) affirmatively vote to accept the Plan or (b) vote to reject the Plan but affirmatively elect on their respective Ballots to receive the New Credit Facility Revolving Loans pursuant to the Plan.

59.     "*First Lien Administrative Agent*" means SunTrust Bank in its capacity as administrative and collateral agent under the First Lien Credit Agreement and the other First Lien Loan Documents.

60.     "*First Lien Claims*" means all Claims against the Debtors arising under the First Lien Loan Documents.

61.      "*First Lien Credit Agreement*" means that certain Second Amended and Restated Credit Agreement, dated as of June 8, 2012, by and between the Debtors, as borrowers, the First Lien Agent, and the First Lien Lenders (as amended, restated, supplemented, or otherwise modified from time to time).

62.      "*First Lien Credit Facility*" means the credit facility under the First Lien Credit Agreement.

63.      "*First Lien Deficiency Claims*" means the portion of the First Lien Claims constituting unsecured Claims under section 506(a) of the Bankruptcy Code, which for the avoidance of doubt, shall constitute General Unsecured Claims in Class 8.  The First Lien Deficiency Claims (if any) shall be Allowed in an amount: (a) stipulated by the Debtors and the Requisite First Lien Lenders and approved by the Bankruptcy Court, which approval may be set forth in the Plan or Confirmation Order; or (b) otherwise determined by the Bankruptcy Court, including in connection with Confirmation, after notice and an opportunity for a hearing.

64.      "*First Lien Lenders*" means, collectively, the lenders from time to time party to the First Lien Credit Agreement.

65.      "*First Lien Loan Documents*" means the First Lien Credit Agreement and the other Loan Documents (as defined in the First Lien Credit Agreement), and any other document related to or evidencing the loans and obligations thereunder or executed therewith.

66.      "*First Lien Rejecting Lenders*" means the First Lien Lenders that:  (a) affirmatively vote to reject the Plan and either (i) affirmatively elect on their respective Ballots to receive the New Credit Facility Term Loans pursuant to the Plan or (ii) make no election with respect to receiving New Credit Facility Term Loans or New Credit Facility Revolving Loans pursuant to the Plan; or (b) fail to return a Ballot such that they will have not been deemed to vote in favor or have made an election to receive the New Credit Facility Revolving Loans pursuant to the Plan.

67.      "*First Lien Secured Parties*" means the First Lien Administrative Agent and the First Lien Lenders.

68.      "*General Unsecured Claims*" means the Deficiency Claims and any other Claims against any Debtor that are not otherwise paid in full during the Chapter 11 Cases pursuant to an order of the Bankruptcy Court and is not:  (a) an Administrative Claim; (b) a Priority Tax Claim; (c) an Other Priority Claim; (d) an Other Secured Claim; (e) a First Lien Claim; (f) a Second Lien Notes Claim (g) a Third Lien Notes Claim; (h) an Unsecured Notes Claims; (i) a Lien Trade Claim; (j) an Intercompany Claim; or (k) a Section 510(b) Claim.

69.      "*General Unsecured Creditor*" means the Holder of a General Unsecured Claim.

70.      "*General Unsecured Party*" means any Unsecured Noteholder, any General Unsecured Creditor, or the Committee.

71.      "*Governmental Unit*" shall have the meaning set forth in section 101(27) of the Bankruptcy Code.

72.      "*Holder*" means an Entity holding a Claim or Interest.

73.      "*Impaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is not Unimpaired.

74.      "*Indemnification Obligations*" means each of the Debtors' indemnification obligations in place as of the Effective Date, whether in the bylaws, certificates of incorporation or formation, limited liability company agreements, other organizational or formation documents, board resolutions, management or indemnification agreements, or employment contracts, for the current and former directors and the officers who served in such capacity at any time after or within the 12 months prior to the Petition Date.

75.      "*Intercompany Claim*" means any Claim held by one Debtor against another Debtor.

76. "*Intercompany Interests*" means the Interests in Midstates Petroleum Company LLC, all of which are held by Debtor Midstates Petroleum Company, Inc.

77. "*Intercreditor Agreement*" means that certain Intercreditor Agreement, dated as of May 21, 2015, by and among SunTrust Bank, as priority lien agent, and Wilmington Trust, N.A., as second lien collateral agent and third lien collateral agent, and acknowledged and agreed to by the Debtors.  The Intercreditor Agreement shall be construed to be part of the First Lien Loan Documents, the Second Lien Notes Documents, and the Third Lien Notes Documents.

78. "*Intercreditor Settlement*" means the settlement evidenced by the Plan Support Agreement pursuant to which the Debtors, the Consenting First Lien Lenders, the Consenting Second Lien Noteholders, and the Consenting Cross-Over Noteholders agreed, in full and final resolution of all disputes and claims among the Debtors, the First Lien Secured Parties, the Second Lien Secured Parties, and the Third Lien Secured Parties, that: (a) the Plan shall implement the Unencumbered Value Settlement; (b) the Prepetition Secured Parties will waive recovery on account of their respective Diminution in Value Claims and the Deficiency Claims; and (c) the Plan shall implement the Second/Third Lien Plan Settlement.  For the avoidance of doubt, the Intercreditor Settlement does not implicate, compromise, or eliminate the rights and protections afforded under the Intercreditor Agreement to the parties thereto.

79. "*Interests*" means the common stock, preferred stock, limited liability company interests, and any other equity, ownership, or profits interests of any Debtor and options, warrants, rights, or other securities or agreements to acquire the common stock, preferred stock, limited liability company interests, or other equity, ownership, or profits interests of any Debtor (whether or not arising under or in connection with any employment agreement), including any claim against the Debtors subject to subordination pursuant to section 510(b) of the Bankruptcy Code arising from or related to any of the foregoing.

80. "*Interim Compensation Order*" means that certain order entered by the Bankruptcy Court establishing procedures for the compensation of Professionals.

81. "*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001.

82. "*Lien*" shall have the meaning set forth in section 101(37) of the Bankruptcy Code.

83. "*Lien Trade Claim*" means a Claim against the Debtors arising from the provision to the Debtors of goods or services, which Claims may be Secured by valid and enforceable Liens or security interests, whether pursuant to an agreement with the Debtors or applicable law.

84. "*Lien Trade Creditor*" means a Holder of a Lien Trade Claim.

85. "*Litigation Waivers*" means the Second Lien Litigation Waiver and the Third Lien Litigation Waiver.

86. "*Management Compensation Term Sheet*" means the term sheet attached hereto as **Exhibit B** regarding the Management Incentive Plan and certain other management compensation issues.

87. "*Management Incentive Plan*" means that certain post-Effective Date management incentive plan, which shall be consistent with the Management Compensation Term Sheet and under which 10 percent of the New Common Stock (on a fully-diluted/fully-distributed basis) will be reserved for grants made from time to time to the officers and other management of the Reorganized Debtors, and the other terms of which shall be acceptable to the Debtors and the Requisite Second Lien Noteholders.

88. "*New Board*" means the initial board of directors, members, or managers, as applicable, of the Reorganized Parent.  If the Plan Settlement is approved, the New Board shall be appointed by parties to the Plan Support Agreement who hold, in the aggregate, at least fifty and one-tenth percent (50.1%) in principal amount outstanding of the Second Lien Notes Claims held by all parties to the Plan Support Agreement.

8

89.     "*New Credit Agreement*" means that certain credit agreement, to be dated as of the Effective Date, pursuant to which the First Lien Lenders will agree to provide the New Credit Facility on the terms and conditions set forth in the New Credit Facility Term Sheet, and which shall otherwise be in form and substance reasonably acceptable to the Debtors and the Requisite Second Lien Noteholders and acceptable in all respects to the Requisite First Lien Lenders.  The New Credit Agreement will be included in the Plan Supplement.

90.     "*New Credit Facility*" means the first lien credit facility to be entered into by the Reorganized Debtors on the Effective Date pursuant to the New Credit Agreement, consisting of the New Credit Facility Revolving Loans and the New Credit Facility Term Loans.  On the Effective Date, the New Credit Facility shall consist of an aggregate commitment of $170.0 million and shall be deemed fully drawn, subject to the funding of the $40 million restricted account, which following the Effective Date, may be applied to reduce the outstanding amounts under the New Credit Facility Revolving Loans, but which shall not be available for future borrowing until after Reorganized Debtors' receipt of a borrowing base redetermination notice on or about April 1, 2018.  The lenders under the New Credit Facility shall not be entitled to give notice of a borrowing base redetermination to the Reorganized Debtors until April 1, 2018.  The New Credit Facility shall otherwise be in form and substance (i) reasonably acceptable to the Debtors and the Requisite Second Lien Noteholders and (ii) acceptable in all respects to the Requisite First Lien Lenders.

91.     "*New Credit Facility Documents*" means, in connection with the New Credit Facility, the New Credit Agreement and other loan documents related to or evidencing the loans and obligations thereunder, each in form and substance reasonably acceptable to the Debtors and the Requisite Second Lien Noteholders and acceptable in all respects to the Requisite First Lien Lenders.

92.     "*New Credit Facility Revolving Loans*" means the first lien revolving credit facility, which shall be deemed to be extended to the Reorganized Debtors by the First Lien Accepting Lenders as of the Effective Date pursuant to the New Credit Agreement.  The New Credit Facility Revolving Loans shall consist of an aggregate commitment of $170.0 million less the amount of New Credit Facility Term Loans and shall be subject to a borrowing base equal to $170.0 million less the amount of New Credit Facility Term Loans.  The New Credit Facility Revolving Loans shall be deemed fully drawn on the Effective Date, subject to the funding of the $40 million restricted account, which following the Effective Date, may be applied to reduce the outstanding amounts under the New Credit Facility Revolving Loans, but which shall not be available for future borrowing under the New Credit Facility Revolving Loans until after Reorganized Debtors' receipt of a borrowing base redetermination notice under the New Credit Facility on or about April 1, 2018.

93.     "*New Credit Facility Term Loans*" means the first lien term loan credit facility, which shall be deemed to be extended to the Reorganized Debtors by the First Lien Rejecting Lenders (if any) as of the Effective Date pursuant to the New Credit Agreement, and which shall be subordinate in right of payment to the New Credit Facility Revolving Loans, except as expressly set forth within the New Credit Facility Term Sheet with respect to sales of assets and mandatory payments.  The New Credit Facility Term Loans shall be in an aggregate principal amount equal to amount of Allowed First Lien Claims held by the First Lien Rejecting Lenders divided by the total amount of Allowed First Lien Claims, with the quotient thereof multiplied by $170.0 million.

94.     "*New Credit Facility Term Sheet*" means the term sheet attached to the Plan Support Agreement and also attached hereto as **Exhibit A**.

95.     "*New Common Stock*" means the common equity of Reorganized Parent, which may comprise or be converted to limited liability company interests in the event Reorganized Parent is converted to a limited liability company, authorized and issued pursuant to the Plan.

96.     "*New Organizational Documents*" means the forms of the certificates or articles of incorporation, bylaws, or such other applicable formation documents of each of the Reorganized Debtors, which forms shall be included in the Plan Supplement.

97.     "*New Warrants*" means 3.5-year, out of the money, standard warrants for fifteen percent (15%) of the New Common Stock struck at a strike price of $600 million, the form of which shall be included in the Plan Supplement.

9

98.    "*Notice and Claims Agent*" means Kurtzman Carson Consultants, LLC which was retained as the Debtors' claims, noticing, and solicitation agent pursuant to the *Order Authorizing Retention and Appointment of Kurtzman Carson Consultants, LLC as Claims, Noticing and Solicitation Agent* [Docket No. 76].

99.    "*Ordinary Course Professionals*" shall mean the various attorneys, accountants, auditors, and other professionals the Debtors employ in the ordinary course of their business and retained by the Debtors pursuant to the Ordinary Course Professionals Order.

100.    "*Ordinary Course Professionals Order*" shall mean that certain order entered by the Bankruptcy Court establishing the procedures for retaining the Ordinary Course Professionals.

101.    "*Other Priority Claim*" means any allowed Claim against any Debtor entitled to priority in right of payment under section 507(a) of the Bankruptcy Code, other than:  (a) an Administrative Claim; or (b) a Priority Tax Claim, to the extent such Claim has not already been paid during the Chapter 11 Cases.

102.    "*Other Secured Claim*" means any Secured Claim against any Debtor that is not (a) a First Lien Claim, (b) a Second Lien Notes Claim, (c) a Third Lien Notes Claim, or (d) Lien Trade Claim.

103.    "*Parent*" means Midstates Petroleum Company, Inc.

104.    "*Person*" shall have the meaning set forth in section 101(41) of the Bankruptcy Code.

105.    "*Petition Date*" means April 30, 2016, the date on which the Debtors commenced the Chapter 11 Cases.

106.    "*Plan Supplement*" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan, in each case, as applicable, subject to the Definitive Document Plan Support Agreement Requirements (as amended, supplemented, or modified from time to time), to be Filed by the Debtors no later than 7 days before the Voting Deadline, and additional documents or amendments to previously Filed documents, Filed before the Confirmation Date as amendments to the Plan Supplement, including the following, as applicable:  (a) the New Organizational Documents; (b) the New Credit Agreement; (c) the Schedule of Assumed Executory Contracts and Unexpired Leases; (d) a list of retained Causes of Action; (e) a document listing the members of the New Board; (f) the Registration Rights Agreement; and (g) the form of the New Warrants.  The Debtors shall have the right to amend the documents contained in, and exhibits to, the Plan Supplement (other than the Definitive Documents) through the Effective Date with the reasonable consent of the Requisite Creditors.

107.    "*Plan Support Agreement*" means the Plan Support Agreement, dated as of April 30, 2016, as amended, supplemented, or otherwise modified from time to time in accordance with its terms, a copy of which is attached as <u>Exhibit B</u> to the Disclosure Statement.

108.    "*Prepetition Collateral*" means the Debtors' assets as of the Petition Date that are encumbered by valid, perfected, and enforceable liens pursuant to the First Lien Loan Documents, the Second Lien Notes Documents, and the Third Lien Notes Documents.

109.    "*Prepetition Secured Parties*" means (a) the First Lien Secured Parties, (b) the Second Lien Secured Parties, and (c) the Third Lien Secured Parties.

110.    "*Priority Claims*" means Priority Tax Claims and Other Priority Claims.

111.    "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

112.    "*Pro Rata*" means the proportion that an Allowed Claim or Allowed Interest in a particular Class bears to the aggregate amount of Allowed Claims or Allowed Interests in that respective Class, or the proportion that Allowed Claims or Allowed Interests in a particular Class bear to the aggregate amount of Allowed Claims or

Allowed Interests in a particular Class and other Classes entitled to share in the same recovery as such Allowed Claim or Allowed interests under the Plan.

113.    "*Professional*" means an Entity employed pursuant to a Bankruptcy Court order in accordance with sections 327 or 1103 of the Bankruptcy Code and to be compensated for services rendered before or on the Confirmation Date, pursuant to sections 327, 328, 329, 330, or 331 of the Bankruptcy Code.

114.    "*Professional Fee Claim*" means a Claim by a Retained Professional seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4) or 503(b)(5) of the Bankruptcy Code.

115.    "*Professional Fee Escrow Account*" means an interest-bearing escrow account in an amount equal to the Professional Fee Reserve Amount funded and maintained by the Reorganized Debtors on and after the Effective Date solely for the purpose of paying all Allowed and unpaid fees and expenses of Retained Professionals in the Chapter 11 Cases.

116.    "*Professional Fee Reserve Amount*" means the aggregate Accrued Professional Compensation through the Effective Date as estimated by the Retained Professionals in accordance with Article II.C.3 hereof.

117.    "*Proof of Claim*" means a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

118.    "*Registration Rights Agreement*" means the agreement among the Registration Rights Beneficiaries and the Reorganized Parent, which shall provide the Registration Rights Beneficiaries with certain demand registration rights (including with respect to underwritten offerings) and with piggyback registration rights. The Registration Rights Agreement shall be in form and substance reasonably acceptable to the Debtors, the Requisite Second Lien Noteholders, and the Requisite Cross-Over Noteholders and shall be included in the Plan Supplement.

119.    "*Registration Rights Beneficiaries*" means any party that (i) receives 10% or more of the New Common Stock under the Plan or (ii) otherwise reasonably determines on the advice of counsel (which advice may be from internal or external counsel and may be oral or written) that it is an "affiliate" (as such term is defined in the Securities Act) of the Reorganized Debtors or holds "restricted" or "control" (as such terms are defined in the Securities Act) New Common Stock (including any New Common Stock issued upon exercise of the New Warrants).

120.    "*Reinstated*" or "*Reinstatement*" means, with respect to Claims and Interests, the treatment provided for in section 1124 of the Bankruptcy Code.

121.    "*Released Parties*" means, collectively, in each case, solely in its capacity as such, (a) the Debtors and the Debtors' current and former officers and directors; (b) the First Lien Secured Parties; (c) the First Lien Administrative Agent, Syndication Agent, Co-Documentation Agents, Joint Bookrunners, and Lead Arranger of the First Lien Credit Facility; (d) the Second Lien Secured Parties; (e) the Third Lien Secured Parties; (f) the Consenting First Lien Lenders; (g) Consenting Second Lien Noteholders, (h) the Consenting Cross-Over Noteholders, (i) to the extent permitted by the Bankruptcy Court in the Confirmation Order, each Holder of a Claim or Interest entitled to vote on the Plan that votes to accept the Plan, and (j) with respect to each of the Entities named in (a) through (i) above, such Entity's directors, officers, current and former shareholders (regardless of whether such interests are held directly or indirectly), partners, managers, trustees, assigns, principals, members, employees, agents, affiliates, advisory board members, parents, subsidiaries, predecessors, successors, heirs, executors and assignees, attorneys, financial advisors, investment bankers, accountants, consultants and other professionals or representatives; *provided*, *however*, that any Holder of a Claim that, in its Ballot, "opts" out of the release provided in the Plan shall not be considered to be included in the definition of "Released Parties."

11

122.     "*Releasing Parties*" means, collectively, in each case, solely in its capacity as such, (a) the Debtors and the Debtors' current and former officers and directors; (b) the First Lien Secured Parties; (c) the Second Lien Secured Parties; (d) the Third Lien Secured Parties; (e) each Holder of a Claim entitled to vote to accept or reject the Plan that (i) votes to accept the Plan or (ii) votes to reject the Plan but does not affirmatively elect to "opt out" of being a Releasing Party; (f) to the fullest extent permitted by law, each Holder of a Claims entitled to accept or reject the Plan that does not vote to accept or reject the Plan, provided that such Holder does not affirmatively elect to "opt out" of being a Releasing Party; (g) each Holder of a Claim or Interest to the maximum extent permitted by law, (h) each Holder of a Claim that is Unimpaired and presumed to accept the Plan that does not timely object to the releases set forth in Article VIII.E herein; (i) each Holder of a Claim or Interest that is deemed to reject the Plan that does not timely object to the releases set forth in Article VIII.E herein; and (j) with respect to each of the Entities named in (a) through (i) above, such Entity's directors, officers, current and former shareholders (regardless of whether such interests are held directly or indirectly), partners, managers, officers, principals, members, employees, agents, affiliates, advisory board members, parents, subsidiaries, predecessors, successors, heirs, executors and assignees, attorneys, financial advisors, investment bankers, accountants, consultants, and other professionals or representatives.

123.     "*Reorganized Debtors*" means the Debtors, or any successors thereto, by merger, consolidation, or otherwise, on or after the Effective Date, including any new entity formed pursuant to the Restructuring Transactions to directly or indirectly acquire the assets or equity of the Debtors.

124.     "*Reorganized Parent*" means Parent, or any successors thereto, by merger, consolidation, or otherwise, on and after the Effective Date, including any new holding company formed pursuant to the Restructuring Transactions to indirectly acquire the assets or equity of the Reorganized Debtors.

125.     "*Requisite Cross-Over Noteholders*" means, as of the relevant date, Consenting Cross-Over Noteholders that are members of the Consenting Cross-Over Ad Hoc Committee that collectively hold at least a majority of the aggregate outstanding principal amount of the Third Lien Notes Claims held by all of the Consenting Cross-Over Noteholders that are members of the Consenting Cross-Over Ad Hoc Committee as of such date.

126.     "*Requisite Creditors*" means the Requisite First Lien Lenders, Requisite Second Lien Noteholders, and the Requisite Cross-Over Noteholders.

127.     "*Requisite First Lien Lenders*" means, as of the relevant date, Consenting First Lien Lenders that collectively hold at least a majority of the aggregate outstanding principal amount of the First Lien Claims.

128.     "*Requisite Noteholders*" means the Requisite Second Lien Noteholders and Requisite Cross-Over Noteholders.

129.     "*Requisite Second Lien Noteholders*" means, as of the relevant date, Consenting Second Lien Noteholders that are members of the Consenting Second Lien Ad Hoc Committee that collectively hold at least a majority of the aggregate outstanding principal amount of the Second Lien Notes Claims held by all of the Consenting Second Lien Noteholders that are members of the Consenting Second Lien Ad Hoc Committee as of such date.

130.     "*Restructuring Transactions*" shall have the meaning set forth in Article IV.A.

131.     "*Retained Professional*" means an Entity: (a) employed in the Chapter 11 Cases pursuant to a Final Order in accordance with sections 327 and 1103 of the Bankruptcy Code and to be compensated for services rendered prior to the Effective Date, pursuant to sections 327, 328, 329, 330, or 331 of the Bankruptcy Code; or (b) for which compensation and reimbursement has been allowed by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

132.     "*Schedule of Assumed Executory Contracts and Unexpired Leases*" means the schedule, in form and substance reasonably acceptable to the Debtors and the Requisite Second Lien Noteholders (including any amendments or modifications thereto), if any, of certain Executory Contracts and Unexpired Leases to be assumed

by the Debtors pursuant to the Plan, as set forth in the Plan Supplement, as amended by the Debtors from time to time prior to the Confirmation Date.

133.     "*Schedules*" means, collectively, the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases, and statements of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code and in substantial accordance with the Official Bankruptcy Forms, as the same may have been amended, modified, or supplemented from time to time.

134.     "*Second Lien Indenture*" means that certain Indenture, dated May 21, 2015, by and among the Debtors, as issuers, and the Second Lien Notes Trustee, as indenture trustee and collateral agent (as amended modified, or otherwise supplemented from time to time), providing for the issuance of the Second Lien Notes.

135.     "*Second Lien Notes*" means the 10.0% second lien senior secured notes due 2020 issued under the Second Lien Indenture.

136.     "*Second Lien Notes Claims*" means all Claims against the Debtors arising under the Second Lien Notes Documents, including Second Lien Notes Secured Claims and Second Lien Notes Deficiency Claims.

137.     "*Second Lien Notes Deficiency Claim*" means the portion of the Second Lien Notes Claims constituting unsecured Claims under section 506(a) of the Bankruptcy Code, which, for the avoidance of doubt, shall constitute General Unsecured Claims in Class 8.  The Second Lien Notes Deficiency Claim shall be Allowed in an amount:  (a) stipulated by the Debtors and the Requisite Second Lien Noteholders and approved by the Bankruptcy Court, which approval may be set forth in the Plan or Confirmation Order; or (b) otherwise determined by the Bankruptcy Court, including in connection with Confirmation, after notice and an opportunity for a hearing.

138.     "*Second Lien Notes Documents*" means the Second Lien Indenture and the other Note Documents (as defined in the Second Lien Indenture), and any other document related to or evidencing the obligations thereunder.

139.     "*Second Lien Notes Secured Claims*" means Claims against the Debtors arising under the Second Lien Notes Documents that constitute Secured Claims under section 506(a) of the Bankruptcy Code.

140.     "*Second Lien Notes Trustee*" means Wilmington Trust, N.A., in its capacity as indenture trustee and collateral agent under the Second Lien Indenture and the other Second Lien Notes Documents.

141.     "*Second Lien Noteholders*" means, collectively, the beneficial holders of the Second Lien Notes.

142.     "*Second Lien Secured Parties*" means the Second Lien Noteholders and Second Lien Notes Trustee.

143.     "*Second Lien Litigation Waiver*" means, subject to the terms of the Plan Support Agreement, the waiver by the Second Lien Secured Parties of any and all objections or challenges to, or arguments opposing confirmation of, the Plan, and any and all claims, causes of action or other challenges against any of the Third Lien Secured Parties regardless of whether the Intercreditor Settlement is approved by the Bankruptcy Court, in full and final resolution of all disputes and claims between the Second Lien Secured Parties and the Third Lien Secured Parties, including, without limitation, valuation issues and any rights of the Second Lien Noteholders as General Unsecured Creditors.

144.     "*Second/Third Lien Plan Settlement*" means the settlement among the Consenting Second Lien Noteholders and the Consenting Cross-Over Noteholders that is embodied in the Plan Support Agreement and implemented through the Plan, pursuant to which the Second Lien Secured Parties and Third Lien Secured Parties grant their respective Litigation Waivers in consideration of the Second Lien Secured Parties agreement that the Third Lien Noteholders shall receive under the Plan their Pro Rata share of two and one-half percent (2.5%) of the New Common Stock and the New Warrants.

KE 40522588

145.     "*Section 510(b) Claims*" means any Claims arising from (a) rescission of a purchase or sale of a security of the Debtors or an Affiliate of the Debtors, (b) purchase or sale of such a security or (c) reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such a Claim.

146.     "*Section 1125(e) Parties*" means, collectively, each of the following in their respective capacities as such (a) the First Lien Secured Parties, (b) the Second Lien Secured Parties, (c) the Third Lien Secured Parties, (d) the First Lien Consenting Lenders, (e) the Consenting Second Lien Noteholders, (f) the Consenting Cross-Over Noteholders, and (g) with respect to each of the Entities named in (a) through (f) above, such Entity's directors, officers, current and former shareholders (regardless of whether such interests are held directly or indirectly), partners, managers, trustees, assigns, principals, members, employees, agents, affiliates, advisory board members, parents, subsidiaries, predecessors, successors, heirs, executors and assignees, attorneys, financial advisors, investment bankers, accountants, consultants and other professionals or representatives.

147.     "*Secured*" means when referring to a Claim, a Claim:  (a) secured by a Lien on property in which the applicable Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in such Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code; or (b) otherwise Allowed pursuant to the Plan as a Secured Claim.

148.     "*Secured Notes Deficiency Claims*" means the Second Lien Notes Deficiency Claims and the Third Lien Notes Deficiency Claims.

149.     "*Secured Tax Claims*" means any Secured Claim against any Debtor that, absent its Secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code (determined irrespective of time limitations), including any related Secured Claim for penalties.

150.     "*Securities Act*" means the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, as amended, or any similar federal, state or local law.

151.     "*Securities Exchange Act*" means the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a–78nn, as amended.

152.     "*Security*" shall have the meaning set forth in section 101(49) of the Bankruptcy Code.

153.     "*Settlement Termination Event*" means the occurrence of either (a) any written or oral judgment by the Bankruptcy Court denying approval of the Intercreditor Settlement or any material component thereof or (b) the election by the Requisite Second Lien Noteholders pursuant to Section 6(b)(iv) of the Plan Support Agreement to terminate the Second/Third Lien Plan Settlement.

154.     "*Suspended Funds*" means amounts that are payable by the Debtors to the owners of royalty interests, working interests, and similar interest burdens in the Debtors' oil and gas properties or oil and gas properties operated by the Debtors, but are otherwise unpayable to such owners for a variety of reasons, including incorrect contact information, unmarketable title, and ongoing disputes over ownership of the underlying interests.

155.     "*Third Lien Indenture*" means that certain Indenture, dated May 21, 2015, by and among the Debtors, as issuers, and the Third Lien Notes Trustee, as indenture trustee and collateral agent (as amended modified, or otherwise supplemented from time to time), providing for the issuance of the Third Lien Notes.

156.     "*Third Lien Notes*" means the 12.0% third lien senior secured notes due 2020 issued under the Third Lien Indenture.

157.     "*Third Lien Notes Claims*" means all Claims against the Debtors arising under the Third Lien Notes Documents, including Third Lien Notes Secured Claims and Third Lien Notes Deficiency Claims.

14

158.    "*Third Lien Notes Deficiency Claims*" means the portion of the Third Lien Notes Claims constituting unsecured Claims under section 506(a) of the Bankruptcy Code, which, for the avoidance of doubt, shall constitute General Unsecured Claims in Class 8.  The Third Lien Notes Deficiency Claims shall be Allowed in an amount:  (a) stipulated by the Debtors and the Requisite Cross-Over Noteholders and approved by the Bankruptcy Court, which approval may be set forth in the Plan or Confirmation Order; or (b) otherwise determined by the Bankruptcy Court, including in connection with Confirmation, after notice and an opportunity for a hearing.

159.    "*Third Lien Notes Documents*" means the Third Lien Indenture and the other Note Documents (as defined in the Third Lien Indenture), and any other document related to or evidencing the obligations thereunder.

160.    "*Third Lien Notes Secured Claims*" means Claims against the Debtors arising under the Third Lien Notes Documents that constitute Secured Claims under section 506(a) of the Bankruptcy Code.

161.    "*Third Lien Notes Trustee*" means UMB Bank, National Association, in its capacity as successor indenture trustee and collateral agent under the Third Lien Indenture and the other Third Lien Notes Documents.

162.    "*Third Lien Noteholders*" means, collectively, the beneficial holders of the Third Lien Notes.

163.    "*Third Lien Secured Parties*" means the Third Lien Noteholders and Third Lien Notes Trustee.

164.    "*Third Lien Litigation Waiver*" means, subject to the terms of the Plan Support Agreement, the waiver by the Third Lien Secured Parties of any and all objections or challenges to, or arguments opposing confirmation of, the Plan, and any and all claims, causes of action or other challenges against any of the Second Lien Secured Parties regardless of whether the Intercreditor Settlement is approved by the Bankruptcy Court, in full and final resolution of all disputes and claims between the Third Lien Secured Parties and the Second Lien Secured Parties, including, without limitation, valuation issues and any rights of the Third Lien Noteholders as General Unsecured Creditors.

165.    "*U.S. Trustee*" means the Office of the United States Trustee for the Southern District of Texas.

166.    "*Unencumbered Assets*" means any of the Debtors' assets that are unencumbered by valid, perfected, and enforceable Liens pursuant to the First Lien Loan Documents, the Second Lien Loan Documents, or the Third Lien Loan Documents as of the Petition Date.

167.    "*Unencumbered Assets Equity Distribution*" means one and two-tenths percent (1.2%) of the New Common Stock, subject to dilution under the Management Incentive Plan, any other compensation arrangements under the Management Compensation Term Sheet, and New Common Stock issuable upon exercise of the New Warrants.

168.    "*Unencumbered Value Settlement*" means the settlement embodied in the Plan Support Agreement by and among the Debtors, the Consenting First Lien Lenders, the Consenting Second Lien Noteholders, and the Consenting Cross-Over Noteholders, pursuant to which the parties thereto agreed to the valuation allocation between the Prepetition Collateral and the Unencumbered Assets, as the result of which the New Common Stock shall be allocated ninety-eight and eight tenths percent (98.8%) on account of the Prepetition Collateral and one and two-tenths percent (1.2%) on account of the Unencumbered Assets.

169.    "*Unexpired Lease*" means a lease of nonresidential real property to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

170.    "*Unimpaired*" means, with respect to a Class of Claims or Interests, a Claim or an Interest that is unimpaired within the meaning of section 1124 of the Bankruptcy Code, including through payment in full in cash.

171.    "*Unsecured 2020 Senior Noteholders*" means the beneficial holders of the Unsecured 2020 Senior Notes.

172.    "*Unsecured 2020 Senior Notes*" means the 10.75% senior notes due 2020, issued pursuant to the Unsecured 2020 Senior Notes Indenture.

173.    "*Unsecured 2020 Senior Notes Claims*" means all Claims against the Debtors arising under the Unsecured 2020 Senior Notes Indenture.

174.    "*Unsecured 2020 Senior Notes Indenture*" means that certain Indenture, dated as of October 1, 2012, among the Debtors, as issuers, and Wells Fargo Bank, N.A., as indenture trustee (as amended, restated, supplemented, or otherwise modified from time to time), providing for the issuance of the Unsecured 2020 Senior Notes.

175.    "*Unsecured 2020 Senior Notes Trustee*" means Wells Fargo Bank, N.A., in its capacity as indenture trustee under the Unsecured 2020 Senior Notes Indenture.

176.    "*Unsecured 2021 Senior Noteholders*" means the beneficial Holders of the Unsecured 2021 Senior Notes.

177.    "*Unsecured 2021 Senior Notes*" means the 9.25% senior notes due 2021, issued pursuant to the Unsecured 2021 Senior Notes Indenture.

178.    "*Unsecured 2021 Senior Notes Claims*" means all Claims against the Debtors arising under the Unsecured 2021 Senior Notes Indenture.

179.    "*Unsecured 2021 Senior Notes Indenture*" means that certain Indenture, dated as of May 31, 2013, among the Debtors, as issuers, and Wells Fargo Bank, N.A., as indenture trustee (as amended, restated supplemented or otherwise modified from time to time), providing for the issuance of the Unsecured 2021 Senior Notes.

180.    "*Unsecured 2021 Senior Notes Trustee*" means Wells Fargo Bank, N.A., in its capacity as indenture trustee under the Unsecured 2021 Senior Notes Indenture.

181.    "*Unsecured Noteholders*" means the beneficial Holders of the Unsecured Notes.

182.    "*Unsecured Notes*" mean the Unsecured 2020 Senior Notes and the Unsecured 2021 Senior Notes.

183.    "*Unsecured Notes Claims*" means all Claims against the Debtors arising under the Unsecured 2020 Senior Notes Indenture and the Unsecured 2021 Senior Notes Indenture.

184.    "*Unsecured Notes Documents*" means the Unsecured 2020 Senior Notes Indenture and the Unsecured 2021 Senior Notes Indenture, and any other documentation evidencing the obligations due under the Unsecured Notes.

185.    "*Unsecured Notes Trustees*" means the Unsecured 2020 Senior Notes Trustee and the Unsecured 2021 Senior Notes Trustee.

186.    "*Voting Deadline*" means [_____], 2016 at 4:00 p.m., prevailing Eastern Time.

B.      *Rules of Interpretation*

For purposes herein:  (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) except as otherwise provided, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (3) except as otherwise provided, any reference herein to an existing document or exhibit having been Filed or to be Filed shall mean that document or exhibit, as it may thereafter be

16

amended, restated, supplemented, or otherwise modified in accordance with the terms of the Plan; (4) unless otherwise specified, all references herein to "Articles" are references to Articles of the Plan or hereto; (5) unless otherwise stated, the words "herein," "hereof," and ''hereto'' refer to the Plan in its entirety rather than to a particular portion of the Plan; (6) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (7) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation;" (8) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (9) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; and (10) any docket number references in the Plan shall refer to the docket number of any document Filed with the Bankruptcy Court in the Chapter 11 Cases.

C.      *Computation of Time*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.

D.      *Governing Law*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated herein, the laws of the State of Delaware, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); *provided* that corporate or limited liability company governance matters relating to the Debtors or the Reorganized Debtors, as applicable, shall be governed by the laws of the state of incorporation or formation (as applicable) of the applicable Debtor or Reorganized Debtor.

E.      *Reference to Monetary Figures*

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided herein.

F.      *Reference to the Debtors or the Reorganized Debtors*

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or the Reorganized Debtors shall mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

G.      *Controlling Document*

In the event of an inconsistency between the Plan and the Disclosure Statement, the terms of the Plan shall control in all respects.  In the event of an inconsistency between the Plan and the Plan Supplement, the terms of the relevant document in the Plan Supplement shall control (unless stated otherwise in such Plan Supplement document or in the Confirmation Order).  In the event of an inconsistency between the Confirmation Order and the Plan or the Plan Supplement, the Confirmation Order shall control.

## ARTICLE II.
## ADMINISTRATIVE CLAIMS AND PRIORITY CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in <u>Article III</u> hereof.

A.     *Administrative Claims*

Except with respect to Administrative Claims that are Professional Fee Claims and except to the extent that an Administrative Claim has already been paid during the Chapter 11 Cases or a Holder of an Allowed Administrative Claim and the applicable Debtor(s) agree to less favorable treatment, each Holder of an Allowed Administrative Claim shall be paid in full in Cash on the unpaid portion of its Allowed Administrative Claim on the latest of:  (a) on or as soon as reasonably practicable after the Effective Date if such Administrative Claim is Allowed as of the Effective Date; (b) on or as soon as reasonably practicable after the date such Administrative Claim is Allowed; and (c) the date such Allowed Administrative Claim becomes due and payable, or as soon thereafter as is reasonably practicable; *provided* that Allowed Administrative Claims that arise in the ordinary course of the Debtors' businesses shall be paid in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to such transactions.  Notwithstanding the foregoing, no request for payment of an Administrative Claim need be Filed with respect to an Administrative Claim previously Allowed by Final Order.

B.     *Administrative Claims Bar Date*

All requests for payment of an Administrative Claim (other than Claims derived from or based upon the First Lien Loan Documents, the Second Lien Notes Documents, and the Third Lien Notes Documents, Cure Costs, or Professional Fee Claims) that accrued on or before the Effective Date that were not accrued in the ordinary course of business must be filed with the Bankruptcy Court and served on the Debtors no later than the Administrative Claims Bar Date.  Holders of Administrative Claims that are, based on the preceding sentence, required to, but do not, file and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors or their property and such Administrative Claims shall be deemed discharged as of the Effective Date.

The Reorganized Debtors, in their sole and absolute discretion, may settle Administrative Claims in the ordinary course of business without further Bankruptcy Court approval.  The Debtors may also choose to object to any Administrative Claim no later than 60 days from the Administrative Claims Bar Date, subject to extensions by the Bankruptcy Court, agreement in writing of the parties, or on motion of a party in interest approved by the Bankruptcy Court.  Unless the Debtors or the Reorganized Debtors (or other party with standing) object to a timely-filed and properly served Administrative Claim, such Administrative Claim will be deemed allowed in the amount requested.  In the event that the Debtors or the Reorganized Debtors object to an Administrative Claim, the parties may confer to try to reach a settlement and, failing that, the Bankruptcy Court will determine whether such Administrative Claim should be allowed and, if so, in what amount.

C.     *Professional Compensation*

    1.    <u>Final Fee Applications.</u>

All final requests for Professional Fee Claims shall be filed no later than 30 days after the Effective Date.  After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior Bankruptcy Court orders, the Allowed amounts of such Professional Fee Claims shall be determined by the Bankruptcy Court.

    2.    <u>Professional Fee Escrow Account.</u>

On the Effective Date, the Reorganized Debtors shall fund the Professional Fee Escrow Account with Cash equal to the aggregate Professional Fee Reserve Amount for all Retained Professionals.  The Professional Fee Escrow Account shall be maintained in trust for the Retained Professionals.  Such funds in the Professional Fee Escrow Account shall not constitute property of the Reorganized Debtors.  The remaining amount of Professional Fee Claims owing to the Retained Professionals shall be paid in Cash to such Retained Professionals by the Reorganized Debtors from the Professional Fee Escrow Account, without interest or other earnings therefrom, when such Claims are Allowed by a Bankruptcy Court order.  When all Allowed Professional Fee Claims have been paid

in full, amounts remaining in the Professional Fee Escrow Account, if any, shall promptly be turned over to the Reorganized Debtors.

3.        <u>Professional Fee Reserve Amount.</u>

To receive payment for unbilled fees and expenses incurred through the Effective Date, the Retained Professionals shall estimate their Accrued Professional Compensation prior to and as of the Effective Date and shall deliver such estimate to the Debtors on or before the Effective Date. If a Retained Professional does not provide such estimate, the Reorganized Debtors may estimate the unbilled fees and expenses of such Retained Professional; *provided* that such estimate shall not be considered an admission or limitation with respect to the fees and expenses of such Retained Professional. The total amount so estimated as of the Effective Date shall comprise the Professional Fee Reserve Amount.

4.        <u>Post-Confirmation Date Fees and Expenses.</u>

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, each Debtor and Reorganized Debtor (as applicable) shall pay in Cash the reasonable legal fees and expenses incurred by such Debtor or Reorganized Debtor (as applicable) after the Confirmation Date in the ordinary course of business and without any further notice to or action, order or approval of the Bankruptcy Court. The Debtors and Reorganized Debtors (as applicable) shall pay, within ten Business Days after submission of a detailed invoice to the Debtors or Reorganized Debtors (as applicable), such reasonable claims for compensation or reimbursement of expenses incurred by the Retained Professionals of the Debtors and Reorganized Debtors (as applicable). If the Debtors or Reorganized Debtors (as applicable), dispute the reasonableness of any such invoice, the Debtors or Reorganized Debtors (as applicable) or the affected professional may submit such dispute to the Bankruptcy Court for a determination of the reasonableness of any such invoice, and the disputed portion of such invoice shall not be paid until the dispute is resolved. The undisputed portion of such reasonable fees and expenses shall be paid as provided herein. Upon the Confirmation Date, any requirement that Retained Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and each Debtor or Reorganized Debtor (as applicable) may employ and pay any Retained Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

5.        <u>Substantial Contribution Compensation and Expenses.</u>

Except as otherwise specifically provided in the Plan, any Entity that requests compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), (4), and (5) of the Bankruptcy Code must file an application and serve such application on counsel for the Debtors or Reorganized Debtors, as applicable, and as otherwise required by the Bankruptcy Court, the Bankruptcy Code, and the Bankruptcy Rules on or before the Administrative Claims Bar Date.

D.       *Priority Tax Claims*

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code. In the event an Allowed Priority Tax Claim is also a Secured Tax Claim, such Claim shall, to the extent it is Allowed, be treated as an Other Secured Claim if such Claim is not otherwise paid in full.

E.       *Statutory Fees*

All fees due and payable pursuant to section 1930 of Title 28 of the U.S. Code prior to the Effective Date shall be paid by the Debtors. On and after the Effective Date, the Reorganized Debtors shall pay any and all such fees when due and payable, and shall file with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee. Each Debtor shall remain obligated to pay quarterly fees to the U.S. Trustee until the

earliest of that particular Debtor's case being closed, dismissed, or converted to a case under Chapter 7 of the Bankruptcy Code.

## ARTICLE III.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

A.    *Summary of Classification*

Claims and Interests, except for Administrative Claims, Professional Fee Claims, and Priority Tax Claims, are classified in the Classes set forth in this Article III. A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes. A Claim or Interest also is classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

Except as provided below, the Plan constitutes a separate chapter 11 plan of reorganization for each Debtor and the classifications set forth in Classes 1 through 12 shall be deemed to apply to each Debtor, except for Class 12, which only applies to Parent. If substantive consolidation is ordered, each Class with respect to the Debtors shall vote as set forth in Article III of the Plan. If substantive consolidation is not ordered, each Class of Claims against or Interests in the Debtors shall be deemed to constitute separate sub-Classes of Claims against and Interests in each of the Debtors, as applicable, and each such sub-Class shall vote as a single separate Class for each of the Debtors, as applicable, and the confirmation requirements of section 1129 of the Bankruptcy Code must be satisfied separately with respect to each of the Debtors.

1.    Class Identification

The classification of Claims and Interests against each Debtor (as applicable) pursuant to the Plan is as follows:

| Class | Claim | Status | Voting Rights |
|:---:|---|:---:|:---:|
| 1 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 2 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 3 | Lien Trade Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 4 | First Lien Claims | Impaired | Entitled to Vote |
| 5 | Second Lien Notes Claims | Impaired | Entitled to Vote |
| 6 | Third Lien Notes Claims | Impaired | Entitled to Vote |
| 7 | Unsecured Notes Claims | Impaired | Entitled to Vote |
| 8 | General Unsecured Claims | Impaired | Entitled to Vote |
| 9 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 10 | Intercompany Claims | Unimpaired/Impaired | Not Entitled to Vote (Presumed to Accept/Deemed to Reject) |
| 11 | Intercompany Interests | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 12 | Interests in Parent | Impaired | Not Entitled to Vote (Deemed to Reject) |

B.    *Treatment of Claims and Interests*

1.    Class 1 – Other Priority Claims

a.    *Classification*: Class 1 consists of Allowed Other Priority Claims.

20

    b.    *Treatment*:  Except to the extent that a Holder of an Allowed Other Priority Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed Other Priority Claim, each such Holder shall receive payment in full, in cash, of the unpaid portion of its Allowed Other Priority Claim on the Effective Date or as soon thereafter as reasonably practicable (or, if payment is not then due, shall be paid in accordance with its terms) or pursuant to such other terms as may be agreed to by the Holder of an Allowed Other Priority Claim and the Debtors.

    c.    *Voting*:  Class 1 is Unimpaired under the Plan.  Each Holder of an Allowed Other Priority Claim will be conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, each Holder of an Allowed Other Priority Claim will not be entitled to vote to accept or reject the Plan.

2.    <u>Class 2 – Other Secured Claims</u>

    a.    *Classification*:  Class 2 consists of Allowed Other Secured Claims.

    b.    *Treatment*:  Except to the extent that a Holder of an Allowed Other Secured Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed Other Secured Claim, each such Holder shall receive either (i) payment in full in cash of the unpaid portion of its Allowed Other Secured Claim, including any interest thereon required to be paid under section 506(b) of the Bankruptcy Code, on the Effective Date or as soon thereafter as reasonably practicable (or if payment is not then due, in accordance with the terms of such Allowed Other Secured Claim), (ii) reinstatement pursuant to section 1124 of the Bankruptcy Code, (iii) the collateral securing such Allowed Other Secured Claim, plus any interest thereon required to be paid under section 506(b) of the Bankruptcy Code, on the Effective Date or as soon thereafter as is reasonably practicable or (iv) such other recovery necessary to satisfy section 1129 of the Bankruptcy Code.

    c.    *Voting*:   Class 2 is Unimpaired under the Plan.  Each Holder of an Allowed Other Secured Claim will be conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, each Holder of an Allowed Other Secured Claim will not be entitled to vote to accept or reject the Plan.

3.    <u>Class 3 – Lien Trade Claims</u>

    a.    *Classification*:  Class 3 consists of Allowed Lien Trade Claims.

    b.    *Treatment*:  Except to the extent that a Holder of an Allowed Lien Trade Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed Lien Trade Claim, each such Holder shall receive payment in full in cash of the unpaid portion of its Allowed Lien Trade Claim, including any interest thereon required to be paid under section 506(b) of the Bankruptcy Code, on the Effective Date or as soon thereafter as reasonably practicable (or if payment is not then due, in accordance with the terms of such Allowed Lien Trade Claim).

    c.    *Voting*:  Class 3 is Unimpaired under the Plan.  Each Holder of an Allowed Lien Trade Claim will be conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, each Holder of an Allowed Lien Trade Claim will not be entitled to vote to accept or reject the Plan.

4.      Class 4 - First Lien Claims

      a.      *Classification*:  Class 4 consists of all First Lien Claims.

      b.      *Allowance*:  The First Lien Claims shall be Allowed in the aggregate amount equal to $252,024,575.00, plus accrued and unpaid interest, fees, costs, and expenses, including any and all reasonable and documented expenses and other obligations payable pursuant to the First Lien Loan Documents.

            *Treatment*:  On the Effective Date, or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed First Lien Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed First Lien Claim, each Holder of an Allowed First Lien Claim shall receive its Pro Rata share of (a) approximately $82 million in Cash or otherwise the amount necessary to reduce the outstanding obligations to the First Lien Lenders (including outstanding obligations with respect to existing letters of credit) to $170 million and (b)(i) if such Holder is a First Lien Accepting Lender, the New Credit Facility Revolving Loans, or (ii) if such Holder is a First Lien Rejecting Lender, the New Credit Facility Term Loans, in all events consistent with the terms of the New Credit Facility Term Sheet; *provided* that, in the event of a Settlement Termination Event, each Holder of an Allowed First Lien Claim shall receive, in addition to the foregoing distributions, its Pro Rata share of the Unencumbered Assets Equity Distribution equal in value to 100 percent of the amount of the Diminution in Value Claims held by such Holder, up to the full amount of the Unencumbered Assets Equity Distribution.  For the avoidance of doubt, in the event the Intercreditor Settlement is approved, then the Holders of Allowed First Lien Claims will be deemed to waive their respective rights to any distribution on account of any Diminution in Value Claims.

      c.      *Voting*:  Class 4 is Impaired under the Plan.  Each Holder of an Allowed First Lien Claim will be will be entitled to vote to accept or reject the Plan.

5.      Class 5 - Second Lien Notes Claims

      a.      *Classification*:  Class 5 consists of all Second Lien Notes Claims.

      b.      *Allowance*:  The Second Lien Notes Claims shall be Allowed in the aggregate principal amount equal to $625,000,000.00, plus accrued and unpaid interest, fees, costs, and expenses, including any and all reasonable and documented expenses, other obligations, and make-whole amounts (if any) payable pursuant to the Second Lien Notes Documents.

      c.      *Treatment*:  On the Effective Date, or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed Second Lien Notes Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for its Allowed Second Lien Notes Claim, each Holder of an Allowed Second Lien Notes Claim shall receive, on account of its Allowed Second Lien Notes Secured Claim, its Pro Rata share of (a) ninety-six and three-tenths percent (96.3%) of the New Common Stock (subject to dilution by the Management Incentive Plan, any other compensation arrangements under the Management Compensation Term Sheet, and New Common Stock issuable upon the exercise of the New Warrants) and (b) the Excess Cash; *provided*, *however*, that in the event of a Settlement Termination Event, each Holder of an Allowed Second Lien Notes Claim shall instead receive, on account of its Allowed Second Lien Notes Secured Claim, its Pro Rata share of (x) ninety-eight and eight-tenths percent (98.8%) of the New Common Stock (subject to dilution by the Management Incentive Plan and any other compensation arrangements under the Management Compensation Term Sheet), (y) the Excess Cash, and (z) the portion of the Unencumbered Assets Equity Distribution equal in value to 100 percent of

22

the amount of the Diminution in Value Claims held by such Holder, up to the full amount of the Unencumbered Assets Equity Distribution remaining after any distribution thereof to Holders of Allowed First Lien Claims.

    d.    *Voting*: Class 5 is Impaired under the Plan. Each Holder of an Allowed Second Lien Notes Claim will be entitled to vote to accept or reject the Plan.

6.    <u>Class 6 - Third Lien Notes Claims</u>

    a.    *Classification*: Class 6 consists of all Third Lien Notes Claims.

    b.    *Allowance*: The Third Lien Notes Claims shall be Allowed in the aggregate principal amount equal to $529,653,388.00, plus accrued and unpaid interest, fees, costs, and expenses, including any and all reasonable and documented expenses, other obligations, and make-whole amounts (if any) payable pursuant to the Third Lien Notes Documents.

    c.    *Treatment*: On the Effective Date, or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed Third Lien Notes Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed Third Lien Notes Claim, each Holder of an Allowed Third Lien Notes Claim shall receive its Pro Rata share of (i) two and one-half percent (2.5%) of the New Common Stock (subject to dilution under the Management Incentive Plan, any other compensation arrangements under the Management Compensation Term Sheet, and New Common Stock issuable upon exercise of the New Warrants) and (ii) the New Warrants; *provided*, *however*, that in the event of a Settlement Termination Event, each Holder of Allowed Third Lien Notes Claims shall instead receive its Pro Rata share, on account of its Allowed Third Lien Notes Deficiency Claim, of the Unencumbered Assets Equity Distribution, which (i) will be distributed first to the Prepetition Secured Parties on account of their respective Diminution in Value Claims and (ii) thereafter shared Pro Rata among all Holders of Unsecured Notes Claims and General Unsecured Claims, including the Deficiency Claims.

    d.    *Voting*: Class 6 is Impaired under the Plan. Each Holder of an Allowed Third Lien Notes Claim will be entitled to vote to accept or reject the Plan.

7.    <u>Class 7 - Unsecured Notes Claims</u>

    a.    *Classification*: Class 7 consists of all Unsecured Notes Claims.

    b.    *Allowance*: The Unsecured 2020 Senior Notes Claims shall be Allowed in the aggregate principal amount of $293,626,000.00, plus accrued and unpaid interest, fees, costs, and expenses, including any and all reasonable and documented expenses and other obligations payable pursuant to the Unsecured 2020 Senior Notes Indenture, and the Unsecured 2021 Senior Notes Claims shall be Allowed in the aggregate principal amount equal to $347,651,000.00, plus accrued and unpaid interest, fees, costs, and expenses, including any and all reasonable and documented expenses and other obligations payable pursuant to the Unsecured 2021 Senior Notes Indenture.

    c.    *Treatment*: On the Effective Date, or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed Unsecured Notes Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed Unsecured Notes Claim, each Holder of an Allowed Unsecured Notes Claim shall receive its Pro Rata share of the Unencumbered Assets Equity Distribution, *provided* that the Prepetition Secured Parties shall be deemed to have waived any right to any distribution from the Unencumbered Assets Equity Distribution

23

on account of the Diminution in Value Claims and the Deficiency Claims; *provided*, *further*, *however*, that in the event of (a) a Settlement Termination Event, or (b) any Challenge by any General Unsecured Party, the Unencumbered Assets Equity Distribution will be (i) distributed first to the Prepetition Secured Parties on account of their respective Diminution in Value Claims and (ii) thereafter shared Pro Rata among all Holders of Unsecured Notes Claims and General Unsecured Claims, including the Deficiency Claims.

d.      *Voting*:  Class 7 is Impaired under the Plan.  Each Holder of an Allowed Unsecured Notes Claim will be entitled to vote to accept or reject the Plan.

8.      <u>Class 8 - General Unsecured Claims</u>

a.      *Classification*: Class 8 consists of all Allowed General Unsecured Claims.

b.      *Treatment*:  On the Effective Date, or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed General Unsecured Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall receive its Pro Rata share of the Unencumbered Assets Equity Distribution, *provided* that the Prepetition Secured Parties shall be deemed to have waived any right to any distribution from the Unencumbered Assets Equity Distribution on account of the Diminution in Value Claims and the Deficiency Claims; *provided*, *further*, *however*, that in the event of (a) a Settlement Termination Event, or (b) any Challenge by any General Unsecured Party, the Unencumbered Assets Equity Distribution will be (i) distributed first to the Prepetition Secured Parties on account of their respective Diminution in Value Claims and (ii) thereafter shared Pro Rata among all Holders of Unsecured Notes Claims and General Unsecured Claims, including the Deficiency Claims.

c.      *Voting*:  Class 8 is Impaired under the Plan.  Each Holder of an Allowed General Unsecured Claim will be entitled to vote to accept or reject the Plan.

9.      <u>Class 9 - Section 510(b) Claims</u>

a.      *Classification*:  Class 9 consists of all Section 510(b) Claims.

b.      *Treatment*:  On the Effective Date, each Section 510(b) Claim shall be cancelled without any distribution and such Holders of Section 510(b) Claims will receive no recovery.

c.      *Voting*:  Class 9 is Impaired under the Plan.  Each Holder of a 510(b) Claim will be conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, each Holder of a 510(b) Claim will not be entitled to vote to accept or reject the Plan.

10.     <u>Class 10 - Intercompany Claims</u>

a.      *Classification*:  Class 10 consists of all Intercompany Claims.

b.      *Treatment*:  Intercompany Claims may be Reinstated as of the Effective Date or, at the Debtors' or the Reorganized Debtors' option, with the consent of the Requisite Second Lien Noteholders, be cancelled, and no distribution shall be made on account of such Claims.

24

c.      *Voting*:   Class 10 Intercompany Claims are either Unimpaired, and Holders of Intercompany Claims conclusively are presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, or Impaired, and Holders of Intercompany Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.   Therefore, each Holder of an Intercompany Claim will not be entitled to vote to accept or reject the Plan.

11.     <u>Class 11 - Intercompany Interests</u>

a.      *Classification*:  Class 11 consists of all Intercompany Interests.

b.      *Treatment*:  Intercompany Interests will be Reinstated as of the Effective Date.

c.      *Voting*:   Class 11 Intercompany Interests are Unimpaired, and the Holder of the Intercompany Interests conclusively are presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.   Therefore, the Holder of the Intercompany Interests will not be entitled to vote to accept or reject the Plan.

12.     <u>Class 12 - Interests in Parent</u>

a.      *Classification*:  Class 12 consists of all Interests in the Parent.

b.      *Treatment*:  On the Effective Date, existing Interests in Parent shall be deemed canceled and extinguished, and shall be of no further force and effect, whether surrendered for cancelation or otherwise, and there shall be no distribution to holders of Interests in Parent on account of such Interests.

c.      *Voting*:  Class 12 is Impaired under the Plan.  Each holder of an Interest in Parent will be conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, each Holder of an Interest in the Parent will not be entitled to vote to accept or reject the Plan.

C.      *Special Provision Governing Unimpaired Claims*

Nothing under the Plan shall affect the Debtors' rights in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to or setoffs or recoupment against any such Unimpaired Claims.

D.      *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code*

The Debtors reserve the right to seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.

E.      *Elimination of Vacant Classes*

Any Class of Claims or Interests that does not have a holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

F.      *Voting Classes; Presumed Acceptance by Non-Voting Classes*

If a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Plan shall be presumed accepted by the Holders of such Claims or Interests in such Class.

G.     *Presumed Acceptance and Rejection of the Plan*

To the extent Class 10 Intercompany Claims are cancelled, each Holder of a Claim in Class 10 is deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and is not entitled to vote to accept or reject the Plan.  To the extent Class 10 Intercompany Claims are Reinstated, each Holder of a Claim in Class 10 is presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and is not entitled to vote to accept or reject the Plan.

H.     *Subordinated Claims*

The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise, including, without limitation, the Intercreditor Agreement. Pursuant to section 510 of the Bankruptcy Code, the Debtors or Reorganized Debtors reserve the right to re-classify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

## ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF THE PLAN

A.     *The Intercreditor Settlement*

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, the Plan incorporates and implements the Intercreditor Settlement, a compromise and settlement of numerous issues and disputes between and among the Debtors and the Prepetition Secured Parties designed to achieve a reasonable and effective resolution of the Chapter 11 Cases.  Except as otherwise expressly set forth herein, the Intercreditor Settlement constitutes a settlement of potential litigation of all issues and Claims against the Debtors and certain Prepetition Secured Parties including the treatment of Claims held by the Prepetition Secured Parties under the Plan, the valuation of the Debtors' assets, the allocation of asset values, the determination as to which assets are encumbered and unencumbered, the validity and perfection of Liens, and certain other claims and causes of action.

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies resolved pursuant to the Plan, including those resolved by the Intercreditor Settlement. Distributions made to Holders of Allowed Claims are intended to be indefeasible.

Pursuant to the Intercreditor Settlement, (a) the Debtors, the Consenting First Lien Lenders, the Consenting Second Lien Noteholders, and the Consenting Cross-Over Noteholders agreed to the Unencumbered Value Settlement, (b) the Consenting Second Lien Noteholders and Consenting Cross-Over Noteholders agreed to the Second/Third Lien Plan Settlement, and (c) the Prepetition Secured Parties agreed to waive any right to recover on account of their respective Diminution in Value Claims and the Deficiency Claims (as applicable) for the benefit of General Unsecured Parties.

In the event any General Unsecured Party commences a Challenge, any costs to the Estates, including, without limitation, any fees and expenses incurred by the Debtors or incurred by the Prepetition Secured Parties and to be reimbursed by the Debtors, arising from such Challenge, shall be added to the Diminution in Value Claims held by the Prepetition Secured Parties (i.e., a dollar-for-dollar reduction will occur in the value of the recovery by the General Unsecured Parties for all such fees and costs); *provided*, *however*, that the Allowed amount of any Diminution in Value Claims shall be determined by the Bankruptcy Court in connection with Confirmation and the litigation schedule to be set and approved in connection with the order approving the Disclosure Statement.

Nothing herein shall terminate or otherwise abrogate the rights of the parties under and to the Intercreditor Agreement, which rights remain valid and enforceable, subject to payments allowed pursuant to the New Credit Facility Term Sheet and the Intercreditor Settlement.

In addition, in the event of a Settlement Termination Event, the Prepetition Secured Parties shall not be deemed to have waived their respective rights to recover on account of their respective Diminution in Value Claims or Deficiency Claims (as applicable), meaning that the Unencumbered Asset Equity Distribution will be (1) distributed first to the Prepetition Secured Parties on account of any Diminution in Value Claims and (2) thereafter shared Pro Rata among all Holders of Unsecured Notes Claims and General Unsecured Claims, including the Deficiency Claims.

Furthermore, in the event of a Settlement Termination Event, the distributions provided for under the Plan will exclude the Second/Third Lien Plan Settlement; *provided*, *however*, that the Litigation Waivers under the Second/Third Lien Plan Settlement shall remain effective as long as the Plan Support Agreement is in full force and effect unless the Requisite Second Lien Noteholders elect to terminate the Second/Third Lien Plan Settlement pursuant to Section 6(b)(iv) of the Plan Support Agreement.

B.      *Restructuring Transactions*

On the Effective Date, or as soon as reasonably practicable thereafter, the Reorganized Debtors may take all actions as may be necessary or appropriate to effectuate any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan Support Agreement and the Plan (the "Restructuring Transactions"), including:   (1) the execution and delivery of any appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution, or liquidation containing terms that are consistent with the terms of the Plan, and that satisfy the requirements of applicable law and any other terms to which the applicable Entities may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any Interest, asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (3) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law; (4) the execution and delivery of the New Credit Facility Documents; and (5) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

C.      *Sources of Consideration for Plan Distributions*

The Debtors shall fund distributions under the Plan, with: (1) Cash on hand, including cash from operations, (2) the New Credit Facility, (3) the New Common Stock, and (4) the New Warrants, as applicable.  From and after the Effective Date, the Reorganized Debtors, subject to applicable limitations set forth in any post-Effective Date agreement (including, without limitation, the New Credit Facility Documents), shall have the right and authority without further order of the Bankruptcy Court to raise additional capital and obtain additional financing as the New Board deems appropriate.

D.      *The New Credit Facility and Approval of the New Credit Facility*

Confirmation of the Plan shall be deemed to constitute approval of the New Credit Facility and the New Credit Facility Documents (including all transactions contemplated thereby, such as any supplementation or additional syndication of the New Credit Facility, and all actions to be taken, undertakings to be made and obligations to be incurred by the Reorganized Debtors in connection therewith, including the payment of all fees, indemnities and expenses provided for therein) and, subject to applicable limitations set forth in any post-Effective Date agreement (including, without limitation, the New Credit Facility Documents), shall have the right and authority to enter into and perform their obligations under the New Credit Facility Documents and such other documents as may be reasonably required or appropriate, in each case, in accordance with the New Credit Facility Documents.  For the avoidance of doubt, from and after the Effective Date, the First Lien Accepting Lenders will hold New Credit Facility Revolving Loans and the First Lien Rejecting Lenders will hold New Credit Facility Term Loans, in each case subject to the terms of the New Credit Facility Documents.

On the Effective Date, the New Credit Facility Documents shall constitute legal, valid, binding, and authorized obligations of the Reorganized Debtors, enforceable in accordance with their terms. The financial accommodations to be extended pursuant to the New Credit Facility Documents are being extended, and shall be deemed to have been extended, in good faith, for legitimate business purposes, are reasonable, shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever, and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any other applicable non-bankruptcy law. On the Effective Date, all of the Liens and security interests to be granted in accordance with the New Credit Facility Documents (a) shall be legal, binding, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the New Credit Facility Documentation, (b) shall be deemed automatically attached and perfected on the Effective Date, subject only to such Liens and security interests as may be permitted under the New Credit Facility Documents, and (c) shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy law. The Reorganized Debtors and the Entities granted such Liens and security interests are authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish, attach, and perfect such Liens and security interests under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order, and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties. To the extent that any Holder of a Secured Claim that has been satisfied or discharged in full pursuant to the Plan, or any agent for such Holder, has filed or recorded publicly any Liens and/or security interests to secure such Holder's Secured Claim, then as soon as practicable on or after the Effective Date, such Holder (or the agent for such Holder) shall take any and all steps requested by the Debtors, the Reorganized Debtors or any administrative agent under the New Credit Facility Documents that are necessary to cancel and/or extinguish such Liens and/or security interests.

E.      *The New Common Stock and New Warrants*

   1.      <u>New Common Stock</u>

On the Effective Date, the Reorganized Debtors shall issue or reserve for issuance all of the New Common Stock in accordance with the terms herein, subject to dilution on the terms described herein.   The issuance of the New Common Stock by the Reorganized Debtors for distribution pursuant to the Plan is authorized without the need for further corporate action and all of the shares of New Common Stock issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable. The New Common Stock issued to Holders of Claims on or about the Effective Date pursuant to the Plan shall be subject to dilution by the New Common Stock to be issued under the Management Incentive Plan, any other compensation arrangements provided under the Management Compensation Term Sheet, and New Common Stock issuable upon exercise of the New Warrants.

On the Effective Date, the Reorganized Debtors, the Second Lien Noteholders, and the Third Lien Noteholders, in their capacity as Holders of the New Common Stock, shall enter into the Stockholders Agreement in substantially the form included in the Plan Supplement. The Stockholders Agreement shall be deemed to be valid, binding, and enforceable in accordance with its terms, and each holder of New Common Stock shall be bound thereby, in each case without the need for execution by any party thereto other than Reorganized Debtors.

   2.      <u>New Warrants</u>

In the event the New Warrants are to be issued under the Plan to the Holders of Allowed Third Lien Notes Claims, on the Effective Date, the Reorganized Debtors shall issue the New Warrants. The issuance of the New Warrants by the Reorganized Debtors for distribution pursuant to the Plan is authorized without the need for further corporate action and all of the New Warrants issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable.

F.    *Exemption from Registration Requirements*

All shares of New Common Stock and the New Warrants (if any) issued under the Plan will be issued without registration under the Securities Act or any similar federal, state, or local law in reliance upon either (a) section 1145 of the Bankruptcy Code or (b) section 4(2) of the Securities Act or Regulation D promulgated thereunder.

1.    <u>New Common Stock and New Warrants Issued Pursuant to Section 4(2) of the Securities Act</u>

All shares of New Common Stock and New Warrants (if any) issued pursuant to the exemption from registration set forth in section 4(2) of the Securities Act or Regulation D promulgated thereunder will be considered "restricted securities" and may not be transferred except pursuant to an effective registration statement under the Securities Act or an available exemption therefrom. Resales of such restricted securities would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Holders of restricted securities would, however, be permitted to resell New Common Stock and New Warrants (if any) without registration if they are able to comply with the applicable provisions of Rule 144 or Rule 144A under the Securities Act, or if such securities are registered with the Securities and Exchange Commission.

2.    <u>New Common Stock and New Warrants Issued Pursuant to Section 1145 of the Bankruptcy Code</u>

New Common Stock and New Warrants (if any), as applicable, issued to Holders of Second Lien Notes Claims, Third Lien Notes Claims, Unsecured Notes Claims and General Unsecured Claims pursuant to <u>Article III.B</u> shall be issued in reliance on section 1145 of the Bankruptcy Code.

The New Common Stock and New Warrants (if any) (as well as New Common Stock issuable upon the exercise of the New Warrants) issued pursuant to section 1145 of the Bankruptcy Code (a) are not "restricted securities" as defined in Rule 144(a)(3) under the Securities Act, and (b) are freely tradable and transferable by any initial recipient thereof that (i) is not an "affiliate" of the Reorganized Debtors as defined in Rule 144(a)(1) under the Securities Act, (ii) has not been such an "affiliate" within 90 days of such transfer, and (iii) is not an entity that is an "underwriter" as defined in subsection (b) of Section 1145 of Bankruptcy Code.

Should the Reorganized Debtors elect on or after the Effective Date to reflect any ownership of the New Common Stock or New Warrants (if any) through the facilities of the DTC, the Reorganized Debtors need not provide any further evidence other than the Plan or the Confirmation Order with respect to the treatment of the New Common Stock or New Warrants (if any) under applicable securities laws.

Notwithstanding anything to the contrary in the Plan, no entity (including, for the avoidance of doubt, the DTC) may require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether the New Common Stock or New Warrants (if any) are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services. The DTC shall be required to accept and conclusively rely upon the Plan or Confirmation Order in lieu of a legal opinion regarding whether the New Common Stock or New Warrants (if any) are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

3.    <u>Registration Rights Agreement</u>

On the Effective Date, the Registration Rights Beneficiaries and Reorganized Parent shall enter into the Registration Rights Agreement. The Registration Rights Agreement shall provide the Registration Rights Beneficiaries with certain demand registration rights (including with respect to underwritten offerings) and with piggyback registration rights. The Registration Rights Agreement shall also provide that on or before the date that is ninety (90) days after the Effective Date, the Reorganized Parent shall file, and shall thereafter use its commercially reasonable efforts to cause to be declared effective as promptly as practicable, a registration statement on Form S-1 (or other appropriate form) for the offer and resale of the New Common Stock held by the Registration Rights Beneficiaries. The Registration Rights Agreement shall contain customary terms and conditions, including, without limitation, provisions with respect to blackout periods.

G.    *Corporate Existence*

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, each Debtor shall continue to exist after the Effective Date as a separate corporation, limited liability company, partnership, or other form of entity, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form of entity, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and by-laws (or other analogous formation documents) in effect before the Effective Date, except to the extent such certificate of incorporation and bylaws (or other analogous formation documents) are amended by the Plan or otherwise (including in connection with any conversion of the Reorganized Parent to a limited liability company), and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law).

H.    *Vesting of Assets in the Reorganized Debtors*

Except as otherwise provided in the Plan Support Agreement or the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, all property in each Estate, including all Causes of Action, and any property acquired by any of the Debtors, after the Petition Date shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances.  On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property, and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

I.    *Cancellation of Existing Securities*

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date:  (1) the obligations of the Debtors under the First Lien Loan Documents, the Second Lien Notes Documents, the Third Lien Notes Documents, the Unsecured Notes Documents, and any other certificate, share, note, bond, indenture, purchase right, option, warrant, or other instrument or document, directly or indirectly, evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors giving rise to any Claim or Interest (except such certificates, notes, or other instruments or documents evidencing indebtedness or obligations of the Debtors that are specifically Reinstated pursuant to the Plan) shall be cancelled solely as to the Debtors and the Reorganized Debtors shall not have any continuing obligations thereunder; and (2) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtors (except such agreements, certificates, notes, or other instruments evidencing indebtedness or obligations of the Debtors that are specifically Reinstated pursuant to the Plan) shall be released and discharged; *provided* that notwithstanding Confirmation or the occurrence of the Effective Date, any such indenture or agreement that governs the rights of the Holder of a Claim or Interest shall continue in effect solely for purposes of enabling Holders of Allowed Claims and Allowed Interests to receive distributions under the Plan as provided herein; *provided*, *further*, that the preceding proviso shall not affect the discharge of Claims or Interests pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan or result in any expense or liability to the Reorganized Debtors, except to the extent set forth in or provided for under this Plan; *provided*, *further*, that nothing in this section shall effectuate a cancellation of any New Common Stock or Intercompany Interests.  Notwithstanding the foregoing, the Second Lien Notes Documents, Third Lien Notes Documents, and the Unsecured Notes Documents shall continue in effect solely with respect to any obligations thereunder governing the relationship between the Second Lien Noteholders and the Second Lien Notes Trustee,  the Third Lien Noteholders and the Third Lien Notes Trustee, and the Unsecured Noteholders and the Unsecured Notes Trustees (as applicable) (including, but not limited to, those provisions relating to the Second Lien Notes Trustee's, Third Lien Notes Trustee's, or Unsecured Notes Trustees' rights to charging liens on account of fees, expense reimbursement, indemnification, and similar amounts) or that may survive the termination or maturity of the Second Lien Indenture, Third Lien Indenture, and the Unsecured Notes Documents in accordance with the terms thereof.

On and after the Effective Date, all duties and responsibilities of the First Lien Administrative Agent under the First Lien Credit Documents, the Unsecured 2020 Senior Notes Trustee under the Unsecured 2020 Senior Notes Indenture, and the Unsecured 2021 Senior Notes Trustee under the Unsecured 2021 Senior Notes Indenture, as applicable, shall be discharged unless otherwise specifically set forth in or provided for under the Plan or the Plan Supplement.

J.      *Corporate Action*

Upon the Effective Date, or as soon thereafter as is reasonably practicable, all actions contemplated by the Plan shall be deemed authorized and approved by the Bankruptcy Court in all respects, including, as applicable:  (1) the issuance of the New Common Stock; (2) the issuance of the New Warrants, if any; (3) selection of the directors and officers for Reorganized Parent and the other Reorganized Debtors; (4) execution and delivery of the New Credit Facility Documents; (5) adoption of the Management Incentive Plan by the New Board of Reorganized Parent; (6) implementation of the Restructuring Transactions; and (7)  all other actions contemplated by the Plan (whether to occur before, on, or after the Effective Date).  Upon the Effective Date, all matters provided for in the Plan involving the corporate structure of the Reorganized Debtors, and any corporate action required by the Debtors or the Reorganized Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, directors, or officers of the Debtors or the Reorganized Debtors.  On or (as applicable) before the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of Reorganized Parent and the other Reorganized Debtors, including the New Credit Facility Documents and any and all other agreements, documents, securities, and instruments relating to the New Credit Facility, to the extent not previously authorized by the Bankruptcy Court. The authorizations and approvals contemplated by this Article IV.J shall be effective notwithstanding any requirements under non-bankruptcy law.

K.      *New Organizational Documents*

To the extent required under the Plan or applicable non-bankruptcy law, Reorganized Parent and the other Reorganized Debtors will file their respective New Organizational Documents with the applicable Secretaries of State and/or other applicable authorities in their respective states of incorporation in accordance with the corporate laws of the respective states, provinces, or countries of incorporation.  Pursuant to section 1123(a)(6) of the Bankruptcy Code, the New Organizational Documents of the Reorganized Debtors will prohibit the issuance of non-voting equity securities.  After the Effective Date, Reorganized Parent and the other Reorganized Debtors, as applicable, may amend and restate their respective New Organizational Documents and other constituent documents as permitted by the laws of their respective states of incorporation and their respective New Organizational Documents.

L.      *Directors and Officers of the Reorganized Debtors*

As of the Effective Date, the term of the current members of the board of directors of the Parent shall expire, and the New Board, as well as the officers of each of the Reorganized Debtors, shall be appointed in accordance with the New Organizational Documents.

Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtors will, to the extent practicable, disclose in advance of the Confirmation Hearing the identity and affiliations of any Person proposed to serve on the initial New Board, as well as those Persons that will serve as an officer of any of the Reorganized Debtors.  Successors will be elected in accordance with the New Organizational Documents of Reorganized Parent.  To the extent any such director or officer is an "insider" under the Bankruptcy Code, the nature of any compensation to be paid to such director or officer will also be disclosed.  Each such director and officer shall serve from and after the Effective Date pursuant to the terms of the New Organizational Documents and other constituent documents of Reorganized Parent and the Reorganized Debtors.

M.      *Effectuating Documents; Further Transactions*

On and after the Effective Date, the Reorganized Debtors, and the officers and members of the New Board thereof, are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the Securities issued pursuant to the Plan, including the New Common Stock, in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorization, or consents those expressly required pursuant to the Plan.

N.      *Exemption from Certain Taxes and Fees*

Pursuant to section 1146(a) of the Bankruptcy Code, any issuance, transfer or exchange of a security (including, without limitation, the New Common Stock and the New Warrants, if any) or transfers of property pursuant hereto shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, sale or use tax, mortgage recording tax, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents pursuant to such transfers of property without the payment of any such tax, recordation fee, or governmental assessment.

O.      *Preservation of Causes of Action*

In accordance with section 1123(b) of the Bankruptcy Code, but subject in all respects to <u>Article VIII</u> hereof, and except as otherwise set forth in the Plan Support Agreement, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and such rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors. **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Causes of Action against it as any indication that the Debtors or the Reorganized Debtors will not pursue any and all available Causes of Action against it. The Debtors or the Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan.** Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan Support Agreement or the Plan or a Bankruptcy Court order, the Debtors or Reorganized Debtors, as applicable, expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or consummation of the Plan.

In accordance with section 1123(b)(3) of the Bankruptcy Code, except as otherwise provided herein, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors. The applicable Reorganized Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

P.      *Director and Officer Liability Insurance*

To the extent that the D&O Liability Insurance Policies are considered to be Executory Contracts, notwithstanding anything in the Plan to the contrary, effective as of the Effective Date, the Reorganized Debtors shall be deemed to have assumed all unexpired D&O Liability Insurance Policies with respect to the Debtors' directors, managers, officers, and employees serving on or prior to the Petition Date pursuant to section 365(a) of the Bankruptcy Code. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtors' assumption of each of the unexpired D&O Liability Insurance Policies. Notwithstanding

32

anything to the contrary contained in the Plan, Confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Reorganized Debtors under the Plan as to which no Proof of Claim need be filed.

After the Effective Date, the Reorganized Debtors shall not terminate or otherwise reduce the coverage under any D&O Liability Insurance Policy (including such tail coverage liability insurance) in effect and all members, managers, directors, and officers of the Debtors who served in such capacity at any time prior to the Effective Date of the Plan shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such members, managers, directors, and/or officers remain in such positions after the Effective Date of the Plan.

Q.      *Management Incentive Plan and Management Employment Agreements*

The Management Incentive Plan is hereby approved in its entirety and shall be implemented on the Effective Date by the Reorganized Debtors without any further action by the New Board of the Bankruptcy Court. Additionally, the Debtors' existing management employment agreements shall be assumed and/or amended and assumed pursuant to section 365(a) of the Bankruptcy Code on the terms set forth in the Management Compensation Term Sheet and otherwise acceptable to management and the Requisite Second Lien Noteholders.

R.      *Employee and Retiree Benefits*

As set forth in the Schedule of Assumed Executory Contracts and Unexpired Leases included in the Plan Supplement, all employment, severance, retirement, indemnification, and other similar employee-related agreements or arrangements in place as of the Effective Date with the Debtors, including retirement income plans and welfare benefit plans, or discretionary bonus plans or variable incentive plans regarding payment of a percentage of annual salary based on performance goals and financial targets for certain employees, shall be assumed by the Reorganized Debtors and shall remain in place after the Effective Date, as may be amended by agreement between the beneficiaries of such agreements, plans, or arrangements, on the one hand, and the Debtors, on the other hand or, after the Effective Date, by agreement with the Reorganized Debtors, and the Reorganized Debtors will continue to honor such agreements, arrangements, programs, and plans; *provided* that the foregoing shall not apply to any equity-based compensation, agreement, or arrangement existing as of the Effective Date. Nothing in the Plan shall limit, diminish, or otherwise alter the Reorganized Debtors' defenses, claims, Causes of Action, or other rights with respect to any such contracts, agreements, policies, programs, and plans. Notwithstanding the foregoing, pursuant to section 1129(a)(13) of the Bankruptcy Code, on and after the Effective Date, all retiree benefits (as that term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.

S.      *Payment of Fees and Expenses of the First Lien Administrative Agent*

Prior to the Effective Date (and thereafter with respect to fees and expenses relating to post-Effective Date services), the Debtors shall pay in Cash all reasonable and documented unpaid fees and expenses of the First Lien Administrative Agent and its advisors, including counsel, without application to or approval of the Bankruptcy Court. For the avoidance of doubt, nothing herein affects the First Lien Administrative Agent's right to exercise any charging lien arising under and in accordance with the First Lien Loan Document to obtain payments of its fees and expenses and the fees and expense of its professionals.

T.      *Payment of Fees and Expenses of the Second Lien Notes Trustee*

Prior to the Effective Date (and thereafter with respect to fees and expenses relating to post-Effective Date services), the Debtors shall pay in Cash all reasonable and documented unpaid fees and expenses of the Second Lien Notes Trustee and its advisors, including counsel, without application to or approval of the Bankruptcy Court. For the avoidance of doubt, nothing herein affects the Second Lien Notes Trustee's right to exercise any charging lien arising under and in accordance with the Second Lien Indenture to obtain payments of its fees and expenses and the fees and expense of its professionals.

U.      *Payment of Fees and Expenses of the Third Lien Notes Trustee*

Prior to the Effective Date (and thereafter with respect to fees and expenses relating to post-Effective Date services), the Debtors shall pay in Cash all reasonable and documented unpaid fees and expenses of the Third Lien Notes Trustee and its advisors, including counsel, without application to or approval of the Bankruptcy Court.  For the avoidance of doubt, nothing herein affects the Third Lien Notes Trustee's right to exercise any charging lien arising under and in accordance with the Third Lien Indenture to obtain payments of its fees and expenses and the fees and expenses of its professionals.

V.      *Payment of Fees and Expenses of the Consenting Second Lien Noteholders and Consenting Cross-Over Noteholders*

Prior to the Effective Date (and thereafter with respect to fees and expenses relating to post-Effective Date services), the Debtors shall pay in cash all reasonable and documented fees and expenses of the Consenting Second Lien Noteholders and Consenting Cross-Over Noteholders and each of their advisors, including counsel, without application to or approval of the Bankruptcy Court and in accordance with, and subject to, the terms of the Plan Support Agreement.

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.      *Assumption and Rejection of Executory Contracts and Unexpired Leases*

Except as otherwise provided herein, as of the Effective Date, each Debtor shall be deemed to have rejected each Executory Contract and Unexpired Lease to which it is a party, unless such Executory Contract or Unexpired Lease:  (1) was previously assumed or rejected; (2) was previously expired or terminated pursuant to its own terms; (3) is the subject of a motion or notice to assume filed on or before the Confirmation Date; or (4) is designated specifically or by category as an Executory Contract or Unexpired Lease on the Schedule of Assumed Executory Contracts and Unexpired Leases.  For the avoidance of doubt, any Executory Contract or Unexpired Lease which does not appear on the Schedule of Assumed Executory Contracts and Unexpired Leases, and which is not subject to one of the conditions for assumption of Executory Contracts and Unexpired Leases listed in this paragraph shall be deemed rejected.

Entry of the Confirmation Order shall constitute a Bankruptcy Court order approving the assumptions, assumptions and assignments, or rejections of such Executory Contracts or Unexpired Leases as set forth in the Plan or the Schedule of Assumed Executory Contracts and Unexpired Leases, pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  Unless otherwise indicated, assumptions or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date.  Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall re-vest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal law.  Any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by a Final Order of the Bankruptcy Court on or after the Effective Date.

B.      *Claims Based on Rejection of Executory Contracts or Unexpired Leases*

Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, must be filed with the Bankruptcy Court within thirty (30) days after the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection.  **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed within such time will be automatically Disallowed, forever barred from assertion, and shall not be enforceable against, as applicable, the Debtors, the Reorganized Debtors, the Estates, or property of the foregoing parties, without the need for any objection by the Debtors or the Reorganized Debtors, as applicable, or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory**

34

**Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules or a Proof of Claim to the contrary.**  Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with <u>Article III.B.8</u> of the Plan, as applicable.

C.      *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases*

        Any monetary defaults under an Executory Contract or Unexpired Lease, as reflected on the Cure Notice, shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash on the Effective Date or as soon as reasonably practicable thereafter, subject to the limitations described below, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree in writing. In the event of a dispute regarding (1) the amount of any payments to cure such a default, (2) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (3) any other matter pertaining to assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order or orders resolving the dispute and approving the assumption, which, for the avoidance of doubt, may occur after the date of Confirmation.

        In connection with filing the Plan Supplement, the Debtors shall distribute, or cause to be distributed, Cure Notices of proposed assumption and proposed amounts of Cure Claims to the applicable third parties.  Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or related cure amount must be Filed, served and actually received by the Debtors at least seven (7) days before the Confirmation Hearing.  Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or cure amount will be deemed to have assented to such assumption or cure amount.  Notwithstanding anything herein to the contrary, in the event that any Executory Contract or Unexpired Lease is added to the Schedule of Assumed Executory Contracts and Unexpired Leases after such 14-day deadline, a Cure Notice of proposed assumption and proposed amounts of Cure Claims with respect to such Executory Contract or Unexpired Lease will be sent promptly to the counterparty thereof and a noticed hearing set to consider whether such Executory Contract or Unexpired Lease can be assumed.

        In any case, if the Bankruptcy Court determines that the Allowed Cure Claim with respect to any Executory Contract or Unexpired Lease is greater than the amount set forth in the applicable Cure Notice, the Debtors or Reorganized Debtors, as applicable, will have the right to remove such Executory Contract or Unexpired Lease from the Schedule of Assumed Executory Contracts and Unexpired Leases in which case such Executory Contract or Unexpired Lease will be deemed to have been rejected as of the Effective Date.

        Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the date that the Debtors assume such Executory Contract or Unexpired Lease.  Any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed shall be deemed Disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.

D.      *Indemnification Obligations*

        The Debtors and Reorganized Debtors shall assume the Indemnification Obligations for the current and former directors and the officers who served in such capacity, in their capacities as such, and such Indemnification Obligations shall not be modified, reduced, discharged, impaired, or otherwise affected in any way. Notwithstanding the foregoing, nothing shall impair the ability of Reorganized Debtors to modify indemnification obligations (whether in the bylaws, certificates or incorporation or formation, limited liability company agreements, other organizational or formation documents, board resolutions, indemnification agreements, employment contracts, or otherwise) arising after the Effective Date; *provided* that none of the Reorganized Debtors shall amend and/or restate any New Organizational Documents after the Effective Date to terminate or adversely affect any of the Reorganized Debtors' Indemnification Obligations

E.      *Insurance Policies*

Without limiting Article IV.P, all of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, are treated as and deemed to be Executory Contracts under the Plan.  On the Effective Date, the Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments related thereto.

F.      *Modifications, Amendments, Supplements, Restatements, or Other Agreements*

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

G.      *Reservation of Rights*

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Schedule of Assumed Executory Contracts and Unexpired Leases, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors, or, after the Effective Date, the Reorganized Debtors shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

H.      *Nonoccurrence of Effective Date*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

I.      *Contracts and Leases Entered into After the Effective Date*

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, will be performed by the applicable Debtor or Reorganized Debtor liable thereunder in the ordinary course of its business.  Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) that have not been rejected as of the date of Confirmation will survive and remain unaffected by entry of the Confirmation Order.

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

A.      *Timing and Calculation of Amounts to Be Distributed*

Unless otherwise provided in the Plan, on the Effective Date or as soon as reasonably practicable thereafter (or, if a Claim is not an Allowed Claim on the Effective Date, on the date that such Claim becomes Allowed or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim (or such Holder's designee) shall receive the full amount of the distributions that the Plan provides for such Holder; *provided* that distributions to Holders of Allowed First Lien Claims and Allowed Second Lien Notes Claims shall occur on the Effective Date,

36

and if the Intercreditor Settlement is approved in connection with Confirmation of the Plan, distributions to Holders of Allowed Third Lien Notes Claims shall occur on the Effective Date; *provided*, *further*, for the avoidance of doubt, any distributions of the Unencumbered Assets Equity Distribution will not occur until the completion of the claims reconciliation process or until the Bankruptcy Court enters an order approving interim distribution procedures.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article VII of the Plan.  Except as otherwise provided in the Plan, Holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

B.      *Delivery of Distributions and Undeliverable or Unclaimed Distributions*

1.      Delivery of Distributions

a.      Delivery of Distributions to First Lien Administrative Agent

Except as otherwise provided in the Plan, all distributions to Holders of First Lien Claims shall be governed by the First Lien Credit Agreement and shall be deemed completed when made to the First Lien Administrative Agent, which shall be deemed to be the Holder of all First Lien Claims for purposes of distributions to be made hereunder.  The First Lien Administrative Agent shall hold or direct such distributions for the benefit of the Holders of Allowed First Lien Claims, as applicable.  As soon as practicable in accordance with the requirements set forth in this Article VI, the First Lien Administrative Agent shall arrange to deliver such distributions to or on behalf of such Holders of Allowed First Lien Claims.

b.      Delivery of Distributions to Second Lien Notes Trustee

Except as otherwise provided in the Plan, all distributions to Holders of Second Lien Notes Claims shall be governed by the Second Lien Indenture and shall be deemed completed when made to the Second Lien Notes Trustee, which shall be deemed to be the sole Holder of all Second Lien Notes Claims for purposes of distributions to be made hereunder, and shall receive such distributions for the benefit of the beneficial owners of Second Lien Notes Claims. As soon as practicable in accordance with the requirements set forth in this Article VI, the Second Lien Notes Trustee shall arrange to deliver such distributions to or on behalf of such Holders of Allowed Second Lien Notes Claims.  All reasonable and documented fees and expenses of the Second Lien Notes Trustee arising in connection with the Confirmation and Consummation of the Plan, including, without limitation, with respect to distributions made to Holders of Second Lien Notes Claims hereunder, which remain unpaid as of the Effective Date (or accrue thereafter) shall be paid by the Reorganized Debtors in the ordinary course of business following the Effective Date.

c.      Delivery of Distributions to Third Lien Notes Trustee

Except as otherwise provided in the Plan, all distributions to Holders of Third Lien Notes Claims shall be governed by the Third Lien Indenture and shall be deemed completed when made to the Third Lien Notes Trustee, which shall be deemed to be the sole Holder of all Third Lien Notes Claims for purposes of distributions to be made hereunder, and shall receive such distributions for the benefit of the beneficial owners of Third Lien Notes Claims. As soon as practicable in accordance with the requirements set forth in this Article VI, the Third Lien Notes Trustee shall arrange to deliver such distributions to or on behalf of such Holders of Allowed Third Lien Notes Claims.  All reasonable and documented fees and expenses of the Third Lien Notes Trustee arising in connection with the Confirmation and Consummation of the Plan, including, without limitation, with respect to distributions made to Holders of Third Lien Notes Claims hereunder, which remain unpaid as of the Effective Date (or accrue thereafter) shall be paid by the Reorganized Debtors in the ordinary course of business following the Effective Date.

d.      Delivery of Distributions to Unsecured 2020 Senior Notes Trustee

Except as otherwise provided in the Plan or reasonably requested by the Unsecured 2020 Senior Notes Trustee, all distributions to Holders of Unsecured 2020 Senior Notes Claims shall be deemed completed when made to the Unsecured 2020 Senior Notes Trustee, which shall be deemed to be the sole Holder of all Unsecured 2020 Senior Notes Claims for purposes of distributions to be made hereunder, and shall receive such distributions for the beneficial owners of Allowed Unsecured 2020 Senior Notes Claims.  As soon as practicable in accordance with the requirements set forth in this Article VI, the Unsecured 2020 Senior Notes Indenture Trustee shall arrange to deliver such distributions to or on behalf of such Holders of Allowed Unsecured 2020 Senior Notes Claims.

e.      Delivery of Distributions to the Unsecured 2021 Senior Notes Trustee

Except as otherwise provided in the Plan or reasonably requested by the Unsecured 2021 Senior Notes Trustee, all distributions to Holders of Unsecured 2021 Senior Notes Claims shall be deemed completed when made to the Unsecured 2021 Senior Notes Trustee, which shall be deemed to be the sole Holder of all Unsecured 2021 Senior Notes Claims for purposes of distributions to be made hereunder, and shall receive such distributions for the beneficial owners of Allowed Unsecured 2021 Senior Notes Claims.  As soon as practicable in accordance with the requirements set forth in this Article VI, the Unsecured 2021 Senior Notes Indenture Trustee shall arrange to deliver such distributions to or on behalf of such Holders of Allowed Unsecured 2021 Senior Notes Claims.

f.      Delivery of Distributions in General

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims (other than Holders of First Lien Claims, Second Lien Claims, Third Lien Notes Claims, and Unsecured Notes Claims) or Interests shall be made to Holders of record as of the Distribution Record Date by the Reorganized Debtors:  (1) to the signatory set forth on any of the Proofs of Claim Filed by such Holder or other representative identified therein (or at the last known addresses of such Holder if no Proof of Claim is Filed or if the Debtors have been notified in writing of a change of address); (2) at the addresses set forth in any written notices of address changes delivered to the Reorganized Debtors after the date of any related Proof of Claim; (3) at the addresses reflected in the Schedules if no Proof of Claim has been Filed and the Reorganized Debtors have not received a written notice of a change of address; or (4) on any counsel that has appeared in the Chapter 11 Cases on the Holder's behalf.  Subject to this Article VI, distributions under the Plan on account of Allowed Claims shall not be subject to levy, garnishment, attachment, or like legal process, so that each Holder of an Allowed Claim shall have and receive the benefit of the distributions in the manner set forth in the Plan.  The Debtors and the Reorganized Debtors shall not incur any liability whatsoever on account of any distributions under the Plan except for gross negligence or willful misconduct.

2.      Minimum Distributions

No fractional shares of New Common Stock shall be distributed, and no Cash shall be distributed in lieu of such fractional amounts.  When any distribution pursuant to the Plan on account of an Allowed Claim would otherwise result in the issuance of a number of shares of New Common Stock that is not a whole number, the actual distribution of shares of New Common Stock shall be rounded as follows: (a) fractions of one-half or greater shall be rounded to the next higher whole number and (b) fractions of less than one-half shall be rounded to the next lower whole number with no further payment therefore.  The total number of authorized shares of New Common Stock to be distributed pursuant to the Plan shall be adjusted as necessary to account for the foregoing rounding.

3.      Undeliverable Distributions and Unclaimed Property

In the event that any distribution to any Holder is returned as undeliverable, no distribution to such Holder shall be made unless and until the Reorganized Debtors have determined the then-current address of such Holder, at which time such distribution shall be made to such Holder without interest; *provided* that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of four months after the date that such distribution was made.  After such date, all unclaimed property or interests in property shall revert to the Reorganized Debtors without need for a further order by the Bankruptcy Court (notwithstanding any applicable

federal, provincial, or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder to such property or Interest in property shall be discharged and forever barred; *provided, however,* that this Article VI.B.3 shall not apply to the Suspended Funds held by the Debtors, and such Suspended Funds shall remain subject to any applicable federal, provincial, or state escheat, abandoned, or unclaimed property laws.

C.      *Compliance with Tax Requirements*

In connection with the Plan, to the extent applicable, Reorganized Parent and the Reorganized Debtors shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions or establishing any other mechanisms they believe are reasonable and appropriate.  The Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.

D.      *Allocations*

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest as Allowed herein.

E.      *No Postpetition Interest on Claims*

Unless otherwise specifically provided for in an order of the Bankruptcy Court, the Plan, or the Confirmation Order, or required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on any Claims or Interests and no Holder of a Claim or Interest shall be entitled to interest accruing on or after the Petition Date on any such Claim.

F.      *Setoffs and Recoupment*

The Debtors or the Reorganized Debtors, as applicable, may, but shall not be required to, setoff against or recoup from any Claims of any nature whatsoever that the Debtors or the Reorganized Debtors may have against the claimant, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the Reorganized Debtors of any such Claim it may have against the Holder of such Claim.

G.      *Claims Paid or Payable by Third Parties*

        1.      Claims Paid by Insurance Providers

The Debtors or the Reorganized Debtors, as applicable, shall reduce in full a Claim, and such Claim shall be Disallowed without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or Reorganized Debtor; *provided* that the Debtors shall provide 21 days' notice to the Holder prior to any disallowance of such Claim during which period the Holder may object to such disallowance, and if the parties cannot reach an agreed resolution, the matter shall be decided by the Bankruptcy Court.  Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such Holder shall, within fourteen days of receipt thereof, repay or return the distribution to the Reorganized Debtors to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.  The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the

39

Reorganized Debtors annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the fourteen-day grace period specified above until the amount is repaid.

 2.  <u>Claims Payable by Third Parties</u>

 No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy.  To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court; *provided* that the Debtors shall provide 21 days' notice to the Holder of such Claim prior to any disallowance of such Claim during which period the Holder may object to such disallowance, and if the parties cannot reach an agreed resolution, the matter shall be decided by the Bankruptcy Court.

 3.  <u>Applicability of Insurance Policies</u>

 Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy.  Notwithstanding anything to the contrary contained (including <u>Article VIII</u>), nothing contained in the Plan shall constitute or be deemed a release, settlement, satisfaction, compromise, or waiver of any Cause of Action that the Debtors or any other Entity may hold against any other Entity, including insurers, under any policies of insurance or applicable indemnity, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

**ARTICLE VII.**
**PROCEDURES FOR RESOLVING CONTINGENT,**
**UNLIQUIDATED, AND DISPUTED CLAIMS**

A. *Allowance of Claims*

 After the Effective Date, each of the Debtors or the Reorganized Debtors shall have and retain any and all rights and defenses such Debtor had with respect to any Claim immediately before the Effective Date.  Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code, or the Bankruptcy Court has entered a Final Order, including the Confirmation Order (when it becomes a Final Order), in the Chapter 11 Cases allowing such Claim.

B. *Claims and Interests Administration Responsibilities*

 Except as otherwise specifically provided in the Plan and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, after the Effective Date, the Reorganized Debtors, by order of the Bankruptcy Court, shall have the sole authority: (1) to File, withdraw, or litigate to judgment objections to Claims; (2) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Court; and (3) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.

C. *Estimation of Claims*

 Before or after the Effective Date, the Debtors or the Reorganized Debtors may (but are not required to) at any time request that the Court estimate any Disputed Claim or Disputed Interest that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim, including during the litigation of any objection to any Claim or during the appeal relating to such objection.  Notwithstanding any provision otherwise in the Plan, a Claim that has

40

been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. In the event that the Bankruptcy Court estimates any Disputed, contingent, or unliquidated Claim, that estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions), and the relevant Debtor may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim. If the estimated amount constitutes a maximum limitation on such Claim, the Debtors or the Reorganized Debtors, as applicable, may elect to pursue any supplemental proceedings to object to any ultimate distribution on account of such Claim. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before 21 days after the date on which such Claim is estimated. All of the aforementioned Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

D.      *Adjustment to Claims Without Objection*

Any Claim that has been paid or satisfied, or any Claim that has been amended or superseded, may be adjusted or expunged on the Claims Register by the Debtors or the Reorganized Debtors without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

E.      *Time to File Objections to Claims*

Any objections to Claims shall be Filed on or before the Claims Objection Deadline.

F.      *Disallowance of Claims*

Any Claims held by Entities from which property is recoverable under section 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed Disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Debtors or the Reorganized Debtors. All Proofs of Claim Filed on account of an indemnification obligation to a director, officer, or employee shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent such indemnification obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to or action, order, or approval of the Bankruptcy Court.

**Except as provided herein or otherwise agreed, any and all Proofs of Claim filed after the Claims Bar Date shall be deemed Disallowed and expunged as of the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court, and Holders of such Claims may not receive any distributions on account of such Claims, unless on or before the Confirmation Hearing such late Filed Claim has been deemed timely Filed by a Final Order.**

G.      *Amendments to Claims*

On or after the Effective Date, except as provided in the Plan or the Confirmation Order, a Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court and the Reorganized Debtors and any such new or amended Claim Filed shall be deemed Disallowed in full and expunged without any further action, order, or approval of the Bankruptcy Court.

H.      *No Distributions Pending Allowance*

If an objection to a Claim or portion thereof is Filed as set forth in Article VII, no payment or distribution provided under the Plan shall be made on account of such Claim or portion thereof unless and until such Disputed Claim becomes an Allowed Claim.

I.      *Distributions After Allowance*

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan.  As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Reorganized Debtors shall provide to the Holder of such Claim the distribution (if any) to which such Holder is entitled under the Plan as of the Effective Date, less any previous distribution (if any) that was made on account of the undisputed portion of such Claim, without any interest, dividends, or accruals to be paid on account of such Claim unless required under applicable bankruptcy law or as otherwise provided in Article III.B.

## ARTICLE VIII.
## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

A.      *Discharge of Claims and Termination of Interests; Compromise and Settlement of Claims, Interests, and Controversies*

Pursuant to and to the fullest extent permitted by section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in full and final satisfaction, settlement, release, and discharge, effective as of the Effective Date, of all Interests and Claims of any nature whatsoever, including any interest accrued on Claims from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against the Debtors, the Reorganized Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims, including demands, liabilities, and Causes of Action that arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not:  (1) a Proof of Claim or Interest is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest is Allowed; or (3) the Holder of such Claim or Interest has accepted the Plan.  Except as otherwise provided herein, any default by the Debtors with respect to any Claim or Interest that existed immediately prior to or on account of the filing of the Chapter 11 Cases shall be deemed cured on the Effective Date.  The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring, except as otherwise expressly provided in the Plan.  For the avoidance of doubt, nothing in this Article VIII.A shall affect the rights of Holders of Claims and Interests to seek to enforce the Plan, including the distributions to which Holders of Allowed Claims and Interests are entitled under the Plan.

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan, including the Intercreditor Settlement, shall constitute a good faith compromise and settlement of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have on account of such Allowed Claim or Interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement, including the Intercreditor Settlement, is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable.  In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors may compromise and settle Claims against, and Interests in, the Debtors and their Estates and Causes of Action against other Entities.

B.      *Term of Injunctions or Stays*

Unless otherwise provided herein or in a Final Order, all injunctions or stays arising under or entered during the Chapter 11 Cases under section 362 of the Bankruptcy Code or otherwise and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date set forth in the order providing for such injunction or stay.

C.      *Release of Liens*

Except as otherwise provided herein or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates (except for those mortgages, deeds of trust, Liens, pledges or other security interests against any property of the Estates granted under and in relation to the First Lien Credit Agreement) shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the applicable Reorganized Debtor and its successors and assigns.

D.      **Releases by the Debtors**

PURSUANT TO SECTION 1123(b) OF THE BANKRUPTCY CODE, AND EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED IN THE PLAN, FOR GOOD AND VALUABLE CONSIDERATION, INCLUDING THE EFFORTS OF THE RELEASED PARTIES TO FACILITATE THE EXPEDITIOUS REORGANIZATION OF THE DEBTORS AND THE IMPLEMENTATION OF THE RESTRUCTURING CONTEMPLATED BY THE PLAN, PURSUANT TO THE CONFIRMATION ORDER AND ON AND AFTER THE EFFECTIVE DATE, THE RELEASED PARTIES AND THEIR RESPECTIVE PROPERTIES ARE CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY, AND FOREVER DEEMED RELEASED, ACQUITTED AND DISCHARGED BY THE DEBTORS, THE REORGANIZED DEBTORS AND THE ESTATES FROM ANY AND ALL CLAIMS, DEBTS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, DEBTS, CAUSES OF ACTION, REMEDIES, AND LIABILITIES WHATSOEVER, INCLUDING ANY DERIVATIVE CLAIMS ASSERTED OR ASSERTABLE ON BEHALF OF THE DEBTORS OR THEIR ESTATES, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, MATURED OR UNMATURED, EXISTING OR HEREINAFTER ARISING, IN LAW, EQUITY, CONTRACT, TORT, OR OTHERWISE, BY STATUTE, VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS OR OTHERWISE THAT THE DEBTORS, THE REORGANIZED DEBTORS, THE ESTATES OR THEIR AFFILIATES WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR ON BEHALF OF THE HOLDER OF ANY CLAIM OR EQUITY INTEREST OR OTHER ENTITY, BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS, THE REORGANIZED DEBTORS, THE CHAPTER 11 CASES, THE DEBTORS' RESTRUCTURING, THE PURCHASE, SALE OR RESCISSION OF THE PURCHASE OR SALE OF ANY SECURITY OF THE DEBTORS OR THE REORGANIZED DEBTORS, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN THE DEBTORS AND ANY RELEASED PARTY, THE RESTRUCTURING OF CLAIMS AND INTERESTS PRIOR TO OR IN THE CHAPTER 11 CASES, THE NEGOTIATION, FORMULATION OR PREPARATION OF THE PLAN, THE PLAN SUPPORT AGREEMENT, THE PLAN SUPPLEMENT, THE DISCLOSURE STATEMENT, THE NEW CREDIT FACILITY DOCUMENTS AND ANY RELATED AGREEMENTS, INSTRUMENTS, OR OTHER DOCUMENTS, ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE CONFIRMATION DATE.

THE FOREGOING RELEASE (1) SHALL NOT APPLY TO ANY EXPRESS CONTRACTUAL OR FINANCIAL OBLIGATIONS OR ANY RIGHT OR OBLIGATIONS ARISING UNDER OR THAT IS PART OF THE PLAN OR ANY AGREEMENTS ENTERED INTO PURSUANT TO, IN CONNECTION WITH OR CONTEMPLATED BY THE PLAN (INCLUDING THE PLAN SUPPORT AGREEMENT) AND (2) SHALL HAVE NO EFFECT ON THE LIABILITY OF ANY ENTITY THAT RESULTS FROM ANY

SUCH ACT OR OMISSION THAT IS DETERMINED IN A FINAL ORDER TO HAVE CONSTITUTED FRAUD, GROSS NEGLIGENCE, OR WILLFUL MISCONDUCT.  FOR THE AVOIDANCE OF DOUBT, THE DEBTORS AND REORGANIZED DEBTORS WILL CONTINUE TO HONOR ALL POSTPETITION AND POST-EFFECTIVE DATE OBLIGATIONS UNDER THE NEW CREDIT FACILITY DOCUMENTS AND ANY RELATED AGREEMENTS, INSTRUMENTS, OR OTHER DOCUMENTS.

E.      *Releases by Holders of Claims and Interests*

        AS OF THE EFFECTIVE DATE, EACH OF THE RELEASING PARTIES (REGARDLESS OF WHETHER A RELEASING PARTY IS A RELEASED PARTY) SHALL BE DEEMED TO HAVE CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY AND FOREVER RELEASED, ACQUITTED AND DISCHARGED THE DEBTORS, THE REORGANIZED DEBTORS AND THE RELEASED PARTIES AND THEIR RESPECTIVE PROPERTY FROM ANY AND ALL CLAIMS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, DEBTS, CAUSES OF ACTION, REMEDIES, AND LIABILITIES WHATSOEVER, INCLUDING ANY DERIVATIVE CLAIMS ASSERTED OR ASSERTABLE OR ASSERTABLE ON BEHALF OF A DEBTOR, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, MATURED OR UNMATURED, EXISTING OR HEREAFTER ARISING, IN LAW, EQUITY, CONTRACT, TORT OR OTHERWISE, BY STATUTE, VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS OR OTHERWISE THAT SUCH ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR ON BEHALF OF THE HOLDER OF ANY CLAIM OR EQUITY INTEREST OR OTHER ENTITY, BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS, THE REORGANIZED DEBTORS, THE DEBTORS' RESTRUCTURING, THE CHAPTER 11 CASES, THE PURCHASE, SALE OR RESCISSION OF THE PURCHASE OR SALE OF ANY SECURITY OF THE DEBTORS OR THE REORGANIZED DEBTORS, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN THE DEBTORS AND ANY RELEASED PARTY, THE RESTRUCTURING OF CLAIMS AND INTERESTS PRIOR TO OR DURING THE CHAPTER 11 CASES, THE NEGOTIATION, FORMULATION, OR PREPARATION OF THE PLAN, THE DISCLOSURE STATEMENT, THE PLAN SUPPLEMENT, THE PLAN SUPPORT AGREEMENT, THE NEW CREDIT FACILITY DOCUMENTS AND ANY RELATED AGREEMENTS, INSTRUMENTS OR OTHER DOCUMENTS, ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE CONFIRMATION DATE.

        NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING, THE RELEASE SET FORTH ABOVE DOES NOT RELEASE ANY POST-EFFECTIVE DATE OBLIGATIONS OF ANY PARTY OR ENTITY UNDER THE PLAN OR ANY DOCUMENT, INSTRUMENT OR AGREEMENT (INCLUDING THOSE SET FORTH IN THE PLAN SUPPLEMENT) EXECUTED TO IMPLEMENT THE PLAN (REGARDLESS OF WHETHER RIGHTS TO ENFORCE SUCH OBLIGATIONS IN COLLATERAL ARISE FROM INSTRUMENTS ESTABLISHING SUCH RIGHTS PRIOR TO THE EFFECTIVE DATE), INCLUDING THE RIGHT TO RECEIVE DISTRIBUTIONS FROM THE DEBTORS OR THE REORGANIZED DEBTORS ON ACCOUNT OF AN ALLOWED CLAIM AGAINST THE DEBTORS PURSUANT TO THIS PLAN (WHICH, FOR THE AVOIDANCE OF DOUBT, SHALL INCLUDE OBLIGATIONS UNDER OR IN CONNECTION WITH THE NEW CREDIT FACILITY DOCUMENTS AND ANY RELATED AGREEMENTS, INSTRUMENTS, OR OTHER DOCUMENTS AND THE PLAN SUPPORT AGREEMENT).  NOTWITHSTANDING THE FOREGOING, THE DEBTORS AND THE REORGANIZED DEBTORS WILL CONTINUE TO HONOR ALL POSTPETITION AND POST-EFFECTIVE DATE OBLIGATIONS UNDER ANY ASSUMED EXECUTORY CONTRACTS AND UNEXPIRED LEASES IN ACCORDANCE WITH THEIR TERMS REGARDLESS OF WHETHER SUCH OBLIGATIONS ARE LISTED AS A CURE AMOUNT, AND WHETHER SUCH OBLIGATIONS ACCRUED PRIOR TO OR AFTER THE EFFECTIVE DATE, AND NEITHER THE PAYMENT OF CURE NOR ENTRY OF THE CONFIRMATION ORDER SHALL BE DEEMED TO RELEASE THE DEBTORS OR THE REORGANIZED DEBTORS FROM SUCH OBLIGATIONS.  NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING, THE RELEASE SET FORTH ABOVE (1) DOES NOT RELEASE THE PERSONAL LIABILITY OF ANY OF

THE AFOREMENTIONED RELEASED PARTIES IN THIS <u>ARTICLE VIII</u> FOR ANY STATUTORY VIOLATION OF APPLICABLE TAX LAWS OR BAR ANY RIGHT OF ACTION ASSERTED BY A GOVERNMENTAL TAXING AUTHORITY AGAINST THE AFOREMENTIONED RELEASED PARTIES FOR ANY STATUTORY VIOLATION OF APPLICABLE TAX LAWS AND (2) SHALL HAVE NO EFFECT ON THE LIABILITY OF ANY ENTITY THAT RESULTS FROM ANY SUCH ACT OR OMISSION THAT IS DETERMINED IN A FINAL ORDER TO HAVE CONSTITUTED FRAUD, GROSS NEGLIGENCE, OR WILLFUL MISCONDUCT.

F.      *Exculpation*

UPON AND EFFECTIVE AS OF THE EFFECTIVE DATE, THE DEBTORS AND THEIR DIRECTORS, OFFICERS, EMPLOYEES, ATTORNEYS, INVESTMENT BANKERS, FINANCIAL ADVISORS, RESTRUCTURING CONSULTANTS AND OTHER PROFESSIONAL ADVISORS AND AGENTS WILL BE DEEMED TO HAVE SOLICITED ACCEPTANCES OF THIS PLAN IN GOOD FAITH AND IN COMPLIANCE WITH THE APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE , INCLUDING SECTION 1125(E) OF THE BANKRUPTCY CODE.

EXCEPT WITH RESPECT TO ANY ACTS OR OMISSIONS EXPRESSLY SET FORTH IN AND PRESERVED BY THE PLAN, THE PLAN SUPPLEMENT, OR RELATED DOCUMENTS, THE EXCULPATED FIDUCIARIES AND, SOLELY TO THE EXTENT PROVIDED BY SECTION 1125(E) OF THE BANKRUPTCY CODE, THE SECTION 1125(E) PARTIES, SHALL NEITHER HAVE, NOR INCUR ANY LIABILITY TO ANY ENTITY FOR ANY PREPETITION OR POSTPETITION ACT TAKEN OR OMITTED TO BE TAKEN IN CONNECTION WITH, OR RELATED TO FORMULATING, NEGOTIATING, PREPARING, DISSEMINATING, IMPLEMENTING, ADMINISTERING, CONFIRMING, OR EFFECTING THE PLAN (INCLUDING THE PLAN SUPPORT AGREEMENT) OR ANY CONTRACT, INSTRUMENT, RELEASE OR OTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO IN CONNECTION WITH THE PLAN OR ANY OTHER PREPETITION OR POSTPETITION ACT TAKEN OR OMITTED TO BE TAKEN IN CONNECTION WITH OR IN CONTEMPLATION OF THE RESTRUCTURING OF THE DEBTORS; *PROVIDED, THAT* THE FOREGOING "EXCULPATION" SHALL HAVE NO EFFECT ON THE LIABILITY OF ANY ENTITY THAT RESULTS FROM ANY SUCH ACT OR OMISSION THAT IS DETERMINED IN A FINAL ORDER TO HAVE CONSTITUTED FRAUD, GROSS NEGLIGENCE, OR WILLFUL MISCONDUCT; *PROVIDED, FURTHER* THAT EACH EXCULPATED PARTY SHALL BE ENTITLED TO RELY UPON THE ADVICE OF COUNSEL CONCERNING HIS, HER OR ITS DUTIES PURSUANT TO, OR IN CONNECTION WITH, THE PLAN OR ANY OTHER RELATED DOCUMENT, INSTRUMENT, OR AGREEMENT.

THE EXCULPATED PARTIES HAVE, AND UPON CONFIRMATION, SHALL BE DEEMED TO HAVE, PARTICIPATED IN GOOD FAITH AND IN COMPLIANCE WITH THE APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE, INCLUDING WITH REGARD TO THE DISTRIBUTIONS OF NEW COMMON STOCK AND NEW WARRANTS (IF ANY) PURSUANT TO THE PLAN AND, THEREFORE, ARE NOT AND SHALL NOT BE LIABLE AT ANY TIME FOR THE VIOLATIONS OF ANY APPLICABLE LAW, RULE, OR REGULATION GOVERNING THE SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN OR SUCH DISTRIBUTIONS MADE PURSUANT TO THE PLAN.

G.      *Injunction*

EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, ALL ENTITIES WHO HAVE HELD, HOLD, OR MAY HOLD CLAIMS, INTERESTS, CAUSES OF ACTION, OR LIABILITIES THAT:  (A) ARE SUBJECT TO COMPROMISE AND SETTLEMENT PURSUANT TO THE TERMS OF THE PLAN; (B) HAVE BEEN RELEASED PURSUANT TO <u>ARTICLE VIII.D</u> HEREOF; (C) HAVE BEEN RELEASED PURSUANT TO <u>ARTICLE VIII.E</u> HEREOF, (D) ARE SUBJECT TO EXCULPATION PURSUANT TO <u>ARTICLE VIII.F</u> HEREOF (BUT ONLY TO THE EXTENT OF THE EXCULPATION PROVIDED IN <u>ARTICLE VIII.F</u> HEREIN), OR (E) ARE OTHERWISE DISCHARGED, SATISFIED, STAYED OR TERMINATED PURSUANT TO THE TERMS

45

**OF THE PLAN, ARE PERMANENTLY ENJOINED AND PRECLUDED, FROM AND AFTER THE EFFECTIVE DATE, FROM COMMENCING OR CONTINUING IN ANY MANNER, ANY ACTION OR OTHER PROCEEDING, INCLUDING ON ACCOUNT OF ANY CLAIMS, INTERESTS, CAUSES OF ACTION, OR LIABILITIES THAT HAVE BEEN COMPROMISED OR SETTLED AGAINST THE DEBTORS, THE REORGANIZED DEBTORS, OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATE OF ANY ENTITY, DIRECTLY OR INDIRECTLY, SO RELEASED OR EXCULPATED) ON ACCOUNT OF, OR IN CONNECTION WITH OR WITH RESPECT TO, ANY DISCHARGED, RELEASED, SETTLED, COMPROMISED, OR EXCULPATED CLAIMS, INTERESTS, CAUSES OF ACTION, OR LIABILITIES.**

H.      *Protection Against Discriminatory Treatment*

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Reorganized Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors, or another Entity with whom the Reorganized Debtors have been associated, solely because each Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

I.      *Recoupment*

In no event shall any Holder of Claims or Interests be entitled to recoup any Claim against any claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

J.      *Subordination Rights.*

Any distributions under the Plan to Holders shall be received and retained free from any obligations to hold or transfer the same to any other Holder and shall not be subject to levy, garnishment, attachment, or other legal process by any Holder by reason of claimed contractual subordination rights.  Any such subordination rights shall be waived, and the Confirmation Order shall constitute an injunction enjoining any Entity from enforcing or attempting to enforce any contractual, legal, or equitable subordination rights to property distributed under the Plan, in each case other than as provided in the Plan.

**ARTICLE IX.
CONDITIONS PRECEDENT TO CONFIRMATION
AND CONSUMMATION OF THE PLAN**

A.      *Conditions Precedent to the Effective Date*

It shall be a condition to Consummation of the Plan that the following conditions shall have been satisfied (or waived pursuant to the provisions of <u>Article IX.B</u> hereof):

1.      The Bankruptcy Court shall have approved the Disclosure Statement as containing adequate information with respect to the Plan within the meaning of section 1125 of the Bankruptcy Code;

2.      The Definitive Documents shall satisfy the Definitive Document Plan Support Agreement Requirements;

3.      The Confirmation Order shall have been entered, shall be in full force and effect, and shall not be subject to any stay;

4.      All documents and agreements necessary to implement the Plan, including, without limitation, the New Credit Facility Documents shall have been executed and tendered for delivery.  All conditions precedent to the effectiveness of such documents and agreements shall have been satisfied or waived pursuant to the terms thereof (or will be satisfied and waived substantially concurrently with the occurrence of the Effective Date);

5.      All documents, certificates, and agreements necessary to implement this Plan shall have been executed and delivered to the required parties and, to the extent required, filed with the applicable Governmental Units in accordance with applicable laws, and all other requisite actions in connection with the foregoing shall have been performed.

6.      All governmental and material third party approvals and consents, including Bankruptcy Court approval, necessary in connection with the transactions contemplated by this Plan shall have been obtained, not be subject to unfulfilled conditions, and be in full force and effect, and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain, prevent, or otherwise impose materially adverse conditions on such transactions;

7.      The Professional Fee Escrow Account shall have been established and funded.

B.      *Waiver of Conditions*

The conditions to Confirmation of the Plan and to the Effective Date of the Plan set forth in this <u>Article IX</u> may be waived only by consent of the Debtors, the Requisite First Lien Lenders, and the Second Lien Noteholders without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan; *provided*, *however*, the condition in <u>Article IX.A.6</u> may be waived with respect to a particular Definitive Document only to the extent that every party that maintains a consent right over the subject Definitive Document agrees to waive such condition with respect to the subject Definitive Document.

C.      *Substantial Consummation*

"Substantial Consummation" of the Plan, as defined in 11 U.S.C. § 1101(2), shall be deemed to occur on the Effective Date.

D.      *Effect of Non-Occurrence of Conditions to the Effective Date*

If the Effective Date does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall:  (1) constitute a waiver or release of any Claims by or Claims against or Interests in the Debtors; (2) prejudice in any manner the rights of the Debtors, any Holders of a Claim or Interest or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders, or any other Entity in any respect; *provided* that the Litigation Waivers shall remain in full force and effect so long as the Plan Support Agreement is in full force and effect.

## ARTICLE X.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

A.      *Modification of Plan*

Subject to the limitations contained in the Plan, the Debtors reserve the right, in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Plan Support Agreement, and with the prior consent of the Requisite Creditors: (1) to amend or modify the Plan prior to the entry of the Confirmation Order, including amendments or modifications to satisfy section 1129(b) of the Bankruptcy Code; and (2) after the entry of the Confirmation Order, the Debtors or the Reorganized Debtors, as the case may be, may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code and the Plan Support Agreement, or remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan.

47

B.      *Effect of Confirmation on Modifications*

Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan occurring after the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C.      *Revocation or Withdrawal of the Plan*

Subject to the terms of the Plan Support Agreement, the Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date.  If the Debtors revoke or withdraw the Plan, or if Confirmation and consummation of the Plan does not occur, then:  (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall:  (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of the Debtors or any other Entity, including the Holders of Claims; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Entity.

**ARTICLE XI.**
**RETENTION OF JURISDICTION**

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over the Chapter 11 Cases and all matters, arising out of, or related to, the Chapter 11 Cases and the Plan, including jurisdiction to:

1.      Allow, Disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2.      decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.      resolve any matters related to:  (a) the assumption and assignment or rejection of any Executory Contract or Unexpired Lease to which a Debtor is a party or with respect to which a Debtor may be liable in any manner and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Claims related to the rejection of an Executory Contract or Unexpired Lease, Cure Costs pursuant to section 365 of the Bankruptcy Code, or any other matter related to such Executory Contract or Unexpired Lease; (b) the Reorganized Debtors amending, modifying, or supplementing, after the Confirmation Date, pursuant to <u>Article V</u> hereof, any Executory Contracts or Unexpired Leases to the list of Executory Contracts and Unexpired Leases to be assumed and assigned or rejected or otherwise; and (c) any dispute regarding whether a contract or lease is or was executory or expired;

4.      ensure that distributions to Holders of Allowed Claims and Interests are accomplished pursuant to the provisions of the Plan;

5.      adjudicate, decide, or resolve any motions, adversary proceedings, contested, or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.      adjudicate, decide, or resolve any and all matters related to Causes of Action;

7.      adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

48

8.        enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

9.        enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

10.       resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

11.       issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with consummation or enforcement of the Plan;

12.       resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the settlements, compromises, discharges, releases, injunctions, exculpations, and other provisions contained in Article VIII hereof and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

13.       resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid pursuant to Article VI.G.1 hereof;

14.       enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

15.       determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or the Plan Supplement;

16.       adjudicate any and all disputes arising from or relating to distributions under the Plan or any transactions contemplated therein;

17.       consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

18.       determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

19.       hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

20.       hear and determine all disputes involving the existence, nature, or scope of the release provisions set forth in the Plan, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

21.       enforce all orders previously entered by the Bankruptcy Court;

22.       hear any other matter not inconsistent with the Bankruptcy Code;

23.       enter an order concluding or closing the Chapter 11 Cases; and

24.       enforce the injunction, release, and exculpation provisions set forth in Article VIII hereof, as well as the Litigation Waivers.

KE 40522588

As of the Effective Date, notwithstanding anything in this <u>Article XI</u> to the contrary, the New Credit Facility Documents shall be governed by the respective jurisdictional provisions therein.

# ARTICLE XII.
## MISCELLANEOUS PROVISIONS

A.      *Immediate Binding Effect*

Subject to <u>Article IX.A</u> hereof and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan, the final versions of the documents contained in the Plan Supplement, and the Confirmation Order shall be immediately effective and enforceable and deemed binding upon the Debtors or the Reorganized Debtors, as applicable, and any and all Holders of Claims or Interests (regardless of whether such Claims or Interests are deemed to have accepted or rejected the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions described in the Plan, each Entity acquiring property under the Plan or the Confirmation Order, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.  All Claims and debts shall be as fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or debt has voted on the Plan.

B.      *Additional Documents*

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Debtors and all Holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

C.      *Payment of Statutory Fees*

All fees payable pursuant to section 1930(a) of the Judicial Code, as determined by the Bankruptcy Court at a hearing pursuant to section 1128 of the Bankruptcy Code or as agreed to by the United States Trustee and Reorganized Debtors, shall be paid for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed or closed, whichever occurs first.

D.      *Dissolution of the Committee*

In the event a statutory committee of the Debtors' unsecured creditors is appointed by the U.S. Trustee, such official committee shall dissolve, and the members thereof shall be released and discharged from all rights and duties arising from, or related to, the Chapter 11 Cases on the Effective Date; *provided*, that such official committee shall be deemed to remain in existence solely with respect to, and shall not be heard on any issue except, applications filed by the Professionals pursuant to sections 330 and 331 of the Bankruptcy Code.  The Reorganized Debtors shall not be responsible for paying any fees or expenses incurred by the members of or advisors to the Committee after the Effective Date.

E.      *Reservation of Rights*

The Plan shall have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order. None of the filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests prior to the Effective Date.

F.    *Successors and Assigns*

The rights, benefits, and obligations of any Entity named or referred to in the Plan or the Confirmation Order shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, affiliate, officer, director, manager, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

G.    *Service of Documents*

Any pleading, notice, or other document required by the Plan to be served on or delivered to the Debtors or Reorganized Debtors shall be served on:

the Debtors:

> Midstates Petroleum Company
> 321 South Boston Avenue, Suite 1000
> Tulsa, Oklahoma 74103
> Attn.:    Scott C. Weatherholt
>           Nelson M. Haight

with copies to:

> Kirkland & Ellis LLP
> Kirkland & Ellis International LLP
> 601 Lexington Avenue
> New York, New York  10022
> Attn.:    Edward O. Sassower, P.C.
>           Joshua A. Sussberg, P.C.

> Kirkland & Ellis LLP
> Kirkland & Ellis International LLP
> 300 North LaSalle Drive
> Chicago, Illinois  60654
> Attn.:    James H.M. Sprayregen
>           William A. Guerrieri
>           Jason Gott

After the Effective Date, the Debtors have authority to send a notice to Entities that to continue to receive documents pursuant to Bankruptcy Rule 2002, they must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002.  After the Effective Date, the Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have filed such renewed requests.

In accordance with Bankruptcy Rules 2002 and 3020(c), within ten (10) Business Days of the date of entry of the Confirmation Order, the Debtors shall serve the Notice of Confirmation by United States mail, first class postage prepaid, by hand, or by overnight courier service to all parties served with the Confirmation Hearing Notice; *provided* that no notice or service of any kind shall be required to be mailed or made upon any Entity to whom the Debtors mailed a Confirmation Hearing Notice, but received such notice returned marked "undeliverable as addressed," "moved, left no forwarding address" or "forwarding order expired," or similar reason, unless the Debtors have been informed in writing by such Entity, or are otherwise aware, of that Entity's new address. To supplement the notice described in the preceding sentence, within twenty days of the date of the Confirmation Order the Debtors shall publish the Notice of Confirmation once in *The Wall Street Journal* (national edition).  Mailing and publication of the Notice of Confirmation in the time and manner set forth in the this paragraph shall be good and sufficient notice under the particular circumstances and in accordance with the requirements of Bankruptcy Rules 2002 and 3020(c), and no further notice is necessary.

H.      *Term of Injunctions or Stays*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

I.      *Entire Agreement*

Except as otherwise indicated, the Plan, the Confirmation Order, the Plan Supplement, and the New Credit Facility Documents supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

J.      *Successors and Assigns*

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, affiliate, officer, director, agent, representative, attorney, beneficiaries or guardian, if any, of each Entity.

K.      *Exhibits*

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan.  After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Debtors' restructuring website at http://www.kccllc.net/midstates or the Bankruptcy Court's website at www.txs.uscourts.gov/bankruptcy.  To the extent any exhibit or document is inconsistent with the terms of the Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit or non-document portion of the Plan shall control.

L.      *Nonseverability of Plan Provisions upon Confirmation*

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall be prohibited from  altering or  interpreting such term or provision to make it valid or enforceable, *provided* that at the request of the Debtors, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such terms or provision shall then be applicable as altered or interpreted *provided* that any such alteration or interpretation shall be reasonably acceptable to the Debtors and the Requisite Creditors and fully in compliance with the Plan Support Agreement.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the Debtors' consent; and (3) nonseverable and mutually dependent.

M.      *Votes Solicited in Good Faith*

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan and any previous plan, and, therefore, neither any of such parties or individuals or the Reorganized Debtors will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan and any previous plan.

N.      *Further Assurances*

The Debtors, Reorganized Debtors, all Holders of Claims receiving distributions hereunder and all other parties-in-interest shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan or the Confirmation Order.

O.      *Closing of Chapter 11 Cases*

The Reorganized Debtors shall, promptly after the full administration of the Chapter 11 Cases, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

[*Remainder of page intentionally left blank.*]

Respectfully submitted, as of the date first set forth above,

Date:  May 14, 2016

Midstates Petroleum Company, Inc. and
Midstates Petroleum Company, LLC

By:      */s/  Nelson M. Haight*
Name:   Nelson M. Haight
Title:     Executive Vice President & Chief Financial Officer

**Exhibit A**

**New Credit Facility Term Sheet**

**MIDSTATES PETROLEUM COMPANY**

**RESTRUCTURING OF DEBT FACILITIES**

**Summary of Terms and Conditions**

This Term Sheet sets forth the summary of contemplated terms and conditions with respect to a new credit facility that the Agent (as defined below) would be willing to propose to the Lenders (as defined below) as an exit facility, under the Credit Agreement (as defined below) in connection with a restructuring of the obligations of the Obligors (as defined below).  We understand that the restructuring shall be consummated through cases to be filed under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas and, once fully negotiated and agreed upon by the necessary lenders, shall be reflected in the terms of a plan of reorganization (the "Plan of Reorganization").  This Term Sheet is intended only to summarize terms of a proposed agreement and is not a comprehensive recitation of all terms and conditions.  This Term Sheet does not represent a commitment, obligation or understanding on the part of the Agent or any Lender to restructure or otherwise provide any financing on the terms outlined herein.  Further, this Term Sheet is not intended to suggest or reflect that the Lenders holding the necessary percentages of obligations under the Credit Agreement have consented or agreed to each of the terms set forth herein.  No such party shall be so obligated unless and until all internal credit approvals are sought and obtained, all definitive documentation is negotiated and executed and all conditions precedent are satisfied or waived.  The definitive documentation may contain terms which vary from the terms described herein.  Unless otherwise defined herein, capitalized terms used herein shall have the definition ascribed to such terms in the Credit Agreement (as defined below).

## 1. Existing Obligations

Credit Facility

| | |
|---|---|
| Credit Agreement: | Second Amended and Restated Credit Agreement dated as of June 8, 2012 (as amended, restated, amended and restated, supplemented or otherwise modified prior to the date hereof, the "Credit Agreement") among Midstates Petroleum Company, Inc., as guarantor (the "Parent"), Midstates Petroleum Company LLC, as borrower (the "Borrower"; together with the Parent, the "Obligors"), the financial institutions party thereto (the "Lenders") and SunTrust Bank, as Administrative Agent (in its capacity as administrative agent, the "Agent"), Lender and Issuing Bank. |
| Obligations: | The Borrower is indebted to the Lenders in an aggregate amount equal to the principal amount outstanding under the Credit Agreement in the amount of approximately $249,183,640.00, plus accrued but unpaid interest, fees, costs and expenses, and has reimbursement obligations in respect of letters of credit that are outstanding in the aggregate face amount of approximately $2,840,935.00 (the "Existing Letters of Credit"; collectively, the "First Lien Obligations"). |

<u>Second Lien Notes</u>

Issuers:                          The Obligors.

Second Lien Indenture:            Indenture dated May 21, 2015 (the "<u>Second Lien Indenture</u>"), among the Parent, the Borrower and Wilmington Trust, National Association, as trustee (in such capacity, "<u>Wilmington Trust</u>").  Holders of outstanding notes under the Second Lien Indenture are referred to as the "<u>Second Lien Noteholders</u>."

Obligations:                      The Obligors are indebted to the Second Lien Noteholders in an aggregate principal amount equal to approximately $625 million plus accrued but unpaid interest, fees, costs and expenses.

<u>Third Lien Notes</u>

Issuers:                          The Obligors.

Third Lien Indenture:             Indenture dated May 21, 2015 (the "<u>Third Lien Indenture</u>"), among the Parent, the Borrower and Wilmington Trust, as trustee.   Holders of outstanding notes under the Third Lien Indenture are referred to as the "<u>Third Lien Noteholders</u>."

Obligations:                      The Obligors are indebted to the Third Lien Noteholders in an aggregate principal amount equal to approximately $529.7 million plus accrued but unpaid interest, fees, costs and expenses.

<u>Unsecured Notes</u>

Issuers:                          The Obligors.

Indentures:                       (i)  10.75% Senior Notes due 2020  issued pursuant to the Indenture dated as of October 1, 2012 (the "<u>10.75% Notes</u>") and (ii) 9.25%  Senior Notes due 2021  issued pursuant to the Indenture dated as of May 31, 2013 (the "<u>9.25%  Notes</u>"), in each case, with Wells Fargo Bank, N.A., as trustee.

Obligations:                      The Obligors are indebted to the holders of the 10.75% Notes and the 9.25% Notes (collectively, the "<u>Unsecured Noteholders</u>") as follows:  (i) approximately $293.6 million principal amount outstanding under the 10.75% Notes and (ii) approximately $347.7 million principal amount outstanding under the 9.25% Notes.

## 2. Restructure of First Lien Obligations

The First Lien Obligations, which shall be paid in full, shall be restructured in conjunction with a Plan of Reorganization that eliminates all debt for borrowed money junior to the First Lien Obligations (which junior obligations may be exchanged for equity as appropriate and negotiated by such parties) as follows:

Cash Payments

Generally:

On the effective date of the Plan of Reorganization (the "Plan Effective Date"), the Lenders shall receive a payment in cash of an amount not less than $82,024,575 (the "Plan Effective Date Payment"), which shall be allocated among the Lenders on a pro rata basis in accordance with their respective share of the outstanding principal amount of the Obligations.

Following the cash payment to the Lenders on the Plan Effective Date, the Obligors (as reorganized pursuant to the Plan of Reorganization, "Reorganized Midstates") shall hold not less than $110,000,000 in "cash on hand" on the Plan Effective Date, of which $40,000,000 shall be allocated to fund the Cash Collateral Account (as defined below) on the Plan Effective Date.  In the event that Reorganized Midstates shall have cash in excess of $70,000,000 (after deducting for the funding of the Cash Collateral Account and the payment of all claims and expenses due and payable on the Plan Effective Date) on the Plan Effective Date, the Lenders shall consent to the payment in cash on the Plan Effective Date of such excess cash and cash equivalents up to a total amount, not to exceed, of $60,000,000 to the Second Lien Noteholders.

New Credit Facility

Amount:                          $170,000,000.

Facility:

Revolving Loans.  On the Plan Effective Date, those Lenders that shall have voted to accept the Plan (the "Accepting Lenders" or "RBL Lenders") shall be deemed to have extended a reserve based revolving credit facility (the "RBL Facility"; the loans made thereunder, the "Revolving Loans") to Reorganized Midstates in a principal amount outstanding, and having a commitment amount, of (i) $170,000,000 less (ii) the aggregate principal amount of the Term Loan (as defined below) (the "Commitment").  The initial conforming borrowing base shall be equal to $170,000,000 (the "Initial Borrowing Base").

Term Loans. On the Plan Effective Date, those Lenders that shall have voted to reject the Plan, if any (the "Rejecting Lenders" or "Term Lenders") shall elect either to participate in the RBL Facility or the Term Loan.  If any Rejecting Lender either fails to make an election, elects to participate in the Term Loan, or otherwise fails to return a ballot such that they will have not been deemed to vote in favor or have made an election to participate in the RBL Facility, such Rejecting Lender will be deemed to have extended a term loan (a "Term Loan") to Reorganized Midstates in a principal amount equal to (i) such Rejecting Lender's pro rata share of  the First Lien Obligations, less (ii) such Rejecting Lender's

pro rata share of the Effective Date Cash Payment. Notwithstanding any other provisions herein, the Commitment and Initial Borrowing Base shall be lowered by the pro rata share of each such Rejecting Lender's loans which become the Term Loan.[1]  The Obligations in respect of the Term Loan shall be subordinated to those in respect of the RBL Facility. Upon exercise of remedies or maturity, the Term Loan shall be a last-out loan, which shall be paid only following indefeasible payment in full of the Obligations in respect of the Revolver Loans.

For the avoidance of doubt, Reorganized Midstates shall not be permitted to convert Revolving Loans to Term Loans.

Fees.   Reorganized Midstates will pay to the Agent, for the ratable benefit of each RBL Lender (excluding defaulting lenders), the following fees:  (i) on the Plan Effective Date, a non-refundable upfront fee in an aggregate amount equal to 0.50% of the Commitment on the Plan Effective Date, and (ii) quarterly in arrears on the first day of each calendar quarter, a commitment fee calculated on the average daily amount of the Availability at a per annum rate equal to 0.50%.

Letter of Credit.  In connection with the RBL Facility, SunTrust (in such capacity, the "Issuing Lender") will make available to Reorganized Midstates a letter of credit sub-facility of up to $10,000,000 (the "Sub-Facility Capacity") subject to customary notice requirements and Availability.  Letters of credit issued under the RBL Facility (the "Letters of Credit") will be used for general corporate purposes and shall expire not later than the earlier of (i) 12 months after its date of issuance or such longer period of time as may be agreed by the applicable Issuing Lender and (ii) the fifth business day prior to the Commitment Termination Date (as defined below); provided that any Letter of Credit may provide for automatic renewal thereof for additional periods of up to 12 months or such longer period of time as may be agreed by the Issuing Lender (which in no event shall extend beyond the date referred to in clause (ii) above, except to the extent cash collateralized or backstopped pursuant to arrangements reasonably acceptable to the Issuing Lender).

The Existing Letters of Credit shall be "rolled over" and deemed Letters of Credit under the RBL Facility and shall count towards its Sub-Facility Capacity.[2]

Reorganized Midstates will pay a fee equal to the Applicable Margin (as defined below) then in effect for LIBOR borrowings, which fee will accrue on the aggregate face amount of outstanding Letters of Credit, payable in arrears at the end of each quarter and upon the termination of

---

[1] NTD: Each Rejecting Lender would have the option of being treated as an Accepting Lender by giving irrevocable notice of such decision to Reorganized Midstates and the Agent not less than three (3) business days before the Plan Effective Date.

[2] NTD: Note that no new Letters of Credit would be available after the Plan Effective Date absent repayment of loans or expiry or termination of Existing Letters of Credit.

the RBL Facility, in each case for the actual number of days elapsed over a 360-day year.  Such fees shall be distributed to the RBL Lenders pro rata in accordance with the amount of each such RBL Lender's Commitment.   In addition, Reorganized Midstates shall pay to the Issuing Lender, for its own account, (i) a fronting fee equal to a 0.125% of the aggregate face amount of outstanding Letters of Credit, payable in arrears at the end of each quarter and upon the termination of the RBL Facility, calculated based upon the actual number of days elapsed over a 360-day year and (ii) customary issuance and administration fees to be mutually agreed.

Administrative Agent:   SunTrust Bank (the "Agent").

Maturity:   The RBL Facility shall terminate, and all amounts outstanding shall be due and payable, on the earlier of (i) the four-year anniversary of the Plan Effective Date or (ii) September 30, 2020 (such earlier date, the "Commitment Termination Date").

The Term Loans shall mature, and all amounts outstanding shall be payable, on the Commitment Termination Date.

Guarantors:   All   obligations   of   Reorganized   Midstates   (collectively,   the "Obligations") under (i) the RBL Facility, (ii) the Term Loans, (iii) interest rate protection, commodity trading or hedging, currency exchange or other hedging or swap arrangements entered into with any person that was then a Lender or any affiliate thereof (the "Hedging Arrangements") and (iv) treasury management arrangements entered into with any person that was then a Lender or any affiliate thereof ("Treasury Arrangements") will be unconditionally guaranteed jointly and severally on a pari passu senior secured basis (the "Guarantees") by any direct or indirect subsidiary of Reorganized Midstates (the "Guarantors"; together with Reorganized Midstates, the "Credit Parties").

RBL Availability:   So long as the Total Outstandings (as defined below) do not exceed the Revolving Loan Limit (as defined below): (i) Revolving Loans will be available at any time on same day notice in the case of ABR loans prior to the Commitment Termination Date, in minimum principal amounts of $500,000 and increments of $100,000 in excess thereof, (ii) Letters of Credit will be issued as described below and (iii) amounts repaid under the RBL Facility may be reborrowed.

"Total Outstandings" means, at any time, the aggregate principal amount of Revolving Loans then outstanding plus the aggregate stated amount of all issued Letters of Credit and, without duplication, all unreimbursed disbursements on any Letter of Credit as of such date (unless cash collateralized or backstopped pursuant to arrangements acceptable to the Issuing Lender).

"Revolving Loan Limit" means, at any time, the lesser of (i) the Commitment and (ii) the Borrowing Base.   For purposes hereof,

"Availability" shall mean an amount (if positive) equal to the Revolving Loan Limit less Total Outstandings, and "Liquidity" shall mean at any time an amount (if positive) equal to Availability plus unrestricted cash and cash equivalents at the Credit Parties at such time minus the amount of any Borrowing Base Deficiency (as defined below) at such time.

Borrowing Base:

Subject to the Borrowing Base Redetermination Holiday (as defined below), the borrowing base for the RBL Facility shall be based on the loan value of the proved oil and gas reserves included in a Reserve Report (as defined below) and other oil and gas properties of Reorganized Midstates located within the geographic boundaries of the United States or the outer continental shelf adjacent to the United States, determined in accordance with the Credit Agreement, subject to adjustments in accordance with the terms set forth below (the "Borrowing Base").

The Borrowing Base shall be re-determined semi-annually on or about April 1 and October 1 of each year, based upon a reserve report prepared as of the immediately preceding December and June, respectively, and other related information, and delivered on or before March 1 and September 1, respectively (each such report, a "Reserve Report") and other related information, if any, required by the Agent to be delivered. The Credit Parties shall produce to the Agent a Reserve Report prepared as of December 31st of each year by an independent reserve engineer, such as Cawley Gillespie & Associates, Netherland, Sewell & Associates, Inc., Ryder Scott Company Petroleum Consultants, L.P., DeGolyer and MacNaughton or another independent petroleum engineering firm reasonably acceptable to the Agent and Reorganized Midstates (any such firm, an "Approved Petroleum Engineer"). The Credit Parties shall produce to the Agent a Reserve Report prepared as of June 30th of each year, which Reserve Reports may be prepared internally by a petroleum engineer employed by Reorganized Midstates (or may, at the election of Reorganized Midstates, be prepared by an Approved Petroleum Engineer). The Borrowing Base shall be proposed by the Agent in good faith and approved by the Lenders under the RBL Facility consistent with the terms under the Credit Agreement. Each determination of the Borrowing Base shall be made by the Agent and the Lenders in good faith in accordance with its respective usual and customary oil and gas lending criteria as it exists at the particular time (as determined by each such Lender in its sole discretion) pursuant to procedures set forth in the Credit Agreement.

So long as there is no Event of Default under the Credit Agreement and the Curtailment Covenant (as defined below) has not been breached, the Initial Borrowing Base shall remain the same and the RBL Lenders shall not be entitled to give to Reorganized Midstates notice of a Borrowing Base redetermination for Fall 2016, Spring 2017 and/or Fall 2017 (such periods collectively, the "Borrowing Base Redetermination Holiday"). The Borrowing Base Redetermination Holiday shall extend up to the Spring 2018 Borrowing Base redetermination, on or about April 1, 2018.

Unscheduled re-determinations of the Borrowing Base, may be made not more than once between any two scheduled re-determination dates (i) at the request of the Agent or Required RBL Lenders (to be defined in the RBL Loan Documents) and (ii) at the request of Reorganized Midstates; provided that no unscheduled re-determinations of the Borrowing Base may be made during the Borrowing Base Redetermination Holiday.

To the extent any redetermination represents an increase in the Borrowing Base in effect prior to such redetermination, such Borrowing Base will be the largest amount approved or deemed approved by each Lender under the RBL Facility and to the extent any redetermination represents a decrease in, or reaffirmation of, the Borrowing Base in effect prior to such redetermination, such Borrowing Base will be the largest amount approved or deemed approved by the Required RBL Lenders, provided that no Lender shall be required to increase its commitment amount under the RBL Facility in connection with an increase in the Borrowing Base.

In addition to the foregoing, the Borrowing Base will also be subject to adjustments between re-determinations, including during the Borrowing Base Redetermination Holiday in connection with:

(i) sales or other dispositions of, and casualty and condemnation events in respect of, Borrowing Base Properties (as defined below) and early monetization or early termination of any hedge or swap positions relied on by the Lenders in determining the Borrowing Base, in each case, in excess of three percent (3%) of the Borrowing Base in any period between scheduled redeterminations as a result of any one transaction or a series of transactions, and as set forth in the RBL Facility loan documents (the "RBL Loan Documents"); and

(ii) at Reorganized Midstates' election, acquisitions of oil and gas properties as set forth in the RBL Loan Documents;

provided, that, for the avoidance of doubt, these adjustments shall be limited to the effects of the transactions described above and shall not include changes in the Reserve Reports vis-à-vis continuing properties or changes in the Lenders' price decks.

Reorganized Midstates may on any redetermination date elect a reduced Borrowing Base.

A Borrowing Base reduction shall result in a concurrent reduction of the Commitments under the RBL Facility (it being understood that any reduction of Commitments under the RBL Facility shall only be tied to the pro rata reduction of the Borrowing Base attributable to the RBL Facility).

Interest:                          Reorganized Midstates may elect that the Loans comprising each borrowing bear interest at a rate per annum equal to: (i) the ABR plus the

Applicable Margin (as defined below) or (ii) the LIBOR rate plus the Applicable Margin, with a LIBOR floor to be established at 1.00%. Reorganized Midstates may elect interest periods of 1, 2, 3 or 6 months (or, if available to all relevant Lenders, 12 months) for LIBOR borrowings.   Calculation of interest shall be on the basis of the actual days elapsed in a year of 360 days (or 365 or 366 days, as the case may be, in the case of ABR loans based on the Prime Rate) and interest shall be payable at the end of each interest period and, in any event, at least every 3 months.

"Applicable Margin" means 4.50% with respect to Revolving Loans and 3.50% with respect to Term Loans.

At any time when there is an Event of Default, all outstanding amounts shall bear interest at 2.00% above the rate otherwise applicable thereto.

Collateral:                   The Obligations shall be secured by the following (the "Collateral"):

(i) a first priority perfected security interest in, and mortgage lien on, not less than 95.0% of the proved oil and gas reserves and all other oil and gas properties of Reorganized Midstates and any other Credit Party (as of the Plan Effective Date), including as may be set forth in the Reserve Report delivered on or before the Plan Effective Date and each subsequent Reserve Report; provided, that the Borrower agrees to use commercially reasonable efforts to grant a first-priority perfected security interest in, and mortgage lien on, substantially all of the other oil and gas properties of Reorganization Midstates and any other Credit Party in connection with the delivery of each Reserve Report;

(ii) a first priority perfected security interest in, and lien on, substantially all other presently owned and after-acquired property of the Credit Parties, including, without limitation, cash and cash equivalents which shall be placed only in accounts subject to deposit account control agreements in form and substance acceptable to the Agent or accounts at the Agent, receivables, all intangibles, and all rights to payments; and

(iii) a first priority perfected pledge of all equity interests of any Credit Party (other than Parent), with any such certificated interests to be delivered to the Agent together with blank stock powers.

None of the Collateral or other assets of the Credit Parties shall be subject to other pledges, security interests or mortgages, subject to customary exceptions for financings of this kind.

Mandatory Prepayments:     At any time (other than as set forth in the last paragraph of this section) that the aggregate amount of the outstanding (i) Revolving Loans and Letters of Credit (including unreimbursed amounts drawn on any Letter of Credit that have not been cash collateralized or backstopped) plus (ii) Term Loans exceeds the Borrowing Base (a "Borrowing Base

Deficiency"), Reorganized Midstates shall, within ten (10) business days after written notice from the Agent to Reorganized Midstates of such Borrowing Base Deficiency, notify the Agent that it intends to take one or more of the following actions:

> (i) within thirty (30) days after receipt of the Agent's notice, provide additional Borrowing Base Properties to the extent necessary to eliminate such Borrowing Base Deficiency;

> (ii) within thirty (30) days after receipt of the Agent's notice, prepay the Revolving Loans and the Term Loans in a pro rata amount based on the then-outstanding principal amounts of the Revolving Loans and the Term Loans in an amount sufficient to eliminate such Borrowing Base Deficiency;

> (iii) prepay the Revolving Loans and the Term Loans in a pro rata amount based on the then-outstanding principal amounts of the Revolving Loans and the Term Loans in an amount sufficient to eliminate such Borrowing Base Deficiency in six equal monthly installments with principal and interest beginning on the date that is thirty (30) days after Reorganized Midstates' receipt of notice of such Borrowing Base Deficiency from the Agent ; or

> (iv) take any combination of actions set forth in clauses (i) through (iii) above;

provided, in each case, that all amounts outstanding must be repaid by the Commitment Termination Date.

If the Borrowing Base is adjusted as the result of an asset sale, disposition, casualty or condemnation event or early monetization or termination of any hedge or swap position and a Borrowing Base Deficiency results from such adjustment, then no later than two (2) business days following the date Reorganized Midstates receives the net cash proceeds thereof, if any, Reorganized Midstates shall apply such proceeds to the repayment of Revolving Loans (and concurrent reduction of the Commitment (it being understood that any reduction of Commitments under the RBL Facility shall only be tied to the pro rata reduction of the Borrowing Base attributable to the RBL Facility)) and the Term Loans in a pro rata amount based on the then-outstanding principal amounts of the Revolving Loans and the Term Loans (with any Borrowing Base Deficiency that remains after applying such proceeds to be addressed as required herein for Mandatory Prepayments). Additionally, any Borrowing Base Deficiency resulting from a voluntary termination of commitments shall be required to be eliminated within one (1) business day of the date of such termination.

Voluntary Prepayments:        Voluntary reductions of the unutilized portion of the RBL Facility commitments and voluntary prepayments of borrowings under the RBL Facility will be permitted at any time, in minimum principal amounts of $500,000 or increments of $100,000 in excess thereof, without premium

or penalty, subject to reimbursement of the Lenders' redeployment costs in the case of a prepayment of LIBOR borrowings other than on the last day of the relevant interest period.

The documentation in respect of the Term Loan (the "<u>Term Loan Documents</u>"; together with the RBL Documents, the "<u>Loan Documents</u>") shall provide that Reorganized Midstates shall not be permitted to prepay the Term Loan so long as the Commitment under the RBL Facility shall remain in effect.

|  |  |
|---|---|
| Conditions to Borrowings: | The making of each extension of credit under the RBL Facility shall be conditioned upon (a) the accuracy of representations and warranties set forth in the RBL Loan Documents in all material respects (without duplication of any materiality standard), (b) delivery of a customary borrowing notice and (c) the absence of defaults or events of default at the time of, and after giving effect to the making of, such extension of credit. |
| Representations and Warranties: | The Loan Documents shall include usual and customary representations and warranties, including: existence and organizational status; power and authority; qualification; execution, delivery and enforceability; compliance with laws; with respect to the execution, delivery and performance, no violation of, or conflict with, law, charter documents or material agreements; litigation; margin regulations; material governmental approvals and other consents with respect to the execution, delivery and performance of the RBL Facility; Investment Company Act; PATRIOT Act; absence of undisclosed liabilities; accuracy of disclosure and financial statements; no material adverse effect; no defaults; insurance; taxes; ERISA; subsidiaries; creation and perfection of security interests (including compliance with collateral coverage ratio); environmental laws; properties; subsidiaries and equity interests; sanctions laws; direct benefit; and consolidated closing date solvency; gas imbalances; marketing of production; hedge agreement; and other representations and warranties deemed appropriate by the Agent and the Lenders; subject, in the case of each of the foregoing representations and warranties, to qualifications and limitations for materiality to be agreed. |
| Affirmative Covenants: | The Loan Documents shall include usual and customary affirmative covenants, including: (i) delivery of annual, quarterly, and monthly financial statements and other information, with annual financial statements to be accompanied by an audit opinion from nationally recognized auditors that is not subject to qualification as to "going concern" or the scope of such audit (other than any "going concern" qualification as a result of impending maturity of the Revolving Loans or Term Loans); with the delivery of Reserve Reports, financial projections (presented on a semi-annual basis) for the then immediately following one (1) year period; (ii) compliance certificates, other certificates and other information; (iii) delivery of notices of defaults and certain material events; (iv) inspections (including books and records); (v) maintenance of organizational existence and rights and privileges; (vi) maintenance of |

insurance; (vii) payment of taxes and other obligations; (viii) corporate franchises; (ix) compliance with laws (including environmental laws); (x) maintenance of properties; (xi) operations; (xii) additional guarantors and collateral; (xiii) satisfactory title opinions or other title information with respect to at least 80% of the total value of proved oil and gas properties in the Reserve Report that are mortgaged as Collateral; (xiv) use of proceeds; (xv) sanctions laws; (xvi) further assurances on collateral matters; and (xvii) reserve reports, subject, in the case of each of the foregoing covenants, to exceptions and qualifications to be agreed.

In addition, Reorganized Midstates shall provide:  (i) monthly operations/business plan updates; (ii) updated ARIES database semi-annually; (iii) thirteen (13) week cash flow (including sources and uses) and a variance against prior periods, updated monthly (which reporting requirement shall be eliminated from and after the date that notice is given to Reorganized Midstates on or about April 1, 2018 of the Spring 2018 Borrowing Base redetermination (the "April 2018 Notice Date").

| Negative Covenants: | The Loan Documents shall include usual and customary negative covenants, including limitations on (i) the incurrence or maintenance of debt; (ii) the incurrence or maintenance of liens; (iii) fundamental changes; (iv) asset sales or early monetization or early termination of any hedge or swap positions relied on by the Lenders in determining the Borrowing Base; (v) investments; (vi) dividends or distributions on, or redemptions of, capital stock of the Borrower; (vii) amendments of material debt documents (if any) and prepayments or redemptions in respect thereof; (viii) negative pledges and limitations subsidiary distributions; (ix) commodity hedging (with non-speculative commodity hedging permitted with respect to aggregate notional volumes of oil, gas and NGLs (calculated separately) hedged on a monthly basis not to exceed 75% of reasonably anticipated production (based on the most recently delivered Reserve Report, as adjusted in good faith to account for updated information) of oil, gas and NGLs, respectively, for any month (measured as of each date any such commodity hedging transaction is entered into); provided that no commodity hedging shall be permitted for any month more than 48 months following the date any commodity hedging transaction is entered into); (x) transactions with affiliates; (xi) change in nature of business; (xii) gas imbalances, take-or-pay or other prepayments; and (xiii) use of proceeds. |

The Loan Documents shall also contain a negative covenant concerning the effect upon hydrocarbon production from any regulatory curtailment of the Credit Parties' ability to dispose of salt water in the State of Oklahoma arising from the effect of any such regulation by the Oklahoma Corporation Commission (the "Curtailment Covenant").  A breach of the Curtailment Covenant shall occur if a Negative Effect (defined below) upon the hydrocarbon production volumes of the Credit Parties results, in whole or in part, from any curtailment of salt-water disposal operations in the State of Oklahoma imposed by any regulatory body, including but not limited to the Oklahoma Corporation Commission, regardless of whether the imposition of such curtailment

results from any negotiation, mandate, exercise of regulatory authority, or judicial order or enforcement.   A negative effect (the "<u>Negative Effect</u>") occurs when the Credit Parties fail to achieve the projected hydrocarbon production levels set forth in the Reorganized Midstates' Business Plan (a copy of which shall be attached as an exhibit to the RBL Loan Documents, the "<u>Business Plan</u>") as a result of the effect of any regulatory curtailment on the Credit Parties' ability to dispose of salt water in the State of Oklahoma at any point prior to the Commitment Termination Date by an amount more than 10.0% lower than the projected sixty (60) day rolling average of hydrocarbon production levels, as measured each two-month period by looking at hydrocarbon production for the prior sixty (60) day period.   In the event the Curtailment Covenant is breached (i) prior to April 1, 2018, a Borrowing Base redetermination shall occur promptly thereafter, notwithstanding any other limits on unscheduled redetermination or (ii) after April 1, 2018, Reorganized Midstates shall provide prompt written notice thereof to the Agent and the Agent shall reserve all rights to request an unscheduled redetermination under the terms of the Loan Documents.

| | |
|---|---|
| Financial Covenants: | The Loan Documents shall contain the following financial covenants: |

<u>Leverage Ratio</u>.  As of the last day of any fiscal quarter, commencing December 31, 2016 through the fiscal quarter ended March 31, 2018, the ratio of Total Indebtedness to EBITDA for the trailing four fiscal quarters shall not exceed 2.25:1.00; provided that Total Indebtedness and EBITDA (i) for the fiscal quarter ended December 31, 2016, shall be equal to Total Indebtedness and EBITDA, respectively, for the fiscal quarter ending on such date multiplied by 4, (ii) for the fiscal quarter ended March 31, 2017, shall be equal to Total Indebtedness and EBITDA, respectively, for the two fiscal quarters ending on such date multiplied by 2 and (iii) for the fiscal quarter ended June 30, 2017, shall be equal to Total Indebtedness and EBITDA, respectively, for the three fiscal quarters ending on such date multiplied by 4/3.  As of the last day of any fiscal quarter, commencing June 30, 2018, the ratio of Total Indebtedness to EBITDA for the trailing four fiscal quarters shall not exceed 3.00:1.00.

<u>Interest Coverage</u>.  As of the last day of any fiscal quarter, commencing December 31,  2016, the ratio of EBITDA to Interest Expense for the trailing four fiscal quarters shall not less than 3.00:1.00; <u>provided</u> that EBITDA and Interest Expense (i) for the fiscal quarter ended December 31, 2016, shall be equal to EBITDA and Interest Expense, respectively, for the fiscal quarter ending on such date multiplied by 4, (ii) for the fiscal quarter ended March 31, 2017, shall be equal to EBITDA and Interest Expense, respectively, for the two fiscal quarters ending on such date multiplied by 2 and (iii) for the fiscal quarter ended June 30, 2017, shall be equal to EBITDA and Interest Expense, respectively, for the three fiscal quarters ending on such date multiplied by 4/3.

<u>Capital Expenditures</u>.  Beginning with the quarter ended December 31, 2016, Capital Expenditures shall be capped at (a) for the 6 months

ending December 31, 2016, $50,000,000, (b) for the fiscal year ending December 31, 2017, $81,000,000, (c) for the fiscal year ending December 31, 2018, $85,000,000 and (d) for the fiscal year ending December 31, 2019, $78,000,000; provided, however, that Capital Expenditures in an aggregate amount up $10,000,000 and used solely for purposes of mitigating the consequences of a regulatory curtailment issued by the Oklahoma Corporation Commission shall not be included for purposes of calculating Capital Expenditures for purposes of the covenant.

If the amount of Capital Expenditures in the Company's Business Plan (a) for the 6 months ending December 31, 2016 is greater than the amount of Capital Expenditures actually made in such six month period (the amount by which such Capital Expenditures in the Company's Business Plan for such six month period exceeds the actual amount of Capital Expenditures for such six month period in an aggregate amount up to $10,000,000, the "Initial Excess Amount") or (b) for any Fiscal Year is greater than the amount of Capital Expenditures actually made in such Fiscal Year (the amount by which such Capital Expenditures in the Company's Business Plan for such Fiscal Year exceeds the actual amount of Capital Expenditures for such Fiscal Year in an aggregate amount up to $10,000,000, the "Excess Annual Amount" and, together with the Initial Excess Amount, the "Excess Amount"), then the Excess Amount (such amount, the "Carry-Over Amount") may be carried forward to the next succeeding Fiscal Year (the "Succeeding Fiscal Year"); provided, that the Carry-Over Amount applicable to a particular Succeeding Fiscal Year may not be carried forward to another Fiscal Year. Capital Expenditures made by the Credit Parties in any Fiscal Year shall be deemed to reduce (x) first, the Carry-Over Amount, and (y) then, the amount provided for above for such Fiscal Year.

Minimum Liquidity:     On the Plan Effective Date, Reorganized Midstates shall fund a cash collateral account which shall be maintained at the Agent (the "Cash Collateral Account") in an amount equal to $40,000,000. The documentation with respect to the Cash Collateral Account shall be acceptable to the Agent in its sole discretion. Reorganized Midstates shall have no authority to access funds in the Cash Collateral Account until the April 2018 Notice Date (after which, so long as no Borrowing Base Deficiency then exists, Reorganized Midstates will have unfettered access to the funds but subject to ongoing control); provided, however, that either Reorganized Midstates or the Required RBL Lenders may at any time, direct the Agent to apply all, but not less than all, of the funds in the Cash Collateral Account to the repayment of the Revolving Loans. In the event that Reorganized Midstates or the Required RBL Lenders directs the Agent to repay the Revolving Loans with funds in the Cash Collateral Account (such amount, the "Released Funds"), then from such date until the April 2018 Notice Date, notwithstanding the amount of the Commitment, Availability shall in no event exceed (i) the aggregate principal amount of Revolving Loans outstanding on the Plan Effective Date, less (ii) the Released Funds. For the avoidance of doubt, following

the April 2018 Notice Date, Availability shall be determined in accordance with the terms and provisions of the Loan Documents.

From and after the April 2018 Notice Date, the Credit Parties shall maintain at all times minimum Liquidity (cash and cash equivalents plus Availability) equal to 20% of the then-existing Borrowing Base.

Events of Default:

The Loan Documents shall include usual and customary defaults and events of default with thresholds and grace periods to be agreed by the Agent and the Lenders, including: (i) nonpayment of principal, interest or other amounts; (ii) violation of covenants; (iii) incorrectness of representations and warranties in any material respect; (iv) cross default and cross acceleration to material indebtedness; (v) bankruptcy of a Credit Party; (vi) material monetary judgments; (vii) material ERISA events; (viii) actual or asserted invalidity of material guarantees or security documents; and (ix) change of control.

Cost and Yield Protection:

The RBL Loan Documents shall contain customary provisions (i) protecting the Lenders against increased costs or loss of yield resulting from changes in reserve, tax, capital adequacy and other requirements of law and from the imposition of or changes in withholding or other taxes and (ii) indemnifying the Lenders for "breakage costs" incurred in connection with, among other things, any prepayment of a LIBOR loan on a day other than the last day of an interest period with respect thereto. The Dodd-Frank Wall Street Reform and Consumer Protection Act and Basel III (and all requests, rules, guidelines or directives relating to each of the foregoing or issued in connection therewith) shall be deemed to be changes in law regardless of the date enacted, adopted or issued. The RBL Loan Documents shall contain "EU Bail-In" protections.

Expenses and
Indemnification:

Reorganized Midstates shall pay (i) all reasonable and documented out-of-pocket expenses of the Agent associated with the preparation, execution, delivery and administration of the loan documentation and any amendment or waiver with respect thereto (including the reasonable fees, disbursements and other charges of counsel and financial advisors) and (ii) all out-of-pocket expenses of the Agent and the Lenders (and their affiliates and their respective officers, directors, employees, advisors and agents) (including the reasonable and documented fees, disbursements and other charges of legal counsel and financial advisors) in connection with the enforcement of the Loan Documents, including pursuing remedies in respect thereof.

The Agent and the Lenders (and their affiliates and their respective officers, directors, employees, advisors and agents) will have no liability to the Credit Parties, and will be indemnified and held harmless against, any loss, liability, cost or expense incurred in respect of the financing contemplated hereby or the use or the proposed use of proceeds thereof; *provided* that the foregoing will not, as to any indemnified person, apply to losses, claims, damages, liabilities or related expenses to the extent they are found by a final, non-appealable judgment of a court of

competent jurisdiction to (i) arise or result from (A) the willful misconduct, bad faith or gross negligence of such indemnified person or (B) a breach in bad faith of the funding obligations of such indemnified person, or (ii) have not resulted from an act or omission by you or any of your affiliates and have been brought by an indemnified person against any other indemnified person (other than any claims against Agent in its capacity as such).

**Closing Conditions:**
The closing shall be conditioned upon satisfaction (or waiver by the Lenders) of conditions precedent usual for facilities and transactions of this type, but in any event on or before _____, 2016, including, without limitation, the following (the date upon which all such conditions precedent shall be satisfied, the "Closing Date"):

(i)   The Loan Documents shall contain the terms set forth in this Term Sheet and shall contain representations, warranties, covenants and events of default customary for financings of this type and other terms deemed appropriate by and acceptable to the Borrower, the Agent and the Lenders;

(ii)   The Agent and each Lender shall be satisfied that the disclosure statement filed in accordance with Section 1125 of the Code (the "Disclosure Statement") with respect to the Plan of Reorganization does not contain any materially inaccurate information (or fail to disclose material information) and that there are no material administrative expenses, priority tax claims, reclamation claims, general unsecured claims or other claims that have not been disclosed or estimated in the Disclosure Statement;

(iii)   The Plan of Reorganization, and all orders of the Bankruptcy Court, including, without limitation, the confirmation order entered in connection with the Plan of Reorganization (the "Confirmation Order") shall be in form and substance satisfactory to each of the Agent and each Lender and shall be final and non-appealable and in full force and effect and shall not have been stayed, reversed, vacated or otherwise modified in a manner material and adverse to interests of the Agent and the Lenders or otherwise contrary to this Term Sheet;

(iv)   The Plan Effective Date shall have occurred, all conditions precedent to the effectiveness of the Plan of Reorganization shall have been fulfilled or waived as permitted therein, including, without limitation, the execution, delivery and all transactions contemplated in the Plan of Reorganization or in the Confirmation Order to occur on the effective date of the Plan of Reorganization shall have been substantially consummated in accordance with the terms thereof and in compliance with applicable law, Bankruptcy Court and regulatory approvals;

(v)   The Agent shall have received satisfactory evidence as to the payment in full on the Plan Effective Date of all material

administrative expense claims, priority claims and other claims required to be paid upon the Plan Effective Date;

(vi)  The execution and delivery of the Loan Documents, including security agreements, mortgages, deeds of trust, control agreements, any stock certificates and UCC and real property filings and (ii) delivery of customary legal opinions, customary insurance certificates, lien searches, customary officer's closing certificates, organizational documents, customary evidence of authorization and good standing certificates in jurisdictions of formation/organization;

(vii)   All governmental and third party consents and approvals necessary in connection with the Loan Documents and the transactions contemplated thereby shall have been obtained and shall remain in effect; and no law or regulation shall be applicable in the judgment of the Agent that prevents the RBL Facility, the Term Loan or the transactions contemplated thereby;

(viii)  All representations and warranties in the Loan Documents shall be true and correct in all material respects (without duplication of any materiality standard);

(ix)   All fees required to be paid on the Closing Date and all reasonable out-of-pocket expenses required to be paid on the Closing Date in connection with the RBL Facility and the Term Loan, including the fees and expenses of the Agent's legal counsel and financial advisors, including Mayer Brown LLP and FTI, respectively, shall have been paid in full; and

(x)  Customary releases shall have been granted to the Lenders, and their customary related and representative parties, under the Plan of Reorganization.

| | |
|---|---|
| Miscellaneous: | *The Loan Documents may contain other terms and conditions that are customary of agreements of this nature.* |
| Governing Law and Forum: | State of New York. |

**Exhibit B**

**Management Compensation Term Sheet**

**MIDSTATES PETROLEUM COMPANY, INC.**

**MANAGEMENT INCENTIVE TERM SHEET: SEVERANCE PROVISIONS**

The following summarizes the principal terms of the severance provisions of the employment agreements (each, an "Agreement") between Midstates Petroleum Company, Inc. (the "Company") and the executives of the Company (each, an "Executive"). All other aspects of the Management Incentive Plan (as defined in the Company's plan of reorganization to which this term sheet is attached) and all remaining employment and compensation terms, including to what extent the Management Incentive Plan and any such remaining employment and compensation terms will be determined by the post-emergence board of the Company, will be included in an amended term sheet that is agreed prior to the hearing on the disclosure statement for the Company's plan of reorganization.

| Executive | Position | Base Salary | Target Bonus | Severance Amount |
|---|---|---|---|---|
| Frederic (Jake) Brace | President & Chief Executive Officer | $[_____] | 100% of Base Salary | 2.0x (Base Salary + Target Bonus) |
| Nelson Haight | EVP, CFO and Chief Accounting Officer | $375,000 | 80% of Base Salary | 1.5x (Base Salary + Target Bonus) |
| Mitch Elkins | EVP of Operations | $400,000 | 80% of Base Salary | 1.0x (Base Salary + Target Bonus) |
| Scott Weatherholt | VP - GC & Corporate Secretary VP - Land | $300,000 | 60% of Base Salary | 1.0x (Base Salary + Target Bonus) |
| Amelia Kim Harding | VP - Human Resources & Administration | $235,000 | 60% of Base Salary | 1.0x (Base Salary + Target Bonus) |

| Selected Employment Terms | |
|---|---|
| Events of Termination: | The Agreement may be terminated (i) upon the Executive's death, (ii) upon the Executive's disability, (iii) by the Company with or without Cause or (iv) by the Executive with or without Good Reason (as defined below). |
| Obligations Upon Termination: | Termination for Cause by the Company or without Good Reason by the Executive, other than due to death or Disability. If the Executive is terminated for Cause by the Company or without Good Reason by the Executive then the Executive will receive their accrued Base Salary, any earned but unpaid Annual Bonus (prorated through the end of the month of termination) and other accrued incentive awards and accrued vacation (the "Accrued Benefits").<br><br>Termination by Reason of Death or Disability. If the Executive is terminated pursuant to the Executive's death or disability then the Executive (or the estate of the Executive in the event of death) will receive the Accrued Benefits and monthly payments equal to the monthly COBRA premium for Executive and any eligible dependents for up to the number of months provided for in their respective Agreement for payment of severance benefits following the Executive's termination of employment.<br><br>Termination without Cause by the Company or for Good Reason by the Executive. If the Executive is terminated without Cause by the Company or for Good Reason by the |

| | |
|---|---|
| | Executive, conditioned on the execution of a general release, then the Executive will receive (i) their Accrued Benefits, (ii) a lump-sum cash payment equal to the Severance Amount set forth for each Executive on Page 1 and (iii) monthly payments equal to the monthly COBRA premium for Executive and any eligible dependents for up to the number of months provided for in their respective Agreement for payment of severance benefits following the Executive's termination of employment.<br><br>Termination without Cause or for Good Reason following a Change in Control. If the Executive is terminated without Cause or for Good Reason within one year following a Change in Control (as defined in the Plan), conditioned on the execution of a general release, then the Executive will receive (i) their Accrued Benefits, (ii) a lump-sum payment (the "CIC Severance") on the first payroll date following termination equal to 2 times the sum of (x) the Target Bonus and (y) the highest base salary paid to Executive by the Company over the prior three fiscal years and (iii) monthly payments equal to the monthly COBRA premium for Executive and any eligible dependents for up to the number of months provided for in their respective Agreement for payment of severance benefits following the Executive's termination of employment.<br><br>Forfeiture and Repayment. On the Executive's material breach of any of the restrictive covenants contained in the Executive's Agreement that is not cured within 30 days of notice from the Company, the Executive will forfeit his or her entitlement to a prorated portion of the Severance Amount or the CIC Severance based on the time at which the material breach occurred relative to the remaining period of time of the applicable restrictive covenant that was materially breached, and the Executive will be required to repay any previously paid portion of the Severance Amount or the CIC Severance. The foregoing is in addition to any other remedies, in law or in equity, that the Company may have.<br><br>Section 280G. [Reserved for future discussion]. |
| Key Definitions | "Cause" means (i) a breach by the Executive of the Executive's obligations under the Executive's employment agreement, which constitutes nonperformance by the Executive of their obligations and duties thereunder, as determined by the Board (which may, in its sole discretion, give the Executive notice of, and the opportunity to remedy, such breach), (ii) commission by the Executive of an act of fraud, embezzlement, misappropriation, willful misconduct or breach of fiduciary duty against the Company, (iii) a material breach by the Executive of any restrictive covenants contained within the Executive's employment agreement that is not cured within 15 days of the Executive's receipt of written notice thereof from the Board, (iv) the Executive's conviction, plea of no content or nolo contendere, deferred adjudication or unadjudicated probation for any felony or any crime involving fraud, dishonesty, or moral turpitude or causing material harm, financial or otherwise, to the Company, (v) the willful refusal or intentional failure of the Executive to carry out, or comply with, in any material respect, any lawful and material written directive of the Board (of which the Board will give the Executive written notice of and a reasonable opportunity to remedy), (vi) the Executive's unlawful use (including being under the influence) or possession of illegal drugs, or (vii) the Executive's willful and material violation of any federal, state, or local law or regulation applicable to the Company or its business which adversely affects the Company that is not cured after written notice from the Board. For purposes of the definition of "Cause", no act or failure to act on the Executive's part shall be deemed "willful" unless done, or omitted to be done, by the Executive not in good faith and without reasonable belief that the Executive's action or omission was in the best interest of |

the Company.

"Good Reason" means any of the following, but only if occurring without the Executive's consent: (i) a material diminution in the Executive's Base Salary or Target Bonus opportunity, (ii) a material diminution in the Executive's titles, positions, authority, duties, or responsibilities, (iii) the relocation of the Executive's principal office to an area more than 50 miles from its location immediately prior to such relocation, or (iv) the failure of the Company to comply with any material provision of the Executive's employment agreement or equity agreement. The Executive must give the Company at least 30 days' prior written notice of their intent to terminate employment for Good Reason, which notice specifies the facts and circumstances constituting Good Reason, the Company has not remedied such facts and circumstances during such 30-day period, and the Executive terminates employment not later than the 60th day after the last day of such 30-day period.

**<u>Exhibit B</u>**

**Plan Support Agreement**

## <u>Exhibit C</u>

**Plan Support Agreement**

*EXECUTION VERSION*

# PLAN SUPPORT AGREEMENT

This PLAN SUPPORT AGREEMENT (as amended, supplemented or otherwise modified from time to time in accordance with the terms hereof, this "***Agreement***"), dated as of April 30, 2016, is entered into by and among the following parties:

(i) Midstates Petroleum Company, Inc. and Midstates Petroleum Company LLC (collectively, the "***Company***");

(ii) (a) the First Lien Agent (as defined below) and (b) the undersigned holders of First Lien Claims (as defined below) solely in their capacity as holders of First Lien Claims (collectively, with their respective successors and permitted assigns and any subsequent holder of First Lien Claims that becomes party hereto in accordance with the terms hereof, the "***Consenting First Lien Lenders***");

(iii) the undersigned beneficial holders, or investment advisors or managers for the account of beneficial holders, of Second Lien Notes Claims (as defined below) (together with any beneficial holders, or investment advisors or managers for the account of beneficial holders, of Second Lien Notes that subsequently become party hereto in accordance with the terms hereof after the Plan Support Effective Date, the "***Consenting Second Lien Noteholders***") that are members of the ad hoc committee of holders of the Second Lien Notes Claims that is represented by, *inter alia*, Davis Polk & Wardwell LLP and Houlihan Lokey Capital, Inc. (the "***Consenting Second Lien Ad Hoc Committee***");

(iv) the undersigned beneficial holders, or investment advisors or managers for the account of beneficial holders, of both Second Lien Notes Claims and Third Lien Notes Claims (as defined below) (together with any beneficial holders, or investment advisors or managers for the account of beneficial holders, of Second Lien Notes and Third Lien Notes that subsequently become party hereto in accordance with the terms hereof after the Plan Support Effective Date, the "***Consenting Cross-Over Noteholders***") that are members of the ad hoc committee of holders of both Second Lien Notes Claims and Third Lien Notes Claims that is represented by *inter alia*, Milbank, Tweed, Hadley & McCloy LLP and Centerview Partners LLC (the "***Consenting Cross-Over Ad Hoc Committee***").

The Company, the First Lien Agent, each Consenting First Lien Lender, each Consenting Noteholder (as defined below), and any subsequent person or entity that becomes a party hereto in accordance with the terms hereof are referred to herein as the "***Parties***" and individually as a "***Party***." The Parties other than the Company are collectively referred to herein as the "***Consenting Parties***." Capitalized terms used and not defined herein shall have the meanings ascribed to such terms in the term sheet attached hereto as **Exhibit A** (the "***Term Sheet***"). Each Consenting Party intends to be and is bound under this Agreement with respect to any and all claims against, or interests in, the Company held by such Consenting Party.

**WHEREAS**, the Parties and their respective professionals have negotiated a restructuring of the Company (the "***Restructuring***" and the transactions contemplated therein, the "***Restructuring Transactions***") that will be implemented and consummated pursuant to a chapter 11 plan of reorganization (as may be modified in accordance with Section 10 hereof), the

terms of which shall be consistent in all respects with those set forth in this Agreement, the Term Sheet, the RBL Term Sheet (defined below) and the Definitive Documents (as defined below), (hereinafter, the "***Plan***") in cases commenced under chapter 11 (the "***Chapter 11 Cases***") of title 11 of the United States Code (the "***Bankruptcy Code***") in the United States Bankruptcy Court for the Southern District of Texas (the "***Bankruptcy Court***");

**WHEREAS,** as of the date hereof, the Consenting First Lien Lenders hold, in the aggregate, approximately 80% of the aggregate outstanding principal amount of the secured revolving first lien credit facility (the "***RBL Facility***") pursuant to the terms of that certain Second Amended and Restated Credit Agreement, dated as of June 8, 2012, by and among the Company, the banks and other financial institutions named therein as lenders (the "***First Lien Lenders***"), Sun Trust Bank, N.A., as administrative agent (the "***First Lien Agent***"), swing line lender, issuing lender, and lender, and the other mandated lead arranger, bookrunner parties, syndication agent, and co-documentation agents thereto (as amended, modified, or otherwise supplemented from time to time prior to the date hereof, the "***First Lien Credit Agreement***," and the claims and other obligations arising thereunder, the "***First Lien Claims***");

**WHEREAS,** as of the date hereof, the Consenting Second Lien Noteholders hold, in the aggregate, approximately 46% of the aggregate outstanding principal amount of the 10.0% second lien senior secured notes due 2020 (the "***Second Lien Notes***") issued under that certain indenture dated as of May 21, 2015, by and among the Company, as issuer, and Wilmington Trust, N.A., as trustee and collateral agent (the "***Second Lien Notes Trustee***") (as amended, modified, or otherwise supplemented from time to time prior to the date hereof, the "***Second Lien Indenture***," and such claims and other obligations arising thereunder, the "***Second Lien Notes Claims***");

**WHEREAS**, as of the date hereof, the Consenting Cross-Over Noteholders hold, in the aggregate, (i) approximately 28% of the aggregate outstanding Second Lien Notes; and (ii) approximately 77% of the aggregate outstanding principal amount of the 12.0% third lien senior secured notes due 2020 (the "***Third Lien Notes***") issued under that certain indenture dated as of May 21, 2015, by and among the Company, as issuer, and Wilmington Trust, N.A., as trustee and collateral agent (the "***Third Lien Notes Trustee***") (as amended modified, or otherwise supplemented from time to time prior to the date hereof, the "***Third Lien Indenture***," and such claims and other obligations arising thereunder, the "***Third Lien Notes Claims***");

**WHEREAS**, each of the First Lien Lenders, the holders of the Second Lien Notes Claims, and the holders of the Third Lien Notes Claims have security interests in and to substantially all of the Company's assets, including without limitation substantially all of the oil and gas assets, cash and cash equivalents, and other property of the Company, and the rights of these secured parties are set forth in that certain Intercreditor Agreement, dated as of May 21, 2015, executed by and among these secured parties and the Company (as amended, restated or otherwise modified from time to time, the "***Intercreditor Agreement***") which remains in full force and effect;

**WHEREAS**, prior to the commencement of the Chapter 11 Cases, the Company, the Consenting First Lien Lenders, the First Lien Agent, the Consenting Second Lien Noteholders, and the Consenting Cross-Over Noteholders engaged in arm's length, good faith negotiations

culminating in the Parties' agreement on a settlement (the "***Settlement***"), as more particularly detailed and described in the Term Sheet and the RBL Term Sheet (as defined below), that will be implemented through the Plan and this Agreement and consensually resolves the Parties' disputes as further detailed in the Term Sheet, the RBL Term Sheet and the Plan, related to, among other things, the Company, the RBL Facility, the Second Lien Notes, the Third Lien Notes, the GUC Claims (as defined below), and any actions, inactions, or transactions occurring before the date on which the Company commences the Chapter 11 Cases (the "***Petition Date***"), which date shall be no later than one calendar day after the Plan Support Effective Date (the "***Outside Petition Date***"); and

**WHEREAS**, the Parties desire to express to each other their mutual support and commitment in respect of those matters contained within the Plan as well as those set forth herein.

**NOW, THEREFORE**, in consideration of the premises and the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound hereunder, do agree as follows:

1. **Certain Definitions**.

As used in this Agreement, the following terms have the following meanings:

(a)     "***Consenting Noteholders***" means, collectively, the Consenting Second Lien Noteholders and the Consenting Cross-Over Noteholders.

(b)     "***Consenting Second Lien Notes Claims***" means any and all Second Lien Notes Claims held by any Consenting Party solely in its capacity as a holder of a Second Lien Notes Claim.

(c)     "***Consenting Third Lien Notes Claims***" means any and all Third Lien Notes Claims held by any Consenting Party solely in its capacity as a holder of a Third Lien Notes Claim.

(d)     "***Effective Date***" means the effective date of the Plan.

(e)     "***GUC Claims***" means any and all unsecured claims against the Company including, but not limited to, claims arising under the Unsecured Notes and any deficiency claims.

(f)     "***Prepetition Secured Parties***" means the holders of First Lien Claims, Second Lien Notes Claims, and Third Lien Notes Claims.

(g)     "***Plan Support Effective Date***" means the date on which counterpart signature pages to this Agreement shall have been executed and delivered by the Company, the Consenting First Lien Lenders, and the Consenting Noteholders.

(h)　　"***Plan Support Period***" means the period commencing on the Plan Support Effective Date and ending on the earlier of the (i) date on which this Agreement is terminated in accordance with Section 6 hereof and (ii) the Effective Date.

(i)　　"***Requisite Creditors***" means the Requisite First Lien Lenders, Requisite Second Lien Noteholders, and the Requisite Cross-Over Noteholders.

(j)　　"***Requisite Cross-Over Noteholders***" means, as of the relevant date, Consenting Cross-Over Noteholders that are members of the Consenting Cross-Over Ad Hoc Committee that collectively hold at least a majority of the aggregate outstanding principal amount of the Third Lien Notes Claims held by all of the Consenting Cross-Over Noteholders that are members of the Consenting Cross-Over Ad Hoc Committee as of such date.

(k)　　"***Requisite First Lien Lenders***" means, as of the relevant date, Consenting First Lien Lenders that collectively hold at least a majority of the aggregate outstanding principal amount of the First Lien Claims.

(l)　　"***Requisite Second Lien Noteholders***" means, as of the relevant date, Consenting Second Lien Noteholders that are members of the Consenting Second Lien Ad Hoc Committee that collectively hold at least a majority of the aggregate outstanding principal amount of the Second Lien Notes Claims held by all of the Consenting Second Lien Noteholders that are members of the Consenting Second Lien Ad Hoc Committee as of such date.

(m)　　"***Unsecured Notes***" means the 10.75% senior unsecured notes due 2020, and the 9.25% senior unsecured notes due 2021 issued under the Unsecured Notes Indentures.

(n)　　"***Unsecured Notes Indentures***" means (i) that certain Indenture, dated as of October 1, 2012, among the Company, as issuers, and Wells Fargo Bank, N.A., as indenture trustee (as amended, restated, supplemented, or otherwise modified from time to time), and (ii) that certain Indenture, dated as of May 31, 2013, among the Company, as issuers, and Wells Fargo Bank, N.A., as indenture trustee (as amended, restated supplemented or otherwise modified from time to time).

## 2.　　**Definitive Documents**.

(a)　　The definitive documents (the "***Definitive Documents***") with respect to the Restructuring shall include all documents (including any related orders, agreements, instruments, schedules or exhibits) that are contemplated by the Plan and that are otherwise necessary or desirable to implement, effectuate, or otherwise relate to the Restructuring, including, without limitation:  (i) the Plan; (ii) the documents to be filed in the supplement to the Plan; (iii) the disclosure statement for the Plan that is prepared and distributed in accordance with sections 1125, 1126(b), and 1145 of the Bankruptcy Code (the "***Disclosure Statement***"); (iv) the motion seeking approval of the Disclosure Statement (the "***Disclosure Statement Motion***") and the order approving the Disclosure Statement (the "***Disclosure Statement Order***"); (v) the order confirming the Plan (the "***Confirmation Order***"); (vi) any documentation relating to the use of cash collateral including a motion seeking authority to use cash collateral, an interim order (the "***Interim Cash Collateral Order***"), and a final order (the "***Final Cash Collateral Order***," and together with the Interim Cash Collateral Order, the "***Cash Collateral Orders***")

4

approving the same; (vii) the credit agreement with respect to the New Credit Facility having the terms and conditions as set forth in the term sheet attached hereto as **Exhibit B** (the "*RBL Term Sheet*"), and any agreements, documents or instruments related thereto (the "*New Credit Facility Loan Agreements*"); and (viii) any organizational documents, shareholder and member related agreements, or other governance documents for the reorganized Company.   Each of the Definitive Documents shall (1) contain terms and conditions consistent in all material respects with this Agreement, the Term Sheet, and the RBL Term Sheet, and (2) shall otherwise be reasonably satisfactory in all respects to the Company, the Requisite First Lien Lenders, the Requisite Second Lien Noteholders and the Requisite Cross-Over Noteholders (solely with respect to any provision directly impacting the $2^{nd}/3^{rd}$ Lien Plan Settlement (as defined in the Term Sheet)) , including with respect to any modifications, amendments, or supplements to such Definitive Documents at any time during the Plan Support Period; provided, however, that solely with respect to the Definitive Documents referenced in clauses (vi) and (vii) hereof, only the Requisite First Lien Lenders and Requisite Second Lien Noteholders shall have such consent rights, and the Cash Collateral Orders and the New Credit Facility Loan Agreements referenced in clauses (vi) and (vii), respectively, must be acceptable in all respects to the Requisite First Lien Lenders; provided further, however, that solely with respect to the Definitive Documents referenced in clause (viii) hereof, only the Requisite Second Lien Noteholders shall have such consent rights.   Notwithstanding anything herein to the contrary, the Consenting Cross-Over Ad Hoc Committee shall have the right to receive all Definitive Documents contemporaneously with the Company, the First Lien Agent, and the Consenting Second Lien Ad Hoc Committee, as applicable.

(b)    Each of the exhibits attached hereto (such as the Term Sheet and the RBL Term Sheet) and any schedules to such exhibits (collectively, the "*Exhibits and Schedules*") is expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include the Exhibits and Schedules.  In the event of any inconsistency between this Agreement (without reference to the Exhibits and Schedules) and the Exhibits and Schedules, this Agreement (without reference to the Exhibits and Schedules) shall govern.

### 3.    <u>Agreements of the Consenting Parties</u>.

(a)    During the Plan Support Period, subject to the terms and conditions hereof, each Consenting Party other than the Consenting First Lien Lenders, in its capacity as a holder of Second Lien Notes Claims, Third Lien Notes Claims, and/or GUC Claims (as applicable), or each Consenting First Lien Lender, solely in its capacity as holders of First Lien Claims now or hereafter acquired, agrees, solely with respect to itself, that:

(i)    it will use its commercially reasonable efforts to support the Settlement, the Restructuring and the transactions contemplated by the Term Sheet, as applicable, and to act in good faith and take all commercially reasonable actions necessary to consummate the Restructuring and the transactions contemplated by the Term Sheet and the Plan in a manner consistent with this Agreement, including the timelines set forth herein;

(ii)    it shall not (A) direct any administrative agent, collateral agent, or indenture trustee (as applicable) to take any action inconsistent with such Consenting Party's obligations under this Agreement, and, if any applicable administrative agent, collateral agent, or

indenture trustee takes any action inconsistent with such Consenting Party's obligations under this Agreement, such Consenting Party shall use its commercially reasonable efforts to request that such administrative agent, collateral agent, or indenture trustee (as applicable) cease and refrain from taking any such action, or (B) directly or indirectly encourage any other person or entity to directly or indirectly, (x) object to, delay, impede, or take any other action or any inaction to interfere with the acceptance, approval, implementation, consummation, or amendment of the Plan (whether before or after confirmation, <u>provided</u> that such amendment is consistent with the Term Sheet, the RBL Term Sheet and this Agreement), including the Settlement contained therein; (y) propose, file, support, vote for, or take any other action in furtherance of any restructuring, workout, plan of arrangement, or plan of reorganization for the Company that is inconsistent with this Agreement, the RBL Term Sheet or the Term Sheet; or (z) exercise any right or remedy for the enforcement, collection, or recovery of any claim against the Company except in a manner consistent with this Agreement, the Cash Collateral Orders, and the Plan, as applicable;

       (iii)    subject to the receipt of the Disclosure Statement pursuant to the Disclosure Statement Order, it shall (A) timely vote or cause to be voted any First Lien Claims, Second Lien Notes Claims, Third Lien Notes Claims, and/or GUC Claims (as applicable) it holds that are subject to this Agreement to accept the Plan (to the extent permitted to vote) by timely delivering its duly executed and completed ballot or ballots, as applicable, accepting the Plan on a timely basis following commencement of the solicitation of acceptances of the Plan in accordance with sections 1125(g) and 1126 of the Bankruptcy Code, (B) not change or withdraw such vote or the elections described below (or cause or direct such vote or elections to be changed or withdrawn); <u>provided</u>, <u>however</u>, that such vote or elections shall be immediately revoked (and deemed void *ab initio*) by all Consenting Parties upon the expiration of the Plan Support Period or the termination of this Agreement, and (C) to the extent it is permitted to elect whether to opt out of the releases set forth in the Plan, not elect to opt out of the releases set forth in the Plan by timely delivering its duly executed and completed ballot or ballots indicating such election; and

       (iv)    use commercially reasonable efforts to support and take all commercially reasonable actions necessary to facilitate the approval of the Disclosure Statement, solicitation of votes on the Plan, and confirmation and consummation of the Plan (it being understood that the Consenting Parties shall not be required to incur any out of pocket cost or expense, or any liability in connection therewith).

       (b)    <u>Transfers</u>.  During the Plan Support Period, subject to the terms and conditions hereof, each Consenting Party agrees, solely with respect to itself, that it shall not sell, use, pledge, assign, convey, grant, transfer, permit the participation in, or otherwise dispose of, in whole or in part (each, a "***Transfer***") any ownership (including any beneficial ownership)[1] in the First Lien Claims, the Second Lien Notes Claims, the Third Lien Notes Claims, or GUC Claims that it holds in the capacity in which it executed this Agreement (collectively with the First Lien Claims, the Second Lien Notes Claims, and the Third Lien Notes Claims, for purposes of this

---

[1]   As used herein, the term "**beneficial ownership**" means the direct or indirect economic ownership of, and/or the power, whether by contract or otherwise, to direct the exercise of the voting rights and the disposition of, all or any portion of the Consenting Party Claims or the right to acquire any such Consenting Party Claims.

Section 3, the "***Consenting Party Claims***"), as applicable, or any option thereon or any right or interest therein (including, but not limited to, accomplishing the same, by granting any proxies or depositing any interests in the Consenting Party Claims into a voting trust or by entering into a voting agreement with respect to the Consenting Party Claims), unless (i) the intended transferee is a Consenting Party or (ii) if the intended transferee is not a Consenting Party, such intended transferee executes and delivers to counsel to the Company on the terms set forth below an executed transfer agreement in the form attached hereto as **Exhibit C** (a "***Transfer Agreement***") before such Transfer is effective (it being understood and agreed by the Parties that any such Transfer shall not be effective as against the Company until notification of such Transfer and a copy of the executed, unaltered, and unredacted Transfer Agreement is received by counsel to the Company, in each case, on the terms set forth herein) (such transfer, a "***Permitted Transfer***" and such party to such Permitted Transfer, a "***Permitted Transferee***").

(i)      Notwithstanding anything to the contrary herein, (A) the foregoing provisions shall not preclude any Consenting Party from settling or delivering any Consenting Party Claims to settle any confirmed transaction pending as of the date of such Consenting Party's entry into this Agreement (subject to compliance with applicable securities laws and it being understood that such Consenting Party Claims so acquired and held (i.e., not as a part of a short transaction) shall be subject to the terms of this Agreement), (B) a Qualified Marketmaker[2] that acquires any Consenting Party Claims with the purpose and intent of acting as a Qualified Marketmaker for such Consenting Party Claims, shall not be required to execute and deliver to counsel a Transfer Agreement or otherwise agree to be bound by the terms and conditions set forth in this Agreement if the transfer otherwise is a Permitted Transfer; provided, however, that if any of the conditions in this clause (B) is not satisfied, the Qualified Marketmaker will be required to execute and deliver a Transfer Agreement, and (C) to the extent any Party is acting solely in its capacity as a Qualified Marketmaker, it may Transfer any ownership interests in the Consenting Party Claims (as applicable) that it acquires from a holder of the Consenting Party Claims that is not a Consenting Party to a transferee that is not a Consenting Party at the time of such Transfer without the requirement that the transferee be or become a signatory to this Agreement or execute a Transfer Agreement; provided, however, that in the event such Party fails to act solely in its capacity as a Qualified Marketmaker in compliance with this clause (C), any transferee that is not a Consenting Party must execute and deliver a Transfer Agreement.

(ii)      This Agreement shall in no way be construed to preclude any Consenting Party from acquiring additional Consenting Party Claims; provided, however, that (A) (1) any Consenting Party that is a member of the Consenting Cross-Over Ad Hoc Committee that acquires additional Consenting Party Claims during the Plan Support Period shall reasonably promptly notify the Company and (2) any other Consenting Party that acquires additional Consenting Party Claims during the Plan Support period shall promptly notify the Company and counsel to the First Lien Agent (with respect to transfers of First Lien Claims) or counsel to the

---

[2]      As used herein, the term "**Qualified Marketmaker**" means an entity that (a) holds itself out to the public or the applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers claims against the Company (or enter with customers into long and short positions in claims against the Company), in its capacity as a dealer or market maker in claims against the Company and (b) is, in fact, regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

Consenting Second Lien Ad Hoc Committee (with respect to transfers of Second Lien Notes Claims held by members of the Consenting Second Lien Ad Hoc Committee) of such acquisition, including the amount of such acquisition, and (B) such acquired Consenting Party Claims shall automatically and immediately upon acquisition by a Consenting Party be deemed subject to the terms of this Agreement (regardless of when or whether notice of such acquisition is given to the Company), in the case of each of clauses (A) and (B), other than with respect to any Consenting Party Claims acquired by such Consenting Party in its capacity as a Qualified Marketmaker, in accordance with Section 3(b)(i).

(iii)    This Section 3 shall not impose any obligation on the Company to issue any "cleansing letter" or otherwise publicly disclose information for the purpose of enabling a Consenting Party to Transfer any Consenting Party Claims. Notwithstanding anything to the contrary herein, to the extent the Company and another Party have entered into a separate agreement with respect to the issuance of a "cleansing letter" or other public disclosure of information (each such executed agreement, a "**Confidentiality Agreement**"), the terms of such Confidentiality Agreement shall continue to apply and remain in full force and effect according to its terms.

(iv)    Any Transfer made in violation of this Section 3(b) shall be void *ab initio*.

4.    **Additional Agreements of the Consenting Noteholders**.

(a)    In exchange for consideration that is contemplated to be provided under the proposed Settlement, each Consenting Second Lien Noteholder, in its capacity as a holder of Second Lien Notes Claims, agrees that:

(i)    during the Plan Support Period, each Third Lien Noteholder shall be deemed released and discharged by each of the holders of Consenting Second Lien Notes Claims, to the fullest extent permitted under applicable law, from any and all causes of action and any other claims, debts, obligations, rights, suits, damages, actions, derivative claims, remedies, and liabilities whatsoever existing as of the Plan Support Effective Date (the "**Third Lien Released Claims**"), whether known or unknown, foreseen or unforeseen, latent, patent, non-existent at the present time and which may arise in the future or are unanticipated at this time, in law, at equity, or otherwise, whether for tort, contract, or otherwise, including without limitation claims arising out of violations of federal or state securities laws, fraud, misrepresentation (whether intended or negligent), breach of duty, any laws or statutes similar to the foregoing, or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to the Plan Support Effective Date arising from or related in any way to the Company, the RBL Facility, the Second Lien Notes, the Third Lien Notes, the GUC Claims, the Intercreditor Agreement, the purchase, sale, marketing of, or rescission of the purchase or sale of any security of the Company, the subject matter of, or the transactions or events giving rise to, any claim or equity interest that is treated under the RBL Facility, the Second Lien Notes, the Third Lien Notes, or the GUC Claims, and the negotiation, formulation, or preparation of the Term Sheet, the Plan, this Agreement, or related agreements, instruments, or other documents delivered in connection therewith, including those that any holder of a claim against or interest in any holder of Second Lien Notes Claims or

8

any other entity could have been legally entitled to assert derivatively or on behalf of any other entity;

(ii)     during the Plan Support Period, it shall not directly or indirectly, or encourage any other entity to directly or indirectly, (A) object to, delay, impede, or take any other action or any inaction to interfere with the acceptance, approval, implementation, consummation, or amendment of the Plan (whether before or after confirmation, provided that such amendment is consistent with this Agreement), including the Settlement contained therein, the valuations contemplated by the Term Sheet, and the treatment provided under the Plan for holders of Second Lien Notes Claims and GUC Claims in the event any or all of the Settlement (as defined in the Term Sheet) is not approved, (B) propose, file, support, vote for, or take any other action in furtherance of any restructuring, workout, plan of arrangement, or plan of reorganization for the Company other than the Plan, (C) exercise any right or remedy for the enforcement, collection, or recovery of any claim against the Company other than as permitted by the Plan or (D) it shall not directly or indirectly, or encourage any other person or entity to directly or indirectly, pursue, litigate, threaten to litigate, or otherwise raise in any proceeding any Third Lien Released Claim; and

(iii)     during the Plan Support Period, it shall not direct the Second Lien Notes Trustee to take any action inconsistent with such Consenting Second Lien Noteholder's agreements and obligations under this Agreement, and if the Second Lien Notes Trustee takes any action inconsistent with such agreements and obligations, such Consenting Second Lien Noteholder shall reasonably promptly request the Second Lien Notes Trustee to cease and refrain from taking any such action.

(b)     In exchange for consideration that is contemplated to be provided under the proposed Settlement, each Consenting Cross-Over Noteholder, in its capacity as a holder of Third Lien Notes Claims, agrees that:

(i)     during the Plan Support Period, each Second Lien Noteholder shall be deemed released and discharged by each of the holders of Consenting Third Lien Notes Claims to the fullest extent permitted under applicable law, from any and all causes of action and any other claims, debts, obligations, rights, suits, damages, actions, derivative claims, remedies, and liabilities whatsoever existing as of the Plan Support Effective Date (the "***Second Lien Released Claims***"), whether known or unknown, foreseen or unforeseen, latent, patent, non-existent at the present time and which may arise in the future or are unanticipated at this time, in law, at equity, or otherwise, whether for tort, contract, or otherwise, including without limitation claims arising out of violations of federal or state securities laws, fraud, misrepresentation (whether intended or negligent), breach of duty, any laws or statutes similar to the foregoing, or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to the Plan Support Effective Date arising from or related in any way to the Company, the RBL Facility, the Second Lien Notes, the Third Lien Notes, the GUC Claims, the Intercreditor Agreement, the purchase, sale, marketing of, or rescission of the purchase or sale of any security of the Company, the subject matter of, or the transactions or events giving rise to, any claim or equity interest that is treated under the RBL Facility, the Second Lien Notes, the Third Lien Notes, or the GUC Claims, and the negotiation, formulation, or preparation of the Term Sheet, the Plan, this Agreement, or related agreements,

9

instruments, or other documents delivered in connection therewith, including those that any holder of a claim against or interest in any holder of Third Lien Notes Claims or any other entity could have been legally entitled to assert derivatively or on behalf of any other entity;

(ii)     during the Plan Support Period, it shall not directly or indirectly, or encourage any other person or entity to directly or indirectly, (A) object to, delay, impede, or take any other action or any inaction to interfere with the acceptance, approval, implementation, consummation, or amendment of the Plan (whether before or after confirmation, provided that such amendment is consistent with this Agreement), including the Settlement contained therein, the valuations contemplated by the Term Sheet and the contingent treatment provided under the Plan for holders of Third Lien Notes Claims and GUC Claims in the event any or all of the Settlement (as defined in the Term Sheet) is not approved, (B) propose, file, support, vote for, or take any other action in furtherance of any restructuring, workout, plan of arrangement, or plan of reorganization for the Company other than the Plan,  (C) exercise any right or remedy for the enforcement, collection, or recovery of any claim against the Company other than as permitted by the Plan or (D) it shall not directly or indirectly, or encourage any other person or entity to directly or indirectly, pursue, litigate, threaten to litigate, or otherwise raise in any proceeding any Second Lien Released Claim; and

(iii)     during the Plan Support Period, it shall not direct the Third Lien Notes Trustee to take any action inconsistent with such Consenting Cross-Over Noteholder's agreements and obligations under this Agreement, and if the Third Lien Notes Trustee takes any action inconsistent with such agreements and obligations, such Consenting Cross-Over Noteholder shall reasonably promptly request the Third Lien Notes Trustee to cease and refrain from taking any such action.

## 5.     **Agreements of the Company**.

(a)     Prior to and during the Plan Support Period, subject to the terms and conditions hereof, the Company agrees that it shall, without limitation:

(i)     (A)(1) complete and file, within the timeframes contemplated herein, the Plan, the Disclosure Statement, and the other Definitive Documents and (2) use commercially reasonable efforts to obtain entry by the Bankruptcy Court of the Cash Collateral Orders, the Disclosure Statement Order and the Confirmation Order within the timeframes contemplated by this Agreement; and (B) use commercially reasonable efforts to obtain any and all required regulatory and/or third-party approvals for the Restructuring embodied in the Plan, if any, and solely to the extent necessary to effectuate the Restructuring;

(ii)     continue to operate its businesses without material change in such operations or disposition of material assets (unless in such instance, the Required Creditors have consented thereto in writing) in accordance with its business judgment, and confer with the Consenting Parties and their respective representatives, as reasonably requested, to report on operational matters and the general status of ongoing operations;

(iii)     (A) support and take all reasonable actions necessary or reasonably requested by the Requisite Creditors to facilitate the solicitation, confirmation, and

consummation of the Restructuring, the Plan and the transactions contemplated thereby, and (B) not take any action directly or indirectly that is inconsistent with, or that would reasonably be expected to prevent, interfere with, delay or impede the approval of the Disclosure Statement, the solicitation of votes on the Plan, and the confirmation and consummation of the Plan and the Restructuring, including soliciting or causing or allowing any of its agents or representatives to solicit any agreements relating to any chapter 11 plan or restructuring transaction (including, for the avoidance of doubt, a transaction premised on an asset sale of substantially all of the Company's assets under section 363 of the Bankruptcy Code) other than the Restructuring (an "*Alternative Transaction*"), and (C) not, nor encourage any other person to, take any action which would, or would reasonably be expected to, breach or be inconsistent with this Agreement or delay, impede, appeal, or take any other negative action, directly or indirectly, or encourage any other entity to interfere with the acceptance or implementation of the Restructuring;

(iv)     (A) file on the Petition Date such first day motions and pleadings that are reasonably acceptable, in form and substance, to the Requisite Creditors;

(B) (i) file the Plan, the Disclosure Statement (other than any exhibits attached thereto), and the Disclosure Statement Motion with the Bankruptcy Court within fourteen (14) calendar days of the Petition Date (the "*Plan Filing Date*"); (ii) obtain approval of the Disclosure Statement Motion within forty (40) calendar days of the Plan Filing Date, and (iii) obtain entry of the Confirmation Order within seventy-five (75) calendar days of the Plan Filing Date (such date that the Confirmation Order is entered, the "*Confirmation Date*");

(C) cause the Confirmation Order to become effective and enforceable immediately upon its entry and to have the period in which an appeal thereto must be filed commence immediately upon its entry;

(v)     obtain authority, pursuant to the Cash Collateral Orders, to pay all pre- and postpetition reasonable and documented fees and expenses of (A) the First Lien Agent and its advisors, including, without limitation, the fees and expenses of (1) Mayer Brown LLP, as counsel to the First Lien Agent, (2) local counsel to the First Lien Agent, and (3) FTI Consulting, Inc., as financial advisor to the First Lien Agent; (B) the Consenting Second Lien Ad Hoc Committee and its advisors, including, without limitation, the fees and expenses of (1) Davis Polk & Wardwell LLP, as counsel to the Consenting Second Lien Ad Hoc Committee, (2) local counsel to the Consenting Second Lien Ad Hoc Committee, and (3) Houlihan Lokey Capital, Inc., as financial advisor to the Consenting Second Lien Ad Hoc Committee; and (C) the Consenting Cross-Over Ad Hoc Committee, and their advisors, including, without limitation, the fees and expenses of (1) Milbank, Tweed, Hadley & McCloy LLP, as counsel to the Consenting Cross-Over Ad Hoc Committee, (2) local counsel to the Consenting Cross-Over Ad Hoc Committee, and (3) Centerview Partners LLC, as financial advisors to the Consenting Cross-Over Ad Hoc Committee; provided, however, that the Company shall not be responsible under this Agreement for any fees or expenses referenced in subclauses (B) or (C) hereof incurred after termination of this Agreement and that the Company shall not be responsible under this Agreement or the Cash Collateral Orders for any fees or expenses referenced in subclause (C) hereof incurred in connection with any litigation (or preparation thereof) against, or adverse to,

11

the Company, the First Lien Agent, the holders of First Lien Claims, the Second Lien Notes Trustee and the holders of Second Lien Notes Claims;

(vi)    provide draft copies of all "first day" motions or applications and other documents the Company intends to file with the Bankruptcy Court on the Petition Date to counsel to the First Lien Agent, counsel to the Consenting Second Lien Ad Hoc Committee and counsel to the Consenting Cross-Over Ad Hoc Committee at least three (3) calendar days prior to the date when the Company intends to file such documents and shall consult in good faith with such parties regarding the form and substance of any such proposed filing with the Bankruptcy Court.  The Company will use good faith efforts to provide draft copies of all other material pleadings the Company intends to file with the Bankruptcy Court to counsel to each of the First Lien Agent, the Consenting Second Lien Ad Hoc Committee and the Consenting Cross-Over Ad Hoc Committee, within a reasonable time prior to filing, and in no event later than one (1) Business Day in advance of any filing thereof, such pleading to the extent reasonably practicable and shall consult in good faith with such counsel regarding the form and substance of any such proposed pleading;

(vii)   maintain their good standing under the laws of the state in which they are incorporated or organized;

(viii)  timely file with the Bankruptcy Court or any other applicable United States court a formal written objection to any motion filed with the Bankruptcy Court or any other United States court by any party seeking the entry of an order (A) directing the appointment of an examiner with expanded powers or a trustee in any of the Chapter 11 Cases, (B) converting any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (C) dismissing any of the Chapter 11 Cases, (D) modifying or terminating the Company's exclusive right to file and/or solicit acceptances of a plan of reorganization, or (E) granting any relief inconsistent with this Agreement and the Definitive Documents;

(ix)    provide to the Consenting Parties and/or their respective professionals, upon reasonable advance notice to the Company, (A) reasonable access (without any material disruption to the conduct of the Company's business) during normal business hours to the Company's books, records, and facilities, (B) reasonable access to the respective management and advisors of the Company for the purposes of evaluating the Company's finances and operations and participating in the planning process with respect to the Restructuring, (C) prompt access to any information provided to any existing or prospective financing sources (including lenders under any exit financing), and (D) timely and reasonable responses to all diligence requests;

(x)     use their commercially reasonable efforts to preserve intact in all material respects their current business organizations, keep available the services of their current officers and material employees (in each case, other than voluntary resignations, terminations for cause, or terminations consistent with applicable fiduciary duties) and preserve in all material respects their relationships with customers, sales representatives, suppliers, distributors, and others, in each case, having material business dealings with the Company (other than terminations for cause or consistent with applicable fiduciary duties);

12

(xi)     provide prompt written notice to the Consenting Parties between the date hereof and the Effective Date of (A) the occurrence, or failure to occur, of any event of which the Company has actual knowledge which occurrence or failure would be likely to cause (1) any covenant of the Company contained in this Agreement not to be satisfied in any material respect or (2) any condition precedent contained in the Plan or this Agreement not to timely occur or become impossible to satisfy, (B) receipt of any notice from any third party alleging that the consent of such party is or may be required in connection with the transactions contemplated by the Restructuring, (C) receipt of any notice from any governmental unit with jurisdiction in connection with this Agreement or the transactions contemplated by the Restructuring, (D) receipt of any notice of any proceeding commenced, or, to the actual knowledge of the Company, threatened against the Company, relating to or involving or otherwise affecting in any material respect the transactions contemplated by the Restructuring, and (E) any failure of the Company to comply, in any material respect, with or satisfy any covenant, condition or agreement to be complied with or satisfied by it hereunder;

(xii)    promptly notify the other Parties in writing following the receipt, in writing, of notice of any material governmental, regulatory or third party complaints, litigations, investigations, or hearings (or communications indicating that the same may be contemplated or threatened); and

(xiii)   provide a copy of any written offer or proposal (and notice of any oral offer or proposal) for an Alternative Transaction received to the advisors to the First Lien Agent, the Consenting Second Lien Ad Hoc Committee, and the Consenting Cross-Over Ad Hoc Committee within one (1) business day of the Company's or their advisors' receipt of such offer or proposal.

(b)     Negative Covenants.  The Company agrees that, for the duration of the Plan Support Period, the Company shall not take any action inconsistent with, or omit to take any action required by, this Agreement, the Plan, or any of the other Definitive Documents.  The Company further agrees that prior to and during the Plan Support Period, the Company shall not: (i) take any action that impairs or removes any interest or right the Consenting Parties have in and to any collateral held or owned by the Company without the consent of the First Lien Lenders or bankruptcy court order authorizing such action; (ii) make any transfers from and after April 28, 2016 and through the Plan Support Period to or for the account of insiders or affiliates in respect of antecedent debt without a bankruptcy court order; and (iii) other than voluntary departure or termination for cause, change any of its management team without immediate replacement with another individual possessing at least equal oil and gas exploration and production experience.

(c)     Automatic Stay.  The Company acknowledges and agrees and shall not dispute that after the commencement of the Chapter 11 Cases, the giving of notice of termination by any Party pursuant to this Agreement shall not be a violation of the automatic stay of section 362 of the Bankruptcy Code (and the Company hereby waives, to the fullest extent permitted by law, the applicability of the automatic stay as it relates to any such notice being provided).  Notwithstanding anything to the contrary herein, following the commencement of the Chapter 11 Cases and unless and until there is an unstayed order of the Bankruptcy Court providing that the giving of notice under and/or termination of this Agreement in accordance

with its terms is not prohibited by the automatic stay imposed by section 362 of the Bankruptcy Code, the occurrence of any of the termination events in Section 6(b), 6(d), or 6(e) shall result in an automatic termination of this Agreement, to the extent any of the Terminating Consenting Parties would otherwise have the ability to terminate this Agreement in accordance with Section 6(b), 6(d), or 6(e), five (5) calendar days following such occurrence unless waived in writing by all of the Terminating Consenting Parties.

## 6.    Termination of Agreement.

(a)    Automatic Termination.  This Agreement shall terminate automatically, without any further action required by any Party, upon the occurrence of any of the following events:  (i) entry of an order denying confirmation of the Plan, (ii) the occurrence of the Effective Date, (iii) an order confirming the Plan is reversed or vacated, or (iv) any court of competent jurisdiction has entered a final, non-appealable judgment or order declaring this Agreement to be unenforceable.

(b)    Consenting Party Termination Events. This Agreement may be terminated by (i) the Requisite First Lien Lenders, (ii) the Requisite Second Lien Noteholders, or (iii) solely upon the occurrence of any of the events enumerated in Sections 6(b)(vii), (ix) and (xv) (in each case solely with respect to any issues directly impacting the 2nd/3rd Lien Plan Settlement) and 6(b)(x), (xiii) and (xiv), the Requisite Cross-Over Noteholders, in each case by the delivery to the Company, and counsel to the Consenting Parties, other than the Consenting Parties seeking to terminate this Agreement pursuant to this Section 6(b) (such Consenting Parties seeking to terminate, the "***Terminating Consenting Parties***") of a written notice in accordance with Section 20 hereof, upon the occurrence of any of the following events:

(i)    as of 11:59 p.m. Eastern Time on the Outside Petition Date, as such date may be extended with the written consent of Requisite First Lien Lenders and Requisite Second Lien Noteholders, if the Chapter 11 Cases shall not have been filed by such time;

(ii)    the Company fails to file the Plan, the Disclosure Statement, and the Disclosure Statement Motion on or before the date that is fourteen (14) calendar days after the Petition Date, provided, however, that such date may be extended with the prior written consent of Requisite First Lien Lenders and Requisite Second Lien Noteholders;

(iii)    the Bankruptcy Court fails to enter the Disclosure Statement Order within forty (40) calendar days after the Plan Filing Date, provided, however, that such date may be extended with the written consent of Requisite First Lien Lenders and Requisite Second Lien Noteholders;

(iv)    the Bankruptcy Court fails to enter the Confirmation Order within seventy-five (75) calendar days after the Plan Filing Date, provided, however, that such date may be extended with the written consent of Requisite First Lien Lenders and Requisite Second Lien Noteholders, and provided, further, in the event such date is so extended beyond the ninetieth (90) calendar day after the Plan Filing Date, the Requisite Second Lien Noteholders shall have the right to terminate the 2nd/3rd Lien Plan Settlement (as defined in the Term Sheet), and in the

14

event such right to terminate is exercised, the Plan (pursuant to its terms) will be automatically deemed modified to exclude (A) the 2nd/3rd Lien Plan Settlement, (B) the waiver of (1) the Diminution in Value Claim (as defined in the Term Sheet) and (2) the Noteholder Deficiency Claims (as defined in the Term Sheet) by the First Lien Lenders and the Second Lien Noteholders (as applicable) and (C) the Waivers (as defined in the Term Sheet), and in such event, (I) the Consenting Cross-Over Noteholders shall be relieved of all obligations under this Agreement and any releases or waivers granted as between the Consenting Second Lien Noteholders and Consenting Cross-Over Noteholders herein or in the Term Sheet shall be null and void, (II) the Consenting Cross-Over Noteholders shall have the right at any time following the exercise of the foregoing termination right, upon written notice to the Company, to revoke and change their votes in respect of the Plan, and (III) notwithstanding any otherwise applicable objection deadline, none of the Company, the Consenting First Lien Lenders, or the Consenting Second Lien Noteholders shall object, contest, or oppose a request by the Consenting Cross-Over Noteholders to adjourn the confirmation hearing by fourteen (14) days, and nothing herein shall prevent the Consenting Cross-Over Noteholders from requesting an adjournment of the confirmation hearing beyond fourteen (14) days or objecting to the Plan (in all cases subject to the Intercreditor Agreement);

(v)     the breach by any Party other than the Terminating Consenting Parties, of (A) any affirmative or negative covenant contained in this Agreement or (B) any other obligations of such breaching Party set forth in this Agreement, in each case, in any material respect (without giving effect to any "materiality" qualifiers set forth therein), and, in either respect, to the extent such breach would have a material adverse effect on the consummation of the Restructuring in accordance with the Term Sheet or the RBL Term Sheet and which breach remains uncured for a period of five (5) calendar days following such breaching Party's receipt of notice pursuant to Section 20 hereof (as applicable);

(vi)     any representation or warranty in this Agreement made by the Company shall have been untrue in any material respect when made or shall have become untrue in any material respect, or the Company violates any of the covenants herein, and such breach remains uncured for a period of ten (10) calendar days following the Company's receipt of notice pursuant to Section 20 hereof (as applicable);

(vii)     the Company files any motion, pleading, or related document with the Bankruptcy Court in a manner that is materially inconsistent with this Agreement, the Term Sheet, or the Plan, and such motion, pleading, or related document has not been withdrawn after three (3) business days of the Company receiving written notice in accordance with Section 20 that such motion, pleading, or related document is materially inconsistent with this Agreement or, the Term Sheet, the RBL Term Sheet or the Plan;

(viii)     the Bankruptcy Court (A) does not enter the Interim Cash Collateral Order on or before the date that is five (5) calendar days after the Petition Date, or (B) does not enter the Final Cash Collateral Order on or before the date that is forty (40) calendar days after the Petition Date, provided, however, that such dates may be extended with the written consent of Requisite First Lien Lenders and Requisite Second Lien Noteholders;

(ix)    the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment, or order enjoining the consummation of or rendering illegal the Plan or the Restructuring or any material portion thereof, and either (A) such ruling, judgment, or order has been issued at the request of or with the acquiescence of the Company, or (B) in all other circumstances, such ruling, judgment, or order has not been reversed or vacated within thirty (30) calendar days after such issuance;

(x)    the Bankruptcy Court (or other court of competent jurisdiction) enters an order (A) directing the appointment of an examiner with expanded powers or a trustee in any of the Chapter 11 Cases, (B) converting any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (C) dismissing any of the Chapter 11 Cases, or (D) the effect of which would render the Plan incapable of consummation on the terms set forth in this Agreement or the Term Sheet;

(xi)    the Company's consensual use of cash collateral has been terminated in accordance with the terms of the Cash Collateral Orders;

(xii)    other than pursuant to any relief sought by the Company that is not materially inconsistent with its obligations under this Agreement or the Plan, the Bankruptcy Court grants relief terminating, annulling, or modifying the automatic stay (as set forth in section 362 of the Bankruptcy Code) with respect to any assets of the Company having an aggregate fair market value in excess of $1 million without the prior written consent of the Requisite Creditors;

(xiii)    the Company files or supports (or fails to timely object to) another party in filing (A) a motion or pleading challenging the amount, validity, or priority of any First Lien Claims, Second Lien Notes Claims, or Third Lien Notes Claims or (B) any plan of reorganization, liquidation, or sale of all or substantially all of the Company's assets, other than the Restructuring set forth herein;

(xiv)    the Company (A) withdraws the Plan, (B) publicly announces or otherwise informs any of the Consenting Parties of its intention not to support the Plan or the Restructuring, (C) files a motion with the Bankruptcy Court seeking the approval of an Alternative Transaction, or (D) agrees to pursue (including, for the avoidance of doubt, as may be evidenced by a term sheet, letter of intent, or similar document) or publicly announces its intent to pursue an Alternative Transaction;

(xv)    if the Definitive Documents and any amendments, modifications, or supplements thereto do not comply with Section 2 or Section 10 of this Agreement, as applicable; provided that such Definitive Documents or amendments, modifications, or supplements thereto were not modified to be consistent with Section 2 or Section 10, as applicable, or withdrawn within five (5) business days following such breaching Party's receipt of notice pursuant to Section 20 hereof;

(xvi)    the Bankruptcy Court enters an order modifying or terminating the Company's exclusive right to file and/or solicit acceptances of a plan of reorganization (including the Plan); or

16

(xvii)   the Effective Date shall not have occurred on or before the date that is ninety (90) calendar days after the Plan Filing Date, provided, however, that such deadline may be extended with the written consent of Requisite First Lien Lenders and Requisite Second Lien Noteholders.

(c)   This Agreement may be terminated by the Company pursuant to this Section 6(c) by the delivery to counsel to the Consenting Parties of a written notice in accordance with Section 20 hereof, upon the occurrence of any of the following events (each, a "Company Termination Event"):

(i)   the breach by one or more of the (A) Consenting Second Lien Noteholders representing in excess of 50.01% of the aggregate principal amount of the Second Lien Notes Claims held by the Consenting Second Lien Noteholders, or (B) Consenting Cross-Over Noteholders representing in excess of 50.01% of the aggregate principal amount of the Third Lien Notes Claims held by the Consenting Cross-Over Noteholders, in each case with respect to any of the representations, warranties, or covenants of such Consenting Parties, as set forth in this Agreement, to the extent such breach would have a material adverse effect on the consummation of the Restructuring, and which breach remains uncured for a period of five (5) calendar days after the receipt by the applicable Consenting Party from the Company of written notice of such breach;

(ii)   the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment, or order enjoining the consummation of or rendering illegal the Plan or the Restructuring or any material portion thereof, and either (A) such ruling, judgment, or order has been issued at the request of or with the acquiescence of the Company, or (B) in all other circumstances, such ruling, judgment, or order has not been reversed or vacated within thirty (30) calendar days after such issuance; or

(iii)   the board of directors, managers, or similar governing body, as applicable, of any Company entity determines that continued performance under this Agreement (including taking any action or refraining from taking any action) would be inconsistent with the exercise of its fiduciary duties under applicable law (as reasonably determined by the Company in good faith after consultation with legal counsel).

(d)   Mutual Termination.   This Agreement may be terminated by mutual agreement of the Company and the Requisite Creditors upon the receipt of written notice delivered in accordance with Section 20 hereof.

(e)   Outside Date.   Any individual Consenting Party shall have the right to terminate this Agreement, as to itself only, if the effective date of the Plan shall not have occurred by the date that is two hundred seventy (270) calendar days after the Petition Date.  In the event a Consenting Party terminates pursuant to this Section 6(e), such termination shall be effective as to such Consenting Party only and shall not affect any of the rights or obligations of any other party to this Agreement.

(f)   Effect of Termination.   Upon the termination of this Agreement in accordance with this Section 6, and except as provided in Section 14 hereof, this Agreement

17

shall forthwith become null and void and of no further force or effect as to all Parties and each Party shall, except as provided otherwise in this Agreement, be immediately released from its liabilities, obligations, commitments, undertakings, and agreements under or related to this Agreement and shall have all the rights and remedies that it would have had and shall be entitled to take all actions, whether with respect to the Restructuring or otherwise, that it would have been entitled to take had (notwithstanding the passage of any applicable deadlines) it not entered into this Agreement; provided, however, that in no event shall any such termination relieve a Party from liability for its breach or non-performance of its obligations hereunder prior to the date of such termination.  Upon any such termination of this Agreement, each Consenting Party may, upon written notice to the Company and the other Parties, revoke its vote or any consents given by such Consenting Party prior to such termination, whereupon any such vote or consent shall automatically be deemed, for all purposes, to be null and void *ab initio* and shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring and this Agreement and such consents or ballots may be changed or resubmitted regardless of whether the applicable voting deadline has passed (without the need to seek a court order or consent from the Company allowing such change or resubmission).

## 7. Definitive Documents; Good Faith Cooperation; Further Assurances.

Subject to the terms and conditions described herein, during the Plan Support Period, each Party, severally and not jointly, hereby covenants and agrees to reasonably cooperate with each other in good faith in connection with the negotiation, drafting, execution, and delivery of the Definitive Documents.  Furthermore, subject to the terms and conditions hereof, each of the Parties shall take such action as may be reasonably necessary or reasonably requested by the other Parties to carry out the purposes and intent of this Agreement, including making and filing any required regulatory filings (provided, however, that no Consenting Party shall be required to incur any out of pocket cost or expense, or any liability in connection therewith).

## 8. Representations and Warranties.

(a)     Each Party, severally and not jointly, represents and warrants to the other Parties that the following statements are true, correct, and complete as of the date hereof (or as of the date a Consenting Party becomes a party hereto):

(i)     such Party is validly existing and in good standing under the laws of its jurisdiction of incorporation or organization, and has all requisite corporate, partnership, limited liability company, or similar authority to enter into this Agreement and carry out the transactions contemplated hereby and perform its obligations contemplated hereunder; and the execution and delivery of this Agreement and the performance of such Party's obligations hereunder have been duly authorized by all necessary corporate, limited liability company, partnership, or other similar action on its part;

(ii)     the execution, delivery, and performance by such Party of this Agreement does not and will not (A) violate any provision of law, rule, or regulation applicable to it, its charter, or its bylaws (or other similar governing documents), or (B) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any material

contractual obligation to which it is a party (except to the extent such conduct is consented to by the counterparty thereto or the Requisite Creditors relevant thereto);

               (iii)    the execution, delivery, and performance by such Party of this Agreement does not and will not require any registration or filing with, consent or approval of, or notice to, or other action, with or by, any federal, state, or governmental authority or regulatory body, except such filings as may be necessary and/or required by the SEC; and

               (iv)    this Agreement is the legally valid and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium, or other similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability or a ruling of the Bankruptcy Court.

        (b)    Each Consenting Party severally (and not jointly) represents and warrants to the Company that, as of the date hereof (or as of the date such Consenting Party becomes a party hereto), such Consenting Party (i) is the beneficial owner of the aggregate principal amount of First Lien Claims, Second Lien Notes Claims, Third Lien Notes Claims, and/or GUC Claims (as applicable) set forth below its name on the signature page hereof (or below its name on the signature page of a Transfer Agreement for any Consenting Party that becomes a party hereto after the date hereof), and/or (ii) has, with respect to the beneficial owners of such First Lien Claims, Second Lien Notes, Third Lien Notes, and/or GUC Claims (as applicable), (A) sole investment or voting discretion with respect to such First Lien Claims, Second Lien Notes, Third Lien Notes, and/or GUC Claims (as applicable), (B) full power and authority to vote on and consent to matters concerning such First Lien Claims, Second Lien Notes, Third Lien Notes, and/or GUC Claims (as applicable), or to exchange, assign, and transfer such First Lien Claims, Second Lien Notes, Third Lien Notes, and/or GUC Claims (as applicable), and (C) full power and authority to bind or act on the behalf of, such beneficial owners.

        **9.**    **Disclosure; Publicity**.

        (a)    On or before the Petition Date, the Company shall disseminate a press release disclosing the existence of this Agreement and the terms hereof and of the Plan (including any schedules and exhibits thereto that are filed with the Bankruptcy Court on the Petition Date) with such redactions as may be reasonably requested by counsel to any Consenting Party to maintain the confidentiality of the items provided below in Section 9(b), except as otherwise required by law.

        (b)    The Company shall make commercially reasonably efforts to submit drafts to counsel to the Consenting Parties of any press releases, public documents, and any and all filings with the SEC that constitute disclosure of the existence or terms of this Agreement or any amendment to the terms of this Agreement at least one (1) business day prior to making any such disclosure, and shall afford them a reasonable opportunity under the circumstances to comment on such documents and disclosures and shall consider any such comments in good faith. Except as required by law or otherwise permitted under the terms of any other agreement between the Company on the one hand, and any Consenting Party, on the other hand, no Party or its advisors (including counsel to any Party) shall disclose to any person or entity (including, for the

avoidance of doubt, any other Consenting Party), other than advisors to the Company, the principal amount or percentage of any First Lien Claims, Second Lien Notes Claims, Third Lien Notes Claims, GUC Claims, or any other securities of the Company held by any Party, in each case, without such Party's prior written consent; provided, however, that (i) if such disclosure is required by law, subpoena, or other legal process or regulation, the disclosing Party shall afford the relevant Party a reasonable opportunity to review and comment in advance of such disclosure and shall take all reasonable measures to limit such disclosure (the expense of which, if any, shall be borne by the relevant disclosing Party) and (ii) the foregoing shall not prohibit the disclosure of the aggregate percentage or aggregate principal amount of First Lien Claims, Second Lien Notes Claims, Third Lien Notes Claims, or GUC Claims held by all Consenting Parties.  Notwithstanding the provisions in this Section 9, any Party may disclose, to the extent consented to in writing by a duly authorized officer or representative of the affected Consenting Party (including Section 11 hereof), such Consenting Party's individual holdings.

## 10.   **Amendments and Waivers**.

During the Plan Support Period, this Agreement, including any exhibits or schedules hereto, may not be waived, modified, amended, or supplemented except in a writing signed by the Company and the Requisite First Lien Lenders and Requisite Second Lien Noteholders; provided, however, that (i) any modification, amendment, or change to the definition of Requisite First Lien Lenders shall require the prior written consent of each Consenting First Lien Lender, (ii) any modification, amendment, or change to the definition of Requisite Second Lien Noteholders shall require the prior written consent of each Consenting Second Lien Noteholder that is a member of the Consenting Second Lien Ad Hoc Committee, (iii) any modification, amendment, or change to the definition of the Requisite Cross-Over Noteholders shall require the prior written consent of each Consenting Cross-Over Noteholder that is a member of the Consenting Cross-Over Ad Hoc Committee, (iv) any modification, amendment or change solely with respect to any provision directly and negatively impacting the Consenting Cross-Over Noteholders shall require the prior written consent of the Requisite Cross-Over Noteholders, and (v) any modification, amendment, or change to this Section 10 or the definition of Requisite Creditors shall require the prior written consent of each Requisite Creditor; provided further, however, that any waiver, modification, amendment or supplement that disproportionately and adversely affects the economic recoveries or treatment of any Consenting Party under the Plan may not be made without the prior written consent of each such adversely affected Consenting Party.

## 11.   **Effectiveness.**

This Agreement shall become effective and binding on the Parties on the Plan Support Effective Date, and not before such date; provided, however, that signature pages executed by Consenting Parties shall be delivered to (a) counsel to the First Lien Agent, in redacted form, (b) counsel to the Consenting Second Lien Ad Hoc Committee, as applicable, in redacted form, (c) counsel to the Consenting Cross-Over Ad Hoc Committee, as applicable, in redacted form, and (d) the Company and its counsel in an unredacted form (to be held on a confidential basis by such counsel in accordance with Section 9 hereof).

Notwithstanding any language herein to the contrary, any Consenting First Lien Lender shall have executed solely in such capacity as a First Lien Lender and shall be committing solely with respect to the First Lien Claims held by such Lender, without regard to whether that institution, entity or any affiliate thereof may acquire or hold Second Lien Note Claims or Third Lien Note Claims.

## 12. <u>GOVERNING LAW; JURISDICTION; WAIVER OF JURY TRIAL</u>.

(a)     This Agreement shall be construed and enforced in accordance with, and the rights of the Parties shall be governed by, the law of the State of New York, without giving effect to the conflicts of law principles thereof.

(b)     Each of the Parties irrevocably agrees that any legal action, suit, or proceeding arising out of or relating to this Agreement brought by any party or its successors or assigns shall be brought and determined in any federal or state court in the Borough of Manhattan, the City of New York, and each of the Parties hereby irrevocably submits to the exclusive jurisdiction of the aforesaid courts for itself and with respect to its property, generally and unconditionally, with regard to any such proceeding arising out of or relating to this Agreement or the Restructuring Transactions.  Each of the Parties agrees not to commence any proceeding relating hereto or thereto except in the courts described above in New York or in the Bankruptcy Court, other than proceedings in any court of competent jurisdiction to enforce any judgment, decree, or award rendered by any such court in New York as described herein.  Each of the Parties further agrees that notice as provided herein shall constitute sufficient service of process and the Parties further waive any argument that such service is insufficient.  Subject to the foregoing, each of the Parties hereby irrevocably and unconditionally waives, and agrees not to assert, by way of motion or as a defense, counterclaim, or otherwise, in any proceeding arising out of or relating to this Agreement or the Restructuring Transactions, (i) any claim that it is not personally subject to the jurisdiction of the courts in New York as described herein for any reason, (ii) that it or its property is exempt or immune from jurisdiction of any such court or from any legal process commenced in such courts (whether through service of notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment, or otherwise) and (iii) that (A) the proceeding in any such court is brought in an inconvenient forum, (B) the venue of such proceeding is improper, or (C) this Agreement, or the subject matter hereof, may not be enforced in or by such courts.  Notwithstanding the foregoing, during the pendency of the Chapter 11 Cases, all proceedings contemplated by this <u>Section 12(b)</u> shall be brought in the Bankruptcy Court.

(c)     EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT, OR ANY OTHER THEORY). EACH PARTY (I) CERTIFIES THAT NO REPRESENTATIVE, AGENT, OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY,

AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

        **13.**      **Specific Performance/Remedies**.

It is understood and agreed by the Parties that money damages would not be a sufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (including attorneys' fees and costs) as a remedy of any such breach, without the necessity of proving the inadequacy of money damages as a remedy, including an order of the Bankruptcy Court requiring any Party to comply promptly with any of its obligations hereunder.

        **14.**      **Survival**.

Notwithstanding the termination of this Agreement pursuant to Section 6 hereof, (a) the Company's obligations in Section 24 of this Agreement accrued up to and including termination of this Agreement, and (b) the agreements and obligations of the Parties set forth in the following Sections:   4, 6(b)(iv), 6(f), 9, 11, 12, 13, 15, 16, 17, 18, 19, 20, 21, 22, and 23 hereof (and any defined terms used in any such Sections) shall survive such termination and shall continue in full force and effect for the benefit of the Consenting Parties in accordance with the terms hereof; provided, however, that any liability of a Party for failure to comply with the terms of this Agreement shall survive such termination.

        **15.**      **Headings**.

The headings of the sections, paragraphs, and subsections of this Agreement are inserted for convenience only and shall not affect the interpretation hereof or, for any purpose, be deemed a part of this Agreement.

        **16.**      **Successors and Assigns; Severability; Several Obligations**.

This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors, permitted assigns, heirs, executors, administrators, and representatives; provided, however, that nothing contained in this Section 16 shall be deemed to permit Transfers of interests in the First Lien Claims, Second Lien Notes Claims, Third Lien Notes Claims, and/or GUC Claims other than in accordance with the express terms of this Agreement.   If any provision of this Agreement, or the application of any such provision to any person or entity or circumstance, shall be held invalid or unenforceable in whole or in part, such invalidity or unenforceability shall attach only to such provision or part thereof and the remaining part of such provision hereof and this Agreement shall continue in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party.   Upon any such determination of invalidity, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a reasonably acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible. The agreements, representations, and obligations of the Parties are, in all respects, several and neither joint nor joint and several.

17.     **No Third-Party Beneficiaries**.

Unless expressly stated otherwise herein, this Agreement shall be solely for the benefit of the Parties and no other person or entity shall be a third-party beneficiary hereof.

18.     **Prior Negotiations; Entire Agreement**.

This Agreement, including the exhibits and schedules hereto, constitutes the entire agreement of the Parties, and supersedes all other prior negotiations (whether written, verbal or otherwise), with respect to the subject matter hereof and thereof, except that the Parties acknowledge that any confidentiality agreement and/or non-disclosure agreement (if any) heretofore executed between the Company and any Consenting Party shall continue in full force and effect in accordance with its terms.

19.     **Counterparts**.

This Agreement may be executed in several counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same agreement. Execution copies of this Agreement may be delivered by facsimile, electronic mail, or otherwise, which shall be deemed to be an original for the purposes of this paragraph.

20.     **Notices**.

All notices hereunder shall be deemed given if in writing and delivered, if contemporaneously sent by electronic mail, facsimile, courier, or by registered or certified mail (return receipt requested) to the following addresses and facsimile numbers:

(1)     If to the Company, to:

Midstates Petroleum Company
321 South Boston Avenue, Suite 1000
Tulsa, Oklahoma 74103
Attention: Scott C. Weatherholt
           (scott.weatherholt@midstatespetroleum.com)
           Nelson M. Haight
           (nelson.haight@midstatespetroleum.com)

With a copy to:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Attention:   Edward O. Sassower, P.C.
                    (esassower@kirkland.com)
                    Joshua A. Sussberg, P.C.
                    (joshua.sussberg@kirkland.com)

        - and -

Kirkland & Ellis LLP
300 North LaSalle
Chicago, Illinois 60654
Attention:  William A. Guerrieri
                    (will.guerrieri@kirkland.com)
                    Jason B. Gott
                    (jason.gott@kirkland.com)


(2)      If to the First Lien Agent, to:

Sun Trust Bank, N.A.
401 Commerce Street, Suite 2100
Nashville, Tennessee 37219
Attention:  Jan Naifeh
                    (jan.naifeh@suntrust.com)
                    T. Michael Logan
                    (mike.logan@suntrust.com)

With a copy to:

Mayer Brown LLP
700 Louisiana Street, #3400
Houston, Texas 77002
Attention:  Charles S. Kelley
                    ckelley@mayerbrown.com
                    Rick Hyman
                    fhyman@mayerbrown.com

(3)      If to a Consenting Noteholder that is a member of the Consenting Second
Lien Ad Hoc Committee, to the addresses or facsimile numbers set forth below
following such Consenting Noteholder's signature, as the case may be, with a copy
to:

Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, New York 10017
Attention: Brian Resnick
     (brian.resnick@davispolk.com)
     Natasha Tsiouris
     (natasha.tsiouris@davispolk.com)

(4)     If to a Consenting Noteholder that is a member of the Consenting Cross-Over Ad Hoc Committee, to the addresses or facsimile numbers set forth below following such Consenting Noteholder's signature, as the case may be, with a copy to:

Milbank, Tweed, Hadley & McCloy LLP
28 Liberty Street
New York, New York 10005
Attention:    Dennis Dunne
         (ddunne@milbank.com)
         Tyson Lomazow
         (tlomazow@milbank.com)

(5)     If to a Consenting Noteholder that is not a member of the Consenting Second Lien Ad Hoc Committee or of the Consenting Cross-Over Ad Hoc Committee, to the addresses or facsimile numbers set forth below or on a Transfer Agreement following such Consenting Noteholder's signature, as the case may be.

Any notice given by electronic mail, facsimile, delivery, mail, or courier shall be effective when received.

## 21.    <u>Reservation of Rights; No Admission</u>.

(a)     Nothing contained herein shall (i) limit (A) the ability of any Party to consult with other parties or entities, or (B) the rights of any Party under any applicable bankruptcy, insolvency, foreclosure, or similar proceeding, including, without limitation, the right to appear as a party in interest in any matter to be adjudicated in order to be heard concerning any matter arising in the Chapter 11 Cases, in each case, so long as such consultation or appearance is consistent with such Party's obligations hereunder, or under the terms of the Plan; (ii) limit the ability of any Consenting Party to sell or enter into any transactions in connection with the First Lien Claims, Second Lien Notes Claims, Third Lien Notes Claims, GUC Claims, or any other interests in the Company, subject to the terms of Section 3(b) hereof; (iii) limit the rights of any Consenting Party under the First Lien Credit Agreement, the Second Lien Indenture, the Third Lien Indenture, the Unsecured Notes Indentures, or any agreements executed in connection with the foregoing; or (iv) constitute a waiver or amendment of any provision of the First Lien Credit Agreement, the Second Lien Indenture, the Third Lien Indenture, the Unsecured Notes Indentures, or any agreements executed in connection with the foregoing.

(b)     Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict the ability of each of the Parties to protect and preserve its rights, remedies, and interests, including, without limitation, its claims against any of the other Parties (or their respective affiliates or subsidiaries) or its full participation in the Chapter 11 Cases.  This Agreement and the Plan are part of a proposed settlement of matters that could otherwise be the subject of litigation among the Parties. Pursuant to Rule 408 of the Federal Rule of Evidence, any applicable state rules of evidence and any other applicable law, foreign or domestic, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms.  This Agreement shall in no event be construed as or be deemed to be evidence of an admission or concession on the part of any Party of any claim or fault or liability or damages whatsoever.  Each of the Parties denies any and all wrongdoing or liability of any kind and does not concede any infirmity in the claims or defenses which it has asserted or could assert.

(c)     Notwithstanding anything herein to the contrary, nothing in this Agreement and neither a vote to accept the Plan by any Consenting Party nor the acceptance of the Plan by any Consenting Party shall (a) be construed to prohibit any Consenting Party from contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement or the Definitive Documents, or exercising rights or remedies specifically reserved herein, or (b) impair or waive the rights of any Consenting Party to assert or raise any objection permitted  under this Agreement in connection with any hearing on confirmation of the Plan or in the Bankruptcy Court.

## 22.     Relationship Among Consenting Parties.

(a)     It is understood and agreed that no Consenting Party has any duty of trust or confidence in any kind or form with any other Consenting Party, and, except as expressly provided in this Agreement, there are no commitments among or between them.  In this regard, it is understood and agreed that any Consenting Party may trade in the First Lien Claims, Second Lien Notes Claims, Third Lien Notes Claims, and/or GUC Claims, or other equity securities of the Company without the consent of the Company or any other Consenting Party, subject to applicable securities laws, the terms of this Agreement, and any confidentiality agreement and/or non-disclosure agreement entered into with the Company; provided, however, that no Consenting Party shall have any responsibility for any such trading to any other person or entity by virtue of this Agreement.  No prior history, pattern, or practice of sharing confidences among or between the Consenting Parties shall in any way affect or negate this understanding and agreement.

## 23.     No Solicitation; Representation by Counsel; Adequate Information.

(a)     This Agreement is not and shall not be deemed to be a solicitation for votes in favor of the Plan in the Chapter 11 Cases.  The acceptances of the Consenting Parties with respect to the Plan will not be solicited until such Consenting Party has received the Disclosure Statement and related ballots and solicitation materials, each as approved by the Bankruptcy Court.

(b)     Each Party acknowledges that it has had an opportunity to receive information from the Company and that it has been represented by counsel in connection with this Agreement and the transactions contemplated hereby. Accordingly, any rule of law or any legal decision that would provide any Party with a defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal counsel shall have no application and is expressly waived.

(c)     Although none of the Parties intends that this Agreement should constitute, and they each believe it does not constitute, a solicitation or acceptance of a chapter 11 plan of reorganization or an offering of securities, each Consenting Party acknowledges, agrees, and represents to the other Parties that it (i) is an "accredited investor" as such term is defined in Rule 501(a) of the Securities Act of 1933 (the "**Securities Act**"), (ii) understands that any securities to be acquired by it pursuant to the Restructuring Transactions have not been registered under the Securities Act and that such securities are, to the extent not acquired pursuant to section 1145 of the Bankruptcy Code, being offered and sold pursuant to an exemption from registration contained in the Securities Act, based in part upon such Consenting Party's representations contained in this Agreement, and cannot be sold unless subsequently registered under the Securities Act or an exemption from registration is available, and (iii) has such knowledge and experience in financial and business matters that such Consenting Party is capable of evaluating the merits and risks of the securities to be acquired by it pursuant to the Restructuring Transactions and understands and is able to bear any economic risks with such investment.

## 24.     Fees and Expenses

(a)     Subject to <u>Section 14</u> of this Agreement, during the Plan Support Period, the Company shall pay all pre- and postpetition reasonable and documented fees and expenses of (A) the First Lien Agent and its advisors, including, without limitation, the fees and expenses of (1) Mayer Brown LLP, as counsel to the First Lien Agent, (2) local counsel to the First Lien Agent, and (3) FTI Consulting, Inc., as financial advisor to the First Lien Agent; (B) the Consenting Second Lien Ad Hoc Committee and its advisors, including, without limitation, the fees and expenses of (1) Davis Polk & Wardwell LLP, as counsel to the Consenting Second Lien Ad Hoc Committee, (2) local counsel to the Consenting Second Lien Ad Hoc Committee, and (3) Houlihan Lokey Capital, Inc., as financial advisor to the Consenting Second Lien Ad Hoc Committee; and (C) the Consenting Cross-Over Ad Hoc Committee, and their advisors, including, without limitation, the fees and expenses of (1) Milbank, Tweed, Hadley & McCloy LLP, as counsel to the Consenting Cross-Over Ad Hoc Committee, (2) local counsel to the Consenting Cross-Over Ad Hoc Committee, and (3) Centerview Partners LLC, as financial advisors to the Consenting Cross-Over Ad Hoc Committee; <u>provided</u>, <u>however</u>, that the Company shall not be responsible for any fees or expenses referenced in subclause (C) hereof incurred in connection with any litigation (or preparation thereof) against, or adverse to, the Company, the First Lien Agent, the holders of First Lien Claims, the Second Lien Notes Trustee and the holders of Second Lien Notes Claims.

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed and delivered by their respective duly authorized officers, solely in their respective capacity as officers of the undersigned and not in any other capacity, as of the date first set forth above.

**Company Signature Page to the Plan Support Agreement**

MIDSTATES PETROLEUM COMPANY, INC.
MIDSTATES PETROLEUM COMPANY LLC

By: _____
Name: *Nelson M. Haight*
Title: *Executive Vice President + Chief Financial Officer*

*[Signature Page to Plan Support Agreement]*

[*Creditor Signature Pages Redacted*]

**EXHIBIT A**

**Term Sheet**

# MIDSTATES PETROLEUM COMPANY, INC.

## RESTRUCTURING TERM SHEET

This non-binding indicative term sheet (the "Restructuring Term Sheet") sets forth the principal terms of a financial restructuring (the "Restructuring") of the existing debt and other obligations of the Company (as defined herein). The Restructuring will be consummated through cases under chapter 11 (the "Chapter 11 Case(s)") of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court"), in accordance with the terms of a plan support agreement (the "PSA") to be executed by the Company, the Administrative Agent, the 2012 Credit Facility Lenders, the members of the Second Lien Group and the members of the Cross-Over Group (each as defined below, and together, the "Parties").

THIS RESTRUCTURING TERM SHEET DOES NOT CONSTITUTE (NOR SHALL IT BE CONSTRUED AS) AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS AS TO ANY PLAN, IT BEING UNDERSTOOD THAT SUCH A SOLICITATION, IF ANY, ONLY WILL BE MADE IN COMPLIANCE WITH APPLICABLE PROVISIONS OF SECURITIES, BANKRUPTCY AND/OR OTHER APPLICABLE LAWS.

THE TRANSACTIONS DESCRIBED HEREIN WILL BE SUBJECT TO THE NEGOTIATION AND COMPLETION OF DEFINITIVE DOCUMENTS INCORPORATING THE TERMS SET FORTH HEREIN AND THE CLOSING OF ANY TRANSACTION SHALL BE SUBJECT TO THE TERMS AND CONDITIONS SET FORTH IN SUCH AGREED DEFINITIVE DOCUMENTS.

| *The Parties* | |
|---|---|
| Company | Midstates Petroleum Company, Inc. and Midstates Petroleum Company LLC shall be collectively referred to as "Midstates" or, the "Company," and, as reorganized pursuant to the Restructuring, "Reorganized Midstates." |
| 2012 Credit Facility Lenders | The lenders (collectively, the "2012 Credit Facility Lenders") under that certain Second Amended and Restated Credit Agreement, dated as of June 8, 2012, by and among Midstates Petroleum Company, Inc., as Parent, Midstates Petroleum Company LLC, as borrower, the banks and other financial institutions named therein as lenders, SunTrust Bank, N.A. as administrative agent, swing line lender, issuing lender, and lender (the "Administrative Agent"), and the other mandated lead arranger, bookrunner parties, syndication agent, and co-documentation agents thereto, by which the lenders made available to Midstates a reserve based senior secured revolving credit facility (as amended, restated, modified or supplemented from time to time prior to the date hereof, the "2012 Credit Facility"). As of the date hereof, approximately $249.2 million of the principal amount remains outstanding under the 2012 Credit Facility, plus accrued and unpaid interest and outstanding letters of credit in the approximate amount of $2.8 million. |

| | |
|---|---|
| Second Lien Noteholders | The holders (collectively, the "Second Lien Noteholders") of the 10.0% Second Lien Senior Secured Notes Due 2020 issued pursuant to that certain Indenture dated as of May 21, 2015, among Midstates Petroleum Company, Inc. and Midstates Petroleum Company LLC, as issuers, and Wilmington Trust, N.A. (in such capacity, the "Second Lien Trustee"), as Trustee and Collateral Agent (as may be amended and restated from time to time, the "Second Lien Notes").  As of the date hereof, approximately $625.0 million of the principal amount remains outstanding under the Second Lien Notes, plus accrued and unpaid interest. |
| Third Lien Noteholders | The holders (collectively, the "Third Lien Noteholders") of the 12.0% Third Lien Senior Secured Notes Due 2020 issued pursuant to that certain Indenture dated as of May 21, 2015, among Midstates Petroleum Company, Inc. and Midstates Petroleum Company LLC, as issuers, and Wilmington Trust, N.A. (in such capacity, the "Third Lien Trustee"), as Trustee and Collateral Agent (as may be amended and restated from time to time, the "Third Lien Notes").  As of the date hereof, approximately $529.7 million of the principal amount remains outstanding under the Third Lien Notes, plus accrued and unpaid interest. |
| 10.75% Unsecured Noteholders | The holders (collectively, the "10.75% Unsecured Noteholders") of the 10.75% Senior Notes Due 2020 issued pursuant to that certain Indenture dated as of October 1, 2012, among Midstates Petroleum Company, Inc. and Midstates Petroleum Company LLC, as issuers, and Wells Fargo Bank , N.A., as Trustee (as may be amended and restated from time to time, the "10.75% Unsecured Notes").  As of the date hereof, approximately $293.6 million of the principal amount remains outstanding under the 10.75% Unsecured Notes, plus accrued and unpaid interest. |
| 9.25% Unsecured Noteholders | The holders (collectively, the "9.25% Unsecured Noteholders," and together with the 10.75% Unsecured Noteholders, the "Unsecured Noteholders") of the 9.25% Senior Notes Due 2021 issued pursuant to that certain Indenture dated as of May 31, 2013, among Midstates Petroleum Company, Inc. and Midstates Petroleum Company LLC, as issuers, and Wells Fargo Bank, N.A., as Trustee (as may be amended and restated from time to time, the "9.25% Unsecured Notes," and together with the 10.75% Unsecured Notes, the "Unsecured Notes").  As of the date hereof, approximately $347.7 million of the principal amount remains outstanding under the 9.25% Unsecured Notes, plus accrued and unpaid interest. |
| Lien Trade Creditors | The holders (collectively, the "Lien Trade Creditors") of claims against the Company arising from the provision to the Company of goods or services, which claims may be secured by valid and enforceable liens or security interests, whether pursuant to an agreement with the |

2

| | |
|---|---|
| | Company or applicable law (the "Lien Trade Claims"). |
| General Unsecured Claims | The holders (collectively, the "General Unsecured Creditors"), other than the Unsecured Noteholders, of unsecured claims against the Company, including, without limitation, claims arising from the rejection of any executory contract or unexpired lease in connection with the Chapter 11 Cases. |
| Ad Hoc Noteholder Groups | The ad hoc group of Second Lien Noteholders (the "Second Lien Group") and the ad hoc group of certain holders of both Second Lien Notes and Third Lien Notes (the "Cross-Over Group"). |
| ***The Settlement*** | |
| Intercreditor Settlement | In accordance with and subject to the terms and conditions of the PSA, the PSA and the chapter 11 plan described herein (the "Plan") shall be proposed and supported by the Company in its Chapter 11 Cases and shall incorporate and implement the terms of the intercreditor settlement (the "Settlement") among the Company, the Administrative Agent, the 2012 Credit Facility Lenders, the members of the Second Lien Group, and the members of the Cross-Over Group as described below: |
| | • agreement among the Parties on a valuation allocation with respect to the Company's assets that are encumbered by valid, perfected and enforceable liens (the "Prepetition Collateral") and any of the Company's assets that are unencumbered as of the Petition Date (as defined below) (the "Unencumbered Assets"), such that the New Midstates Equity (as defined below) will be allocated ninety-eight and eight-tenths percent (98.8%) on account of Prepetition Collateral and one and two-tenths percent (1.2%) on account of Unencumbered Assets, which valuation allocation reflects the Debtors good faith determination of their encumbered and unencumbered assets as of the Petition Date; *provided* that the Administrative Agent, on behalf of the 2012 Credit Facility Lenders, and the Second Lien Trustee, on behalf of the Second Lien Noteholders, shall be granted a provisional claim and lien on the Unencumbered Assets as part of their respective adequate protection packages under the cash collateral order to be entered by the Court at the outset of the Chapter 11 Cases, which adequate protection claim and lien shall be waived only if the Settlement is consummated. |
| | • agreement by the Administrative Agent, the 2012 Credit Facility Lenders, the Second Lien Trustee and the Second Lien Lenders to waive any adequate protection claim, under section 507(b) of the Bankruptcy Code or otherwise, as it relates to any |

diminution in value with respect to the Prepetition Collateral, solely to the extent that such adequate protection claim would otherwise be satisfied through a claim against and lien on the Unencumbered Assets (the "Diminution in Value Claim"); *provided*, *however*, that in the event of any challenge to the Settlement and/or the Plan by the statutory committee of unsecured creditors appointed in the Company's Chapter 11 Cases (the "Committee"), any Unsecured Noteholder or any General Unsecured Creditor (and together with the Committee and the Unsecured Noteholders, the "General Unsecured Parties"), the Diminution in Value Claim will not be waived, the contingent adequate protection claim and lien will attach to the Unencumbered Assets, and will include, without limitation, all estate fees and costs associated with any General Unsecured Party's challenge to the Settlement or the Plan (i.e., a dollar-for-dollar reduction will occur in the value of the recovery for the General Unsecured Creditors and the Unsecured Noteholders for the fees and costs incurred or reimbursed by the Debtors' estates in connection with defending or prosecuting any such challenge);

- agreement by the Second Lien Noteholders and the Third Lien Noteholders to waive any deficiency claims otherwise assertable as General Unsecured Claims (the "Noteholder Deficiency Claims") or giving rise to the right to share *pro rata* in any distribution available to holders of General Unsecured Claims, including the Noteholders; *provided*, *however*, that in the event of any challenge to the Settlement and/or the Plan by any General Unsecured Party, the Noteholder Deficiency Claims shall share pro rata in any recovery available to the class of General Unsecured Creditors;

- agreement by: (i) the Third Lien Noteholders to waive any and all objections or challenges to, or arguments opposing confirmation of, the Plan, and any and all claims, causes of action or other challenges against the Second Lien Noteholders and the Second Lien Trustee (the "Second Lien Secured Parties") regardless of whether the Settlement is approved by the Bankruptcy Court but only to the extent the PSA remains in full force and effect, in full and final resolution of all disputes and claims between the Second Lien Secured Parties and the Third Lien Noteholders and the Third Lien Trustee (the "Third Lien Secured Parties"), including, without limitation, valuation issues and any rights of the Third Lien Noteholders as General Unsecured Creditors (the "Third Lien Waiver"), (ii) the Second Lien Noteholders to waive any and all objections or challenges to, or arguments opposing confirmation of, the Plan, and any and all claims, causes of action or other challenges against the Third Lien Secured Parties regardless of whether the Settlement is approved by the Bankruptcy Court but only to the

4

extent the PSA remains in full force and effect, in full and final resolution of all disputes and claims between the Second Lien Secured Parties and the Third Lien Secured Parties, including, without limitation, valuation issues and any rights of the Second Lien Noteholders as General Unsecured Creditors (the "Second Lien Waiver" and, together with the Third Lien Waiver, the "Waivers"), and (iii) the Second Lien Noteholders that the Third Lien Noteholders shall receive through the Plan their pro rata share of two and one-half percent (2.5%) of the equity interests in Reorganized Midstates (the "New Midstates Equity") and 3.5-year, out of the money, standard warrants for fifteen percent (15%) of the New Midstates Equity struck at a strike price of $600 million (the "Third Lien Intercreditor Settlement" and, together with the Waivers, the "$2^{nd}/3^{rd}$ Lien Plan Settlement"), provided that the PSA remains in full force and effect.   The Waivers are granted by the Second Lien Noteholders and the Third Lien Noteholders in consideration of the Second Lien Noteholders and Third Lien Noteholders' willingness to enter into the Third Lien Intercreditor Settlement.

The Debtors shall use their commercially reasonable efforts to obtain language in the order approving the Disclosure Statement providing that the Waivers shall be binding on the Second Lien Secured Parties and the Third Lien Secured Parties to the extent the PSA remains in full force and effect.

The Plan filed on or about the Petition Date will be consistent in all material respects with the terms of the Settlement.

If the Settlement is not approved in connection with confirmation of the Plan, the Plan (pursuant to its terms) will be automatically deemed modified to exclude: (i) the Third Lien Intercreditor Settlement and (ii) the waiver of (a) the Diminution in Value Claim and (b) the Noteholder Deficiency Claims by the 2012 Credit Facility Lenders, the Second Lien Noteholders, and the Third Lien Noteholders (as applicable).

To the extent the Settlement is not approved in connection with confirmation of the Plan, the Diminution in Value Claim, including all fees and costs associated with defending any challenge to the Settlement or to the Plan, will be determined in connection with confirmation of the Plan and the litigation schedule to be set and approved in connection with approval of the disclosure statement related to the Plan.

For the avoidance of doubt, the $2^{nd}/3^{rd}$ Lien Plan Settlement will bind the Second Lien Noteholders and the Third Lien Noteholders (including, for the avoidance of doubt, the Second Lien Group and the Cross-Over Group) in the event the Plan is immaterially modified,

| | altered, or revised, or any or all of the Settlement is approved as part of the Plan. |
|---|---|
| ***The Restructuring*** | |
| Definitions | "<u>Excess Cash</u>" means cash in an amount equal to any cash remaining on any of the Debtors' balance sheets as of the Plan Effective Date, less (a) the amount of cash to be paid to holders of the 2012 Facility Claims (as defined below) on the Plan Effective Date, less (b) all payments of cash and reserves of cash required under the Plan (other than distributions of cash on account of Second Lien Note Claims (as defined below), including, but not limited to, payments and reserves on account of administrative claims, priority claims, tax claims, and transaction and professional fees, less (c) $110 million (the minimum amount of cash needed for the Debtors' balance sheets as agreed to by the Debtors, the 2012 Credit Facility Lenders and the Second Lien Group); *provided* that the amount of Excess Cash shall be no greater than $60 million. |
| Treatment of Claims/Equity Interests | The Plan will provide that each holder of an allowed claim will receive the following on or as soon as practicable after the effective date of the Plan (the "<u>Plan Effective Date</u>"), unless different treatment is agreed to by the holder of such allowed claim and the Company: <br><br> • *Administrative, Priority, and Priority Tax Claims*: Allowed administrative, priority, and tax claims will be satisfied in full, in cash, or otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code. <br><br> • *2012 Credit Facility Claims*: On the Plan Effective Date, the holders of allowed claims under the 2012 Facility shall have an allowed claim in the approximate principal amount of $252,000,000, plus accrued interest and fees (the "<u>2012 Facility Claims</u>"). Holders of 2012 Facility Claims will receive their pro rata share of (i) approximately $82 million in cash and (ii) the New Credit Facility (in each case, on the terms and conditions as set forth in the RBL Term Sheet attached as Exhibit B to the PSA). <br><br> • *Second Lien Notes Claims*: On the Plan Effective Date, the holders of allowed claims under the Second Lien Notes shall have an allowed claim in the principal amount of $625,000,000, plus accrued interest and fees (the "<u>Second Lien Notes Claims</u>"). Holders of Second Lien Notes Claims will receive their pro rata share of (a) ninety-six and three-tenths percent (96.3%) of the New Midstates Equity and (b) the Excess Cash; *provided*, *however*, if the Settlement is not approved and consummated as part of the Plan, holders of Second Lien Note Claims will instead receive their pro rata share of (x) ninety-eight and eight-tenths percent (98.8%) of the New Midstates Equity, (y) the Excess Cash, and (z) their pro |

rata share of the Unencumbered Assets Equity Distribution (as defined below) on account of the Noteholder Deficiency Claims held by such holders of Second Lien Notes Claims.

- *Third Lien Notes Claims*:  On the Plan Effective Date, the holders of allowed claims under the Third Lien Notes shall have an allowed claim in the principal amount of $529,653,388, plus accrued interest and fees (the "<u>Third Lien Notes Claims</u>").  Holders of Third Lien Notes Claims will receive their pro rata share of the Third Lien Intercreditor Settlement if the Settlement is consummated as part of the Plan in accordance with the terms of the PSA.  For the avoidance of doubt, if the Settlement is not approved and consummated as part of the Plan, the holders of the Third Lien Notes Claims shall receive only their pro rata share of the Unencumbered Assets Equity Distribution on account of the Noteholder Deficiency Claims held by the holders of Third Lien Notes Claims (and shall not receive the Third Lien Intercreditor Settlement).

- *10.75% Unsecured Notes Claims and 9.25% Unsecured Notes Claims*:  On the Plan Effective Date, the holders of allowed claims under the 10.75% Unsecured Notes shall have an allowed claim in the principal amount of $293,626,000, plus accrued interest and fees (the "<u>10.75% Unsecured Notes Claims</u>") and the holders of allowed claims under the 9.25% Unsecured Notes shall have an allowed claim in the principal amount of $347,651,000, plus accrued interest and fees (the "<u>9.25% Unsecured Notes Claims</u>," and together with the 10.75% Unsecured Notes Claims, the "<u>Unsecured Notes Claims</u>")).  Holders of Unsecured Notes Claims will receive their pro rata share of one and two-tenths percent (1.2%) of the New Midstates Equity on account of the Company's unencumbered assets (the "<u>Unencumbered Assets Equity Distribution</u>"); *provided*, *however*, if the Settlement is not approved and consummated as part of the Plan, the Unencumbered Assets Equity Distribution will be (a) charged for any Diminution in Value Claims and (b) shared among all holders of Unsecured Notes Claims and General Unsecured Claims, including the holders of Second Lien Notes Claims and Third Lien Notes Claims on account of their respective Noteholder Deficiency Claims.

- *Lien Trade Claims*:  Holders of Lien Trade Claims will be paid in full on account of such Lien Trade Claims on the later of (a) the Plan Effective Date and (b) the date a holder's Lien Trade Claim comes due in the ordinary course of business.

- *GUC Claims*: Holders of General Unsecured Claims will receive their pro rata share of the Unencumbered Assets Equity Distribution (either free of dilution if the Settlement is approved or subject to dilution, for both the Diminution in Value Claim and the

|  | Noteholder Deficiency Claims, if the Settlement is not approved).<br><br>• *Existing Equity*: All existing equity interests (including common stock, preferred stock and any options, warrants or rights to acquire any equity interests) in Midstates Petroleum Company, Inc. shall be cancelled on the Plan Effective Date and holders of such interests shall receive no recovery under the Plan. |
|---|---|
| **Other Plan Terms** | |
| Releases and Exculpation | The Plan and Confirmation Order shall provide customary releases (including third party releases) and exculpation provisions, in each case, to the fullest extent permitted by law, for the benefit of the Debtors, Reorganized Midstates, 2012 Credit Facility Lenders, the Administrative Agent, the Second Lien Noteholders, the Third Lien Noteholders, such entities' respective current and former affiliates, and such entities' and their current and former affiliates' current and former officers, managers, directors, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and each of their current and former officers, managers, directors, equity holders, principals, members, employees, agents, managed accounts or funds, management companies, fund advisors, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such. |
| Management Incentive Plan and Management Employment Agreements | The Plan will provide for the establishment of a management equity incentive plan (the "MIP") under which 10% of the New Midstates Equity (on a fully-diluted/fully-distributed basis) will be reserved for grants made from time to time to the directors, officers, and other management of Reorganized Midstates.  The other aspects of the MIP and the remainder of compensation issues, including to what extent the MIP and such compensation issues will be determined by the new board, will be negotiated in connection with the Plan.<br>Existing employment agreements will be assumed and/or amended and assumed with the consent of management and the Second Lien Group. |
| Corporate Governance | The terms and conditions of the new corporate governance documents of the Reorganized Midstates (including the bylaws, certificates of incorporation, among other governance documents) shall be subject to the consent of the Second Lien Group; provided that, if the Settlement is approved in connection with confirmation of the Plan, the new corporate governance documents shall provide for all members of the initial board of directors (or similar governing body) of reorganized Midstates Petroleum Company, Inc. to be appointed by those parties to the PSA who hold, in the aggregate, at least 50.1% in principal amount outstanding of the Second Lien Notes held by all parties to the PSA. |

## EXHIBIT B

## RBL Term Sheet

**MIDSTATES PETROLEUM COMPANY**

**RESTRUCTURING OF DEBT FACILITIES**

**Summary of Terms and Conditions**

This Term Sheet sets forth the summary of contemplated terms and conditions with respect to a new credit facility that the Agent (as defined below) would be willing to propose to the Lenders (as defined below) as an exit facility, under the Credit Agreement (as defined below) in connection with a restructuring of the obligations of the Obligors (as defined below).  We understand that the restructuring shall be consummated through cases to be filed under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas and, once fully negotiated and agreed upon by the necessary lenders, shall be reflected in the terms of a plan of reorganization (the "Plan of Reorganization").  This Term Sheet is intended only to summarize terms of a proposed agreement and is not a comprehensive recitation of all terms and conditions.  This Term Sheet does not represent a commitment, obligation or understanding on the part of the Agent or any Lender to restructure or otherwise provide any financing on the terms outlined herein.  Further, this Term Sheet is not intended to suggest or reflect that the Lenders holding the necessary percentages of obligations under the Credit Agreement have consented or agreed to each of the terms set forth herein.  No such party shall be so obligated unless and until all internal credit approvals are sought and obtained, all definitive documentation is negotiated and executed and all conditions precedent are satisfied or waived.  The definitive documentation may contain terms which vary from the terms described herein.  Unless otherwise defined herein, capitalized terms used herein shall have the definition ascribed to such terms in the Credit Agreement (as defined below).

**1. Existing Obligations**

Credit Facility

| | |
|---|---|
| Credit Agreement: | Second Amended and Restated Credit Agreement dated as of June 8, 2012 (as amended, restated, amended and restated, supplemented or otherwise modified prior to the date hereof, the "Credit Agreement") among Midstates Petroleum Company, Inc., as guarantor (the "Parent"), Midstates Petroleum Company LLC, as borrower (the "Borrower"; together with the Parent, the "Obligors"), the financial institutions party thereto (the "Lenders") and SunTrust Bank, as Administrative Agent (in its capacity as administrative agent, the "Agent"), Lender and Issuing Bank. |
| Obligations: | The Borrower is indebted to the Lenders in an aggregate amount equal to the principal amount outstanding under the Credit Agreement in the amount of approximately $249,183,640.00, plus accrued but unpaid interest, fees, costs and expenses, and has reimbursement obligations in respect of letters of credit that are outstanding in the aggregate face amount of approximately $2,840,935.00 (the "Existing Letters of Credit"; collectively, the "First Lien Obligations"). |

Second Lien Notes

Issuers:                        The Obligors.

Second Lien Indenture:          Indenture dated May 21, 2015 (the "Second Lien Indenture"), among the Parent, the Borrower and Wilmington Trust, National Association, as trustee (in such capacity, "Wilmington Trust").  Holders of outstanding notes under the Second Lien Indenture are referred to as the "Second Lien Noteholders."

Obligations:                    The Obligors are indebted to the Second Lien Noteholders in an aggregate principal amount equal to approximately $625 million plus accrued but unpaid interest, fees, costs and expenses.

Third Lien Notes

Issuers:                        The Obligors.

Third Lien Indenture:           Indenture dated May 21, 2015 (the "Third Lien Indenture"), among the Parent, the Borrower and Wilmington Trust, as trustee.   Holders of outstanding notes under the Third Lien Indenture are referred to as the "Third Lien Noteholders."

Obligations:                    The Obligors are indebted to the Third Lien Noteholders in an aggregate principal amount equal to approximately $529.7 million plus accrued but unpaid interest, fees, costs and expenses.

Unsecured Notes

Issuers:                        The Obligors.

Indentures:                     (i)  10.75% Senior Notes due 2020  issued pursuant to the Indenture dated as of October 1, 2012 (the "10.75% Notes") and (ii) 9.25%  Senior Notes due 2021  issued pursuant to the Indenture dated as of May 31, 2013 (the "9.25%  Notes"), in each case, with Wells Fargo Bank, N.A., as trustee.

Obligations:                    The Obligors are indebted to the holders of the 10.75% Notes and the 9.25% Notes (collectively, the "Unsecured Noteholders") as follows:  (i) approximately $293.6 million principal amount outstanding under the 10.75% Notes and (ii) approximately $347.7 million principal amount outstanding under the 9.25% Notes.

## 2. Restructure of First Lien Obligations

The First Lien Obligations, which shall be paid in full, shall be restructured in conjunction with a Plan of Reorganization that eliminates all debt for borrowed money junior to the First Lien Obligations (which junior obligations may be exchanged for equity as appropriate and negotiated by such parties) as follows:

Cash Payments

| | |
|---|---|
| Generally: | On the effective date of the Plan of Reorganization (the "Plan Effective Date"), the Lenders shall receive a payment in cash of an amount not less than $82,024,575 (the "Plan Effective Date Payment"), which shall be allocated among the Lenders on a pro rata basis in accordance with their respective share of the outstanding principal amount of the Obligations. |
| | Following the cash payment to the Lenders on the Plan Effective Date, the Obligors (as reorganized pursuant to the Plan of Reorganization, "Reorganized Midstates") shall hold not less than $110,000,000 in "cash on hand" on the Plan Effective Date, of which $40,000,000 shall be allocated to fund the Cash Collateral Account (as defined below) on the Plan Effective Date.  In the event that Reorganized Midstates shall have cash in excess of $70,000,000 (after deducting for the funding of the Cash Collateral Account and the payment of all claims and expenses due and payable on the Plan Effective Date) on the Plan Effective Date, the Lenders shall consent to the payment in cash on the Plan Effective Date of such excess cash and cash equivalents up to a total amount, not to exceed, of $60,000,000 to the Second Lien Noteholders. |

New Credit Facility

| | |
|---|---|
| Amount: | $170,000,000. |
| Facility: | Revolving Loans.  On the Plan Effective Date, those Lenders that shall have voted to accept the Plan (the "Accepting Lenders" or "RBL Lenders") shall be deemed to have extended a reserve based revolving credit facility (the "RBL Facility"; the loans made thereunder, the "Revolving Loans") to Reorganized Midstates in a principal amount outstanding, and having a commitment amount, of (i) $170,000,000 less (ii) the aggregate principal amount of the Term Loan (as defined below) (the "Commitment").  The initial conforming borrowing base shall be equal to $170,000,000 (the "Initial Borrowing Base"). |
| | Term Loans. On the Plan Effective Date, those Lenders that shall have voted to reject the Plan, if any (the "Rejecting Lenders" or "Term Lenders") shall elect either to participate in the RBL Facility or the Term Loan.  If any Rejecting Lender either fails to make an election, elects to participate in the Term Loan, or otherwise fails to return a ballot such that they will have not been deemed to vote in favor or have made an election to participate in the RBL Facility, such Rejecting Lender will be deemed to have extended a term loan (a "Term Loan") to Reorganized Midstates in a principal amount equal to (i) such Rejecting Lender's pro rata share of  the First Lien Obligations, less (ii) such Rejecting Lender's |

pro rata share of the Effective Date Cash Payment. Notwithstanding any other provisions herein, the Commitment and Initial Borrowing Base shall be lowered by the pro rata share of each such Rejecting Lender's loans which become the Term Loan.[1]  The Obligations in respect of the Term Loan shall be subordinated to those in respect of the RBL Facility. Upon exercise of remedies or maturity, the Term Loan shall be a last-out loan, which shall be paid only following indefeasible payment in full of the Obligations in respect of the Revolver Loans.

For the avoidance of doubt, Reorganized Midstates shall not be permitted to convert Revolving Loans to Term Loans.

Fees.  Reorganized Midstates will pay to the Agent, for the ratable benefit of each RBL Lender (excluding defaulting lenders), the following fees:  (i) on the Plan Effective Date, a non-refundable upfront fee in an aggregate amount equal to 0.50% of the Commitment on the Plan Effective Date, and (ii) quarterly in arrears on the first day of each calendar quarter, a commitment fee calculated on the average daily amount of the Availability at a per annum rate equal to 0.50%.

Letter of Credit.  In connection with the RBL Facility, SunTrust (in such capacity, the "Issuing Lender") will make available to Reorganized Midstates a letter of credit sub-facility of up to $10,000,000 (the "Sub-Facility Capacity") subject to customary notice requirements and Availability.  Letters of credit issued under the RBL Facility (the "Letters of Credit") will be used for general corporate purposes and shall expire not later than the earlier of (i) 12 months after its date of issuance or such longer period of time as may be agreed by the applicable Issuing Lender and (ii) the fifth business day prior to the Commitment Termination Date (as defined below); provided that any Letter of Credit may provide for automatic renewal thereof for additional periods of up to 12 months or such longer period of time as may be agreed by the Issuing Lender (which in no event shall extend beyond the date referred to in clause (ii) above, except to the extent cash collateralized or backstopped pursuant to arrangements reasonably acceptable to the Issuing Lender).

The Existing Letters of Credit shall be "rolled over" and deemed Letters of Credit under the RBL Facility and shall count towards its Sub-Facility Capacity.[2]

Reorganized Midstates will pay a fee equal to the Applicable Margin (as defined below) then in effect for LIBOR borrowings, which fee will accrue on the aggregate face amount of outstanding Letters of Credit, payable in arrears at the end of each quarter and upon the termination of

---

[1] NTD: Each Rejecting Lender would have the option of being treated as an Accepting Lender by giving irrevocable notice of such decision to Reorganized Midstates and the Agent not less than three (3) business days before the Plan Effective Date.

[2] NTD: Note that no new Letters of Credit would be available after the Plan Effective Date absent repayment of loans or expiry or termination of Existing Letters of Credit.

the RBL Facility, in each case for the actual number of days elapsed over a 360-day year.  Such fees shall be distributed to the RBL Lenders <u>pro rata</u> in accordance with the amount of each such RBL Lender's Commitment.  In addition, Reorganized Midstates shall pay to the Issuing Lender, for its own account, (i) a fronting fee equal to a 0.125% of the aggregate face amount of outstanding Letters of Credit, payable in arrears at the end of each quarter and upon the termination of the RBL Facility, calculated based upon the actual number of days elapsed over a 360-day year and (ii) customary issuance and administration fees to be mutually agreed.

|                       |                                                                 |
|-----------------------|-----------------------------------------------------------------|
| Administrative Agent: | SunTrust Bank (the "<u>Agent</u>").                             |

Maturity:

The RBL Facility shall terminate, and all amounts outstanding shall be due and payable, on the earlier of (i) the four-year anniversary of the Plan Effective Date or (ii) September 30, 2020 (such earlier date, the "<u>Commitment Termination Date</u>").

The Term Loans shall mature, and all amounts outstanding shall be payable, on the Commitment Termination Date.

Guarantors:

All obligations of Reorganized Midstates (collectively, the "<u>Obligations</u>") under (i) the RBL Facility, (ii) the Term Loans, (iii) interest rate protection, commodity trading or hedging, currency exchange or other hedging or swap arrangements entered into with any person that was then a Lender or any affiliate thereof (the "<u>Hedging Arrangements</u>") and (iv) treasury management arrangements entered into with any person that was then a Lender or any affiliate thereof ("<u>Treasury Arrangements</u>") will be unconditionally guaranteed jointly and severally on a pari passu senior secured basis (the "<u>Guarantees</u>") by any direct or indirect subsidiary of Reorganized Midstates (the "<u>Guarantors</u>"; together with Reorganized Midstates, the "<u>Credit Parties</u>").

RBL Availability:

So long as the Total Outstandings (as defined below) do not exceed the Revolving Loan Limit (as defined below): (i) Revolving Loans will be available at any time on same day notice in the case of ABR loans prior to the Commitment Termination Date, in minimum principal amounts of $500,000 and increments of $100,000 in excess thereof, (ii) Letters of Credit will be issued as described below and (iii) amounts repaid under the RBL Facility may be reborrowed.

 "<u>Total Outstandings</u>" means, at any time, the aggregate principal amount of Revolving Loans then outstanding plus the aggregate stated amount of all issued Letters of Credit and, without duplication, all unreimbursed disbursements on any Letter of Credit as of such date (unless cash collateralized or backstopped pursuant to arrangements acceptable to the Issuing Lender).

"<u>Revolving Loan Limit</u>" means, at any time, the lesser of (i) the Commitment and (ii) the Borrowing Base.  For purposes hereof,

"Availability" shall mean an amount (if positive) equal to the Revolving Loan Limit less Total Outstandings, and "Liquidity" shall mean at any time an amount (if positive) equal to Availability plus unrestricted cash and cash equivalents at the Credit Parties at such time minus the amount of any Borrowing Base Deficiency (as defined below) at such time.

Borrowing Base:

Subject to the Borrowing Base Redetermination Holiday (as defined below), the borrowing base for the RBL Facility shall be based on the loan value of the proved oil and gas reserves included in a Reserve Report (as defined below) and other oil and gas properties of Reorganized Midstates located within the geographic boundaries of the United States or the outer continental shelf adjacent to the United States, determined in accordance with the Credit Agreement, subject to adjustments in accordance with the terms set forth below (the "Borrowing Base").

The Borrowing Base shall be re-determined semi-annually on or about April 1 and October 1 of each year, based upon a reserve report prepared as of the immediately preceding December and June, respectively, and other related information, and delivered on or before March 1 and September 1, respectively (each such report, a "Reserve Report") and other related information, if any, required by the Agent to be delivered. The Credit Parties shall produce to the Agent a Reserve Report prepared as of December 31st of each year by an independent reserve engineer, such as Cawley Gillespie & Associates, Netherland, Sewell & Associates, Inc., Ryder Scott Company Petroleum Consultants, L.P., DeGolyer and MacNaughton or another independent petroleum engineering firm reasonably acceptable to the Agent and Reorganized Midstates (any such firm, an "Approved Petroleum Engineer"). The Credit Parties shall produce to the Agent a Reserve Report prepared as of June 30th of each year, which Reserve Reports may be prepared internally by a petroleum engineer employed by Reorganized Midstates (or may, at the election of Reorganized Midstates, be prepared by an Approved Petroleum Engineer). The Borrowing Base shall be proposed by the Agent in good faith and approved by the Lenders under the RBL Facility consistent with the terms under the Credit Agreement. Each determination of the Borrowing Base shall be made by the Agent and the Lenders in good faith in accordance with its respective usual and customary oil and gas lending criteria as it exists at the particular time (as determined by each such Lender in its sole discretion) pursuant to procedures set forth in the Credit Agreement.

So long as there is no Event of Default under the Credit Agreement and the Curtailment Covenant (as defined below) has not been breached, the Initial Borrowing Base shall remain the same and the RBL Lenders shall not be entitled to give to Reorganized Midstates notice of a Borrowing Base redetermination for Fall 2016, Spring 2017 and/or Fall 2017 (such periods collectively, the "Borrowing Base Redetermination Holiday"). The Borrowing Base Redetermination Holiday shall extend up to the Spring 2018 Borrowing Base redetermination, on or about April 1, 2018.

Unscheduled re-determinations of the Borrowing Base, may be made not more than once between any two scheduled re-determination dates (i) at the request of the Agent or Required RBL Lenders (to be defined in the RBL Loan Documents) and (ii) at the request of Reorganized Midstates; provided that no unscheduled re-determinations of the Borrowing Base may be made during the Borrowing Base Redetermination Holiday.

To the extent any redetermination represents an increase in the Borrowing Base in effect prior to such redetermination, such Borrowing Base will be the largest amount approved or deemed approved by each Lender under the RBL Facility and to the extent any redetermination represents a decrease in, or reaffirmation of, the Borrowing Base in effect prior to such redetermination, such Borrowing Base will be the largest amount approved or deemed approved by the Required RBL Lenders, provided that no Lender shall be required to increase its commitment amount under the RBL Facility in connection with an increase in the Borrowing Base.

In addition to the foregoing, the Borrowing Base will also be subject to adjustments between re-determinations, including during the Borrowing Base Redetermination Holiday in connection with:

> (i) sales or other dispositions of, and casualty and condemnation events in respect of, Borrowing Base Properties (as defined below) and early monetization or early termination of any hedge or swap positions relied on by the Lenders in determining the Borrowing Base, in each case, in excess of three percent (3%) of the Borrowing Base in any period between scheduled redeterminations as a result of any one transaction or a series of transactions, and  as set forth in the RBL Facility loan documents (the "RBL Loan Documents"); and

> (ii) at Reorganized Midstates' election, acquisitions of oil and gas properties as set forth in the RBL Loan Documents;

> provided, that, for the avoidance of doubt, these adjustments shall be limited to the effects of the transactions described above and shall not include changes in the Reserve Reports vis-à-vis continuing properties or changes in the Lenders' price decks.

Reorganized Midstates may on any redetermination date elect a reduced Borrowing Base.

A Borrowing Base reduction shall result in a concurrent reduction of the Commitments under the RBL Facility (it being understood that any reduction of Commitments under the RBL Facility shall only be tied to the pro rata reduction of the Borrowing Base attributable to the RBL Facility).

| | |
|---|---|
| Interest: | Reorganized Midstates may elect that the Loans comprising each borrowing bear interest at a rate per annum equal to: (i) the ABR plus the |

Applicable Margin (as defined below) or (ii) the LIBOR rate plus the Applicable Margin, with a LIBOR floor to be established at 1.00%. Reorganized Midstates may elect interest periods of 1, 2, 3 or 6 months (or, if available to all relevant Lenders, 12 months) for LIBOR borrowings.   Calculation of interest shall be on the basis of the actual days elapsed in a year of 360 days (or 365 or 366 days, as the case may be, in the case of ABR loans based on the Prime Rate) and interest shall be payable at the end of each interest period and, in any event, at least every 3 months.

"Applicable Margin" means 4.50% with respect to Revolving Loans and 3.50% with respect to Term Loans.

At any time when there is an Event of Default, all outstanding amounts shall bear interest at 2.00% above the rate otherwise applicable thereto.

Collateral:                          The Obligations shall be secured by the following (the "Collateral"):

(i) a first priority perfected security interest in, and mortgage lien on, not less than 95.0% of the proved oil and gas reserves and all other oil and gas properties of Reorganized Midstates and any other Credit Party (as of the Plan Effective Date), including as may be set forth in the Reserve Report delivered on or before the Plan Effective Date and each subsequent Reserve Report; provided, that the Borrower agrees to use commercially reasonable efforts to grant a first-priority perfected security interest in, and mortgage lien on, substantially all of the other oil and gas properties of Reorganization Midstates and any other Credit Party in connection with the delivery of each Reserve Report;

(ii) a first priority perfected security interest in, and lien on, substantially all other presently owned and after-acquired property of the Credit Parties, including, without limitation, cash and cash equivalents which shall be placed only in accounts subject to deposit account control agreements in form and substance acceptable to the Agent or accounts at the Agent, receivables, all intangibles, and all rights to payments; and

(iii) a first priority perfected pledge of all equity interests of any Credit Party (other than Parent), with any such certificated interests to be delivered to the Agent together with blank stock powers.

None of the Collateral or other assets of the Credit Parties shall be subject to other pledges, security interests or mortgages, subject to customary exceptions for financings of this kind.

Mandatory Prepayments:          At any time (other than as set forth in the last paragraph of this section) that the aggregate amount of the outstanding (i) Revolving Loans and Letters of Credit (including unreimbursed amounts drawn on any Letter of Credit that have not been cash collateralized or backstopped) plus (ii) Term Loans exceeds the Borrowing Base (a "Borrowing Base

Deficiency"), Reorganized Midstates shall, within ten (10) business days after written notice from the Agent to Reorganized Midstates of such Borrowing Base Deficiency, notify the Agent that it intends to take one or more of the following actions:

> (i) within thirty (30) days after receipt of the Agent's notice, provide additional Borrowing Base Properties to the extent necessary to eliminate such Borrowing Base Deficiency;

> (ii) within thirty (30) days after receipt of the Agent's notice, prepay the Revolving Loans and the Term Loans in a pro rata amount based on the then-outstanding principal amounts of the Revolving Loans and the Term Loans in an amount sufficient to eliminate such Borrowing Base Deficiency;

> (iii) prepay the Revolving Loans and the Term Loans in a pro rata amount based on the then-outstanding principal amounts of the Revolving Loans and the Term Loans in an amount sufficient to eliminate such Borrowing Base Deficiency in six equal monthly installments with principal and interest beginning on the date that is thirty (30) days after Reorganized Midstates' receipt of notice of such Borrowing Base Deficiency from the Agent ; or

> (iv) take any combination of actions set forth in clauses (i) through (iii) above;

provided, in each case, that all amounts outstanding must be repaid by the Commitment Termination Date.

If the Borrowing Base is adjusted as the result of an asset sale, disposition, casualty or condemnation event or early monetization or termination of any hedge or swap position and a Borrowing Base Deficiency results from such adjustment, then no later than two (2) business days following the date Reorganized Midstates receives the net cash proceeds thereof, if any, Reorganized Midstates shall apply such proceeds to the repayment of Revolving Loans (and concurrent reduction of the Commitment (it being understood that any reduction of Commitments under the RBL Facility shall only be tied to the pro rata reduction of the Borrowing Base attributable to the RBL Facility)) and the Term Loans in a pro rata amount based on the then-outstanding principal amounts of the Revolving Loans and the Term Loans (with any Borrowing Base Deficiency that remains after applying such proceeds to be addressed as required herein for Mandatory Prepayments). Additionally, any Borrowing Base Deficiency resulting from a voluntary termination of commitments shall be required to be eliminated within one (1) business day of the date of such termination.

Voluntary Prepayments:    Voluntary reductions of the unutilized portion of the RBL Facility commitments and voluntary prepayments of borrowings under the RBL Facility will be permitted at any time, in minimum principal amounts of $500,000 or increments of $100,000 in excess thereof, without premium

or penalty, subject to reimbursement of the Lenders' redeployment costs in the case of a prepayment of LIBOR borrowings other than on the last day of the relevant interest period.

The documentation in respect of the Term Loan (the "<u>Term Loan Documents</u>"; together with the RBL Documents, the "<u>Loan Documents</u>") shall provide that Reorganized Midstates shall not be permitted to prepay the Term Loan so long as the Commitment under the RBL Facility shall remain in effect.

|  |  |
|---|---|
| Conditions to Borrowings: | The making of each extension of credit under the RBL Facility shall be conditioned upon (a) the accuracy of representations and warranties set forth in the RBL Loan Documents in all material respects (without duplication of any materiality standard), (b) delivery of a customary borrowing notice and (c) the absence of defaults or events of default at the time of, and after giving effect to the making of, such extension of credit. |
| Representations and Warranties: | The Loan Documents shall include usual and customary representations and warranties, including: existence and organizational status; power and authority; qualification; execution, delivery and enforceability; compliance with laws; with respect to the execution, delivery and performance, no violation of, or conflict with, law, charter documents or material agreements; litigation; margin regulations; material governmental approvals and other consents with respect to the execution, delivery and performance of the RBL Facility; Investment Company Act; PATRIOT Act; absence of undisclosed liabilities; accuracy of disclosure and financial statements; no material adverse effect; no defaults; insurance; taxes; ERISA; subsidiaries; creation and perfection of security interests (including compliance with collateral coverage ratio); environmental laws; properties; subsidiaries and equity interests; sanctions laws; direct benefit; and consolidated closing date solvency; gas imbalances; marketing of production; hedge agreement; and other representations and warranties deemed appropriate by the Agent and the Lenders; subject, in the case of each of the foregoing representations and warranties, to qualifications and limitations for materiality to be agreed. |
| Affirmative Covenants: | The Loan Documents shall include usual and customary affirmative covenants, including: (i) delivery of annual, quarterly, and monthly financial statements and other information, with annual financial statements to be accompanied by an audit opinion from nationally recognized auditors that is not subject to qualification as to "going concern" or the scope of such audit (other than any "going concern" qualification as a result of impending maturity of the Revolving Loans or Term Loans); with the delivery of Reserve Reports, financial projections (presented on a semi-annual basis) for the then immediately following one (1) year period; (ii) compliance certificates, other certificates and other information; (iii) delivery of notices of defaults and certain material events; (iv) inspections (including books and records); (v) maintenance of organizational existence and rights and privileges; (vi) maintenance of |

insurance; (vii) payment of taxes and other obligations; (viii) corporate franchises; (ix) compliance with laws (including environmental laws); (x) maintenance of properties; (xi) operations; (xii) additional guarantors and collateral; (xiii) satisfactory title opinions or other title information with respect to at least 80% of the total value of proved oil and gas properties in the Reserve Report that are mortgaged as Collateral; (xiv) use of proceeds; (xv) sanctions laws; (xvi) further assurances on collateral matters; and (xvii) reserve reports, subject, in the case of each of the foregoing covenants, to exceptions and qualifications to be agreed.

In addition, Reorganized Midstates shall provide:  (i) monthly operations/business plan updates; (ii) updated ARIES database semi-annually; (iii) thirteen (13) week cash flow (including sources and uses) and a variance against prior periods, updated monthly (which reporting requirement shall be eliminated from and after the date that notice is given to Reorganized Midstates on or about April 1, 2018 of the Spring 2018 Borrowing Base redetermination (the "April 2018 Notice Date").

|                      |                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                     |
|----------------------|---|
| Negative Covenants:  | The Loan Documents shall include usual and customary negative covenants, including limitations on (i) the incurrence or maintenance of debt; (ii) the incurrence or maintenance of liens; (iii) fundamental changes; (iv) asset sales or early monetization or early termination of any hedge or swap positions relied on by the Lenders in determining the Borrowing Base; (v) investments; (vi) dividends or distributions on, or redemptions of, capital stock of the Borrower; (vii) amendments of material debt documents (if any) and prepayments or redemptions in respect thereof; (viii) negative pledges and limitations subsidiary distributions; (ix) commodity hedging (with non-speculative commodity hedging permitted with respect to aggregate notional volumes of oil, gas and NGLs (calculated separately) hedged on a monthly basis not to exceed 75% of reasonably anticipated production (based on the most recently delivered Reserve Report, as adjusted in good faith to account for updated information) of oil, gas and NGLs, respectively, for any month (measured as of each date any such commodity hedging transaction is entered into); provided that no commodity hedging shall be permitted for any month more than 48 months following the date any commodity hedging transaction is entered into); (x) transactions with affiliates; (xi) change in nature of business; (xii) gas imbalances, take-or-pay or other prepayments; and (xiii) use of proceeds. |

The Loan Documents shall also contain a negative covenant concerning the effect upon hydrocarbon production from any regulatory curtailment of the Credit Parties' ability to dispose of salt water in the State of Oklahoma arising from the effect of any such regulation by the Oklahoma Corporation Commission (the "Curtailment Covenant").  A breach of the Curtailment Covenant shall occur if a Negative Effect (defined below) upon the hydrocarbon production volumes of the Credit Parties results, in whole or in part, from any curtailment of salt-water disposal operations in the State of Oklahoma imposed by any regulatory body, including but not limited to the Oklahoma Corporation Commission, regardless of whether the imposition of such curtailment

results from any negotiation, mandate, exercise of regulatory authority, or judicial order or enforcement.   A negative effect (the "Negative Effect") occurs when the Credit Parties fail to achieve the projected hydrocarbon production levels set forth in the Reorganized Midstates' Business Plan (a copy of which shall be attached as an exhibit to the RBL Loan Documents, the "Business Plan") as a result of the effect of any regulatory curtailment on the Credit Parties' ability to dispose of salt water in the State of Oklahoma at any point prior to the Commitment Termination Date by an amount more than 10.0% lower than the projected sixty (60) day rolling average of hydrocarbon production levels, as measured each two-month period by looking at hydrocarbon production for the prior sixty (60) day period.   In the event the Curtailment Covenant is breached (i) prior to April 1, 2018, a Borrowing Base redetermination shall occur promptly thereafter, notwithstanding any other limits on unscheduled redetermination or (ii) after April 1, 2018, Reorganized Midstates shall provide prompt written notice thereof to the Agent and the Agent shall reserve all rights to request an unscheduled redetermination under the terms of the Loan Documents.

| | |
|---|---|
| Financial Covenants: | The Loan Documents shall contain the following financial covenants: |

Leverage Ratio.   As of the last day of any fiscal quarter, commencing December 31, 2016 through the fiscal quarter ended March 31, 2018, the ratio of Total Indebtedness to EBITDA for the trailing four fiscal quarters shall not exceed 2.25:1.00; provided that Total Indebtedness and EBITDA (i) for the fiscal quarter ended December 31, 2016, shall be equal to Total Indebtedness and EBITDA, respectively, for the fiscal quarter ending on such date multiplied by 4, (ii) for the fiscal quarter ended March 31, 2017, shall be equal to Total Indebtedness and EBITDA, respectively, for the two fiscal quarters ending on such date multiplied by 2 and (iii) for the fiscal quarter ended June 30, 2017, shall be equal to Total Indebtedness and EBITDA, respectively, for the three fiscal quarters ending on such date multiplied by 4/3.   As of the last day of any fiscal quarter, commencing June 30, 2018, the ratio of Total Indebtedness to EBITDA for the trailing four fiscal quarters shall not exceed 3.00:1.00.

Interest Coverage.   As of the last day of any fiscal quarter, commencing December 31,  2016, the ratio of EBITDA to Interest Expense for the trailing four fiscal quarters shall not less than 3.00:1.00; provided that EBITDA and Interest Expense (i) for the fiscal quarter ended December 31, 2016, shall be equal to EBITDA and Interest Expense, respectively, for the fiscal quarter ending on such date multiplied by 4, (ii) for the fiscal quarter ended March 31, 2017, shall be equal to EBITDA and Interest Expense, respectively, for the two fiscal quarters ending on such date multiplied by 2 and (iii) for the fiscal quarter ended June 30, 2017, shall be equal to EBITDA and Interest Expense, respectively, for the three fiscal quarters ending on such date multiplied by 4/3.

Capital Expenditures.   Beginning with the quarter ended December 31, 2016, Capital Expenditures shall be capped at (a) for the 6 months

ending December 31, 2016, $50,000,000, (b) for the fiscal year ending December 31, 2017, $81,000,000, (c) for the fiscal year ending December 31, 2018, $85,000,000 and (d) for the fiscal year ending December 31, 2019, $78,000,000; provided, however, that Capital Expenditures in an aggregate amount up $10,000,000 and used solely for purposes of mitigating the consequences of a regulatory curtailment issued by the Oklahoma Corporation Commission shall not be included for purposes of calculating Capital Expenditures for purposes of the covenant.

If the amount of Capital Expenditures in the Company's Business Plan (a) for the 6 months ending December 31, 2016 is greater than the amount of Capital Expenditures actually made in such six month period (the amount by which such Capital Expenditures in the Company's Business Plan for such six month period exceeds the actual amount of Capital Expenditures for such six month period in an aggregate amount up to $10,000,000, the "Initial Excess Amount") or (b) for any Fiscal Year is greater than the amount of Capital Expenditures actually made in such Fiscal Year (the amount by which such Capital Expenditures in the Company's Business Plan for such Fiscal Year exceeds the actual amount of Capital Expenditures for such Fiscal Year in an aggregate amount up to $10,000,000, the "Excess Annual Amount" and, together with the Initial Excess Amount, the "Excess Amount"), then the Excess Amount (such amount, the "Carry-Over Amount") may be carried forward to the next succeeding Fiscal Year (the "Succeeding Fiscal Year"); provided, that the Carry-Over Amount applicable to a particular Succeeding Fiscal Year may not be carried forward to another Fiscal Year.  Capital Expenditures made by the Credit Parties in any Fiscal Year shall be deemed to reduce (x) first, the Carry-Over Amount, and (y) then, the amount provided for above for such Fiscal Year.

| | |
|---|---|
| Minimum Liquidity: | On the Plan Effective Date, Reorganized Midstates shall fund a cash collateral account which shall be maintained at the Agent (the "Cash Collateral Account") in an amount equal to $40,000,000.  The documentation with respect to the Cash Collateral Account shall be acceptable to the Agent in its sole discretion.  Reorganized Midstates shall have no authority to access funds in the Cash Collateral Account until the April 2018 Notice Date (after which, so long as no Borrowing Base Deficiency then exists, Reorganized Midstates will have unfettered access to the funds but subject to ongoing control); provided, however, that either Reorganized Midstates or the Required RBL Lenders may at any time, direct the Agent to apply all, but not less than all, of the funds in the Cash Collateral Account to the repayment of the Revolving Loans. In the event that Reorganized Midstates or the Required RBL Lenders directs the Agent to repay the Revolving Loans with funds in the Cash Collateral Account (such amount, the "Released Funds"), then from such date until the April 2018 Notice Date, notwithstanding the amount of the Commitment, Availability shall in no event exceed (i) the aggregate principal amount of Revolving Loans outstanding on the Plan Effective Date, less (ii) the Released Funds.  For the avoidance of doubt, following |

the April 2018 Notice Date, Availability shall be determined in accordance with the terms and provisions of the Loan Documents.

From and after the April 2018 Notice Date, the Credit Parties shall maintain at all times minimum Liquidity (cash and cash equivalents plus Availability) equal to 20% of the then-existing Borrowing Base.

| | |
|---|---|
| Events of Default: | The Loan Documents shall include usual and customary defaults and events of default with thresholds and grace periods to be agreed by the Agent and the Lenders, including: (i) nonpayment of principal, interest or other amounts; (ii) violation of covenants; (iii) incorrectness of representations and warranties in any material respect; (iv) cross default and cross acceleration to material indebtedness; (v) bankruptcy of a Credit Party; (vi) material monetary judgments; (vii) material ERISA events; (viii) actual or asserted invalidity of material guarantees or security documents; and (ix) change of control. |
| Cost and Yield Protection: | The RBL Loan Documents shall contain customary provisions (i) protecting the Lenders against increased costs or loss of yield resulting from changes in reserve, tax, capital adequacy and other requirements of law and from the imposition of or changes in withholding or other taxes and (ii) indemnifying the Lenders for "breakage costs" incurred in connection with, among other things, any prepayment of a LIBOR loan on a day other than the last day of an interest period with respect thereto. The Dodd-Frank Wall Street Reform and Consumer Protection Act and Basel III (and all requests, rules, guidelines or directives relating to each of the foregoing or issued in connection therewith) shall be deemed to be changes in law regardless of the date enacted, adopted or issued.  The RBL Loan Documents shall contain "EU Bail-In" protections. |
| Expenses and Indemnification: | Reorganized Midstates shall pay (i) all reasonable and documented out-of-pocket expenses of the Agent associated with the preparation, execution, delivery and administration of the loan documentation and any amendment or waiver with respect thereto (including the reasonable fees, disbursements and other charges of counsel and financial advisors) and (ii) all out-of-pocket expenses of the Agent  and the Lenders (and their affiliates and their respective officers, directors, employees, advisors and agents) (including the reasonable and documented fees, disbursements and other charges of legal counsel and financial advisors) in connection with the enforcement of the Loan Documents, including pursuing remedies in respect thereof. |

The Agent and the Lenders (and their affiliates and their respective officers, directors, employees, advisors and agents) will have no liability to the Credit Parties, and will be indemnified and held harmless against, any loss, liability, cost or expense incurred in respect of the financing contemplated hereby or the use or the proposed use of proceeds thereof; *provided* that the foregoing will not, as to any indemnified person, apply to losses, claims, damages, liabilities or related expenses to the extent they are found by a final, non-appealable judgment of a court of

competent jurisdiction to (i) arise or result from (A) the willful misconduct, bad faith or gross negligence of such indemnified person or (B) a breach in bad faith of the funding obligations of such indemnified person, or (ii) have not resulted from an act or omission by you or any of your affiliates and have been brought by an indemnified person against any other indemnified person (other than any claims against Agent in its capacity as such).

**Closing Conditions:**   The closing shall be conditioned upon satisfaction (or waiver by the Lenders) of conditions precedent usual for facilities and transactions of this type, but in any event on or before _____, 2016, including, without limitation, the following (the date upon which all such conditions precedent shall be satisfied, the "Closing Date"):

(i)   The Loan Documents shall contain the terms set forth in this Term Sheet and shall contain representations, warranties, covenants and events of default customary for financings of this type and other terms deemed appropriate by and acceptable to the Borrower, the Agent and the Lenders;

(ii)   The Agent and each Lender shall be satisfied that the disclosure statement filed in accordance with Section 1125 of the Code (the "Disclosure Statement") with respect to the Plan of Reorganization does not contain any materially inaccurate information (or fail to disclose material information) and that there are no material administrative expenses, priority tax claims, reclamation claims, general unsecured claims or other claims that have not been disclosed or estimated in the Disclosure Statement;

(iii)   The Plan of Reorganization, and all orders of the Bankruptcy Court, including, without limitation, the confirmation order entered in connection with the Plan of Reorganization (the "Confirmation Order") shall be in form and substance satisfactory to each of the Agent and each Lender and shall be final and non-appealable and in full force and effect and shall not have been stayed, reversed, vacated or otherwise modified in a manner material and adverse to interests of the Agent and the Lenders or otherwise contrary to this Term Sheet;

(iv)   The Plan Effective Date shall have occurred, all conditions precedent to the effectiveness of the Plan of Reorganization shall have been fulfilled or waived as permitted therein, including, without limitation, the execution, delivery and all transactions contemplated in the Plan of Reorganization or in the Confirmation Order to occur on the effective date of the Plan of Reorganization shall have been substantially consummated in accordance with the terms thereof and in compliance with applicable law, Bankruptcy Court and regulatory approvals;

(v)   The Agent shall have received satisfactory evidence as to the payment in full on the Plan Effective Date of all material

administrative expense claims, priority claims and other claims required to be paid upon the Plan Effective Date;

(vi)  The execution and delivery of the Loan Documents, including security agreements, mortgages, deeds of trust, control agreements, any stock certificates and UCC and real property filings and (ii) delivery of customary legal opinions, customary insurance certificates, lien searches, customary officer's closing certificates, organizational documents, customary evidence of authorization and good standing certificates in jurisdictions of formation/organization;

(vii)  All governmental and third party consents and approvals necessary in connection with the Loan Documents and the transactions contemplated thereby shall have been obtained and shall remain in effect; and no law or regulation shall be applicable in the judgment of the Agent that prevents the RBL Facility, the Term Loan or the transactions contemplated thereby;

(viii)  All representations and warranties in the Loan Documents shall be true and correct in all material respects (without duplication of any materiality standard);

(ix)  All fees required to be paid on the Closing Date and all reasonable out-of-pocket expenses required to be paid on the Closing Date in connection with the RBL Facility and the Term Loan, including the fees and expenses of the Agent's legal counsel and financial advisors, including Mayer Brown LLP and FTI, respectively, shall have been paid in full; and

(x)  Customary releases shall have been granted to the Lenders, and their customary related and representative parties, under the Plan of Reorganization.

| | |
|---|---|
| Miscellaneous: | *The Loan Documents may contain other terms and conditions that are customary of agreements of this nature.* |
| Governing Law and Forum: | State of New York. |

## EXHIBIT C

FORM OF TRANSFER AGREEMENT FOR CONSENTING PARTIES

This Transfer Agreement to the Plan Support Agreement, dated as of [April __,] 2016 (as amended, supplemented or otherwise modified from time to time, the "***Agreement***"), by and among Midstates Petroleum Company, Inc. and Midstates Petroleum Company LLC (together, the "***Company***"), and the other parties signatory thereto (together with their respective successors and permitted assigns, the "***Consenting Parties***," and each, a "***Consenting Party***") is executed and delivered by [_____] (the "***Joining Party***") as of [_____], 2016.  Each capitalized term used herein but not otherwise defined shall have the meaning set forth in the Agreement.

1.  <u>Agreement to be Bound</u>.  The Joining Party hereby agrees to be bound by all of the terms of the Agreement, a copy of which is attached to this Transfer Agreement as <u>Annex I</u> (as the same has been or may be hereafter amended, restated or otherwise modified from time to time in accordance with the provisions hereof).  The Joining Party shall hereafter be deemed to be a "Consenting Party" and a "Party" for all purposes under the Agreement and with respect to any and all First Lien Claims, Second Lien Notes Claims, Third Lien Notes Claims, and/or GUC Claims (if any) held by such Joining Party.

2.  <u>Governing Law</u>.  This Transfer Agreement shall be governed by and construed in accordance with the internal laws of the State of New York, without regard to any conflicts of law provisions which would require the application of the law of any other jurisdiction.

\* \* \* \* \*

**[The Remainder Of This Page Is Intentionally Left Blank]**

IN WITNESS WHEREOF, the Joining Party has caused this Transfer Agreement to be executed as of the date first written above.


**[CONSENTING PARTY]**


By: _____

Name:

Title:


| Principal Amount of First Lien Claims: | $_____ |
| Principal Amount of Second Lien Notes: | $_____ |
| Principal Amount of Third Lien Notes: | $_____ |
| Principal Amount of 2020 Unsecured Notes: | $_____ |
| Principal Amount of 2021 Unsecured Notes: | $_____ |
| Principal Amount of Other GUC Claims: | $_____ |

<u>Notice Address</u>:



Fax:

Attention:

Email:

2

**<u>Exhibit C</u>**

**Disclosure Statement Order**

**<u>Exhibit D</u>**

**Financial Projections**

## Exhibit E

**Valuation Analysis**

**Exhibit F**

**Liquidation Analysis**

**<u>Exhibit G</u>**

**Solicitation and Voting Procedures**